**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-20827-CIV-WILLIAMS/SANCHEZ**

ALBERTO GONZALEZ, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v.

CANO HEALTH, INC. f/k/a JAWS
ACQUISITION CORP., MARLOW
HERNANDEZ, BRIAN D. KOPPY, JOSEPH
L. DOWLING, and MICHAEL RACICH,

Defendants,

**AMENDED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

I.  NATURE OF THE ACTION AND OVERVIEW ............................................................... 1

II.  JURISDICTION AND VENUE .................................................................................... 3

III.  PARTIES ....................................................................................................................... 3

IV.  SUBSTANTIVE ALLEGATIONS .............................................................................. 5

    A.  Background ........................................................................................................ 5

        1.  SPACs Like Jaws Are Incentivized To Complete Any Business Combination ........................................................................................... 5

        2.  In June 2021, Jaws Completes A Business Combination, And Cano Becomes A Public Company ..................................................... 6

        3.  Most of Cano's Revenue Is From Medicare Contracts .............................. 8

    B.  There Is A One Year Lag Between Diagnosis And Capitated Payments From Medicare Advantage Contracts ................................................................. 8

    C.  Generally Accepted Accounting Principles Limit Recognition Of Variable Consideration Like Capitated Payments ......................................................... 9

    D.  Defendants Issued Materially Misleading Statements About Cano's Revenue From Medicare Advantage ................................................................ 11

    E.  The Company Admits It Improperly Recognized Revenue From Medicare Advantage Contracts And Corrects Its Accounting Method ................................ 12

V.  MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ............................................................................................. 15

    A.  Statements About Compliance With GAAP ...................................................... 15

    B.  Statements Reporting Revenue And Financial Statements ................................. 23

VI.  LOSS CAUSATION ..................................................................................................... 27

VII.  POST-CLASS PERIOD EVENTS ............................................................................... 28

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ................................................................... 30

IX.   CORPORATE SCIENTER ALLEGATIONS ................................................................... 31

X.   CLASS ACTION ALLEGATIONS ................................................................................ 32

XI.   UNDISCLOSED ADVERSE FACTS ............................................................................. 33

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..................................................................................................................... 34

XIII.   NO SAFE HARBOR ...................................................................................................... 36

XIV.   CLAIMS ......................................................................................................................... 37

XV.   PRAYER FOR RELIEF ................................................................................................. 41

XVI.   JURY TRIAL DEMANDED .......................................................................................... 42

Lead Plaintiff Gudelio Fundora ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Cano Health, Inc. ("Cano" or the "Company") f/k/a Jaws Acquisition Corp. ("Jaws") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Cano; and (c) review of other publicly available information concerning Cano.

## I.       NATURE OF THE ACTION AND OVERVIEW

1.      Plaintiff brings this federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired the publicly traded securities of Cano between May 7, 2021 and February 25, 2022, inclusive (the "Class Period"), and were damaged thereby.

2.      Cano is a primary care physician group that uses a technology-powered, value based care platform to serve more than 100,000 members. On June 3, 2021, Jaws consummated a business combination with Primary Care (ITC) Intermediate Holdings, LLC and Primary Care (ITC) Holdings, LLC after which the combined entity was renamed Cano (the "Business Combination").

3.      More than 80% of the Company's revenue is derived from Medicare contracts in the form of capitated payments. These payments are administered through the Centers for Medicare and Medicaid Services ("CMS") using a risk adjustment process that accounts for patients' health status and demographics to spread health costs among providers. This process is prospective, meaning that there is a one-year lag between the diagnosis and the capitated payment.

4.      Under generally accepted accounting principles ("GAAP"), these capitated payments are considered variable consideration, and the Company must recognize revenue only to the extent it is not likely to be significantly reversed. One of the factors that increases the likelihood of reversal is that the amount of consideration is highly susceptible to factors outside Cano's influence (*i.e.*, CMS). As a result, Cano's peers booked Medicare related revenue one year after the documentation, thereby matching revenue with cash collections.

5.      Throughout the Class Period, the Company claimed to comply with GAAP and reported revenue growth exceeding 100% year-over-year. These statements were materially misleading because, in truth, Cano misapplied GAAP and recognized revenue from Medicare Advantage contracts before the amounts could be estimated accurately.

6.      On February 28, 2022, Cano announced that it identified certain errors in revenue recognition that would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]" On this news, the Company's stock price fell $0.32, or 6%, to close at $4.87 per share on February 28, 2022, on unusually heavy trading volume.

7.      On March 14, 2022, the Company revealed the impact of the restatement. Specifically, Cano revealed that "[a]s a result of the restatement, approximately $122 million of MRA [Medicare Risk Adjustment] revenue related to care provided in 2021 that would have previously been recognized in 2021 is expected to be recognized in 2022." This was "partially offset by $10 million in MRA revenue that was previously recognized in 2020 under the prior accounting methodology, for a negative impact to 2021 revenue of approximately $112 million."

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

13.     Lead Plaintiff Gudelio Fundora, as set forth in his previously filed certification (Dkt. No. 24-2), incorporated by reference herein, purchased Cano securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Cano is incorporated under the laws of Delaware with its principal executive offices located in Miami, Florida. Cano's Class A common stock and warrants trade on the New York Stock Exchange ("NYSE") under the symbols "CANO" and "CANO/WS,"

respectively. Prior to the Business Combination, Jaws was incorporated under the laws of the Cayman Islands with its principal executive offices located in Miami, Florida, and its units, Class A ordinary shares, and warrants traded on the NYSE under the symbols "JWS.U," "JWS," and "JWS WS," respectively.

15.     Defendant Marlow Hernandez ("Hernandez") has been the Company's Chief Executive Officer ("CEO") of Cano since 2009. He founded the Company.

