**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-20827-CIV-WILLIAMS/SANCHEZ**

ALBERTO GONZALEZ, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

      v.

CANO HEALTH, INC. f/k/a JAWS
ACQUISITION CORP., MARLOW
HERNANDEZ, BRIAN D. KOPPY, JOSEPH
L. DOWLING, and MICHAEL RACICH,

        Defendants,

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................................1

II.     STATEMENT OF RELEVANT FACTS ........................................................................3

        A.      SPAC's Conflicts Of Interest.................................................................................3

        B.      Jaw's Acquisition Of Cano ...................................................................................3

        C.      Cano Misapplied Generally Accepted Accounting Principles By Recognizing
                Revenue From Medicare Advantage Contracts Before The Amounts Could Be
                Estimated Accurately ...........................................................................................4

        D.      The Company's Class Period False Statements.........................................................5

        E.      The Company Admits It Improperly Recognized Revenue From Medicare
                Advantage Contracts And Corrects Its Accounting Method ..................................6

        F.      Contradicting Defendants' Claims Of Faithful Disclosure, Defendant Hernandez Is
                Currently Sued By His Own Board For Misleading Statements ............................8

III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION............9

IV.     PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION........................................9

V.      THE AC ALLEGES A STRONG INFERENCE OF SCIENTER ...................................13

        A.      Defendants Violate *Tellabs*' Mandate That Scienter Must Be Analyzed Holistically
                ...........................................................................................................14

        B.      The Individual Defendants Were Severely Reckless.............................................15

        C.      That Defendants Committed Fraud Is The Only Compelling Narrative................22

        D.      The Complaint Adequately Alleges Corporate Scienter......................................25

VI.     PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON LIABILITY.................26

VII.    CONCLUSION...............................................................................................................26

## TABLE OF AUTHORITIES

CASES

*100079 Canada, Inc. v. Stiefel Labs., Inc.*,
2011 WL 13116079 (S.D. Fla. 2011) ...................................................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 9

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................................................... 17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................. 9

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) ............................................................................... 20

*Bryant v. Dupree*,
252 F.3d 1161 (11th Cir. 2001) ............................................................................... 26

*Carley Cap. Grp. v. Deloitte & Touche*,
27 F. Supp. 2d 1324 (N.D. Ga. 1998) ..................................................................... 18

*Chalverus v. Pegasystems, Inc.*,
59 F. Supp. 2d 226 (D. Mass. 1999) ....................................................................... 18

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) ................................................................................... 19

*Druskin v. Answerthink, Inc.*,
299 F. Supp. 2d 1307 (S.D. Fla. 2004) ............................................................. 13, 20

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ........................................................................................... 10, 13

*Edward J. Goodman Life Incom Tr. v. Jabil Cir., Inc.*,
595 F. Supp. 2d 1253 (M.D. Fla. 2009) .................................................................. 20

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ............................................................... 9, 10, 12, 13

*Foman v. Davis*,
371 U.S. 178 (1962) ................................................................................................. 26

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ................................................................................. 16

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ...................................................................... 25

*In re AFC Enters., Inc. Sec. Litig.*,
  348 F. Supp. 2d 1363 (N.D. Ga. 2004) ..................................................................... 17

*In re AthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010) ..................................................................... 18

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................... 17

*In re Buca Inc. Sec. Lit.*,
  2006 WL 3030886 (D. Minn Oct. 16, 2006) ....................................................... 11, 12

*In re Eagle Bldg. Techs., Inc. Sec. Litig.*,
  319 F. Supp. 2d 1318 (S.D. Fla. 2004) ..................................................................... 19

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) .................................................................. 9, 10

*In re Faro Techs. Sec. Litig.*,
  534 F. Supp. 2d 1248 (M.D. Fla. 2009) ............................................................... 20, 26

*In re Flowers Foods, Inc. Sec. Litig.*,
  2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ...................................................... 10, 19

*In re Hamilton Bankcorp., Inc. Sec. Litig.*,
  194 F. Supp. 2d 1353 (S.D. Fla. 2002) ..................................................................... 25

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
  639 F. Supp. 2d 1038 (N.D. Cal. 2009) .................................................................... 11

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................... 16

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ....................................................................... 17

*In re Miller Indus., Inc. Sec. Litig.*,
  12 F. Supp. 2d 1323 (N.D. Ga. 1998) ....................................................................... 24

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014)..................................................................................... 25

*In re Paincare Holdings Sec. Litig.*,
541 F. Supp. 2d 1283 (M.D. Fla. 2008) ............................................................................... 21

*In re Rent-Way Sec. Litig.*,
209 F. Supp. 2d 493 (E.D. Pa. 2002) ................................................................................... 17

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ...................................................................... 17

*In re Sportsline.com Sec. Litig.*,
366 F. Supp. 2d 1159 (S.D. Fla. 2004) ................................................................................ 18

*In re The Baan Co. Sec. Litig.*,
103 F. Supp. 2d 1 (D.D.C. 2000) ......................................................................................... 17

*In re Unicapital Corp. Sec. Litig.*,
149 F. Supp. 2d 1353 (S.D. Fla. 2001) ................................................................................ 14

*In re Veeco Instruments, Inc. Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) ......................................................................................... 25

*Janbay v. Canadian Solar, Inc.*,
2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..................................................................... 11

*Lemen v. Redwire Corp.*,
2023 WL 2598402 (M.D. Fla. Mar. 22, 2023) ..................................................................... 20

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ............................................................................................. 13

*Luczak v. Nat'l Beverage Corp.*,
812 F. App'x 915 (11th Cir. 2020) ...................................................................................... 11

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)................................................................................................................. 9

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008) ............................................................................. 13, 25, 26

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
572 F. App'x 713 (11th Cir. 2014) ...................................................................................... 20

*Phillips v. Scientific-Atlanta, Inc.*,
374 F.3d 1015 (11th Cir. 2004) ...................................................................................... 25

*Pub. Emp. Ret. Sys. Of Mississippi v. Mohawk Indus., Inc.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021) ......................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................... 9, 13, 14, 15

*Thompson v. RelationServe Media, Inc.*,
610 F.3d 628 (11th Cir. 2010) ...................................................................................... 26

STATUTES

15 U.S.C. § 78u-4(b)(2) .................................................................................................... 13

RULES

Fed. R. Civ. P. 12(b)(6).......................................................................................... 9, 14, 15

Fed. R. Civ. P. 12(g) ......................................................................................................... 9

## I.     PRELIMINARY STATEMENT

This is an incredibly simple and straight-forward case of securities fraud.[1]  Defendants wanted to ensure that an extremely lucrative business combination would be consummated, so they made the target entity look more profitable by inflating its revenue.  The Company did this by using an accounting methodology that was not in accordance with generally accepted accounting guidelines ("GAAP") and was not the method used by its competitors.  Only right before filing its first annual report following the business combination did the Company disclose the truth: that Cano recognized revenue before it was entitled to receive it, which is inconsistent with GAAP, and that it would restate its prior financial results.