16.     Defendant Brian D. Koppy ("Koppy") has been the Company's Chief Financial Officer ("CFO") since April 2021.

17.     Defendant Joseph L. Dowling ("Dowling") was the CEO of Jaws until the close of the Business Combination.

18.     Defendant Michael Racich ("Racich") was the CFO of Jaws until the close of the Business Combination.

19.     Defendants Hernandez, Koppy, Dowling, and Racich (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

#### 1.     SPACs Like Jaws Are Incentivized To Complete Any Business Combination

20.     Special purpose acquisition companies ("SPACs") are publicly traded companies with no business activities that are formed specifically to acquire an existing operating company. The capital from the SPAC's initial public offering ("IPO") is held in trust for a specific period of time to fund the acquisition.

21.     If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless.  Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

22.     The business combination effectuated by the SPAC is in many respects similar to a traditional IPO, in that a previously private company becomes publicly traded. However, SPAC transactions and IPOs have certain key differences. In a traditional IPO, banks underwrite the offering and perform substantial due diligence in order to evaluate the company going public, to formulate appropriate disclosures to prospective investors, and to accurately price its securities. However, in a SPAC transaction, there are no underwriters; the due diligence and the disclosures supporting the business combination are solely determined by the SPAC and its controlling

persons, who have strong incentives to agree to, and obtain shareholder approval for, an acquisition regardless of its true merits.

23.     Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

**2.      In June 2021, Jaws Completes A Business Combination, And Cano Becomes A Public Company**

24.     Jaws Acquisition Corp. was a SPAC incorporated as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination.

25.     On May 18, 2020, Jaws consummated its IPO of 69 million units (where each unit consists of one Class A ordinary share and one-third of one redeemable warrant entitling its holder to purchase one share of Class A ordinary shares at $11.50 per share). As of June 30, 2020, a total of $690,054,727 were held in a trust account established for the benefit of the public shareholders (i.e., to fund a business combination).

26.     According to the prospectus issued in connection with the IPO, Jaws "intends to focus on leading, growth-oriented companies across a variety of industries," but does "not intend to target industries that are competitive with Starwood Capital Group Holdings, L.P., or Starwood Capital, which includes real estate, lodging, oil and gas and energy infrastructure." Barry Sternlicht, the Chairman of Jaws, is also Chairman and CEO of Starwood Capital.

27.     On November 11, 2020, Jaws announced that it had entered into an agreement to consummate a business combination with Primary Care (ITC) Holdings, LLC ("Seller") and Primary Care (ITC) Intermediate Holdings, LLC ("PCIH"). Pursuant to the agreement, Jaws would become domesticated as a Delaware corporation and be renamed Cano Health.

28.     On June 3, 2021, Jaws completed the previously announced business combination with the Seller and PCIH.

29.     Following the business combination, the Company became part of an umbrella partnership-C corporation structure allowing the Seller to retain its equity ownership in PCIH. Specifically, Cano held 35.1% of the economic interest and 100% of the voting interest in PCIH, and the Seller held 64.9% of the economic interest and 0% of the voting interest in PCIH:



### 3. Most of Cano's Revenue Is From Medicare Contracts

30.     Cano is a primary care physician group that uses a technology-powered, value-based care platform to serve more than 100,000 members. CanoPanorama, the Company's proprietary platform, provides analytics, reports, and protocols used to inform key care management decisions by physicians.

31.     Substantially all of its revenue (approximately 95%) is derived from recurring per member per month capitated revenue. Specifically, Medicare accounts for more than 80% of the Company's revenue. During the November 11, 2020 conference call announcing the Business Combination, Defendant Hernandez stated that Cano "focus[es] on the Medicare Advantage population" because it is "arguably the fastest growing market in healthcare with an estimated 10,000 seniors aging in everyday."

### B. There Is A One Year Lag Between Diagnosis And Capitated Payments From Medicare Advantage Contracts

32.     Medicare Advantage allows Medicare-eligible seniors and beneficiaries with disabilities to obtain care through private plans rather than traditional fee-for-service Medicare. The Centers for Medicare and Medicaid Services ("CMS") pays a fixed (or capitated) monthly amount per enrolled beneficiary to provide Medicare benefits.

33.     These capitated payments are calculated using a risk adjustment process to spread healthcare costs such that plans with healthier populations compensate plans with more costly enrollees (*i.e.*, plans with low actuarial risk compensate those with high actuarial risk). Spreading healthcare costs encourages plans to compete for beneficiaries based on price and quality rather than health status.

34.     The risk adjustment process calculates capitated payments to cover "members' predicted health costs based on demographics (age and gender) and health status (claims data)."[1] CMS reduces the payment by 5.91% to account for the fact that some plans risk-code too intensely.[2]

35.     There is a one-year lag between the diagnosis and the capitated payment: "The system is prospective, which means it uses beneficiary diagnoses from one year to calculate a risk adjustment factor used to establish a payment for the following year."[3]

### C.     Generally Accepted Accounting Principles Limit Recognition Of Variable Consideration Like Capitated Payments

36.     Public companies must adhere to generally accepted accounting principles ("GAAP"). ASC 606 is an accounting standard that governs the recognition of revenue from contracts with customers. It was promulgated by the Financial Accounting Standards Board ("FASB") in 2014 to improve the financial reporting of revenue and allow top line financial statements to be compared and generally states that revenue is recognized when (or as) an entity fulfills its performance obligations for each contract.

37.     The consideration allocated to these performance obligations can vary "if an entity's entitlement to the consideration is contingent on the occurrence or nonoccurrence of a future event."  ASC 606-10-32-6.  Variable consideration is estimated using one of two methods, "depending on which method the entity expects to better predict the amount of consideration to which it will be entitled:"

---

[1] https://prc.hmsa.com/s/article/Medicare-Risk-Adjustment

[2]       https://www.commonwealthfund.org/blog/2022/taking-stock-medicare-advantage-risk-adjustment

[3]       https://www.bettermedicarealliance.org/wp-content/uploads/2020/03/Understanding-Risk-Adjustment_WhitePaper_June2017.pdf

a.      The expected value—The expected value is the sum of probability-weighted amounts in a range of possible consideration amounts. An expected value may be an appropriate estimate of the amount of variable consideration if an entity has a large number of contracts with similar characteristics.

b.      The most likely amount—The most likely amount is the single most likely amount in a range of possible consideration amounts (that is, the single most likely outcome of the contract). The most likely amount may be an appropriate estimate of the amount of variable consideration if the contract has only two possible outcomes (for example, an entity either achieves a performance bonus or does not).