Defendants do not contest the falsity of their statements.  Nor could they—the restatement is an admission that their prior financial statements were materially false.  Instead, they attempt to escape liability for the millions of dollars their fraud cost shareholders by arguing there is no loss causation and their false statements were not made with scienter.

In regards to loss causation, Defendants claim their disclosure that the auditor "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606," which would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods," did not reveal the truth of the fraud to its market.  This is simply untrue.  The Company's admissions that it was not complying with GAAP and that it had been prematurely recognizing revenue alerted the market to Defendants' fraudulent conduct,

---

[1] Citations to the Defendants' Motion to Dismiss the Amended Complaint and Supporting Memorandum of Law (Dkt. No. 54) (the "Motion") are in the form Def. Br. at ___, and citations to the Amended Class Action Complaint (the "Complaint," Dkt. No. 51) are in the form "¶__ or §__." Terms not otherwise defined have the same meanings as in the Complaint. Unless otherwise noted, citations and quotations are omitted and emphasis is added throughout.

which is evidenced by the resulting decline in Cano's stock price.  As such, it constitutes a sufficient loss causation event.

Defendants next try to skirt liability by claiming that their accounting violations were not reckless and that they completely relied on its auditor.  But Defendants' story is unbelievable: they point to no intervening changes in accounting standards, CMS regulation, or other circumstance that prompted the change in application of the revenue recognition standards and caused their auditor to do a 180-degree change in belief, necessitating a restatement of its historical financial results. By contrast, Plaintiff has offered a compelling case for Defendants' recklessness. Specifically, the false statements at issue all related to the application of an accounting rule that involved revenue related to the Company's core business.  Cano's accounting treatment was different from its peers, and investors believed Cano engaged this conduct to make its financial results look better in connection with the business combination.  Thus, it is implausible that Defendants incorrectly recognized revenue for their entire business model, and the sudden change in accounting treatment only after the business combination was completed suggests Defendants were reckless.

Finally, Defendants scienter is further demonstrated by newly discovered facts uncovered in a derivative complaint filed by former directors of the Company against the current Board.  This derivative complaint reveals that certain of the Company's executives, including Defendant Hernandez, entered into undisclosed related party transactions, including paying millions of dollars to his family members and pledging their shares for millions of dollars, even though Cano was in a dire financial situation.  Even though these executives were required to disclose these related party transactions, they did not. This complaint, replete with allegations of Defendants' lack of candor, provides valuable context to the fraud alleged herein.

In sum, the Complaint sufficiently alleges that Defendants' materially false and misleading statements with scienter and that the disclosure of Cano's improper accounting was a valid loss causation event.  Therefore, the Motion must be denied.

## II.      STATEMENT OF RELEVANT FACTS

### A.      SPAC's Conflicts Of Interest

A special purpose acquisition company, or "SPAC," is a publicly traded company with no business activities of its own that is formed for the specific purpose of acquiring an existing, privately owned company and taking it public. ¶¶ 20-22.  SPAC transactions by their nature, however, give rise to potential conflicts of interest between a SPAC's management and its stockholders. ¶¶ 21, 23. This is because if a SPAC acquires a target company, the SPAC's founders and managers can profit through their ownership of SPAC securities; yet if a SPAC does not complete an acquisition prior to the expiration of the deadline, the SPAC is dissolved, and the funds held in trust are returned to the SPAC's investors, *with no compensation paid to the SPAC's founders and managers*. ¶ 21. As such, SPAC management is incentivized to complete a deal, even if the deal is a losing proposition for the SPAC's stockholders, because the alternative is liquidation. ¶¶ 21-22.

### B.      Jaw's Acquisition Of Cano

Jaws Acquisition Corp. ("Jaws") was a SPAC formed in 2020, with the stated goal of "focus[ing] on leading, growth-oriented companies across a variety of industries," but does "not intend to target industries that are competitive with Starwood Capital Group Holdings, L.P., or Starwood Capital, which includes real estate, lodging, oil and gas and energy infrastructure." ¶¶ 24-26.  Barry Sternlicht ("Sternlicht"), the Chairman of Jaws, is also Chairman and CEO of Starwood Capital. ¶ 26.  To that end, Jaws raised approximately $690 million through its initial public offering ("IPO"). ¶ 25.

3

With these funds, Jaws entered into an agreement to consummate a business combination with Primary Care (ITC) Holdings, LLC and Primary Care (ITC) Intermediate Holdings, LLC ("PCIH"), which was ultimately completed on June 3, 2021. ¶¶ 27-28. Pursuant to the agreement, Jaws became domesticated as a Delaware corporation and renamed Cano Health. ¶ 27.

**C.      Cano Misapplied Generally Accepted Accounting Principles By Recognizing Revenue From Medicare Advantage Contracts Before The Amounts Could Be Estimated Accurately**

Cano is a primary care physician group that uses a technology-powered, value-based care platform to serve more than 100,000 members. CanoPanorama, its proprietary platform, provides analytics, reports, and protocols used to inform key care management decisions by physicians. ¶ 30. Substantially all of its revenue (approximately 95%) is derived from recurring per member per month capitated revenue. ¶ 31. Specifically, Medicare accounts for more than 80% of the Company's revenue since it "focus[es] on the Medicare Advantage population" because it is "arguably the fastest growing market in healthcare with an estimated 10,000 seniors aging in everyday." *Id.*

Medicare Advantage allows Medicare-eligible seniors and beneficiaries with disabilities to obtain care through private plans rather than traditional fee-for-service Medicare. ¶ 32. The Centers for Medicare and Medicaid Services ("CMS") pays a fixed (or capitated) monthly amount per enrolled beneficiary to provide Medicare benefits. *Id.* There is a one-year lag between the diagnosis and the capitated payment while CMS conducts a risk adjustment to spread costs across healthcare plans. ¶¶ 33-35.