ASC 606-10-32-8. To estimate the range of possible consideration amounts, "an entity shall consider all the information (historical, current, and forecast) that is reasonably available to the entity." ASC 606-10-32-9.

38.      Moreover, an entity "shall include in the transaction price" the variable consideration "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." ASC 606-10-32-11.  To assess this probability, "an entity shall consider both the likelihood and the magnitude of the revenue reversal."  ASC 606-10-32-12.  "Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:

a.      The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.

b.      The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.

c.      The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value.

d.      The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.

e.      The contract has a large number and broad range of possible consideration amounts.

39.     This variable consideration must be reassessed at the end of each reported period "to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reporting period." ASC 606-10-32-14.

40.     According to the correspondence filed with the SEC on March 15, 2021, Cano historically estimated the transaction price for Medicare Advantage contracts using the expected value method using rates provided by CMS and adjusted for the demographics of the Company's enrolled members.

**D.      Defendants Issued Materially Misleading Statements About Cano's Revenue From Medicare Advantage**

41.      In connection with the Business Combination and in the months following it, Defendants issued materially misleading statements about Cano's financial results. Specifically, they claimed that they recognized revenue in accordance with GAAP, including as to Medicare Advantage contracts. Though they acknowledged that such revenue was considered variable consideration (due to the adjustments by CMS), they claimed that such adjustment was presented within accounts receivable.

42.     For each quarterly period of fiscal 2021, Defendants claimed that revenue grew more than 100% year-over-year, leading investors to believe that the Business Combination had been a favorable transaction.

43.     These statements were materially misleading because, in truth, Cano misapplied GAAP and recognized revenue from Medicare Advantage contracts before the amounts could be estimated accurately. Because the adjustments by CMS would not be issued until a year after the initial diagnosis, Cano could not estimate revenue for the new patients until the audit was

completed. Due to this timing difference, Cano's peers booked revenue when they collected cash, *i.e.* one year after the documentation.

**E.      The Company Admits It Improperly Recognized Revenue From Medicare Advantage Contracts And Corrects Its Accounting Method**

44.      On February 28, 2022, Cano delayed the release of its full year 2021 financial results because it had identified certain errors in revenue recognition. Specifically, the Company issued a press release that stated Cano and its auditor "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606," which would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]" However, these adjustments would "not impact the Company's cash from operations, its cash position, or estimated collectability of receivables."

45.      On this news, the Company's stock price fell $0.32, or 6%, to close at $4.87 per share on February 28, 2022, on unusually heavy trading volume.

46.      On March 14, 2022, in a Form 8-K filed with the SEC, Cano revealed that its financial statements for the quarterly periods of fiscal 2021 should no longer be relied upon. These statements would be restated due to "the Company's **correction** of its accounting for Medicare Risk Adjustment ('MRA') revenue within Medicare Advantage contracts." Specifically, "[t]he correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606, *Revenue from Contracts with Customers* ('ASC 606')." Moreover, Cano would revise its financial statements for fiscal 2019 and 2020, though the impact was "not material."

47.      Also on March 14, 2022, Cano filed its fiscal 2021 Form 10-K with the SEC, which indicated a change in the method of revenue recognition. Specifically, it explained that MRA

revenue is recognized under the "most likely amount" methodology, adding that revenue is recognized only if a significant reversal is not likely:

> The Company groups contractual terms into one portfolio because these arrangements are similar. The Company identifies a single performance obligation to stand-ready to provide healthcare services to enrolled members. Capitated revenue is recognized in the month in which the Company is obligated to provide medical care services. The transaction price for the Medicare Advantage and Medicare Direct Contracting services provided (and other programs including Accountability Care Organizations) depends upon the pricing established by the Centers for Medicare & Medicaid ("CMS") and includes rates that are based on the cost of medical care within a local market and the average utilization of healthcare services by the members enrolled. The transaction price is variable since the rates are risk adjusted based on health status (acuity) of members and demographic characteristics of the enrolled members. ***MRA revenues are estimated using the "most likely amount" methodology. The amount of variable consideration recorded in the transaction price is limited to an amount that the Company believes will not result in a significant reversal of revenue based on historical results.*** The risk adjustment to the transaction price is presented as the Medicare Risk Adjustment ("MRA") within accounts receivable on the accompanying consolidated balance sheets. The fees are paid on an interim basis based on submitted enrolled member data for the previous year and are adjusted in subsequent periods after the final data is compiled by CMS. ***Revenue is not recorded until the price can be estimated by the Company and to the extent that it is probable that a significant reversal will not occur once any uncertainty associated with the variable consideration is subsequently resolved.***

48.     Also on March 14, 2022, the Company issued a press release discussing its full year 2021 financial results, including the impact of the restatement. Specifically, Cano revealed that "[a]s a result of the restatement, approximately $122 million of MRA revenue related to care provided in 2021 that would have previously been recognized in 2021 is expected to be recognized in 2022." This was "partially offset by $10 million in MRA revenue that was previously recognized in 2020 under the prior accounting methodology, for a negative impact to 2021 revenue of approximately $112 million." The net negative impact to 2021 Adjusted EBITDA was $91 million.