Because Cano's capitated payment depends on the CMS risk adjustment process, the payments are treated as variable consideration. *See* ¶ 37. Under generally accepted accounting principles ("GAAP"), variable consideration is estimated using one of two methods: the expected value method or the most likely amount method. *Id.* Variable consideration must be reassessed

4

at the end of each reported period "to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reporting period." ¶ 39 (citing ASC 606-10-32-14).  According to the correspondence filed with the SEC on March 15, 2021, Cano historically estimated the transaction price for Medicare Advantage contracts using the expected value method using rates provided by CMS and adjusted for the demographics of the Company's enrolled members.  ¶ 40.  This was not the method that its peers used.  ¶ 43.

During the Class Period, the Company claimed that it recognized revenue in accordance with GAAP, including as to Medicare Advantage contracts. Though they acknowledged that such revenue was considered variable consideration (due to the adjustments by CMS), Defendants claimed that such adjustment was presented within accounts receivable.  ¶ 41.  However, because the adjustments by CMS would not be issued until a year after the initial diagnosis, Cano could not estimate revenue for the new patients until the audit was completed.  ¶ 43.  Due to this timing difference, Cano's peers booked revenue when they collected cash, i.e. one year after the documentation, not in the manner than Cano did.  ¶ 43.

As Credit Suisse analysts explained, Cano's peers "book MRA-related revenue one year after the documentation" whereas Cano's "approach had been booking revenues at the time of documentation itself (essentially, the date of service)."  ¶ 51.  Essentially, Cano's prior practice had been to *predict* expected revenue, and Credit Suisse noted that "several investors have raised questions about whether the company was intentionally trying to overstate its financials for the first few quarters post its De-SPAC and whether there is a write-down risk with the MRA receivables."  ¶ 51.

### D.      The Company's Class Period False Statements

The Complaint identifies two types of statements that misleadingly omitted material facts and explains they were false and misleading.  First are statements about the Company's compliance

with GAAP that were all false and misleading because they failed to disclose that:

> (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.

¶¶52-53, 54-55, 56-57, 58-59, 60-61, 62-63. Second are statements about the Company's reported revenue and net loss that were all false and misleading because they included improperly recognized revenue.   ¶¶64-65, 66-67, 68-69, 70-71, 72-73, 74-75.   Defendants' ultimate restatement was an admission that they made materially misleading statements and omissions during the Class Period.

### E.   The Company Admits It Improperly Recognized Revenue From Medicare Advantage Contracts And Corrects Its Accounting Method

On February 28, 2022, Cano delayed the release of its full year 2021 financial results because it had identified certain errors in revenue recognition.   Specifically, the Company disclosed that its auditor "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606," which would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]"   ¶ 44.   On this news, the Company's stock price fell $0.32, or 6%, to close at $4.87 per share on February 28, 2022, on unusually heavy trading volume.   ¶ 45.

Thereafter, on March 14, 2022, the Company revealed that that its financial statements for the quarterly periods of fiscal 2021 should no longer be relied upon and that these statements would be restated due to "the Company's *correction* of its accounting for Medicare Risk Adjustment ('MRA') revenue within Medicare Advantage contracts."   ¶ 46.   Specifically, "[t]he correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606, *Revenue from Contracts*

*with Customers* ('ASC 606')."  ¶ 46.  The Company further disclosed that it would revise its financial statements for fiscal 2019 through 2022.  ¶ 46.

On that same date, the Company further disclosed that it would now be changing its method of revenue recognition to the "most likely amount" methodology from the "expected value" method.  As the Company explained, for Cano:

> MRA revenues are estimated using the "most likely amount" methodology. The amount of variable consideration recorded in the transaction price is limited to an amount that the Company believes will not result in a significant reversal of revenue based on historical results.

And the Company explained that the basis for using this methodology was that:

> Revenue is not recorded until the price can be estimated by the Company and to the extent that it is probable that a significant reversal will not occur once any uncertainty associated with the variable consideration is subsequently resolved.

¶ 47.

Further, the Company explained that the restatement resulted in "approximately $122 million of MRA revenue related to care provided in 2021 that would have previously been recognized in 2021 is expected to be recognized in 2022" and that this was "partially offset by $10 million in MRA revenue that was previously recognized in 2020 under the prior accounting methodology, for a negative impact to 2021 revenue of approximately $112 million."  ¶ 48.  The net negative impact to 2021 Adjusted EBITDA was $91 million.

The Company further admitted that one "consequence of the [previously-disclosed] material weakness . . . was that in the course of finalizing the audit of our financial statements for the year ended December 31, 2021, [Cano] with [its] independent auditors identified a misapplication of GAAP that resulted in a restatement."  ¶ 48.  This was an admission that the Company was not applying GAAP properly throughout the Class Period.

**F.      Contradicting Defendants' Claims Of Faithful Disclosure, Defendant Hernandez Is Currently Sued By His Own Board For Misleading Statements**

Defendants ask the Court to find that the non-fraudulent inference is more plausible and that they disclosed the misapplication of ASC 606 "promptly." Def. Br. at 5. The Court should not accept Defendants' *ipse dixit* narrative, especially given that Defendant Hernandez and the remaining Cano directors are being sued by Sternlicht for their governance failures, including the failure to promptly disclose related party transactions. *See Sternlicht v. Hernandez, et al.*, C.A. No. 2023-477 (Del. Ch.), Complaint (attached as Exhibit A to Declaration of Casey E. Sadler ("Sadler Decl."), which is filed concurrently herewith).[2]

Sternlicht alleges that outside counsel, Weil, Gotshal & Manges LLP ("Weil"), conducted an investigation and found that Defendant Hernandez's borrowing and pledging activities were "egregious violations of the Company's code of conduct." *Id.* at ¶ 2.  In February 2022—at the same time that Defendants "discovered" the accounting errors—Defendant Hernandez and his affiliates received a $30 million loan from Robert Camerlinck, who was then president of a portfolio company Cano had purchased; after this loan, Mr. Camerlinck was promoted to be Cano's Chief Operating Officer. *Id.* at ¶¶ 51-54.  Defendant Hernandez's $30 million indebtedness to Mr. Camerlinck was not publicly disclosed until *a year later* following Weil's investigation, which Sternlicht and Cano's former directors found likely violated federal securities laws. *Id.* at ¶¶ 55, 57, 77.   Moreover, Defendant "Hernandez had previously denied that his father was involved in any paid marketing and media activities, and the facts uncovered by Weil demonstrated that Dr. Hernandez had misled [the Board]." *Id.* at ¶ 71.