49.     The 2021 Form 10-K restated Cano's previously issued financial statements for the quarterly periods of fiscal 2021. Due to "the reduced MRA estimate," Cano decreased its previously reported capitated revenue by $5.69 million for the period ended March 31, 2021,

13

$49.73 million for the period ended June 30, 2021, and $28.02 million for the period ended September 30, 2021. These amounts correspond to overstatements of total revenue by 2%, 14.43%, and 5.58% for the respective periods. Moreover, in the 2021 Form 10-K, Cano increased its operating loss by $5.64 million for the period ended March 31, 2021, $41.24 million for the period ended June 30, 2021, $23.96 million for the period ended September 30, 2021.

50.     The 2021 Form 10-K also reported that, one "consequence of the [previously-disclosed] material weakness . . . was that in the course of finalizing the audit of our financial statements for the year ended December 31, 2021, [Cano] with [its] independent auditors identified a misapplication of GAAP that resulted in a restatement." Specifically, the 2021 Form 10-K stated:

> One consequence of the material weakness identified above was that in the course of finalizing the audit of our financial statements for the year ended December 31, 2021, we with our independent auditors identified a misapplication of GAAP that resulted in a restatement. *The restatement results from the Company's correction of its accounting for Medicare Risk Adjustment ("MRA") revenue within Medicare Advantage contracts. The correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606, Revenue from Contracts with Customers ("ASC 606"). The correction in the timing of revenue recognition under ASC 606 resulted in adjustments to capitated revenue, direct patient expense, accounts receivable, net of unpaid service provider costs, and accounts payable and accrued expenses.* The Company evaluated the adjustments to the MRA revenue recorded during 2021, 2020 and 2019 and, after assessing the materiality of such adjustments, restated its financial statements for each of the quarterly periods ended March 31, 2021, June 30, 2021 and September 30, 2021 in the 2021 Form 10-K for the year ended December 31, 2021 (collectively, the "Prior Quarterly Financial Statements"). While the effects of the correction in timing of revenue recognition were not material to the previously issued 2020 and 2019 audited consolidated financial statements, those financial statements were revised because correcting the accumulated errors in 2021 could have resulted in a material misstatement of the 2021 financial statements. The Company further concluded that the impact of the accounting adjustments on the Company's unaudited condensed consolidated financial statements for each of the quarterly periods ended March 31, 2020, June 30, 2020 and September 30, 2020, were not material to those financial statements.

14

51.     In a series of reports on February 28, 2022, Credit Suisse analysts posited that these adjustments were to conform with Cano's peers. Specifically, Cano would now "book MRA related revenues in a more conventional approach (matching revenues with cash collections), resulting in MRA related revenues being pushed out to future periods." Though "Cano's prior MRA revenue recognition approach had been booking revenues at the time of documentation itself (essentially, the date of service)," Cano's peers "book MRA-related revenue one year after the documentation." Essentially, Cano's prior practice had been to *predict* expected revenue, and Credit Suisse noted that "several investors have raised questions about whether the company was intentionally trying to overstate its financials for the first few quarters post its De-SPAC and whether there is a write-down risk with the MRA receivables."

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.     Statements About Compliance With GAAP

52.     On May 7, 2021, the Company filed a proxy statement and prospectus on Form 424B3 with the SEC, soliciting stockholder approval of the Business Combination (the "Proxy"). The Proxy claimed that the Company recognizes revenue in accordance with ASC 606. Specifically, it stated:

> Under ASC 606, the Company recognizes revenue when a customer obtains control of the promised goods or services. The amount of revenue that is recorded reflects the consideration that the Company expects to receive in exchange for those goods or services. The Company applies the following five-step model in order to determine this amount: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the Company satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the Company will collect the consideration it is entitled to in exchange for the goods or services the Company transfers to the customer (i.e. patient). At contract inception, once the contract is determined to be within the scope of ASC 606, management reviews the contract to determine which performance obligations must be satisfied and which of these performance obligations are distinct. The

Company recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when the performance obligation is satisfied.

The Company derives its revenue primarily from its capitated fees for medical services provided under capitated arrangement, fee-for-service, and revenue from the sale of pharmaceutical drugs.

Capitated care revenue is derived from fees for medical services provided by the Company under capitated arrangements with health maintenance organizations' ("HMOs") health plans. ***Capitated revenue consists of revenue earned through Medicare as well as through commercial and other non-Medicare governmental programs, such as Medicaid, which is captured as other capitated revenue.*** The Company is required to deliver healthcare services to the enrolled member population and is responsible for medical expenses related to healthcare services required by that patient group, including services not provided by the Company. Since the Company controls the healthcare services provided to enrolled members, the Company acts as a principal. The gross fees under these contracts are reported as revenue and the cost of provider care is included in third-party medical costs. Neither the Company or any of its affiliates is a registered insurance company because state law in the states in which it operates does not require such registration for risk-bearing providers.

Since contractual terms across these arrangements are similar, the Company groups them into one portfolio. The Company identifies a single performance obligation to stand-ready to provide healthcare services to enrolled members. ***Capitated revenues are recognized in the month in which the Company is obligated to provide medical care services. The transaction price for the services provided depends upon the pricing established by the Centers for Medicare & Medicaid ("CMS") and includes rates that are based on the cost of medical care within a local market and the average utilization of healthcare services by the members enrolled. The transaction price is variable since the rates are risk adjusted for projected health status (acuity) of members and demographic characteristics of the enrolled members. The risk adjustment to the transaction price is presented as the Medicare Risk Adjustment ("MRA") within accounts receivable on the accompanying consolidated balance sheets.*** The fees are paid on an interim basis based on submitted enrolled member data for the previous year and are adjusted in subsequent periods after the final data is compiled by the CMS.

53.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of

performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.