But these allegations are "just the tip of the iceberg, with Defendants' having curtailed

---

[2] The derivative complaint was filed on April 28, 2023, after the deadlines for Plaintiff's Complaint and Defendants' motion to dismiss.

Weil's internal investigation, and then suppressing disclosure of Weil's factual findings." *Id.* at ¶ 14. That Sternlicht, the Chairman of Jaws who shepherded the Business Combination, is levelling these claims against the leaders of Cano directly calls into question the Individual Defendants' honesty.

## III.   APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

To state a claim under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) scienter; (3) the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[3]   When ruling on a "Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true[,]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), "and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

To avoid dismissal, a complaint need only "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiff need only plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable." *Id.* at 678.  Also, the Court "must consider the complaint in its entirety." *Tellabs*, 551 U.S. at 310.  A court should deny a motion to dismiss when the complaint plausibly articulates the circumstances constituting fraud. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.   PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION

"To prove loss causation in a section 10(b) claim, a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *In*

---

[3] Defendants challenge only scienter and loss causation, thus any challenge to the remaining elements is deemed waived. *See* Fed. R. Civ. P. 12(g).

*re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1247 (N.D. Ga. 2019); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  "The loss causation element is only subject to Rule 8's notice pleading standard . . ., not the heightened pleading standards of the PSLRA."  *In re Equifax*, 357 F. Supp. 3d at 1248, 1249.  Loss causation can be demonstrated by (1) identifying a corrective disclosure; (2) showing a stock price drop as a result of the corrective disclosure; and (3) eliminating other possible explanations for the price drop.  *FindWhat*, 658 F.3d at 1311-12. Plaintiff has sufficiently pled loss causation.

As the Complaint explains, on February 28, 2022, Cano delayed the release of its full year 2021 financial results because it had identified certain errors in revenue recognition. Specifically, the Company issued a press release that stated Cano and its auditor "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606," which would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]"  ¶¶44, 78.  On this news, the Company's stock closed by approximately 6%.  ¶¶45, 79.  This is a textbook example of a corrective disclosure.  The Company disclosed that it had identified errors in its revenue recognition and thus its financial results were inaccurate, and upon this news the stock declined.

Certainly, these statements—that the Company was not correctly applying ASC 606 in accordance with GAAP and that as a result the Company's financial results were inaccurate— revealed to the market the pertinent truth.  *In re Flowers Foods, Inc. Sec. Litig*., 2018 WL 1558558, at *20 (M.D. Ga. Mar. 23, 2018) ("Disclosures need not address the prior misstatements specifically or fact-for-fact as long as they share the same subject as the prior misstatements."). And since Defendants have failed to provide another explanation for the decline in stock price, loss causation is sufficiently alleged.

10

Faced with this reality, Defendants make a series of specious arguments. First, Defendants claim that "the announcement of a delay in reporting of a company's financials does not establish loss causation because it does not reveal the alleged fraud." Def. Br. at 27. But this is a strawman argument: Plaintiff is not alleging that the announcement of the reporting delay was the corrective disclosure.[4] As Defendants concede elsewhere in their motion, the actual corrective part of the announcement was the "disclos[ure] to investors the need for an adjustment to its [revenue recognition] methodology" and its impact on its financial statement. *See, e.g.*, Def. Br. at 16.[5]

Defendants' primary case for this element is *In re Buca Inc. Sec. Lit.*, 2006 WL 3030886 (D. Minn Oct. 16, 2006). As an initial matter, the fact that Defendants hang their hat on an almost twenty-year-old non-binding, out-of-Circuit district court decision demonstrates the weakness of their position. Regardless, that decision still does not even support a lack of loss causation in this case. There, the alleged disclosures either did not reveal the fraud or did not result in a stock drop.

_____

[4] As such, Defendants cited cases that involved filing delay announcements that did not actual disclose the conduct at issue are inapposite. *See, e.g.*, *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) ("The announcement of a delay in the reporting of CSI's 1Q 2010 financials does not establish loss causation because it fails to reveal the truth that CSI had engaged in sham sales, secret consignments, or any wrongdoing asserted in the Complaint"); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1045 (N.D. Cal. 2009) ("In this case, the alleged fraudulent activity consists of a series of alleged misrepresentations that fail to disclose that Defendant Maxim regularly engaged in backdating stock options, and failed to properly record compensation expenses related to its backdating practices.").

[5] In regards to scienter, Defendants argue their prompt disclosure on February 28, 2022 of their non-compliance with GAAP and need to adjust its accounting methodology supports a lack of scienter. Def. Br. 16. Defendants cannot have their cake and eat it too. If they promptly disclosed this information to the market in a manner to make the public aware of what had occurred (as they claim), it is thus an admission that the February 28, 2022 statement constitutes a corrective disclosure. Indeed, the Eleventh Circuit held that a district court erred in ruling that a disclosure did not "constitute either proof of fraud or proof of liability." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 922 (11th Cir. 2020)". "A corrective disclosure can come from any source, and can take any form from which the market can absorb the information and react, so long as it reveals to the market the falsity of the prior misstatements." *Id*. at 920–21.