54.     The Proxy purported to warn of risks with estimating capitated revenue, stating in relevant part:

> ***There are risks associated with estimating the amount of revenue that we recognize under our capitation agreements with health plans, and if our estimates of revenue are materially inaccurate, it could impact the timing and the amount of our revenue recognition or have a material adverse effect on our business, results of operations, financial condition and cash flows.***
>
> There are risks associated with estimating the amount of revenues that we recognize under our capitation agreements with health plans in a reporting period. Medicare pays capitation using a risk adjusted model, which compensates payers based on the health status, or acuity, of each individual member. Payers with higher acuity members receive a higher payment and those with lower acuity members receive a lower payment. Moreover, some of our capitated revenues also include adjustments for performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payers. ***Our capitated revenues are recognized based on projected member acuity and quality metrics and are subsequently adjusted to reflect actual member acuity and quality metrics.*** Our ability to accurately project and recognize member acuity and quality metric adjustments are affected by many factors. For instance, our ability to accurately project member acuity and quality metrics may be more limited in the case of medical centers operating in new markets or which were recently acquired.
>
> In addition, the billing and collection process is complex due to ongoing insurance coverage changes, geographic coverage differences, differing interpretations of contract coverage, and other payer issues, such as ensuring appropriate documentation. Determining applicable primary and secondary coverage for our members, together with the changes in member coverage that occur each month, requires complex, resource-intensive processes. Errors in determining the correct coordination of benefits may result in refunds to payers. Collections, refunds and payer retractions typically continue to occur for up to three years and longer after services are provided. If our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows.

55.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized

revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.

56.     On August 16, 2021, Cano filed its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q claimed that the Company recognizes revenue in accordance with ASC 606:

**Revenue Recognition**

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09 "Revenue from Contracts with Customers", ASC 606 ("ASC 606"). On January 1, 2019, the Company adopted ASC 606, applying the full retrospective method as of the earliest period presented. The portfolio approach was used to apply the requirements of the standard to groups of contracts with similar characteristics.

Under ASC 606, the Company recognizes revenue when a customer obtains control of the promised goods or services. The amount of revenue that is recorded reflects the consideration that the Company expects to receive in exchange for those goods or services. The Company applies the following five-step model in order to determine this amount: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the Company satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the Company will collect the consideration it is entitled to in exchange for the goods or services the Company transfers to the customer (i.e. patient). At contract inception, once the contract is determined to be within the scope of ASC 606, management reviews the contract to determine which performance obligations must be satisfied and which of these performance obligations are distinct. The Company recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when the performance obligation is satisfied.

The Company derives its revenue primarily from its capitated fees for medical services provided under capitated arrangements, fee-for-service arrangements, and revenue from the sale of pharmaceutical drugs.

Capitated revenue is derived from fees for medical services provided by the Company under capitated arrangements with health maintenance organizations' ("HMOs") health plans. Capitated revenue consists of revenue earned through Medicare as well as through commercial and other non-Medicare governmental

programs, such as Medicaid, which is captured as other capitated revenue. The Company is required to deliver primary care physician services to the enrolled member population and is responsible for medical expenses related to healthcare services required by that patient group, including services not provided by the Company. Since the Company controls the primary care physician services provided to enrolled members, the Company acts as a principal. The gross fees under these contracts are reported as revenue and the cost of provider care is included in third-party medical costs. Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which they operate does not require such registration for risk-bearing providers.

Since contractual terms across these arrangements are similar, the Company groups them into one portfolio. The Company identifies a single performance obligation to stand-ready to provide healthcare services to enrolled members. ***Capitated revenues is recognized in the month in which the Company is obligated to provide medical care services. The transaction price for the services provided depends upon the pricing established by the Centers for Medicare & Medicaid ("CMS") and includes rates that are based on the cost of medical care within a local market and the average utilization of healthcare services by the members enrolled. The transaction price is variable since the rates are risk adjusted for projected health status (acuity) of members and demographic characteristics of the enrolled members. The risk adjustment to the transaction price is presented as the Medicare Risk Adjustment ("MRA") within accounts receivable on the accompanying condensed consolidated balance sheets.*** The fees are paid on an interim basis based on submitted enrolled member data for the previous year and are adjusted in subsequent periods after the final data is compiled by the CMS.

57.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.

58.     The 2Q21 10-Q purported to warn that the estimates of revenue from Medicare may be inaccurate, stating in relevant part:

***There are risks associated with estimating the amount of revenue that we recognize under our capitation agreements with health plans, and if our estimates of revenue are materially inaccurate, it could impact the timing and the amount***

***of our revenue recognition or have a material adverse effect on our business, results of operations, financial condition and cash flows.***

There are risks associated with estimating the amount of revenues that we recognize under our capitation agreements with health plans in a reporting period. Medicare pays capitation using a risk adjusted model, which compensates payors based on the health status, or acuity, of each individual member. Payors with higher acuity members receive a higher payment and those with lower acuity members receive a lower payment. Moreover, some of our capitated revenues also include adjustments for performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payors. ***Our capitated revenues are recognized based on projected member acuity and quality metrics and are subsequently adjusted to reflect actual member acuity and quality metrics.*** Our ability to accurately project and recognize member acuity and quality metric adjustments are affected by many factors. For instance, our ability to accurately project member acuity and quality metrics may be more limited in the case of medical centers operating in new markets or medical centers that were recently acquired.

In addition, the billing and collection process is complex due to ongoing insurance coverage changes, geographic coverage differences, differing interpretations of contract coverage, and other payor issues, such as ensuring appropriate documentation. Determining applicable primary and secondary coverage for our members, together with the changes in member coverage that occur each month, requires complex, resource-intensive processes. Errors in determining the correct coordination of benefits may result in refunds to payors. Collections, refunds and payor retractions typically continue to occur for up to three years and longer after services are provided. ***If our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows.***

59.    As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.

60.     On November 10, 2021, Cano filed its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q claimed that the Company recognized revenue in accordance with ASC 606:

**Revenue Recognition**

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09 "Revenue from Contracts with Customers", ASC 606 ("ASC 606"). On January 1, 2019, the Company adopted ASC 606, applying the full retrospective method as of the earliest period presented. The portfolio approach was used to apply the requirements of the standard to groups of contracts with similar characteristics.