11

*Id.* at \*9 ("the May 10, 2004 Press Release announcing Micatrotto's resignation mentioned no investigation or accounting issues and thus disclosed nothing of the alleged fraud."); ("even though the May 19 Press Release was followed by a drop in stock price, the press release did not disclose the alleged fraud. Next, although February 11, 2005 Form 8–K constituted a partial disclosure of the alleged fraud, Plaintiffs failed to identify a significant price drop in share price following this partial corrective disclosure."); ("although Buca's share price dropped on March 14, 1005, following the March 11, 2005 Press Release, that press release did not constitute a corrective disclosure").  After finding that this series of partial disclosures were not corrective, the court then held that the one disclosure that was arguably corrective was insufficient for loss causation since "this single identification of a drop in Buca's stock price following a partial corrective disclosure negates Plaintiffs' allegation that the fraud was gradually disclosed through a series of partial disclosures." *Id.*  The court further explained that "The fact that Buca's stock price was already down to $6.38 by the time the fraud was allegedly revealed and the artificial inflation allegedly came out of the stock reveals that other factors had caused the decline." *Id.*

Unlike in *Buca*, here, Plaintiff alleges that there was a single corrective disclosure, that it caused the stock to drop, and there were no other reasons for the stock drop.  *FindWhat*, 658 F.3d at 1311-12.  Without directly arguing it, Defendants appear to claim that loss causation is negated by the fact that the Company's stock was already doing poorly before the corrective disclosure caused a further drop.  *See* Def. Br. at 27.  Whether the Company's stock was doing well or poorly before the corrective disclosure has no bearing on loss causation, and Defendants fail to cite any cases indicating otherwise.  As discussed above, *Buca* simply stands for the proposition that loss causation must show the stock drop was unrelated to other events.

Defendants only in Circuit decision, *Druskin v. Answerthink, Inc.*, is similarly inapposite

12

in that it dealt with a situation where the price of the stock rebounded after the disclosures were made. 299 F. Supp. 2d 1307, 1339 (S.D. Fla. 2004) ("…the stock quickly rebounded. Thus … Plaintiffs have failed to adequately allege that Defendants' false statements were in some reasonably direct way responsible for their loss."). *Druskin* is further inapplicable in that it was decided before the concept of loss causation was fully articulated by the Supreme Court in *Dura*, 544 U.S. at 342," and as such, predates the relevant Eleventh Circuit authority on loss causation.

Finally, Defendants point to the fact that the stock went up in March 2022, after the actual restatement was issued (along with other news unrelated to the restatement), as somehow supportive of a lack of loss causation. Def. Br. at 27-28. But this does nothing of the sort. It only demonstrates that the market had already learned of the fraud and digested it into the stock price upon its disclosure on February 28, 2022. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-11 (9th Cir. 2016) (loss causation pled where stock price dropped after announcement of SEC investigation, and subsequent disclosure confirmed the falsity of defendants' statements, even though no price reaction accompanied second disclosure).

## V.    THE AC ALLEGES A STRONG INFERENCE OF SCIENTER

To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Scienter encompasses recklessness, and in this Circuit, scienter is sufficiently alleged by facts demonstrating "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *FindWhat*, 658 F.3d at 1300. An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing inference." *Tellabs*, 551 U.S. at 324, 328 (emphasis in original); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008) ("the question before us boils down to whether a reasonable person *would* infer that there was at least a fifty-fifty chance

13

that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount") (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. When competing inferences are shown, the tie goes to the plaintiff. *Id.*

The relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 310, 322 (emphasis in original); *see also 100079 Canada, Inc. v. Stiefel Labs., Inc.*, 2011 WL 13116079, at *12 (S.D. Fla. 2011). The inference of scienter does not need to be irrefutable, nor even the most plausible of competing inferences — it simply needs to be as compelling as competing inferences. *Id.* In evaluating inferences of scienter, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Stiefel Labs.*, 2011 WL 13116079, at *13 (quoting *Tellabs*, 551 U.S. at 326); *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1372 n.30 (S.D. Fla. 2001) ("It is important to observe that the PSLRA, although mandating more particular pleading, in no way altered the standard of review applicable to the well pleaded allegations of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure (i.e., the allegations are viewed in the light most favorable to the plaintiff)"). Here, Plaintiff sufficiently alleges Defendants' scienter.

## A. Defendants Violate *Tellabs*' Mandate That Scienter Must Be Analyzed Holistically

Despite acknowledging the holistic balancing test required by *Tellabs* (*see e.g*., Def. Br. at 14), Defendants then violate its requirements by isolating and addressing each of the facts supporting scienter separately. Defendants admit that they are doing this. For example, one of

14

their headings literally states that "GAAP Violations **Alone** Are Insufficient to Plead a Strong Inference of Scienter." Def. Br. at 17. Likewise, Defendants address allegations regarding the core operations doctrine, motive, the size and nature of the restatement and the simplicity of accounting issues at issue in isolation. This is entirely improper. *Tellabs*, 551 U.S. at 309-10 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions. The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard").

### B.     The Individual Defendants Were Severely Reckless

Defendants try to downplay the seriousness of their misstatements and the restatement itself by claiming that their accounting issues just relate to timing, not accuracy. *See, e.g.*, Def. Br. at 11 n.4 ("Cano Health's disclosures make clear it was an issue of *timing*, not accuracy") (emphasis in original).[6] But the generally accepted accounting guidelines at issue, which the Company claimed to be applying, specifically dealt with recognizing revenue. *See* Sections II.C-E, *supra*. Revenue is recorded for a particular period; if it is not correct to report some amount of the capitation payment in a given period, that means it was inaccurate revenue recognition. In sum, timing is part and parcel to revenue recognition, which Defendants admit since their restatement was an admission that their financial statements were materially misleading. As such, Defendants' repeated attempts at minimizing the seriousness of their accounting violations does not survive

---

[6] Defendants cite to the February 28, 2022 Credit Suisse analyst report in support of this point, stating that "Cano Health informed Credit Suisse that it had been able to estimate revenue with 99% accuracy." Def. Br. at 11 n. 5. Ignoring that using an analyst report quoting yourself is not actually valid evidence, Defendants' critique of Plaintiff's use of this same report rings hollow. *See* Def. Br. at 20 n.11. In fact, Defendants even explicitly state that Court may consider the analyst report. Def. Br. at 6 n.1.

scrutiny, and this cavalier attitude towards the importance of accounting guidelines tracks the Company's recklessness during the Class Period.  This has only continued to be shown in the recently filed lawsuit against Defendant Hernandez and the remaining Cano directors sued by Sternlicht and other former directors.  *See* Section II.F, *supra*.