Under ASC 606, the Company recognizes revenue when a customer obtains control of the promised goods or services. The amount of revenue that is recorded reflects the consideration that the Company expects to receive in exchange for those goods or services. The Company applies the following five-step model in order to determine this amount: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the Company satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the Company will collect the consideration it is entitled to in exchange for the goods or services the Company transfers to the customer (i.e., patient). At contract inception, once the contract is determined to be within the scope of ASC 606, management reviews the contract to determine which performance obligations must be satisfied and which of these performance obligations are distinct. The Company recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when the performance obligation is satisfied.

The Company derives its revenue primarily from its capitated fees for medical services provided under capitated arrangements, fee-for-service arrangements, and revenue from the sale of pharmaceutical drugs.

Capitated revenue is derived from fees for medical services provided by the Company under capitated arrangements with health maintenance organizations' ("HMOs") health plans. Capitated revenue consists of revenue earned through Medicare as well as through commercial and other non-Medicare governmental programs, such as Medicaid, which is captured as other capitated revenue. The Company is required to deliver primary care physician services to the enrolled member population and is responsible for medical expenses related to healthcare services required by that patient group, including services not provided by the Company. Since the Company controls the primary care physician services provided to enrolled members, the Company acts as a principal. The gross fees

under these contracts are reported as revenue and the cost of provider care is included in third-party medical costs. Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which they operate does not require such registration for risk-bearing providers.

Since contractual terms across these arrangements are similar, the Company groups them into one portfolio. The Company identifies a single performance obligation to stand-ready to provide healthcare services to enrolled members. ***Capitated revenue is recognized in the month in which the Company is obligated to provide medical care services. The transaction price for the Medicare Advantage and Medicare Direct Contracting services provided depends upon the pricing established by the Centers for Medicare & Medicaid ("CMS") and includes rates that are based on the cost of medical care within a local market and the average utilization of healthcare services by the members enrolled. The transaction price is variable since the rates are risk adjusted for projected health status (acuity) of members and demographic characteristics of the enrolled members. The risk adjustment to the transaction price is presented as the Medicare Risk Adjustment ("MRA") within accounts receivable on the accompanying condensed consolidated balance sheets.*** The fees are paid on an interim basis based on submitted enrolled member data for the previous year and are adjusted in subsequent periods after the final data is compiled by the CMS.

61.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.

62.     The 3Q21 10-Q purported to warn that the estimates of revenue from Medicare may be inaccurate, stating in relevant part:

> ***There are risks associated with estimating the amount of revenue that we recognize under our capitation agreements with health plans, and if our estimates of revenue are materially inaccurate, it could impact the timing and the amount of our revenue recognition or have a material adverse effect on our business, results of operations, financial condition and cash flows.***
>
> There are risks associated with estimating the amount of revenues that we recognize under our capitation agreements with health plans in a reporting period. Medicare pays capitation using a risk adjusted model, which compensates payors based on

22

the health status, or acuity, of each individual member. Payors with higher acuity members receive a higher payment and those with lower acuity members receive a lower payment. Moreover, some of our capitated revenues also include adjustments for performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payors. ***Our capitated revenues are recognized based on projected member acuity and quality metrics and are subsequently adjusted to reflect actual member acuity and quality metrics.*** Our ability to accurately project and recognize member acuity and quality metric adjustments are affected by many factors. For instance, our ability to accurately project member acuity and quality metrics may be more limited in the case of medical centers operating in new markets or medical centers that were recently acquired.

In addition, the billing and collection process is complex due to ongoing insurance coverage changes, geographic coverage differences, differing interpretations of contract coverage, and other payor issues, such as ensuring appropriate documentation. Determining applicable primary and secondary coverage for our members, together with the changes in member coverage that occur each month, requires complex, resource-intensive processes. Errors in determining the correct coordination of benefits may result in refunds to payors. Collections, refunds and payor retractions typically continue to occur for up to three years and longer after services are provided. ***If our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows.***

(First emphasis in original.)

63.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.

**B.     Statements Reporting Revenue And Financial Statements**

64.     The Proxy reported $794.16 million in capitated revenue and a net loss of $74.77 million.

65.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company overstated revenue for fiscal 2020 by $10 million.

66.     On June 9, 2021, the Company issued a press release announcing its first quarter 2021 financial results. Therein, the Company reported total revenue of $280.1 million and a net loss of $10.5 million:

**First Quarter 2021 Financial Results**

- $280.1 million total revenue, up 107% from the prior-year period

- 116,895 members, a 91% increase from the prior-year period. Organic membership increased 43% from the prior-year period

- Net loss of $10.5 million

67.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for first quarter 2021 by $5.69 million; and (iii) that, as a result, Cano understated net loss by $5.64 million for first quarter 2021.

68.     On August 12, 2021, Cano issued a press release announcing its second quarter 2021 financial results. Therein, the Company reported total revenue of $393.2 million and net income of $4.9 million:

**Second Quarter Highlights**:

- Total membership of 156,038 including Medicare capitated members of 111,866, an increase of 57% and 54%, respectively, year-over-year

- ***Total revenue of $393.2 million, an increase of 130% year-over-year***

- ***Net income of $4.9 million***

- Adjusted EBITDA of $24.8 million, an increase of 53% year-over year

69.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for second quarter 2021 by $49.73 million; and (iii) that, as a result, Cano understated net loss by $41.24 million for second quarter 2021.

70.     On August 16, 2021, Cano filed its quarterly report on Form 10-Q for the period ended June 30, 2021. Therein, the Company reported $393.16 million in revenue, including $379.21 million in capitated revenue, and a $4.95 million net income. 85.1% of the revenue was derived from Medicare contracts.

71.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for second quarter 2021 by $49.73 million; and (iii) that, as a result, Cano understated net loss by $41.24 million for second quarter 2021.