Defendants similarly argue that the application of ASC 606 was extremely complicated and that there were "many factors impacting revenue recognition."  Def. Br. at 20.  Not so.  The issue was the application of which of the **two methodologies** Cano should have used.  *See* ¶ 37.  Though they acknowledged that such revenue was considered variable consideration (due to the adjustments by CMS), the Company claimed that such adjustment was presented within accounts receivable.  ¶ 41.  However, because the adjustments by CMS would not be issued until a year after the initial diagnosis, Cano could not estimate revenue for the new patients until the audit was completed.  ¶ 43.  Due to this timing difference, Cano's peers booked revenue when they collected cash, *i.e.* one year after the documentation, not in the manner than Cano did.  ¶ 43.  In sum, whether Cano should have waited until after the audit was conducted to recognize revenue was not particularly complicated (as Defendants now claim).

Defendants' decision to recognize revenue before the audit was completed in violation of GAAP was reckless, particularly in light of the fact that the Company's peer groups were not engaging in the same conduct and were waiting for the audit to be completed before recognizing revenue.  As such, this conduct serves as additional support of scienter.  Violations of GAAP may be sufficient to establish scienter when combined with other red flags. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1268 (11th Cir. 2006); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all,

16

books do not cook themselves."); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (E.D. Pa. 2002) (specific facts explaining how defendants violated GAAP support an inference of scienter). Here, there are many red flags that combined with Defendants' admitted GAAP violation make the inference of scienter overwhelming.

First, that the accounting guidelines at issue involve the premature recognition of revenue further supports Defendants' scienter.  *See, e.g.*, *In re The Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) ("[V]iolations involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter."); *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("if the GAAP rules and . . . accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard"); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1186 (S.D. Cal. 2009) (finding defendants acted with scienter, in part, because of "the simplicity of the accounting principles violated"). [7]

Second, the nature and magnitude of the overstatement further supports Defendants' scienter.  "When a company is forced to restate its previously issued financial statements," as is the case here, "the mere fact that the company had to make a large correction is some evidence of scienter." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) ("alleged

---

[7] In contrast, *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, was not an accounting case.  It involved a scheme to conceal lagging demand.  2013 WL 3295951, at *2 (S.D. Fla. Apr. 19, 2013). It did not involve a restatement, which constitutes an admission that its prior financial statements were materially false and misleading, or an admission that the Company had violated GAAP.  *Id.* at *17.

17

GAAP violations combined with a profound overstatement of financial results of a company may establish severe recklessness.... Where the number, size, timing, nature, frequency, and context of the ... restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."). In fact, courts have held that "significant overstatements of revenue tend to support the conclusion that defendants acted with scienter." *Chalverus v. Pegasystems, Inc*., 59 F. Supp. 2d 226, 234 (D. Mass. 1999).  Put differently, "[w]hile alleging a misapplication of Generally Accepted Accounting Principles standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter .... [and] the totality and magnitude of the ... accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." *Carley Cap. Grp. v. Deloitte & Touche*, 27 F. Supp. 2d 1324, 1339-40 (N.D. Ga. 1998).

Here, the restatement conceded that the Company's revenue was overstated by $122 million in 2021 and that for the fiscal quarters at issue previously reported capitated revenue was overstated by $5.69 million for the period ended March 31, 2021, $49.73 million for the period ended June 30, 2021, and $28.02 million for the period ended September 30, 2021.  ¶¶ 48-49. Courts view overstated revenue, specifically, as probative of scienter.[8] *In re AthroCare Corp. Sec. Litig*., 726 F. Supp. 2d 696, 721-22 (W.D. Tex. 2010) ("Many courts have held significant overstatements of revenue or income tend to support the conclusion that defendants acted with

---

[8] Defendants cannot credibly argue that $122 million in a single year is not massive amount for a new company.  Defendants attempt to focus on these figures as percentages (2%, 14.43%, and 5.58% for the respective periods), implying that it is unsubstantial, while ignoring the violations involved revenue, the primary focus of investors.  *See* Def. Br. at 18 n.9. As such, Defendants citation *In re Sportsline.com Sec. Litig.* is inapposite since that case did not involve revenue. 366 F. Supp. 2d 1159, 1170 (S.D. Fla. 2004) ("Plaintiffs do not allege that Defendants greatly overstated their revenue").  Instead, it involved changes in net income related to the  "[a]ccounting for an employee stock option plan, not part of SportsLine's core business activity." *Id.*  As such, it does not provide the support that Defendants' claim it does.

scienter.") (collecting cases).  This is particularly the case where revenue was overstated by such a massive amount in the Company's first year as a public entity.  *In re Eagle Bldg. Techs., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1326-28 (S.D. Fla. 2004) ("the more serious the error, the less believable are defendants' protests that they knew nothing"); *Pub. Emp. Ret. Sys. Of Mississippi v. Mohawk Indus., Inc*., 564 F. Supp. 3d 1272, 1304 (N.D. Ga. 2021) ("The type and amount of fraud alleged here would not be hidden from the CEO ... of the company").

Third, the core operations doctrine further supports an inference of scienter.[9]  More than 80% of the Company's revenue is derived from Medicare contracts in the form of capitated payments.  ¶ 3.  As Defendant Hernandez admitted Cano "focus[es] on the Medicare Advantage population" because it is "arguably the fastest growing market in healthcare with an estimated 10,000 seniors aging in every day."  ¶ 31.  It is illogical that corporate defendants, including the CFO's of the Company, would not be aware of the accounting treatment used and its impact on financial results that accounted for more than 70% of the Company's revenue.  Accordingly, this supports an inference that Defendants knew, or were reckless in not knowing, about the Company's improper accounting practices.  *See, e.g.*, *Atlas Air*, 324 F. Supp. 2d at 491 (finding strong inference of scienter with respect to company's failure to timely recognize impairment of value of its planes, as required by GAAP, because "acquiring and hiring cargo planes" were "activities that constitute[d] the core operations of [the company]"); *Dorsey v. Portfolio Equities*,

---

[9] Defendants again discuss this additional scienter factor in isolation, ignoring that the core operations doctrine can be part of the holistic analysis of scienter. *Compare* Def. Br. at 21-23, *with Flowers Foods*, 2018 WL 1558558, at *14 ("Although Defendants argue that the core operations doctrine has not been adopted by the Eleventh Circuit and runs counter to the PSLRA, Defendants have not argued, and the Court is not aware of any cases stating, that courts in this circuit cannot consider whether the alleged fraudulent activity was a core operation. The Court agrees that Plaintiff must allege specific facts establishing scienter as to each Defendant, and consistent with that, where the alleged fraudulent activity is the basis of 84% of the defendants' business, such a fact is relevant for the issue of scienter.").

*Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (finding allegations to be probative of scienter where the alleged misrepresented information was sufficiently important to the health of the company).

Fourth, the Company and its executives were motivated to consummate the Business Combination, and the incorrect accounting method enabled them to report increased revenue in the short-term to make PCIH appear as a more appealing acquisition target.  ¶ 86; *Lemen v. Redwire Corp.*, 2023 WL 2598402, at \*4 (M.D. Fla. Mar. 22, 2023) (motive to complete de-SPAC transaction by concealing internal control deficiencies supports scienter).  Defendants incorrectly subvert the holistic analysis proscribed by *Tellabs* (Def. Br. at 23), but as their own authority shows, "allegations of motive and opportunity may be relevant to a showing of severe recklessness."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir. 1999); *see also In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263-64 (M.D. Fla. 2009) (crediting fraud "designed to artificially inflate the stock value so that [certain officers] could cash out").  Here, the motive to effectuate the Business Combination and the stock awards received in connection therewith are not the general financial incentives cited by Defendants.[10]  *See Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 718 (11th Cir. 2014) (officer seeking to stem his own financial losses insufficient); *Druskin*, 299 F. Supp. 2d at 1337-38 (insider trading and maintain value of officers' stock options insufficient); *Edward J. Goodman Life Incom Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009) ("standard incentive-based bonus" insufficient).

Finally, Defendants repeatedly seek refuge in their Class Period statements describing the revenue recognition methods, but these statements did not lay bare the inaccuracy of the reported financials or their non-compliance with GAAP.  While Defendants dispute the probative value of

---

[10] Plaintiff concedes that the claims against Defendants Dowling and Racich are significantly weaker than those against the other defendants.  As such, Plaintiff does not oppose Defendants' request that Defendants Dowling and Racich should be dismissed at this time.

the Credit Suisse report (Def. Br. at 24 n.13), the report shows what investors understood from the public statements during the Class Period and confirms that Cano's disclosures did not put them on notice of the GAAP violations. Instead, investors themselves believed that the Defendants had sought to overstate its financials in connection with the Business Combination as there was no change in facts or circumstances to warrant the sudden change in accounting treatment except for the consummation of the Business Combination. *See* ¶ 88.[11]

\*　　　\*　　　\*

In sum, a holistic analysis shows that, even if not "overwhelming," the "inference of scienter is equal to the inference of non-fraudulent intent." *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1291 (M.D. Fla. 2008) (scienter supported by "1) the sheer magnitude of the restatement and the admitted GAAP violations; 2) the push for massive growth by acquisitions; 3) the Company's false rationalization for the Restatement; combined with . . . bonuses tied to the inflated earnings, and [the Individual Defendants'] background and positions of control of the Company."). In *Paincare*, the court considered Defendants' argument that the financial statements had been "certified by an independent auditor, [and] the accounting methodology was disclosed at all times," but still concluded that the fraudulent inference was equally plausible because the restatement "covered virtually [the company's] entire public life." *Id.* at 1293.

---

[11] While trying to minimize the statements in the Credit Suisse from investors by claiming they are "hearsay" (Def. Br. at 24 n.24), Defendants simultaneous also claim that Plaintiff should have included more of the report because those parts that were arguable more beneficial to Defendants' argument. *See* Def. Br. at 16. What Defendants fail to explain however is that the section they believe should have been included, which purportedly "notes that Cano Health's prior outside auditor approved its revenue recognition policy (*see* Def. Br. at 15)," is simply a summary of Cano's self-serving statement to the analyst and is thus hearsay itself. Again, this is simply another example of Defendants trying to have its cake and eat it too.

**C.**     **That Defendants Committed Fraud Is The Only Compelling Narrative**

As the Complaint explains, "there were no new facts or circumstances to change the accounting treatment of these contracts—no new accounting rule, no new process by CMS, and no new auditor for Cano—between the issuance of the Proxy soliciting approval of the Business Combination and the announcement of the restatement."   ¶ 88.  Defendants argue that their auditor simply changed its mind; after previously signing off on the immediate recognizing of revenue, the auditor spontaneously decided that they not only had to change revenue recognition going forward but also that they had to restate their historical financial statements because they had been violating GAAP the entire time.  Def. Br. 20-21.  And that Defendants "promptly disclosed the discovery [that the Company had been violating GAAP] within a week."  *See, e.g.*, Def. Br. at 14.[12]  This story makes no sense as auditors do not just completely change their tune for no reason.

Since the filing of the Complaint and the Motion, former directors of the Company that represent more than one-third of the voting power of the Company have shed new light on the Company's business practices and its forthrightness with Cano's auditors.  *See* Section, II.F, *supra*; *see also* Sadler Decl., Ex. A.  As the derivative complaint explains:

- An independent investigation has found that Defendant "Hernandez's borrowing and pledging activities to be 'egregious violations of the Company's code of conduct,'" and that his activities required remediation."

- While the independent investigation was ongoing, "the Board called a special meeting for March 17, 2023, in which Defendants formed a sham Special Committee comprised of all directors other than Plaintiffs, with Dr. Hernandez permitted to be an 'observer' on the Special Committee. The purported Special Committee was granted an enormously wide scope of authority, which had the effect of unlawfully precluding Plaintiffs from fulfilling their fiduciary duties as directors and creating a 'shadow board.'"

---

[12] Again, this argument completely undermines Defendants' position that the February disclosure was not a loss causation event.

- The independent investigation further found that "troubling evidence that Dr. Hernandez's father, Jose Hernandez, through a number of companies, had likely been directly or indirectly paid by Cano without proper vetting of conflicts of interest or making related-party disclosures."

- Disclosed that Mr. Trujillo—who served as Lead Independent Director of the Company and was required to have "no material relationships with the Company"— was compromised by the fact that Cano, a company in dire financial shape, recently spent hundreds of thousands of dollars sponsoring a 2022 conference put on by Mr. Trujillo's company, L'Attitude, LLC without disclosing it.

Sadler Decl., Ex. A at ¶¶ 3, 4, 10, 59.