25

72.     On November 9, 2021, Cano issued a press release announcing its third quarter 2021 financial results. Therein, the Company reported total revenue of $526.8 million and net loss of $40.9 million:

**Third Quarter Highlights:**

- Total membership of 210,663 including Medicare capitated members of 120,086, an increase of 105% and 65%, respectively, year-over-year

- ***Total revenue of $526.8 million, an increase of 100% year-over-year***

- ***Net loss of $40.9 million***

- Adjusted EBITDA[] of $35.2 million, an increase of 53% year-over year

- Raised 2021 and 2022 guidance for total membership, total revenue, and Adjusted EBITDA

73.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for third quarter 2021 by $28.02 million; and (iii) that, as a result, Cano understated net loss by $23.96 million for third quarter 2021.

74.     On November 10, 2021, Cano filed its quarterly report on Form 10-Q for the period ended September 30, 2021. Therein, the Company reported $526.8 million in revenue, including $501.78 million in capitated revenue, and a $40.88 million net loss. 84.9% of the revenue was derived from Medicare contracts.

75.     As the Company later admitted (*see* Section IV.E, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized

revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for third quarter 2021 by $28.02 million; and (iii) that, as a result, Cano understated net loss by $23.96 million for third quarter 2021.

## VI.    LOSS CAUSATION

76.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Cano's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial results to the market.

77.    The truth regarding the Company's financial results was partially revealed, and/or the concealed risks materialized, on or about February 28, 2022.

78.    On February 28, 2022, Cano announced it had "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606," which would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]" However, these adjustments would "not impact the Company's cash from operations, its cash position, or estimated collectability of receivables."

79.    On this news, the Company's stock price fell $0.32, or 6%, to close at $4.87 per share on February 28, 2022, on unusually heavy trading volume.

80.    During the Class Period, Plaintiff and the Class purchased Cano's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.   POST-CLASS PERIOD EVENTS

81.    On March 2, 2022, Cano filed a Notification of Late Filing on Form 12b-25 with the SEC, stating that it could not timely file its annual report for fiscal 2021 due to the previously discussed revenue recognition adjustments. It also stated that: "It is possible that the adjustments described above may result in changes to current and/or prior period financial statements. The Company and E&Y are still evaluating whether any such adjustments would be material to prior period financial statements."

82.    On March 14, 2022, in a Form 8-K filed with the SEC, Cano revealed that its financial statements for the quarterly periods of fiscal 2021 should no longer be relied upon. These statements would be restated due to "the Company's **_correction_** of its accounting for Medicare Risk Adjustment ("MRA") revenue within Medicare Advantage contracts." Specifically, "[t]he correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606, _Revenue from Contracts with Customers_ ('ASC 606')." Moreover, Cano would revise its financial statements for fiscal 2019 and 2020, though the impact was "not material."

83.    The same day, the Company issued a press release discussing its full year 2021 financial results, including the impact of the restatement. Specifically, Cano revealed that "[a]s a result of the restatement, approximately $122 million of MRA revenue related to care provided in 2021 that would have previously been recognized in 2021 is expected to be recognized in 2022." This was "partially offset by $10 million in MRA revenue that was previously recognized in 2020 under the prior accounting methodology, for a negative impact to 2021 revenue of approximately $112 million." The net negative impact to 2021 Adjusted EBITDA was $91 million.

84.     Also on March 14, 2022, Cano filed its fiscal 2021 Form 10-K with the SEC. Therein, the Company restated its previously issued financial statements for the quarterly periods of fiscal 2021. Due to "the reduced MRA estimate," Cano revised its financial statements as follows:

| | September 30, 2021 | | | June 30, 2021 | | | March 31, 2021 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | |
| Capitated revenue [1] | $ 501,780 | $ (28,017) | $ 473,763 | $ 379,210 | $ (49,726) | $ 329,484 | $ 267,051 | $ (5,694) | $ 261,357 |
| Fee-for-service and other revenue[2] | 25,018 | 150 | 25,168 | 13,953 | 144 | 14,097 | 13,084 | 161 | 13,245 |
| Total revenue | 526,798 | (27,867) | 498,931 | 393,163 | (49,582) | 343,581 | 280,135 | (5,533) | 274,602 |
| **Operating expenses:** | | | | | | | | | |
| Third-party medical costs[3] | 379,316 | 2,000 | 381,316 | 291,816 | — | 291,816 | 195,046 | — | 195,046 |
| Direct patient expense [4] | 57,708 | (7,340) | 50,368 | 43,782 | (8,175) | 35,607 | 34,287 | (50) | 34,237 |
| Selling, general and administrative expenses [5] | 75,926 | 692 | 76,618 | 46,574 | 585 | 47,159 | 34,848 | 161 | 35,009 |
| Depreciation and amortization expense | 16,955 | — | 16,955 | 7,945 | — | 7,945 | 5,846 | — | 5,846 |
| Transaction costs and other [6] | 6,528 | 738 | 7,266 | 16,374 | (756) | 15,618 | 9,239 | — | 9,239 |
| Total operating expenses | 536,433 | (3,910) | 532,523 | 406,491 | (8,346) | 398,145 | 279,266 | 111 | 279,377 |
| Income (loss) from operations | (9,635) | (23,957) | (33,592) | (13,328) | (41,236) | (54,564) | 869 | (5,644) | $ (4,775) |
| **Other income and expense:** | | | | | | | | | |
| Interest expense | (16,023) | — | (16,023) | (9,714) | — | (9,714) | (10,626) | — | (10,626) |
| Interest income | 1 | — | 1 | 1 | — | 1 | 1 | — | 1 |
| Loss on extinguishment of debt | — | — | — | (13,225) | — | (13,225) | — | — | — |
| Change in fair value of warrant liabilities | (14,650) | — | (14,650) | 39,215 | — | 39,215 | — | — | — |
| Other income (expense) | (29) | — | (29) | (25) | — | (25) | — | — | — |
| Total other income (expense) | (30,701) | — | (30,701) | 16,252 | — | 16,252 | (10,625) | — | (10,625) |
| Net income (loss) before income tax expense (benefit) | (40,336) | (23,957) | (64,293) | 2,924 | (41,236) | (38,312) | (9,756) | (5,644) | (15,400) |
| Income tax expense (benefit) | 547 | — | 547 | (2,023) | — | (2,023) | 714 | — | 714 |
| Net income (loss) | $ (40,883) | $ (23,957) | $ (64,840) | $ 4,947 | $ (41,236) | $ (36,289) | $(10,470) | $ (5,644) | $(16,114) |

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

85.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Cano, their control over, and/or receipt and/or modification of Cano's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cano, participated in the fraudulent scheme alleged herein.