Even more egregiously, the derivative complaint explains at the time it claims it was instituting a regime of accurate disclosure (February 2022), Defendant Hernandez and other Company officers had pledged their personal assets which included millions of shares to Mr. Camerlinck for a loan of $30 million dollars. *Id.* at ¶ 54. At the time of the loan, Mr. Camerlinck was president of a portfolio company Cano had purchased. *Id.* Moreover, he was affiliated with a company critical to Cano's business operation" and thus was in a position to "exert leverage over the Company, should he choose to do so." *Id.* at ¶ 56. As the derivative complaint explains :

> Mr. Camerlinck has had extensive business dealings with the Company and is affiliated with a company critical to Cano's business operations. Mr. Camerlinck owns 20% of MedCloud Depot, LLC ("MedCloud"), a Florida-based software development firm that specializes in health information technology and data warehousing. Cano has a non-exclusive licensing agreement with MedCloud, whose technology is mission critical to the Company's conduct of its business. Because MedCloud is critical to Cano's business operations, Mr. Camerlinck's ownership interest in MedCloud positions him to be able to exert leverage over the Company, should he choose to do so.

*Id.* After the loan, Mr. Camerlinck was promoted to Chief Operating Officer of Cano in which Camerlinck reports directly to Dr. Hernandez. *Id.* Yet, when his promotion was announced there was no disclosure of the $30 million loan. *Id.* at ¶ 54.

23

Additionally, the derivative complaint explains that Defendant Hernandez's loan "violated the Company's policies and code of conduct, and it was neither disclosed to nor approved by Plaintiffs, including Dr. Lewis Gold, a former member of Cano's Audit Committee. Dr. Hernandez also likely violated federal securities laws by failing to promptly disclose the Promissory Note in February 2022, and filing a misleading 13D/A in December 2022 implying that he had paid off his debt." *Id.* at ¶ 57. In sum, former directors of Cano allege that Defendant Hernandez failed to disclose material facts relevant to its securities filings to the board of directors and its audit committee, and likely violated the securities laws.

In light of Cano's executives' egregious failure to disclose a slew of related party transactions, including an $30 million dollar loan the very same day (February 28, 2022) that they announced that they it had identified certain errors in revenue recognition, Defendants' claim of negligent error does not outweigh an inference of fraud. If the Company was not disclosing its related party transactions to its auditor who was providing it with clean audit opinions anyway, no value should be given to these clean audit opinions that purportedly blessed Cano's claim that their chosen accounting method complied with GAAP.

The fact that the Company was in a dire financial shape yet was spending hundreds of thousands of dollars sponsoring a conference for the benefit of its "lead independent director" demonstrates that Defendant Hernandez was more interested in enriching its colleagues than doing what was in the best interest of the Company. This supports Plaintiff's allegations that Defendants were making the near term financial results look better. While Defendants claim that this does not make sense, it certainly does if the Company's executives were out in the market desperately trying to raise funds for themselves as the Company was doing poorly. *See In re Miller Indus., Inc. Sec. Litig.*, 12 F. Supp. 2d 1323, 1332 (N.D. Ga. 1998) ("numerous accounting practices [that]

24

artificially inflate[d] and support [the Company's] stock price . . . including GAAP violations [that] resulted in a dramatic overstatement of revenues").

These new facts only bolster the compelling case of scienter against Defendants Hernandez and Koppy.  Courts routinely hold that weak internal controls will support an inference of scienter. *See, e.g.*, *In re Hamilton Bankcorp., Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1357-58 (S.D. Fla. 2002) (company's failure to maintain adequate internal controls, combined with facts, supports a strong inference of scienter); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) ("A lack of adequate internal controls may support the inference of scienter."); *accord Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006).

In sum, that these defendants intended to, or at a minimum were severely reckless, in violating GAAP is the only compelling inference where the accounting at issue was basic, involved revenue related to the Company's core business, Cano's accounting treatment was different than its peers and its own investors believed "the company was intentionally trying to overstate its financials for the first few quarters post its" Business Combination.  ¶ 88.

### D.      The Complaint Adequately Alleges Corporate Scienter

The Eleventh Circuit has held that "even if the amended complaint fails to raise a strong inference of scienter as to any of the individually named defendants, it does raise a strong inference that *somebody* responsible for the allegedly misleading statements must have known about the fraud." *Mizzaro*, 544 F.3d at 1254.  "[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to that statement at issue."  *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1019 n.10 (11th Cir. 2004).  The

25

knowledge of high-level employees such as the CEO or Board of Directors is sufficient to plead corporate scienter. *Faro*, 534 F. Supp. 2d at 1262-63 (M.D. Fla. 2007).

Here, *at minimum*, the Complaint alleges that CEO Hernandez and CFO Koppy were all aware, or were severely reckless in not knowing, that their revenue recognition practices were in violation of GAAP both before and during the Class Period. As such, their scienter can be imputed to Cano. *Mizzaro*, 544 F.3d at 1254 (scienter of corporate official in some way responsible for misleading statement is sufficient to impute knowledge to corporation); *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010) (scienter of any person who serves as a corporate director or officer can be imputed to the company).

## VI.    PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Defendants' sole argument against control person liability is that Plaintiff purportedly has not pled a primary violation of §10(b). Def. Br. at 5, 14 n.7. As Plaintiff adequately pleads a primary violation, he states a §20(a) claim against the Individual Defendants.

## VII.   CONCLUSION

The Motion should be denied in its entirety. If the Court grants any part of the Motion, Plaintiff requests leave to replead. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("Generally, [w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice."). This is particularly the case here where Plaintiff has not been given the chance to draft a new complaint the includes the newly filed derivative complaint.

Dated: May 24, 2023

DESMOND LAW FIRM, P.C.

By: *s/ Leo W. Desmond*
Leo W. Desmond, Esquire
Florida Bar Number 0041920
601 21st Street, Suite 300
Vero Beach, Florida 32960
Telephone: (772) 231-9600
Email: lwd@desmondlawfirm.com

*Liaison Counsel for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
        csadler@glancylaw.com

*Attorneys for Plaintiff and Lead*
*Counsel for the Class*

## <u>PROOF OF SERVICE</u>

I hereby certify that on this 24th day of May, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>*s/ Leo W. Desmond*</u>
Leo W. Desmond