86.    Not only was revenue from Medicare contracts core to the Company's business, but applying general accepted revenue recognition practices is simple and uncomplicated for publicly traded companies. Yet, even then, the Company admitted that it improperly recognized revenue with respect to Medicare contracts, which constituted nearly all of its business. Further, the accounting method that Defendants employed enabled them to report increased revenue in the near-term, making PCIH appear as a more appealing acquisition target. For example, the Proxy touts "the projected growth of PCIH's targeted Medicare Advantage market" as one of the reasons for approving the Business Combination.  Making PCIH appear more profitable helped ensure that shareholders would not redeem their shares for funds from the Trust Account.

87.    The Individual Defendants were financially motivated for the Business Combination to occur.  The approximately $690 million in proceeds in the Trust Account were used as consideration to complete the Business Combination, which was paid to the Seller (as cash consideration) and to PCIH (which was to be used to pay off existing debt and general corporate

purposes). Moreover, in connection with the closing of the Business Combination, Defendant Hernandez was granted a stock option to purchase 2,820,000 shares of Class A stock and Defendant Koppy was granted the option to purchase 400,000 shares of Class A stock (along with an RSU award of 373,972 shares).

88.     The Individual Defendants' scienter is even further supported by the fact that there were no new facts or circumstances to change the accounting treatment of these contracts—no new accounting rule, no new process by CMS, and no new auditor for Cano—between the issuance of the Proxy soliciting approval of the Business Combination and the announcement of the restatement.  Therefore, the most reasonable inference is that the Individual Defendants knew or recklessly disregarded the correct GAAP treatment of Medicare contracts. Indeed, Credit Suisse reports that investors believed "the company was intentionally trying to overstate its financials for the first few quarters post its" Business Combination.

## IX.    CORPORATE SCIENTER ALLEGATIONS

89.     Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Cano, including each high ranking officer or director, is imputable to Cano. The knowledge of each of these individuals should therefore be imputed to the Company for the purposes of assessing corporate scienter.

90.     Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Cano as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the revenue recognition for a majority of the Company's contracts (i.e., Medicare Advantage)—all important topics that

would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## X.   CLASS ACTION ALLEGATIONS

91.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Cano securities between May 7, 2021 and February 25, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

92.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Cano's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Cano shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Cano or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Cano; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.     UNDISCLOSED ADVERSE FACTS

97.     The market for Cano's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Cano's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Cano's securities relying upon the integrity of the market price of the Company's securities and market information relating to Cano, and have been damaged thereby.

98.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Cano's securities, by publicly issuing false and/or misleading statements

and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Cano's business, operations, and prospects as alleged herein.

99.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Cano's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

100.    The market for Cano's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Cano's securities traded at artificially inflated prices during the Class Period.  On September 16, 2021, the Company's share price closed at a Class Period high of $15.44 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Cano's securities and market information relating to Cano, and have been damaged thereby.

101.    During the Class Period, the artificial inflation of Cano's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Cano's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Cano and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

102.    At all relevant times, the market for Cano's securities was an efficient market for the following reasons, among others:

(a)    Cano shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Cano filed periodic public reports with the SEC and/or the NYSE;

(c)    Cano regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Cano was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

103.    As a result of the foregoing, the market for Cano's securities promptly digested current information regarding Cano from all publicly available sources and reflected such information in Cano's share price. Under these circumstances, all purchasers of Cano's securities during the Class Period suffered similar injury through their purchase of Cano's securities at artificially inflated prices and a presumption of reliance applies.

104.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII.  NO SAFE HARBOR

105.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Cano who knew that the statement was false when made.

## XIV.   CLAIMS

### <u>FIRST CLAIM</u>

#### **Violation of Section 10(b) of The Exchange Act and**

#### **Rule 10b-5 Promulgated Thereunder**

#### <u>Against All Defendants</u>

106.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

107.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Cano's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

108.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Cano's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

109.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Cano's financial well-being and prospects, as specified herein.

110.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cano's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Cano and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

111.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the

other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

112.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cano's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

113.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Cano's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants

during the Class Period, Plaintiff and the other members of the Class acquired Cano's securities during the Class Period at artificially high prices and were damaged thereby.

114.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Cano was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Cano securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

115.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

116.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

117.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

118.    Individual Defendants acted as controlling persons of Cano within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence

and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

120.    As set forth above, Cano and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XVI.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  February 21, 2023                    Respectfully submitted,

*/s/Leo W. Desmond*
Leo W. Desmond, Esquire
Florida Bar Number 0041920
**DESMOND LAW FIRM, P.C.**
601 21st Street, Suite 300
Vero Beach, Florida 32960
Telephone: 772.231.9600
Facsimile: 772.217.6134
lwd@desmondlawfirm.com

*Liaison Counsel for Gudelio Fundora and for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler (pro hac vice pending)
Pavithra Rajesh (pro hac vice pending)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: csadler@glancylaw.com
       prajesh@glancylaw.com

*Counsel for Lead Plaintiff Gudelio Fundora and Lead Counsel for the Class*

### CERTIFICATE OF SERVICE

I, Leo W. Desmond, hereby certify that on February 21, 2023, a true and accurate copy of the above document was electronically filed with the Clerk of the Court by using the CM/ECF system which will send Notice of Electronic Filing (NEF) to all counsel of record.

_s/ Leo W. Desmond_
Leo W. Desmond
