# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-20827-CIV-WILLIAMS/SANCHEZ**

ALBERTO GONZALEZ, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

        v.

CANO HEALTH, INC. f/k/a JAWS
ACQUISITION CORP., MARLOW
HERNANDEZ, and BRIAN D. KOPPY,

        Defendants,

**<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND OVERVIEW ............................................................. 1

II.     JURISDICTION AND VENUE ................................................................................. 5

III.    PARTIES ............................................................................................................ 5

        A.      Lead Plaintiff ........................................................................................... 5

        B.      Defendants ............................................................................................... 6

IV.     SUBSTANTIVE ALLEGATIONS ............................................................................ 7

        A.      Background .............................................................................................. 7

                1.      SPACs Like Jaws Are Incentivized To Complete Any Business
                        Combination............................................................................... 7

                2.      In June 2021, Jaws Completes A Business Combination, And Cano
                        Becomes A Public Company ........................................................ 8

                3.      Most of Cano's Revenue Is From Medicare Contracts........................... 10

        B.      There Is A One Year Lag Between Diagnosis And Capitated Payments From
                Medicare Advantage Contracts............................................................... 10

        C.      Generally Accepted Accounting Principles Limit Recognition Of Variable
                Consideration Like Capitated Payments................................................... 11

        D.      The Company Admits It Used The Incorrect Accounting Methodology To
                Recognize Revenue From Medicare Advantage Contracts For The Quarterly
                Periods Of Fiscal 2021 ............................................................................ 13

        E.      Following The Exposure Of Rampant Undisclosed Related Party Transactions And
                Other Improprieties By Certain Executives And Board Members, The Company
                Removes The CEO And Commits To "Adding New Independent Directors With
                Appropriate Experience And Backgrounds" ............................................ 18

        F.      Only Following The Removal Of The Company's CEO Does The Company Finally
                Admit That, At All Times During The Class Period, Its Processes For Estimating
                MRA Revenue Were "Overly Manual" And Thus Provided "Limited Predictive
                Power"..................................................................................................... 19

        G.      Former Employees Confirm That During The Class Period The Company's MRA
                Calculation Process Was Overly Manual and Fraught With Errors, Making It Have
                Limited Predictive Power ........................................................................ 24

i

           1.      Former Employees Confirm That The MRA Process Was Overly Manual And Lacked Policies And Procedures ........................................................ 24

           2.      The Company Attempted To Maximize Revenue By Manipulating The Billing Codes ...................................................................................... 26

V.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ...................................................................................................... 28

     A.     The Company's Financial Statements For Each Quarterly Period Of Fiscal 2021 Were Materially Misleading ................................................................ 28

           1.      Statements Reporting Revenue And Financial Statements ...................... 29

           2.      Statements About Compliance With GAAP And Risks With Estimating Capitated Revenue ................................................................................ 34

     B.     The Company's Financial Statements For Fiscal 2022 And The Fiscal First Quarter Of 2023 Were False And Misleading ................................................. 44

     C.     Risk Warnings In The Company's Class Period Annual Reports Were False And Misleading ........................................................................................... 50

     D.     The Company's Internal Control Statements Were Materially False And Misleading ................................................................................................. 53

VI.    LOSS CAUSATION ....................................................................................................... 55

VII.   ADDITIONAL SCIENTER ALLEGATIONS .............................................................. 56

VIII.  CORPORATE SCIENTER ALLEGATIONS ............................................................... 58

IX.    CLASS ACTION ALLEGATIONS ............................................................................... 58

X.     UNDISCLOSED ADVERSE FACTS ........................................................................... 60

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ................................................................................................................ 61

XII.   NO SAFE HARBOR ..................................................................................................... 63

XIII.  CLAIMS ....................................................................................................................... 64

XIV.  PRAYER FOR RELIEF ................................................................................................ 68

XV.   JURY TRIAL DEMANDED ......................................................................................... 68

Lead Plaintiff Gudelio Fundora ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Cano Health, Inc. ("Cano" or the "Company") f/k/a Jaws Acquisition Corp. ("Jaws") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Cano; and (c) review of other publicly available information concerning Cano.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    Plaintiff brings this federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired the publicly traded securities of Cano between May 7, 2021 and August 10, 2023, inclusive (the "Class Period"), and were damaged thereby.

2.    Cano is a primary care physician group that uses a technology-powered, value based care platform to serve more than 100,000 members.  On June 3, 2021, Jaws consummated a business combination with Primary Care (ITC) Intermediate Holdings, LLC and Primary Care (ITC) Holdings, LLC after which the combined entity was renamed Cano (the "Business Combination").

3.    More than 80% of the Company's revenue is derived from Medicare contracts in the form of capitated payments. These payments are administered through the Centers for Medicare and Medicaid Services ("CMS") using a risk adjustment process that accounts for patients' health status and demographics to spread health costs among providers. This process is prospective, meaning that there is a one-year lag between the diagnosis and the capitated payment.

1

4.      Under generally accepted accounting principles ("GAAP"), these capitated payments are considered variable consideration, and the Company must recognize revenue only to the extent it is not likely to be significantly reversed. One of the factors that increases the likelihood of reversal is that the amount of consideration is highly susceptible to factors outside Cano's influence (*i.e.*, CMS). As a result, Cano's peers booked Medicare related revenue one year after the documentation when revenue was not significantly likely to be reversed by CMS.

5.      Though Cano reported predicted revenue at the time of documentation unlike its peers, the Company claimed to comply with GAAP and reported strong revenue growth after the Business Combination.  These statements were materially misleading because, in truth, Cano misapplied GAAP and recognized revenue from Medicare Advantage contracts before the amounts could be estimated accurately.  More fundamentally, the Company's revenue recognition processes had limited predictive power because they were overly manual, fraught with errors, and suffered from data variability and gaps in real-time data reporting.

6.      The truth partially emerged on February 28, 2022, when Cano announced that it identified certain errors in revenue recognition that would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]" On this news, the Company's stock price fell $0.32, or 6%, to close at $4.87 per share on February 28, 2022, on unusually heavy trading volume.

7.      On March 14, 2022, the Company revealed the impact of the restatement. Specifically, Cano revealed that "[a]s a result of the restatement, approximately $122 million of MRA [Medicare Risk Adjustment] revenue related to care provided in 2021 that would have previously been recognized in 2021 is expected to be recognized in 2022." This was "partially

offset by $10 million in MRA revenue that was previously recognized in 2020 under the prior accounting methodology, for a negative impact to 2021 revenue of approximately $112 million."

8. However, these statements on February 28 and March 14, 2022 were still materially misleading because they attributed the restatement to a change in accounting methodology and omitted to disclose that Cano lacked effective processes to reliably predict revenue.

9. Thereafter, an internal struggle occurred at Cano with some of its largest shareholders and former Board members suing the Company and certain of its executives in Delaware Chancery Court.  From this lawsuit, it was revealed that certain corporate executives had engaged in massive undisclosed related party transactions that benefited themselves and their families.  Just days after Vice Chancellor Paul Fioravanti, Jr. issued his factual findings confirming the accuracy of these allegations, the Company announced that Defendant Marlow Hernandez ("Hernandez"), the Company's founder, had agreed with the Board of Directors to "resign immediately as CEO."

10. On August 10, 2023, in the first financial report after the removal of Defendant Hernandez, the Company disclosed a $44 million charge against its fiscal 2022 revenue.[1]  As the Company explained:[2]

> ***During the second quarter of 2023, the MRA revenue was approximately $58 million lower than previously estimated in the Company's guidance, driven by lower MRA payments received and expected to be received in 2023. Approximately $44 million of lower-than-expected MRA revenue was related to out-of-period items, which are not expected to reoccur.*** In addition, during the quarter third-party medical costs included approximately $44 million of unfavorable prior period development, primarily driven by higher medical utilization and health plans' supplemental benefits.

---

[1] Analysts surmised that this charge is another restatement of the Company's financial results.

[2] All emphasis is added unless otherwise stated.

11. That the newly appointed Interim CEO, deMarquette Kent ("Kent"), was able to quickly determine why the Company's revenue had been overstated for the second time since the Company went public is an indication of the egregiousness of the lack of controls. Kent explained that the Company suffered from "process issues that have affected our ability to project our performance." Specifically, Kent admitted that there were significant issues "attributable to back-end processes and the ways that data from those processes inform our MRA estimates" because "[t]he prior processes were overly manual, and our back testing analysis demonstrated that they provided limited predictive power." As Kent succinctly explained the flaws in the process before he was appointed as CEO:

> ***So historically, I'll put it this way, it was a very tedious and manual process. And as you can imagine, that process can be fraught with all kinds of errors.*** The new process is one based upon where we are predicting based upon the data submissions. We are correlating and corroborating that information with respect to what is received by the health plan and what is received by CMS. And then we are then assigning an overall score to that with a probability predictive analysis to it. ***So this is what is now in place is a very automated process where prior to, it was extremely manual. And so as you just alluded to in prior periods and in prior years, that's what causes the miss.***

12. Following these disclosures, the Company's stock price fell $1.11, or 73%, to close at $0.41 per share on August 11, 2023, on unusually heavy trading volume.

13. Soon after this disclosure of clearly flawed processes that were promptly uncovered by the new Interim CEO, the Company's Chief Financial Officer ("CFO") Defendant Brian D. Koppy ("Koppy"), who had been CFO throughout Cano's public existence and the Class Period, "stepped down" from his position and was replaced by a Cano employee with a long relationship with Kent.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

4

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.     Lead Plaintiff

19.     Lead Plaintiff Gudelio Fundora, as set forth in the attached certification (Exhibit A hereto), purchased Cano securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.      Defendants**

20.      Defendant Cano is incorporated under the laws of Delaware with its principal executive offices located in Miami, Florida. Cano's Class A common stock and warrants trade on the New York Stock Exchange ("NYSE") under the symbols "CANO" and "CANO/WS," respectively. Prior to the Business Combination, Jaws was incorporated under the laws of the Cayman Islands with its principal executive offices located in Miami, Florida, and its units, Class A ordinary shares, and warrants traded on the NYSE under the symbols "JWS.U," "JWS," and "JWS WS," respectively.

21.      Defendant Marlow Hernandez ("Hernandez") has been the Company's Chief Executive Officer ("CEO") of Cano since 2009. He founded the Company.

22.      Defendant Brian D. Koppy ("Koppy") has been the Company's Chief Financial Officer ("CFO") since April 2021.

23.      Defendants Hernandez and Koppy, (collectively, the "Individual Defendants") because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

**IV.     SUBSTANTIVE ALLEGATIONS**

   **A.     Background**

   **1.     SPACs Like Jaws Are Incentivized To Complete Any Business Combination**

24.     Special purpose acquisition companies ("SPACs") are publicly traded companies with no business activities that are formed specifically to acquire an existing operating company. The capital from the SPAC's initial public offering ("IPO") is held in trust for a specific period of time to fund the acquisition.

25.     If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

26.     The business combination effectuated by the SPAC is in many respects similar to a traditional IPO, in that a previously private company becomes publicly traded. However, SPAC transactions and IPOs have certain key differences. In a traditional IPO, banks underwrite the offering and perform substantial due diligence in order to evaluate the company going public, to formulate appropriate disclosures to prospective investors, and to accurately price its securities. However, in a SPAC transaction, there are no underwriters; the due diligence and the disclosures supporting the business combination are solely determined by the SPAC and its controlling

persons, who have strong incentives to agree to, and obtain shareholder approval for, an acquisition regardless of its true merits.

27.     Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

### 2.     In June 2021, Jaws Completes A Business Combination, And Cano Becomes A Public Company

28.     Jaws Acquisition Corp. was a SPAC incorporated as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination.

29.     On May 18, 2020, Jaws consummated its IPO of 69 million units (where each unit consists of one Class A ordinary share and one-third of one redeemable warrant entitling its holder to purchase one share of Class A ordinary shares at $11.50 per share). As of June 30, 2020, a total of $690,054,727 was held in a trust account established for the benefit of the public shareholders (i.e., to fund a business combination).

30.     According to the prospectus issued in connection with the IPO, Jaws "intends to focus on leading, growth-oriented companies across a variety of industries," but does "not intend to target industries that are competitive with Starwood Capital Group Holdings, L.P., or Starwood Capital, which includes real estate, lodging, oil and gas and energy infrastructure." Barry Sternlicht, the Chairman of Jaws, is also Chairman and CEO of Starwood Capital.

31. On November 11, 2020, Jaws announced that it had entered into an agreement to consummate a business combination with Primary Care (ITC) Holdings, LLC ("Seller") and Primary Care (ITC) Intermediate Holdings, LLC ("PCIH"). Pursuant to the agreement, Jaws would become domesticated as a Delaware corporation and be renamed Cano Health.

32. On June 3, 2021, Jaws completed the previously announced Business Combination with the Seller and PCIH.

33. Following the Business Combination, the Company became part of an umbrella partnership-C corporation structure allowing the Seller to retain its equity ownership in PCIH. Specifically, Cano held 35.1% of the economic interest and 100% of the voting interest in PCIH, and the Seller held 64.9% of the economic interest and 0% of the voting interest in PCIH:



### 3. Most of Cano's Revenue Is From Medicare Contracts

34. Cano is a primary care physician group that uses a technology-powered, value-based care platform to serve more than 100,000 members. CanoPanorama, the Company's proprietary platform, provides analytics, reports, and protocols to inform key care management decisions by physicians.

35. Substantially all of the Company's revenue (approximately 95%) is derived from recurring per member per month capitated revenue. Specifically, Medicare accounts for more than 80% of its revenue. During the November 11, 2020 conference call announcing the Business Combination, Defendant Hernandez stated that Cano "focus[es] on the Medicare Advantage population" because it is "arguably the fastest growing market in healthcare with an estimated 10,000 seniors aging in everyday."

### B. There Is A One Year Lag Between Diagnosis And Capitated Payments From Medicare Advantage Contracts

36. Medicare Advantage allows Medicare-eligible seniors and beneficiaries with disabilities to obtain care through private plans rather than traditional fee-for-service Medicare. The CMS pays a fixed (or capitated) monthly amount per enrolled beneficiary to provide Medicare benefits.

37. These capitated payments are calculated using a risk adjustment process to spread healthcare costs such that plans with healthier populations compensate plans with more costly enrollees (*i.e.*, plans with low actuarial risk compensate those with high actuarial risk). Spreading healthcare costs encourages plans to compete for beneficiaries based on price and quality rather than health status.

38.     The risk adjustment process calculates capitated payments to cover "members' predicted health costs based on demographics (age and gender) and health status (claims data)."[3] CMS reduces the payment by 5.91% to account for the fact that some plans risk-code too intensely.[4]

39.     There is a one-year lag between the diagnosis and the capitated payment: "The system is prospective, which means it uses beneficiary diagnoses from one year to calculate a risk adjustment factor used to establish a payment for the following year."[5]

**C.     Generally Accepted Accounting Principles Limit Recognition Of Variable Consideration Like Capitated Payments**

40.     Public companies must adhere to GAAP. ASC 606 is an accounting standard that governs the recognition of revenue from contracts with customers. It was promulgated by the Financial Accounting Standards Board ("FASB") in 2014 to improve the financial reporting of revenue and to allow top line financial statements to be compared, and it generally states that revenue is recognized when (or as) an entity fulfills its performance obligations for each contract.

41.     The consideration allocated to these performance obligations can vary "if an entity's entitlement to the consideration is contingent on the occurrence or nonoccurrence of a future event." ASC 606-10-32-6. Variable consideration is estimated using one of two methods, "depending on which method the entity expects to better predict the amount of consideration to which it will be entitled:"

> a.     The expected value—The expected value is the sum of probability-weighted amounts in a range of possible consideration amounts. An expected value

---

[3] https://prc.hmsa.com/s/article/Medicare-Risk-Adjustment

[4] https://www.commonwealthfund.org/blog/2022/taking-stock-medicare-advantage-risk-adjustment

[5] https://www.bettermedicarealliance.org/wp-content/uploads/2020/03/Understanding-Risk-Adjustment_WhitePaper_June2017.pdf

11

may be an appropriate estimate of the amount of variable consideration if an entity has a large number of contracts with similar characteristics.

b.    The most likely amount—The most likely amount is the single most likely amount in a range of possible consideration amounts (that is, the single most likely outcome of the contract). The most likely amount may be an appropriate estimate of the amount of variable consideration if the contract has only two possible outcomes (for example, an entity either achieves a performance bonus or does not).

ASC 606-10-32-8. To estimate the range of possible consideration amounts, "an entity shall consider all the information (historical, current, and forecast) that is reasonably available to the entity." ASC 606-10-32-9.

42.    Moreover, an entity "shall include in the transaction price" the variable consideration "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." ASC 606-10-32-11. To assess this probability, "an entity shall consider both the likelihood and the magnitude of the revenue reversal." ASC 606-10-32-12. "Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:

a.    The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.

b.    The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.

c.    The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value.

d.    The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.

e.    The contract has a large number and broad range of possible consideration amounts.

12

43. This variable consideration must be reassessed at the end of each reported period "to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reporting period." ASC 606-10-32-14.

44. According to the correspondence filed with the SEC on March 15, 2021, Cano historically estimated the transaction price for Medicare Advantage contracts using the expected value method using rates provided by CMS and adjusted for the demographics of the Company's enrolled members.

**D. The Company Admits It Used The Incorrect Accounting Methodology To Recognize Revenue From Medicare Advantage Contracts For The Quarterly Periods Of Fiscal 2021**

45. On February 28, 2022, Cano delayed the release of its full year 2021 financial results because it had identified certain errors in revenue recognition. Specifically, the Company issued a press release that stated Cano and its auditor "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606," which would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]" However, these adjustments would "not impact the Company's cash from operations, its cash position, or estimated collectability of receivables."

46. On this news, the Company's stock price fell $0.32, or 6%, to close at $4.87 per share on February 28, 2022, on unusually heavy trading volume.

47. On March 2, 2022, Cano filed a Notification of Late Filing on Form 12b-25 with the SEC, stating that it could not timely file its annual report for fiscal 2021 due to the previously discussed revenue recognition adjustments. It also stated that: "It is possible that the adjustments described above may result in changes to current and/or prior period financial statements. The Company and E&Y are still evaluating whether any such adjustments would be material to prior period financial statements."

48.     On March 14, 2022, in a Form 8-K filed with the SEC, Cano revealed that its financial statements for the quarterly periods of fiscal 2021 should no longer be relied upon. These statements would be restated due to "the Company's **correction** of its accounting for Medicare Risk Adjustment ('MRA') revenue within Medicare Advantage contracts." Specifically, "[t]he correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606, *Revenue from Contracts with Customers* ('ASC 606')." Moreover, Cano would revise its financial statements for fiscal 2019 and 2020, though the impact was "not material."

49.     Also on March 14, 2022, Cano filed its fiscal 2021 Form 10-K with the SEC, which indicated a change in the method of revenue recognition. Specifically, it explained that MRA revenue is recognized under the "most likely amount" methodology, adding that revenue is recognized only if a significant reversal is not likely:

> The Company groups contractual terms into one portfolio because these arrangements are similar. The Company identifies a single performance obligation to stand-ready to provide healthcare services to enrolled members. Capitated revenue is recognized in the month in which the Company is obligated to provide medical care services. The transaction price for the Medicare Advantage and Medicare Direct Contracting services provided (and other programs including Accountability Care Organizations) depends upon the pricing established by the Centers for Medicare & Medicaid ("CMS") and includes rates that are based on the cost of medical care within a local market and the average utilization of healthcare services by the members enrolled. The transaction price is variable since the rates are risk adjusted based on health status (acuity) of members and demographic characteristics of the enrolled members. **MRA revenues are estimated using the "most likely amount" methodology. The amount of variable consideration recorded in the transaction price is limited to an amount that the Company believes will not result in a significant reversal of revenue based on historical results.** The risk adjustment to the transaction price is presented as the Medicare Risk Adjustment ("MRA") within accounts receivable on the accompanying consolidated balance sheets. The fees are paid on an interim basis based on submitted enrolled member data for the previous year and are adjusted in subsequent periods after the final data is compiled by CMS. **Revenue is not**

14

> *recorded until the price can be estimated by the Company and to the extent that it is probable that a significant reversal will not occur once any uncertainty associated with the variable consideration is subsequently resolved.*

50.     Also on March 14, 2022, the Company issued a press release discussing its full year 2021 financial results, including the impact of the restatement. Specifically, Cano revealed that "[a]s a result of the restatement, approximately $122 million of MRA revenue related to care provided in 2021 that would have previously been recognized in 2021 is expected to be recognized in 2022." This was "partially offset by $10 million in MRA revenue that was previously recognized in 2020 under the prior accounting methodology, for a negative impact to 2021 revenue of approximately $112 million." The net negative impact to 2021 Adjusted EBITDA was $91 million.

51.     The 2021 Form 10-K restated Cano's previously issued financial statements for the quarterly periods of fiscal 2021. Due to "the reduced MRA estimate," Cano decreased its previously reported capitated revenue by $5.69 million for the period ended March 31, 2021, $49.73 million for the period ended June 30, 2021, and $28.02 million for the period ended September 30, 2021. Moreover, in the 2021 Form 10-K, Cano increased its operating loss by $5.64 million for the period ended March 31, 2021, $41.24 million for the period ended June 30, 2021, $23.96 million for the period ended September 30, 2021.  As such, the restatement increased the Company's net loss by 53.9% for the period ended March 31, 2021, and 58.9% for the period ended September 30, 2021.  Moreover, the Company's net income went from a $4.94 million gain to a $36.29 million loss for the period ended June 30, 2021, a change of 830%.  Cano's revised financial statements were as follows:

| | September 30, 2021 | | | June 30, 2021 | | | March 31, 2021 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **Revenue:** | | | | | | | | | |
| Capitated revenue [1] | $ 501,780 | $ (28,017) | $ 473,763 | $ 379,210 | $ (49,726) | $ 329,484 | $ 267,051 | $ (5,694) | $ 261,357 |
| Fee-for-service and other revenue[2] | 25,018 | 150 | 25,168 | 13,953 | 144 | 14,097 | 13,084 | 161 | 13,245 |
| Total revenue | 526,798 | (27,867) | 498,931 | 393,163 | (49,582) | 343,581 | 280,135 | (5,533) | 274,602 |
| **Operating expenses:** | | | | | | | | | |
| Third-party medical costs[3] | 379,316 | 2,000 | 381,316 | 291,816 | — | 291,816 | 195,046 | — | 195,046 |
| Direct patient expense [4] | 57,708 | (7,340) | 50,368 | 43,782 | (8,175) | 35,607 | 34,287 | (50) | 34,237 |
| Selling, general and administrative expenses [5] | 75,926 | 692 | 76,618 | 46,574 | 585 | 47,159 | 34,848 | 161 | 35,009 |
| Depreciation and amortization expense | 16,955 | — | 16,955 | 7,945 | — | 7,945 | 5,846 | — | 5,846 |
| Transaction costs and other [6] | 6,528 | 738 | 7,266 | 16,374 | (756) | 15,618 | 9,239 | — | 9,239 |
| Total operating expenses | 536,433 | (3,910) | 532,523 | 406,491 | (8,346) | 398,145 | 279,266 | 111 | 279,377 |
| Income (loss) from operations | (9,635) | (23,957) | (33,592) | (13,328) | (41,236) | (54,564) | 869 | (5,644) | $ (4,775) |
| **Other income and expense:** | | | | | | | | | |
| Interest expense | (16,023) | — | (16,023) | (9,714) | — | (9,714) | (10,626) | — | (10,626) |
| Interest income | 1 | — | 1 | 1 | — | 1 | 1 | — | 1 |
| Loss on extinguishment of debt | — | — | — | (13,225) | — | (13,225) | — | — | — |
| Change in fair value of warrant liabilities | (14,650) | — | (14,650) | 39,215 | — | 39,215 | — | — | — |
| Other income (expense) | (29) | — | (29) | (25) | — | (25) | — | — | — |
| Total other income (expense) | (30,701) | — | (30,701) | 16,252 | — | 16,252 | (10,625) | — | (10,625) |
| Net income (loss) before income tax expense (benefit) | (40,336) | (23,957) | (64,293) | 2,924 | (41,236) | (38,312) | (9,756) | (5,644) | (15,400) |
| Income tax expense (benefit) | 547 | — | 547 | (2,023) | — | (2,023) | 714 | — | 714 |
| Net income (loss) | $ (40,883) | $ (23,957) | $ (64,840) | $ 4,947 | $ (41,236) | $ (36,289) | $ (10,470) | $ (5,644) | $ (16,114) |

52.     The 2021 Form 10-K also reported that, one "consequence of the [previously-disclosed] material weakness . . . was that in the course of finalizing the audit of our financial statements for the year ended December 31, 2021, [Cano] with [its] independent auditors identified a misapplication of GAAP that resulted in a restatement." Specifically, the 2021 Form 10-K stated:

16

One consequence of the material weakness identified above was that in the course of finalizing the audit of our financial statements for the year ended December 31, 2021, we with our independent auditors identified a misapplication of GAAP that resulted in a restatement. ***The restatement results from the Company's correction of its accounting for Medicare Risk Adjustment ("MRA") revenue within Medicare Advantage contracts. The correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606, Revenue from Contracts with Customers ("ASC 606"). The correction in the timing of revenue recognition under ASC 606 resulted in adjustments to capitated revenue, direct patient expense, accounts receivable, net of unpaid service provider costs, and accounts payable and accrued expenses.*** The Company evaluated the adjustments to the MRA revenue recorded during 2021, 2020 and 2019, and, after assessing the materiality of such adjustments, restated its financial statements for each of the quarterly periods ended March 31, 2021, June 30, 2021 and September 30, 2021 in the 2021 Form 10-K for the year ended December 31, 2021 (collectively, the "Prior Quarterly Financial Statements"). While the effects of the correction in timing of revenue recognition were not material to the previously issued 2020 and 2019 audited consolidated financial statements, those financial statements were revised because correcting the accumulated errors in 2021 could have resulted in a material misstatement of the 2021 financial statements. The Company further concluded that the impact of the accounting adjustments on the Company's unaudited condensed consolidated financial statements for each of the quarterly periods ended March 31, 2020, June 30, 2020 and September 30, 2020, were not material to those financial statements.

In a series of reports on February 28, 2022, Credit Suisse analysts posited that these adjustments were to conform with Cano's peers. Specifically, Cano would now "book MRA related revenues in a more conventional approach (matching revenues with cash collections), resulting in MRA related revenues being pushed out to future periods." Though "Cano's prior MRA revenue recognition approach had been booking revenues at the time of documentation itself (essentially, the date of service)," Cano's peers "book MRA-related revenue one year after the documentation." Essentially, Cano's prior practice had been to immediately book revenue even though the risk adjustment process had not occurred, and Credit Suisse noted that "several investors have raised questions about whether the company was intentionally trying to overstate its financials for the

17

first few quarters post its De-SPAC and whether there is a write-down risk with the MRA receivables."

> **E.    Following The Exposure Of Rampant Undisclosed Related Party Transactions And Other Improprieties By Certain Executives And Board Members, The Company Removes The CEO And Commits To "Adding New Independent Directors With Appropriate Experience And Backgrounds"**

53.    On May 3, 2023, a derivative complaint was filed by former Board members of Cano against certain of the Company's executives, including Defendant Hernandez. *See Sternlicht v. Hernandez, et al.*, Del. Ch., C.A. No. 2023-477 (May 3, 2023) (Complaint) (Exhibit B hereto). The complaint alleged Cano directors entered into undisclosed related party transactions, including paying millions of dollars to his family members and pledging their shares for millions of dollars, even though Cano was in a dire financial situation. Following substantial discovery, including 250 exhibits and deposition testimony from seven witnesses, Vice Chancellor Paul Fioravanti, Jr. issued his factual findings confirming the accuracy of these allegations.[6] *See Sternlicht v. Hernandez, et al.*, Del. Ch., C.A. No. 2023-477 (Jun. 14, 2023) (Mem. Op.) (Exhibit C hereto).

54.    The factual findings confirmed that Defendant Hernandez repeatedly obtained loans from individuals who had been bought out in Cano acquisitions. In essence, Cano was acquiring companies and then the owners of those companies were lending money to Hernandez with some of the profits they had reaped in the transaction. Additionally, the factual findings confirmed numerous instances where Cano entered into transactions with Hernandez's family members that resulted in huge sums of money being paid to these family members.

---

[6] The Court denied the plaintiffs request to issue preliminary injunction to prevent the Company from holding its annual meeting of stockholders on June 15, 2023 and to enjoin enforcement of the Company's advance notice bylaw.

18

55.     On June 16, 2023, just two days after Vice Chancellor's opinion was issued, the

Company issued a press release announcing that effective immediately that Hernandez would no

longer serve as CEO.  As the Company explained:

> Effective immediately, the Company has named current Chief Strategy Officer Mark Kent as Interim Chief Executive Officer while an external search is conducted for a permanent successor. Dr. Marlow Hernandez and the Company's Board of Directors have agreed that Dr. Hernandez will resign immediately as CEO and will continue to serve on the Board.

*      *      *

> In addition, the Board, working with Russell Reynolds' Board Advisory Group, will advance its ongoing efforts to refresh the Board's membership over the next several months by adding new independent directors with appropriate experience and backgrounds to enhance the Board's capabilities and help optimize performance.

56.      In a filing with the SEC made on June 20, 2023, the Company announcement of

Kent as Interim CEO and further stated that:

> Effective immediately, on June 16, 2023, the Board of Directors (the "Board") of Cano Health, Inc. (the "Company") elected the Company's current Chief Strategy Officer, Mr. deMarquette ("Mark") Kent, as the Company's Interim Chief Executive Officer (the "Interim CEO").

> Mr. Kent will replace Dr. Marlow Hernandez, who tendered his resignation as the Company's Chief Executive Officer, as well as all positions he holds at the Company's subsidiaries, effective immediately on June 16, 2023. Dr. Hernandez will remain as a director on the Company's Board. The Board intends to conduct a search process to identify a permanent Chief Executive Officer.

**F.      Only Following The Removal Of The Company's CEO Does The Company Finally Admit That, At All Times During The Class Period, Its Processes For Estimating MRA Revenue Were "Overly Manual" And Thus Provided "Limited Predictive Power"**

57.     Throughout fiscal 2022 and the first fiscal quarter of 2023, the Company reported

revenue and related financial information to the market that included expected MRA revenue.

Defendants represented that these figures accurately reflected the Company's estimated MRA

revenue from CMS for its members.  However, the Company subsequently admitted that its

19

revenue statements were materially misleading because it had failed to disclose that its processes for predicting MRA revenue, which Cano included in its financial results as revenue, had limited predictive power because they were overly manual, fraught with errors, and suffered from data variability and gaps in real-time data reporting.

58.    On August 10, 2023, the Company disclosed that it was taking a $44 million charge against its 2022 fiscal second quarter revenue.  As the Company explained:

> In the second quarter of 2023, capitated revenue of $743.3 million increased 13% year-over-year. Capitated revenue per member per month, or PMPM, was (19)% primarily driven by lower-than-expected Medicare Risk Adjustment ("MRA") revenue. The medical cost ratio, or MCR2, was 103.5% in the second quarter of 2023 compared to 82.6% in the second quarter of 2022, primarily driven by the reduction in MRA revenue, and higher third-party medical costs due to higher utilization and higher costs associated with supplemental health plan benefits (e.g., over-the-counter flex cards and healthy food cards).
>
> ***During the second quarter of 2023, the MRA revenue was approximately $58 million lower than previously estimated in the Company's guidance, driven by lower MRA payments received and expected to be received in 2023. Approximately $44 million of lower-than-expected MRA revenue was related to out-of-period items, which are not expected to reoccur.*** In addition, during the quarter third-party medical costs included approximately $44 million of unfavorable prior period development, primarily driven by higher medical utilization and health plans' supplemental benefits.

59.    As was further explained by Kent on the earnings call for the quarter with analysts later that day, this $44 million charge reflected the difference between actual and expected revenue, amounting to a restatement of fiscal 2022 results:

> In our core Medicare Advantage business, capitated revenue in the second quarter of 2023 was well below our expectations. ***This was primarily due to a shortfall in the Medicare risk adjustment revenue, or MRA collected versus what was expected and accrued for in prior periods.*** As the second quarter of 2023 close, we received the quarterly service funds from our health plan partners, which reflected their reconciliations of the actual and estimated MRA revenue from CMS for our members. These reconciliations resulted in a reduction to our final 2022 and midyear 2023 estimates during the second quarter.

20

60. On the same earnings call, Defendant Koppy explained that the $44 million charge "was out of period or related to services provided in 2022 in the first quarter of 2023" and related to MRA revenue. As he explained:

Total revenue for the second quarter of 2023 was approximately $767 million, up from approximately $689 million a year ago. Total capitated revenue in the quarter was approximately $743 million, an increase from $655 million in the second quarter of 2022. ***However, in the second quarter of 2023, capitated revenue was lower than expected, primarily driven by Medicare Risk Adjustment, or MRA revenue, which is approximately $58 million lower than previously estimated in our most recent full year 2023 guidance. This lower MRA revenue reflects our updated view of the final 2022 and midyear 2023 MRA revenue estimates.***

***Of the approximate $58 million shortfall versus our expectations, approximately $44 million was out of period or related to services provided in 2022 in the first quarter of 2023.*** The Medicare Advantage revenue PMPM was $1,027 in the second quarter of 2023, down 13% sequentially from the first quarter of 2023, primarily driven by the lower-than-expected MRA revenue. The Medicare ACO reach revenue PMPM was $1,309 down 12% sequentially from the first quarter of 2023, and also lower than expected and was primarily driven by revised benchmark data we received from CMS related to the 2022 and 2023 performance years. Additional information about our membership mix and our PMPM is available in our second quarter earnings release and second quarter financial supplement posted on our website.

61. On the same conference call, Kent explained that soon after he was appointed CEO, he was able to determine that the Company suffered from "process issues that have affected our ability to project our performance."[7] Specifically, Kent admitted that there were significant issues "attributable to back-end processes and the ways that data from those processes inform our MRA estimates" because "[t]he prior processes were overly manual, and our back testing analysis demonstrated that they provided limited predictive power." As Kent explained:

---

[7] As such, it is not surprising that soon after this disclosure of flawed processes that Defendant Koppy, who had been CFO since before the Business Combination and throughout Cano's public existence, "stepped down" from his position and was replaced by a Cano employee with a long relationship with Mr. Kent (more than 12 years), Eladio Gil, on September 29, 2023.

21

Since becoming Interim CEO in June, I have worked with the team to conduct a thorough review of all aspects of our business.

\*         \*         \*

***Unfortunately, we have had several emerging process issues that have affected our ability to project our performance***. However, these issues can and are being remedy.

\*         \*         \*

Upon stepping into the Chief Strategy Officer role in April of 2023, I asked our team to perform a cross-functional review and audit of our clinical documentation, billing and coding and estimation methodologies and to suggest ways to enhance our practices. Our review found that while our clinical documentation, billing and coding followed nearly all internal policies, we have clear opportunities to implement simpler, scalable and more effective protocols designed to enhance our performance. ***The largest gap we found was attributable to back-end processes and the ways that data from those processes inform our MRA estimates. The prior processes were overly manual, and our back testing analysis demonstrated that they provided limited predictive power.***

62.     To remedy these issues, Kent explained that the Company was "revising our approach to limit data variability and to ensure we close gaps in real-time data reporting":

During my time at Humana and during my time operating independent value-based care primary facilities and a hospital, I learned that the value-based care model succeeds best when physicians have every tool necessary to make informed decisions. ***And so to enhance our data capture, this quarter, we quickly began revising our approach to limit data variability and to ensure we close gaps in real-time data reporting. I believe our estimates going forward will reflect a more accurate view of these MRA projections that will result in a higher realized and appropriate MRA revenue.***

63.     These admissions that Cano was required to "enhance" its processes are admissions that the prior processes resulted in data variability, that there had been a gap in real-time data reporting, and that as a result of the foregoing, the Company lacked a reasonable basis to predict MRA revenue.

64.     On that same conference call, an analyst was puzzled "how this is now the second time you guys [are] off by a large amount in this [MRA] process."  After Defendant Koppy

22

explained that a majority of the charge was a related to the 2022 MRA, Kent explained that

"historically, I'll put it this way, it was a very tedious and manual process. And as you can imagine,

that process can be fraught with all kinds of errors."  As he further explained:

> *The new process is one based upon where we are predicting based upon the data submissions. We are correlating and corroborating that information with respect to what is received by the health plan and what is received by CMS. And then we are then assigning an overall score to that with a probability predictive analysis to it.*
>
> *So this is what is now in place is a very automated process where prior to, it was extremely manual. And so as you just alluded to in prior periods and in prior years, that's what causes the miss.*
>
> Being able to predict that going into next year as we approach planning for 2024, we have a much more reliable process, and we've already begun testing that and we back tested it. And we have successfully been able to do that for the month of May 2023 and successfully for the month of June of 2023. So we are very confident of how we move forward. The issue is that all of this transpired in setting this budget and setting this guidance last year in 2022.

65.    Again, that Cano needed to create a "new process" that is "predicting based upon

the data submissions" and "correlating and corroborating that information with respect to what is

received by the health plan and what is received by CMS" is an admission that the prior process

did not use sufficient data to predict results and did not corroborate its revenue with that being

submitted to the CMS.  In fact, Kent even touted that now "we have a much more reliable process"

that was supported by testing, again confirming that the prior process was insufficient, not reliable,

and not adequately supported by testing.

66.    As explained above, Cano's "MRA revenues are estimated using the 'most likely

amount' methodology. The amount of variable consideration recorded in the transaction price is

limited to an amount that the Company believes will not result in a significant reversal of revenue

based on historical results."   That Cano's MRA process "was a very tedious and manual process"

that was "fraught with all kinds of errors" inherently means that the Company's revenues were not

estimated in accordance with this methodology: use of a manual, error-prone process means that the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal.

67. Following these disclosures, the Company's stock price fell $1.11, or 73%, to close at $0.41 per share on August 11, 2023, on unusually heavy trading volume.

**G.     Former Employees Confirm That During The Class Period The Company's MRA Calculation Process Was Overly Manual and Fraught With Errors, Making It Have Limited Predictive Power**

68. Former employees confirm that throughout the Class Period, the Company did not have adequate processes in place. Specifically, the Company's process was overly manual, and employees overrode physicians' billing codes, resulting in an MRA calculation process that had limited predictive power.

**1.     Former Employees Confirm That The MRA Process Was Overly Manual And Lacked Policies And Procedures**

69. According to Former Employee #1 ("FE 1"),[8] Cano had outdated policies, and there was a lack of transparency at the Company.  In fact, FE 1 explained the scope of manual issues at the Company as follows: "Everything was manual. Absolutely everything. Billing and coding. Accounting was manual for a very long time. They were running on spreadsheets: accounts payable, accounts receivable, procurement, everything. After they went public they were still running manual. It changed, possibly in the last year I was there. I know accounts payable implemented Oracle. But it would still, in my mind, lack a lot of the requirements for such a large company, with so much money running through it. It was not scaled to the correct size."

70. Exacerbating the issue and making it difficult for other executives to substantiate the financial results, the access to the underlying data was restricted to one person, Chief

---

[8] FE 1 was a chief administration officer at Cano from August 2021 to December 2022 and reported directly to CEO Marlow Hernandez.

24

Population Health Officer Pedro Cordero. As FE 1 explained, "Data analytics and predictive analytics flowed through one person,  Pedro Cordero, and you could not get a true sense, because there was no data governance as to the methodology, and no data definitions. So whenever you received a piece of information that was titled anything… one might assume that the data pertained to the general population, when it actually pertained to a subset."[9]  He[10] continued that basic information, such as "revenue per procedure, volume of patients for a particular CPT code, a particular location or particular provider, MRAs, RAF scores, the number of cancellations . . . Financial output of our operations," was accessible only through Cordero. According to FE 1, this was problematic because "no one has the capacity to evaluate, assess or audit the information – to make sure the information was actual and factual."

71.     Former Employee 2 ("FE 2")[11] also explained that the billing process was overly manual, stating that "the documentation is not up to par and they do a lot of guessing on the backend, which is billing and coding."  As FE 2 explained, "Someone would go into one software, pick 150 patients, transfer them to Excel and send it around to coders. We would toggle from the Excel sheet to the system to code so, overly manual? Yes. Too many processes to get to the answer."  FE 2 further explained how they coded:

> We had to do 150 patients per day. But you would get the code, push control + copy, go to the other sheet and hit control + paste. Then go to a quick glance to see if level three or level four. You couldn't spend even one minute on a chart…. It wasn't thoroughly reviewed. In my opinion, it wasn't appropriately reviewed because you had to get through all these patients in one day, and in the sequence that she [Dayana Concepcion] wanted – the way they said, 'This is how you've got to send it in to the insurance company, so that it'll get paid'…. We were Profee

---

[9] In fact, FE 1 confirmed that the Company for some of the Class Period, Cano "didn't even have accounting software. A lot of the accounting was being done on Excel spreadsheets."

[10] All former employees are defined using the masculine pronoun to protect their anonymity.

[11] FE 2 was a coding and billing specialist from August 2021 to November 2021 who reported to Dayana Concepcion, a team lead in coding and billing.

coders but what they really had us doing was HCC risk adjustment coding. I think everyone was plugging in numbers like robots and didn't know what they were doing.

72.     Former employee 3 ("FE 3")[12] explained that that Cano's billing was "just very unorganized with coding and billing."  As FE 3 continued, "It was all through Excel. We had a lot of Excel spreadsheets. A lot of paperwork." Moreover, FE 3 explained that "At Cano, everything's on the system but there are so many different hands that they can't regulate who's doing what at what time. If everybody's grabbing from the same pile, they don't know who's doing what. So they separated it into Excel spreadsheets. But there are other ways to do it."

73.     This lack of accurate data and manual processes directly contributed to the misleading financial reports.  According to FE 1:

> First, there was no way to tell what the numbers of patients were for RAF scores… and so forth, because the data was all over the place. Second, billing and coding was all over the place, because if the doctor doesn't know how to put the right codes, a manual person is making changes…. The doctor needs to understand how to catalog things that make sense, in a global evaluation. There are nuances to each of these codings that make a big difference in how Medicare recognizes it. All of these things have to pass M.E.A.T.

### 2.     The Company Attempted To Maximize Revenue By Manipulating The Billing Codes

74.     In addition to the manual processes, former employees confirm that Cano attributed higher-paying codes to medical claims without adequate support from physician notes, thereby overstating MRA revenue estimates.

75.     FE 2 explained that he was pressured to use billing codes that were not necessarily supported by medical records.  FE 2 explained, "You need to have certain linkage language" for codes, distinguishing between for example a patient with high cholesterol and diabetes and a

---

[12] FE 3 was a medical coder from January 2020 through March 2021 who reported to department director Natalie Gonzales.

patient with high cholesterol "due to" diabetes.  FE 2 states that he received instructions to enter higher-paying codes, even when the requisite linkage language was missing.   FE 2 further explained: "It was mainly for diabetic patients that they were trying to up-code…. They even had a cheat sheet that we'd have to follow. It would tell us, 'If you see E1169, you must always add 95.21' – which is erectile disfunction – 'or hyperthyroidism' – which is any type of cholesterol.'"

76.      FE 1 confirmed that Greidys Maleta, the president of billing, coding and credentialing, told him, "We're going to use your assessments, over the primary care physicians', because they are a precise match, for Medicare purposes." He continued, "The patients saw primary care physicians before or after we saw them, but the PCPs changed their assessments to match ours. Literally, we would look back at their notes and see that they had cut and pasted from ours. Mind you," he added, "I was running a nurse practitioner-led clinic."

77.      FE 1 corroborated that Cano manipulated the billing codes.  As FE 1 summarized, "***The billing and coding team would change coding to maximize revenue. I think some of that upcoding – because that's what it is – didn't pass the Medicare audit, and they didn't get the RAF score they thought they would.***" FE 1 further explained that this assertion was based on "conversations with at least three physicians who used to work in Cano. They've told me that some of their coding was changed in the background, and they had told the billing and coding team to stop." One physician told him that this was "normal practice for Cano, for as long as he had been employed there – during 2021 and 2022."

78.      FE 3 further confirms the other former employees experience with Cano's coding. According to FE 3, "It was my first coding job. The way that they were doing it – now, years later, that I have experience – was all wrong. They weren't necessarily focused on the quality of coding but the quantity. There was an expectation of the number of patient charts they needed. We needed

to get through a certain number of charts, even if it injured the quality of your coding…. To code properly, you need to read the notes in their entirely, verify them, take a look at labs and stuff. With the amount of time per claim, there was no time for any of that."

79.     FE 3 further explained that Cano "had templates – and coding should never have templates. It should always be case-by-case. And the way they code is they have a template. . . . They can't read the doctor's notes. So they have these templates, to code off of key words. It's crazy." According to FE 3, "They get a lot of denials because their coding is all wrong. They over-code. They put something that should only be one code as two or three codes. It was very disorganized. It was just all wrong."

80.     By "upcoding" procedures, Cano overestimated the MRA estimate, which would not pass muster when audited by CMS.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.     The Company's Financial Statements For Each Quarterly Period Of Fiscal 2021 Were Materially Misleading

81.     In connection with the Business Combination and in the months following it, Defendants issued materially misleading statements about Cano's financial results. Specifically, they claimed that they recognized revenue in accordance with GAAP, including as to Medicare Advantage contracts. Though they acknowledged that such revenue was considered variable consideration (due to the adjustments by CMS), they claimed that such adjustment was presented within accounts receivable.

82.     For each quarterly period of fiscal 2021, Defendants claimed that revenue grew more than 100% year-over-year, leading investors to believe that the Business Combination had been a favorable transaction.

28

83.     These statements were materially misleading because, in truth, Cano misapplied GAAP and recognized revenue from Medicare Advantage contracts before the amounts could be estimated accurately. Because the adjustments by CMS would not be issued until a year after the initial diagnosis, Cano could not estimate revenue for the new patients until the audit was completed. Due to this timing difference, Cano's peers booked revenue when they collected cash, *i.e.,* one year after the documentation.  Moreover, these statements were further false since the Company had failed to disclose that Cano's revenue recognition processes had limited predictive power because they were overly manual, fraught with errors, and suffered from data variability and gaps in real-time data reporting.

### 1.     Statements Reporting Revenue And Financial Statements

84.     The Proxy reported $794.16 million in capitated revenue and a net loss of $74.77 million for its 2020 fiscal year.

85.     As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company overstated revenue for fiscal 2020 by $10 million.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

86. On June 9, 2021, the Company issued a press release announcing its first quarter 2021 financial results. Therein, the Company reported total revenue of $280.1 million and a net loss of $10.5 million:

**First Quarter 2021 Financial Results**

- $280.1 million total revenue, up 107% from the prior-year period

- 116,895 members, a 91% increase from the prior-year period. Organic membership increased 43% from the prior-year period

- Net loss of $10.5 million

87. As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for first quarter 2021 by $5.69 million; and (iii) that, as a result, Cano understated net loss by $5.64 million for first quarter 2021. Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

88. On August 12, 2021, Cano issued a press release announcing its second quarter 2021 financial results. Therein, the Company reported total revenue of $393.2 million and net income of $4.9 million:

**Second Quarter Highlights**:

- Total membership of 156,038 including Medicare capitated members of 111,866, an increase of 57% and 54%, respectively, year-over-year

- ***Total revenue of $393.2 million, an increase of 130% year-over-year***

- ***Net income of $4.9 million***

- Adjusted EBITDA of $24.8 million, an increase of 53% year-over year

89.     As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for second quarter 2021 by $49.73 million; and (iii) that, as a result, Cano understated net loss by $41.24 million for second quarter 2021.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

90.     On August 16, 2021, Cano filed its quarterly report on Form 10-Q for the period ended June 30, 2021. Therein, the Company reported $393.16 million in revenue, including $379.21 million in capitated revenue, and a $4.95 million net income. 85.1% of the revenue was derived from Medicare contracts.

91.     As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for second quarter 2021 by $49.73 million; and (iii) that, as a result, Cano understated net loss by $41.24 million for second quarter 2021.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

92.     On November 9, 2021, Cano issued a press release announcing its third quarter 2021 financial results. Therein, the Company reported total revenue of $526.8 million and net loss of $40.9 million:

**Third Quarter Highlights:**

- Total membership of 210,663 including Medicare capitated members of 120,086, an increase of 105% and 65%, respectively, year-over-year

- ***Total revenue of $526.8 million, an increase of 100% year-over-year***

- ***Net loss of $40.9 million***

- Adjusted EBITDA[] of $35.2 million, an increase of 53% year-over year

- Raised 2021 and 2022 guidance for total membership, total revenue, and Adjusted EBITDA

32

93.     As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for third quarter 2021 by $28.02 million; and (iii) that, as a result, Cano understated net loss by $23.96 million for third quarter 2021.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

94.     On November 10, 2021, Cano filed its quarterly report on Form 10-Q for the period ended September 30, 2021. Therein, the Company reported $526.8 million in revenue, including $501.78 million in capitated revenue, and a $40.88 million net loss. 84.9% of the revenue was derived from Medicare contracts.

95.     As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) that, as a result, the Company overstated capitated revenue for third quarter 2021 by $28.02 million; and (iii) that, as a result, Cano understated net loss by $23.96

33

million for third quarter 2021.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

### 2. Statements About Compliance With GAAP And Risks With Estimating Capitated Revenue

96.    On May 7, 2021, the Company filed a proxy statement and prospectus on Form 424B3 with the SEC, soliciting stockholder approval of the Business Combination (the "Proxy"). The Proxy claimed that the Company recognizes revenue in accordance with ASC 606. Specifically, it stated:

> Under ASC 606, the Company recognizes revenue when a customer obtains control of the promised goods or services. The amount of revenue that is recorded reflects the consideration that the Company expects to receive in exchange for those goods or services. The Company applies the following five-step model in order to determine this amount: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the Company satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the Company will collect the consideration it is entitled to in exchange for the goods or services the Company transfers to the customer (i.e. patient). At contract inception, once the contract is determined to be within the scope of ASC 606, management reviews the contract to determine which performance obligations must be satisfied and which of these performance obligations are distinct. The Company recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when the performance obligation is satisfied.

> The Company derives its revenue primarily from its capitated fees for medical services provided under capitated arrangement, fee-for-service, and revenue from the sale of pharmaceutical drugs.

34

Capitated care revenue is derived from fees for medical services provided by the Company under capitated arrangements with health maintenance organizations' ("HMOs") health plans. ***Capitated revenue consists of revenue earned through Medicare as well as through commercial and other non-Medicare governmental programs, such as Medicaid, which is captured as other capitated revenue.*** The Company is required to deliver healthcare services to the enrolled member population and is responsible for medical expenses related to healthcare services required by that patient group, including services not provided by the Company. Since the Company controls the healthcare services provided to enrolled members, the Company acts as a principal. The gross fees under these contracts are reported as revenue and the cost of provider care is included in third-party medical costs. Neither the Company or any of its affiliates is a registered insurance company because state law in the states in which it operates does not require such registration for risk-bearing providers.

Since contractual terms across these arrangements are similar, the Company groups them into one portfolio. The Company identifies a single performance obligation to stand-ready to provide healthcare services to enrolled members. ***Capitated revenues are recognized in the month in which the Company is obligated to provide medical care services***. ***The transaction price for the services provided depends upon the pricing established by the Centers for Medicare & Medicaid ("CMS") and includes rates that are based on the cost of medical care within a local market and the average utilization of healthcare services by the members enrolled. The transaction price is variable since the rates are risk adjusted for projected health status (acuity) of members and demographic characteristics of the enrolled members. The risk adjustment to the transaction price is presented as the Medicare Risk Adjustment ("MRA") within accounts receivable on the accompanying consolidated balance sheets.*** The fees are paid on an interim basis based on submitted enrolled member data for the previous year and are adjusted in subsequent periods after the final data is compiled by the CMS.

97.     As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not

misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

98.     The Proxy purported to warn of risks with estimating capitated revenue, stating in relevant part:

> ***There are risks associated with estimating the amount of revenue that we recognize under our capitation agreements with health plans, and if our estimates of revenue are materially inaccurate, it could impact the timing and the amount of our revenue recognition or have a material adverse effect on our business, results of operations, financial condition and cash flows.*** [emphasis in original]

> There are risks associated with estimating the amount of revenues that we recognize under our capitation agreements with health plans in a reporting period. Medicare pays capitation using a risk adjusted model, which compensates payers based on the health status, or acuity, of each individual member. Payers with higher acuity members receive a higher payment and those with lower acuity members receive a lower payment. Moreover, some of our capitated revenues also include adjustments for performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payers. ***Our capitated revenues are recognized based on projected member acuity and quality metrics and are subsequently adjusted to reflect actual member acuity and quality metrics.*** Our ability to accurately project and recognize member acuity and quality metric adjustments are affected by many factors. For instance, our ability to accurately project member acuity and quality metrics may be more limited in the case of medical centers operating in new markets or which were recently acquired.

> In addition, the billing and collection process is complex due to ongoing insurance coverage changes, geographic coverage differences, differing interpretations of contract coverage, and other payer issues, such as ensuring appropriate documentation. Determining applicable primary and secondary coverage for our members, together with the changes in member coverage that occur each month, requires complex, resource-intensive processes. Errors in determining the correct coordination of benefits may result in refunds to payers. Collections, refunds and payer retractions typically continue to occur for up to three years and longer after services are provided. If our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows.

36

99.     As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

100.     On August 16, 2021, Cano filed its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q claimed that the Company recognizes revenue in accordance with ASC 606:

**Revenue Recognition**

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09 "Revenue from Contracts with Customers", ASC 606 ("ASC 606"). On January 1, 2019, the Company adopted ASC 606, applying the full retrospective method as of the earliest period presented. The portfolio approach was used to apply the requirements of the standard to groups of contracts with similar characteristics.

Under ASC 606, the Company recognizes revenue when a customer obtains control of the promised goods or services. The amount of revenue that is recorded reflects the consideration that the Company expects to receive in exchange for those goods or services. The Company applies the following five-step model in order to determine this amount: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the Company satisfies a performance obligation.

37

The Company only applies the five-step model to contracts when it is probable that the Company will collect the consideration it is entitled to in exchange for the goods or services the Company transfers to the customer (i.e. patient). At contract inception, once the contract is determined to be within the scope of ASC 606, management reviews the contract to determine which performance obligations must be satisfied and which of these performance obligations are distinct. The Company recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when the performance obligation is satisfied.

The Company derives its revenue primarily from its capitated fees for medical services provided under capitated arrangements, fee-for-service arrangements, and revenue from the sale of pharmaceutical drugs.

Capitated revenue is derived from fees for medical services provided by the Company under capitated arrangements with health maintenance organizations' ("HMOs") health plans. Capitated revenue consists of revenue earned through Medicare as well as through commercial and other non-Medicare governmental programs, such as Medicaid, which is captured as other capitated revenue. The Company is required to deliver primary care physician services to the enrolled member population and is responsible for medical expenses related to healthcare services required by that patient group, including services not provided by the Company. Since the Company controls the primary care physician services provided to enrolled members, the Company acts as a principal. The gross fees under these contracts are reported as revenue and the cost of provider care is included in third-party medical costs. Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which they operate does not require such registration for risk-bearing providers.

Since contractual terms across these arrangements are similar, the Company groups them into one portfolio. The Company identifies a single performance obligation to stand-ready to provide healthcare services to enrolled members. *Capitated revenues is recognized in the month in which the Company is obligated to provide medical care services. The transaction price for the services provided depends upon the pricing established by the Centers for Medicare & Medicaid ("CMS") and includes rates that are based on the cost of medical care within a local market and the average utilization of healthcare services by the members enrolled. The transaction price is variable since the rates are risk adjusted for projected health status (acuity) of members and demographic characteristics of the enrolled members. The risk adjustment to the transaction price is presented as the Medicare Risk Adjustment ("MRA") within accounts receivable on the accompanying condensed consolidated balance sheets.* The fees are paid on an interim basis based on submitted enrolled member data for the previous year and are adjusted in subsequent periods after the final data is compiled by the CMS.

101.    As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

102.    The 2Q21 10-Q purported to warn that the estimates of revenue from Medicare may be inaccurate, stating in relevant part:

> ***There are risks associated with estimating the amount of revenue that we recognize under our capitation agreements with health plans, and if our estimates of revenue are materially inaccurate, it could impact the timing and the amount of our revenue recognition or have a material adverse effect on our business, results of operations, financial condition and cash flows.***
>
> There are risks associated with estimating the amount of revenues that we recognize under our capitation agreements with health plans in a reporting period. Medicare pays capitation using a risk adjusted model, which compensates payors based on the health status, or acuity, of each individual member. Payors with higher acuity members receive a higher payment and those with lower acuity members receive a lower payment. Moreover, some of our capitated revenues also include adjustments for performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payors. ***Our capitated revenues are recognized based on projected member acuity and quality metrics and are subsequently adjusted to reflect actual member acuity and quality metrics.*** Our ability to accurately project and recognize member acuity and quality metric adjustments are affected by many factors. For instance, our ability to accurately project member

acuity and quality metrics may be more limited in the case of medical centers operating in new markets or medical centers that were recently acquired.

In addition, the billing and collection process is complex due to ongoing insurance coverage changes, geographic coverage differences, differing interpretations of contract coverage, and other payor issues, such as ensuring appropriate documentation. Determining applicable primary and secondary coverage for our members, together with the changes in member coverage that occur each month, requires complex, resource-intensive processes. Errors in determining the correct coordination of benefits may result in refunds to payors. Collections, refunds and payor retractions typically continue to occur for up to three years and longer after services are provided. ***If our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows.***

103. As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

104. On November 10, 2021, Cano filed its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q claimed that the Company recognized revenue in accordance with ASC 606:

40

**Revenue Recognition**

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09 "Revenue from Contracts with Customers", ASC 606 ("ASC 606"). On January 1, 2019, the Company adopted ASC 606, applying the full retrospective method as of the earliest period presented. The portfolio approach was used to apply the requirements of the standard to groups of contracts with similar characteristics.

Under ASC 606, the Company recognizes revenue when a customer obtains control of the promised goods or services. The amount of revenue that is recorded reflects the consideration that the Company expects to receive in exchange for those goods or services. The Company applies the following five-step model in order to determine this amount: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the Company satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the Company will collect the consideration it is entitled to in exchange for the goods or services the Company transfers to the customer (i.e., patient). At contract inception, once the contract is determined to be within the scope of ASC 606, management reviews the contract to determine which performance obligations must be satisfied and which of these performance obligations are distinct. The Company recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when the performance obligation is satisfied.

The Company derives its revenue primarily from its capitated fees for medical services provided under capitated arrangements, fee-for-service arrangements, and revenue from the sale of pharmaceutical drugs.

Capitated revenue is derived from fees for medical services provided by the Company under capitated arrangements with health maintenance organizations' ("HMOs") health plans. Capitated revenue consists of revenue earned through Medicare as well as through commercial and other non-Medicare governmental programs, such as Medicaid, which is captured as other capitated revenue. The Company is required to deliver primary care physician services to the enrolled member population and is responsible for medical expenses related to healthcare services required by that patient group, including services not provided by the Company. Since the Company controls the primary care physician services provided to enrolled members, the Company acts as a principal. The gross fees under these contracts are reported as revenue and the cost of provider care is included in third-party medical costs. Neither the Company nor any of its affiliates is a registered insurance company because state law in the states in which they operate does not require such registration for risk-bearing providers.

41

Since contractual terms across these arrangements are similar, the Company groups them into one portfolio. The Company identifies a single performance obligation to stand-ready to provide healthcare services to enrolled members. ***Capitated revenue is recognized in the month in which the Company is obligated to provide medical care services. The transaction price for the Medicare Advantage and Medicare Direct Contracting services provided depends upon the pricing established by the Centers for Medicare & Medicaid ("CMS") and includes rates that are based on the cost of medical care within a local market and the average utilization of healthcare services by the members enrolled. The transaction price is variable since the rates are risk adjusted for projected health status (acuity) of members and demographic characteristics of the enrolled members. The risk adjustment to the transaction price is presented as the Medicare Risk Adjustment ("MRA") within accounts receivable on the accompanying condensed consolidated balance sheets.*** The fees are paid on an interim basis based on submitted enrolled member data for the previous year and are adjusted in subsequent periods after the final data is compiled by the CMS.

105.    As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

106.    The 3Q21 10-Q purported to warn that the estimates of revenue from Medicare may be inaccurate, stating in relevant part:

> ***There are risks associated with estimating the amount of revenue that we recognize under our capitation agreements with health plans, and if our estimates***

42

*of revenue are materially inaccurate, it could impact the timing and the amount of our revenue recognition or have a material adverse effect on our business, results of operations, financial condition and cash flows.*

There are risks associated with estimating the amount of revenues that we recognize under our capitation agreements with health plans in a reporting period. Medicare pays capitation using a risk adjusted model, which compensates payors based on the health status, or acuity, of each individual member. Payors with higher acuity members receive a higher payment and those with lower acuity members receive a lower payment. Moreover, some of our capitated revenues also include adjustments for performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payors. *Our capitated revenues are recognized based on projected member acuity and quality metrics and are subsequently adjusted to reflect actual member acuity and quality metrics.* Our ability to accurately project and recognize member acuity and quality metric adjustments are affected by many factors. For instance, our ability to accurately project member acuity and quality metrics may be more limited in the case of medical centers operating in new markets or medical centers that were recently acquired.

In addition, the billing and collection process is complex due to ongoing insurance coverage changes, geographic coverage differences, differing interpretations of contract coverage, and other payor issues, such as ensuring appropriate documentation. Determining applicable primary and secondary coverage for our members, together with the changes in member coverage that occur each month, requires complex, resource-intensive processes. Errors in determining the correct coordination of benefits may result in refunds to payors. Collections, refunds and payor retractions typically continue to occur for up to three years and longer after services are provided. *If our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows.*

(First emphasis in original.)

107.    As the Company later admitted (*see* Section IV.D, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; and (ii) that, as a result, the Company did not recognize revenue in accordance with ASC 606.  Moreover, as the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false

43

or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

**B.** **The Company's Financial Statements For Fiscal 2022 And The Fiscal First Quarter Of 2023 Were False And Misleading**

108.    On May 9, 2022, the Company issued a press release announcing its 2022 fiscal first results financial results.  Therein, the Company reported total revenue of $704.3 million and a net loss of $0.1 million for the quarter:

**First Quarter Financial Results**

- Total membership of 269,333, including 160,306 Medicare capitated members, an increase of 130% and 112%, respectively year-over-year

- Total revenue of $704.3 million, an increase of 156% year-over-year

- Net loss of $0.1 million, benefiting from a $27.2 million fair value adjustment of warrant liabilities

- Adjusted EBITDA of $45.0 million, compared to $17.5 million in the first quarter of 2021, an increase of 157% year-over-year

109.    As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

44

110. On May 9, 2022, Cano filed its quarterly report on Form 10-Q for the period ended March 31, 2022. Therein, the Company reported $704.34 million in revenue, including $674.35 million in capitated revenue, and a $0.085 million net loss. 87.3% of the revenue was derived from Medicare contracts.

111. As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

112. On August 9, 2022, the Company issued a press release announcing its 2022 fiscal second quarter financial results. Therein, the Company reported total revenue of $689.4 million and a net loss of $14.6 million for the quarter:

**Second Quarter Financial Results**

- Total membership of 281,525, including 163,947 Medicare capitated members, an increase of 80% and 47%, respectively year-over-year

- Total revenue of $689.4 million, an increase of 101% year-over-year

- Net loss of ($14.6) million, benefiting from a $30.2 million fair value adjustment of warrant liabilities

- Adjusted EBITDA of $29.4 million, compared to ($15.2) million in the second quarter of 2021; results in the quarter were impacted by $6 million of unfavorable prior year development (PYD) related to Medicare Direct Contracting Entity (DCE) program described below

113. As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when

45

made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

114.   On August 9, 2022, Cano filed its quarterly report on Form 10-Q for the period ended June 30, 2022. Therein, the Company reported $689.37 million in revenue, including $655.49 million in capitated revenue, and a net loss of $14.56 million. 87.4% of the revenue was derived from Medicare contracts.

115.   As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

116.   On November 9, 2022, the Company issued a press release announcing its 2022 fiscal third quarter financial results.  Therein, the Company reported total revenue of 665.0 million and a net loss of $112 million for the quarter:

**Third Quarter Financial Results**

- Total membership of 294,596, including 168,346 Medicare capitated members, an increase of 40% year-over-year for both

- Total revenue of $665.0 million, an increase of 33% year-over-year

- Net loss of $(112.0) million, unfavorably impacted by a $65.7 million fair value adjustment of warrant liabilities

- Adjusted EBITDA of $42.5 million, compared to $13.6 million in the third quarter of 2021, an increase of 211% year over year

117.  As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

118.  On November 9, 2022, Cano filed its quarterly report on Form 10-Q for the period ended September 30, 2022. Therein, the Company reported $665.03 million in revenue, including $625.89 million in capitated revenue, and a net loss of $112.01 million. 86.9% of the revenue was derived from Medicare contracts.

119.  As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

47

120.    On March 1, 2023, the Company issued a press release announcing its fourth quarter and full year 2022 financial results. Therein, the Company reported total revenue of $2,738.9 million and a net loss of $428.4 million for the 2022 fiscal year:

**Fourth Quarter 2022 Financial Results**

- Total membership of 309,590 including 179,536 Medicare capitated members, an increase of 36% and 42% year-over-year, respectively

- Total revenue of $680.4 million, compared to $492.3 million the prior year, an increase of 38% year-over-year

- Net loss of $(301.7) million, unfavorably impacted by a non -cash goodwill impairment of $(323.0) million, partially offset by a gain of $81.2 million due to a fair value adjustment of warrant liabilities

- Adjusted EBITDA of $35.7 million, compared to $11.1 million in the prior year Full Year 2022 Financial Results

**Full Year 2022 Financial Results**

- Total revenue of $2,738.9 million, compared to $1,609.4 million in the prior year, an increase of 70% year-over-year

- Net loss of $(428.4) million, inclusive of the previously mentioned non-cash goodwill impairment of $(323.0) million

- Adjusted EBITDA of $152.5 million, compared to $27.3 million in the prior year

In the fourth quarter of 2022, capitated revenue of $651.2 million increased 40% year-over-year. Capitated revenue per member per month, or PMPM, was 2% higher year-over-year. Third-party medical costs PMPM were 1% lower year-over-year. The improved medical cost ratio, or MCR2, of 76.1% was better than expected, driven by lower third-party medical costs across all service lines.

121.    As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-

48

prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

122. On March 15, 2023, Cano filed its annual report on Form 10-K for the fiscal year ended December 31, 2022. Therein, the Company reported $2,738.92 million in revenue, including $2,606.92 million in capitated revenue, and a net loss of $428.39 million. 87.4% of the revenue was derived from Medicare contracts.

123. As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

124. On May 9, 2023, the Company issued a press release announcing its 2023 fiscal first quarter financial results. Therein, the Company reported total revenue of $866.9 million and a net loss of $60.6 million for the quarter:

**First Quarter Financial Results**

- Total membership of 388,667 including 207,420 Medicare capitated members, an increase of 44% and 29% year-over-year, respectively

- Total revenue of $866.9 million, compared to $704.3 million the prior year, an increase of 23% year-over-year

- Net loss of $(60.6) million, compared to a net loss of $(0.1) million in the prior year, primarily driven by a higher operating loss, the change in fair value of warrant liabilities, and higher interest expense

- Adjusted EBITDA of $5.0 million, compared to $29.2 million in the prior year

125.    As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

126.    On May 9, 2023, Cano filed its quarterly report on Form 10-Q for the period ended March 31, 2023. Therein, the Company reported $866.91 million in revenue, including $841.07 million in capitated revenue, and a net loss of $60.59 million. 91.5% of the revenue was derived from Medicare contracts.

127.    As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

**C.    Risk Warnings In The Company's Class Period Annual Reports Were False And Misleading**

128.    On March 14, 2022, the Company filed its 2021 Form 10-K, which purported to warn that the estimates of revenue from Medicare may be inaccurate, stating in relevant part:

***There are risks associated with estimating the amount of revenue that we recognize under our capitation agreements with health plans, and if our estimates of revenue are materially inaccurate, it could impact the timing and the amount of our revenue recognition or have a material adverse effect on our business, results of operations, financial condition and cash flows.*** [emphasis in original]

There are risks associated with estimating the amount of revenues that we recognize under our capitation agreements with health plans in a reporting period. Medicare pays capitation using a risk adjusted model, which compensates payors based on the health status, or acuity, of each individual member. Payors with higher acuity members receive a higher payment and those with lower acuity members receive a lower payment. Moreover, some of our capitated revenues also include adjustments for performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payors. Our capitated revenues are recognized based on projected member acuity and quality metrics and are subsequently adjusted to reflect actual member acuity and quality metrics. Our ability to accurately project and recognize member acuity and quality metric adjustments are affected by many factors. For instance, our ability to accurately project member acuity and quality metrics may be more limited in the case of medical centers operating in new markets or medical centers that were recently acquired.

In addition, the billing and collection process is complex due to ongoing insurance coverage changes, geographic coverage differences, differing interpretations of contract coverage, and other payor issues, such as ensuring appropriate documentation. Determining applicable primary and secondary coverage for our members, together with the changes in member coverage that occur each month, requires complex, resource-intensive processes. Errors in determining the correct coordination of benefits may result in refunds to payors. Collections, refunds and payor retractions typically continue to occur for up to three years and longer after services are provided. If our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows.

129.    The Company also purported to warn that that Cano's records could be inaccurate or unsupportable which could result in the overstatements or understatement of revenue in the 2021 Form 10-K:

***Our records and submissions to a health plan may contain inaccurate or unsupportable information regarding risk adjustment scores of members, which could cause us to overstate or understate our revenue and subject us to various penalties.*** [emphasis in original]

CMS has implemented a risk adjustment payment system for Medicare health plans to improve the accuracy of payments and establish appropriate compensation for Medicare plans that enroll and treat less healthy Medicare beneficiaries. CMS's risk adjustment model bases a portion of the total CMS reimbursement payments on various clinical and demographic factors. The claims and encounter records that we submit to health plans may impact data that support the Medicare Risk Adjustment Factor ("RAF"), scores attributable to members. These RAF scores determine, in part, the revenue to which the health plans and, in turn, we are entitled to for the provision of medical care to such members. The data submitted to CMS by each health plan is based, in part, on medical charts and diagnosis codes that we prepare and submit to the health plans. Each health plan generally relies on us and our affiliated physicians to appropriately document and support such RAF data in our medical records. Each health plan also relies on us and our affiliated physicians to appropriately code claims for medical services provided to members. Erroneous claims and erroneous encounter records and submissions could result in inaccurate revenue and risk adjustment payments, which may be subject to correction or retroactive adjustment in later periods. This corrected or adjusted information may be reflected in financial statements for periods subsequent to the period in which the revenue was recorded. We might also need to refund a portion of the revenue that we received, which refund, depending on its magnitude, could damage our relationship with the applicable health plan and could have a material adverse effect on our business, results of operations, financial condition, liquidity, cash flows and/or stock price.

Additionally, CMS audits Medicare Advantage plans for documentation to support RAF-related payments for members chosen at random. The Medicare Advantage plans ask providers to submit the underlying documentation for members that they serve. It is possible that claims associated with members with higher RAF scores could be subject to more scrutiny in a CMS or plan audit. There is a possibility that a Medicare Advantage plan may seek repayment from us should CMS make any payment adjustments to the Medicare Advantage plan as a result of its audits. The plans also may hold us liable for any penalties owed to CMS for inaccurate or unsupportable RAF scores provided by us or our affiliated physicians. In addition, we could be liable for penalties to the government under the FCA.

CMS has indicated that payment adjustments will not be limited to RAF scores for the specific Medicare Advantage enrollees for which errors are found, but may also be extrapolated to the entire Medicare Advantage plan subject to a particular CMS contract. CMS has described its audit process as plan-year specific and stated that it will not extrapolate audit results for plan years prior to 2011.

130.    On March 15, 2023, the Company filed its Annual Report for its 2022 fiscal year (the "2022 Form 10-K").  The 2022 Form 10-K contained substantially similar purported risk warnings as those in the preceding two paragraphs that were contained in the 2021 Form 10-K.

131.    As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

**D.    The Company's Internal Control Statements Were Materially False And Misleading**

132.    On March 14, 2022, the Company filed its 2021 Form 10-K and stated:

The material weaknesses pertain to (i) our failure to establish controls to ensure the completeness and accuracy of information used to estimate and record certain accruals or make other closing adjustments in the financial statement close process, (ii) our failure in the process of accounting for business combinations related to the design and operation of controls to record and measure the identifiable assets acquired, the liabilities assumed and any non-controlling interest recognized as part of a business combination, and (iii) our failure to have a sufficient complement of personnel with an appropriate level of knowledge, experience and oversight commensurate with their financial reporting requirements to ensure proper selection and application of GAAP.

*One consequence of the material weakness identified above was that in the course of finalizing the audit of our financial statements for the year ended December 31, 2021, we with our independent auditors identified a misapplication of GAAP that resulted in a restatement.* The restatement results from the Company's correction of its accounting for Medicare Risk Adjustment ("MRA") revenue within Medicare Advantage contracts. The correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606, Revenue from Contracts with Customers ("ASC 606"). The correction in the timing of revenue recognition under ASC 606 resulted in adjustments to capitated revenue, direct patient expense, accounts receivable, net of unpaid service provider costs, and accounts payable and accrued expenses. The Company evaluated the adjustments to the MRA revenue recorded during 2021, 2020 and 2019, and, after assessing the materiality of such adjustments, restated its financial statements for each of the quarterly periods ended March 31, 2021, June 30, 2021 and September 30, 2021 in the 2021 Form 10-K for the year ended December 31, 2021

53

(collectively, the "Prior Quarterly Financial Statements"). While the effects of the correction in timing of revenue recognition were not material to the previously issued 2020 and 2019 audited consolidated financial statements, those financial statements were revised because correcting the accumulated errors in 2021 could have resulted in a material misstatement of the 2021 financial statements. The Company further concluded that the impact of the accounting adjustments on the Company's unaudited condensed consolidated financial statements for each of the quarterly periods ended March 31, 2020, June 30, 2020 and September 30, 2020, were not material to those financial statements.

The material weaknesses have not been remediated as of the date of the filing of this Annual Report on Form 10-K.

133.    On March 15, 2023, the Company filed its 2022 Form 10-K and purported to have "remediated" the material weaknesses with respect to revenue recognition. Specifically, the 2022 Form 10-K stated:

As of December 31, 2022, the Company had remediated these material weaknesses, as described below.

The material weaknesses that existed at December 31, 2021, and which were remediated as of December 31, 2022, pertained to (i) our failure to establish controls to ensure the completeness and accuracy of information used to estimate and record certain accruals or make other closing adjustments in the financial statement close process, (ii) our failure in the process of accounting for business combinations related to the design and operation of controls to record and measure the identifiable assets acquired, the liabilities assumed and any non-controlling interest recognized as part of a business combination, and (iii) our failure to have a sufficient complement of personnel with an appropriate level of knowledge, experience and oversight commensurate with their financial reporting requirements to ensure proper selection and application of GAAP.

Throughout 2022, our management implemented plans and carried out actions that were successful in remediating these material weaknesses as of December 31, 2022. These plans and actions included implementing enhanced documentation of policies and procedures, allocating resources dedicated to training, monitoring these policies and procedures and recruiting personnel with appropriate levels of skills commensurate with their roles. Management concluded, after implementing these remediation plans and actions, that our internal control over financial reporting was effective as of December 31, 2022.

134.    As the Company later admitted (*see* Section IV.F, *supra*) and former employees confirmed (*see* Section IV.G, *supra*), these statements were materially false or misleading when

54

made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) its revenue recognition process was manual and error-prone; (ii) as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and (iii) that, as a result of the foregoing, the Company lacked a reasonable basis to report MRA revenue.

## VI.    LOSS CAUSATION

135.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.   Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Cano's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial results to the market.

136.    The truth regarding the Company's financial results was partially revealed, and/or the concealed risks materialized, on or about February 28, 2022, and August 10, 2023.

137.    On February 28, 2022, Cano announced it had "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606," which would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]" However, these adjustments would "not impact the Company's cash from operations, its cash position, or estimated collectability of receivables."

138.    On this news, the Company's stock price fell $0.32, or 6%, to close at $4.87 per share on February 28, 2022, on unusually heavy trading volume.

139.     On August 10, 2023, the Company disclosed that it was taking a $44 million charge against its 2022 fiscal second quarter revenue and that the Company suffered from "process issues that have affected our ability to project our performance,"  including sufficient issues "attributable to back-end processes and the ways that data from those processes inform our MRA estimates"

55

that were related to the fact that "[t]he prior processes were overly manual, and our back testing analysis demonstrated that they provided limited predictive power."  The Company further disclosed that its MRA estimate process was "historically" "a very tedious and manual process" that was "fraught with all kinds of errors."

140.   Following these disclosures, the Company's stock price fell $1.11, or 73%, to close at $0.41 per share on August 11, 2023, on unusually heavy trading volume.

141.   During the Class Period, Plaintiff and the Class purchased Cano's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

142.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Cano, their control over, and/or receipt and/or modification of Cano's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cano, participated in the fraudulent scheme alleged herein.

143.   Not only was revenue from Medicare contracts core to the Company's business, but applying general accepted revenue recognition practices is simple and uncomplicated for

publicly traded companies. Yet, even then, the Company admitted that it improperly recognized revenue with respect to Medicare contracts, which constituted nearly all of its business. Further, the accounting method that Defendants employed enabled them to report increased revenue in the near-term, making PCIH appear as a more appealing acquisition target. For example, the Proxy touts "the projected growth of PCIH's targeted Medicare Advantage market" as one of the reasons for approving the Business Combination.  Making PCIH appear more profitable helped ensure that shareholders would not redeem their shares for funds from the Trust Account.

144.    The Individual Defendants were financially motivated for the Business Combination to occur.  The approximately $690 million in proceeds in the Trust Account were used as consideration to complete the Business Combination, which was paid to the Seller (as cash consideration) and to PCIH (which was to be used to pay off existing debt and general corporate purposes). Moreover, in connection with the closing of the Business Combination, Defendant Hernandez was granted a stock option to purchase 2,820,000 shares of Class A stock and Defendant Koppy was granted the option to purchase 400,000 shares of Class A stock (along with an RSU award of 373,972 shares).

145.    The Individual Defendants' scienter is even further supported by the fact that there were no new facts or circumstances to change the accounting treatment of these contracts—no new accounting rule, no new process by CMS, and no new auditor for Cano—between the issuance of the Proxy soliciting approval of the Business Combination and the announcement of the restatement.  Therefore, the most reasonable inference is that the Individual Defendants knew or recklessly disregarded the correct GAAP treatment of Medicare contracts. Indeed, Credit Suisse reports that investors believed "the company was intentionally trying to overstate its financials for the first few quarters post its" Business Combination.

## VIII.    CORPORATE SCIENTER ALLEGATIONS

146.    Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Cano, including each high ranking officer or director, is imputable to Cano. The knowledge of each of these individuals should therefore be imputed to the Company for the purposes of assessing corporate scienter.

147.    Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Cano as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the revenue recognition for a majority of the Company's contracts (i.e., Medicare Advantage)—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## IX.    CLASS ACTION ALLEGATIONS

148.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Cano securities between May 7, 2021 and August 10, 2023, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

149.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Cano's shares actively traded on the NYSE.  While

58

the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Cano shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Cano or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

150.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

151.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

152.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Cano; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

153.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    UNDISCLOSED ADVERSE FACTS

154.    The market for Cano's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Cano's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Cano's securities relying upon the integrity of the market price of the Company's securities and market information relating to Cano, and have been damaged thereby.

155.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Cano's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Cano's business, operations, and prospects as alleged herein.

156.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Cano's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or

60

misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

157.    The market for Cano's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Cano's securities traded at artificially inflated prices during the Class Period.  On September 16, 2021, the Company's share price closed at a Class Period high of $15.44 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Cano's securities and market information relating to Cano, and have been damaged thereby.

158.    During the Class Period, the artificial inflation of Cano's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Cano's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Cano and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

61

159.   At all relevant times, the market for Cano's securities was an efficient market for the following reasons, among others:

(a)   Cano shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Cano filed periodic public reports with the SEC and/or the NYSE;

(c)   Cano regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Cano was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

160.   As a result of the foregoing, the market for Cano's securities promptly digested current information regarding Cano from all publicly available sources and reflected such information in Cano's share price. Under these circumstances, all purchasers of Cano's securities during the Class Period suffered similar injury through their purchase of Cano's securities at artificially inflated prices and a presumption of reliance applies.

161.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse

62

information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.   NO SAFE HARBOR

162.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Cano who knew that the statement was false when made.

## XIII.  CLAIMS

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

163.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

164.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Cano's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

165.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Cano's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

166.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Cano's financial well-being and prospects, as specified herein.

167. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cano's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Cano and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

168. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

169. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

65

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cano's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

170. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Cano's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Cano's securities during the Class Period at artificially high prices and were damaged thereby.

171. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Cano was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Cano securities, or, if they had

acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

172. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

173. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

174. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

175. Individual Defendants acted as controlling persons of Cano within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67

176. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

177. As set forth above, Cano and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XV.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

68

Dated: _____, 2023

Respectfully submitted,

_____
Leo W. Desmond, Esquire
Florida Bar Number 0041920
**DESMOND LAW FIRM, P.C.**
601 21st Street, Suite 300
Vero Beach, Florida 32960
Telephone: 772.231.9600
lwd@desmondlawfirm.com

*Liaison Counsel for Gudelio Fundora and for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler (admitted pro hac vice)
Pavithra Rajesh (admitted pro hac vice)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: csadler@glancylaw.com
        prajesh@glancylaw.com

*Counsel for Lead Plaintiff Gudelio Fundora and Lead Counsel for the Class*

# EXHIBIT A

**SWORN CERTIFICATION OF PLAINTIFF
CANO HEALTH, INC. (CANO) SECURITIES LITIGATION**

I, Gudelio Fundora, certify that:

1.      I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2.      I did not purchase the Cano Health, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in Cano Health, Inc. securities during the period set forth in the Complaint are as follows:

(See attached transactions)

5.      I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

10/19/2023
_____
Date

*Gudelio Fundora*
_____
Gudelio Fundora

**Gudelio Fundora's Transactions in Cano Health, Inc. (CANO)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 10/20/2021 | Bought | 5,000 | $12.0000 |
| 10/26/2021 | Bought | 3,000 | $11.0900 |
| 2/28/2022 | Bought | 2,143 | $4.6800 |
| 3/1/2022 | Sold | -2,143 | $5.5100 |

# EXHIBIT B

**EFiled:  May 03 2023 04:57PM EDT**
**Transaction ID 69948536**
**Case No. 2023-0477-PAF**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BARRY STERNLICHT, DR. LEWIS GOLD, ELLIOT COOPERSTONE<br><br>Plaintiffs,<br><br>v.<br><br>MARLOW HERNANDEZ, ANGEL MORALES, JACQUELINE GUICHELAAR, ALAN MUNEY, KIM RIVERA, AND SOLOMON TRUJILLO<br><br>Defendants,<br><br>and<br><br>CANO HEALTH, INC.<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 2023-477-PAF<br><br>PUBLIC VERSION FILED<br>MAY 3, 2023 |

## VERIFIED COMPLAINT TO REOPEN WINDOW FOR STOCKHOLDERS TO MAKE DIRECTOR PROPOSALS AND NOMINATIONS AT THE 2023 ANNUAL MEETING

Plaintiffs Barry Sternlicht, Dr. Lewis Gold, and Elliot Cooperstone ("Plaintiffs"), by and through their undersigned counsel, hereby allege upon personal knowledge as to their actions, and upon information and belief as to all other allegations herein, as follows:

### PRELIMINARY STATEMENT

1. Plaintiffs are beneficial owners of shares representing more than 36% of the voting power of Cano Health, Inc. ("Cano" or the "Company") and former members of Cano's Board of Directors (the "Board").  Extraordinary and material

issues have transpired after the window to make nominations and proposals closed on February 15, 2023 (the "Nomination Deadline"), including rampant self-dealing, a thwarted investigation into related-party transactions by outside counsel, unfathomable directorial fealty to a compromised CEO who borrowed tens of millions of dollars from individuals who sold companies to Cano, the formation of a "Special Committee" that wrongfully excluded Plaintiffs and usurped Board power in violation of Delaware law, and Plaintiffs resigning as directors because Defendants—who make up the balance of the Board—effectively blocked any further investigation of the conflicted transactions, and broadly precluded Plaintiffs from performing their jobs as directors. Plaintiffs therefore bring this action to reopen the window under Cano's Bylaws (the "Bylaws") for stockholders to propose the removal of one or more directors pursuant to 8 *Del. C.* § 141(k) and to nominate director candidates at the 2023 annual meeting ("Annual Meeting"). The brazen nature of these governance failures may be the subject of further fiduciary duty litigation, but the issues in this action are limited to reopening the window to prevent the Company from abusing its advance notice bylaws to the detriment of its stockholders.

2.      On March 7, 2023, outside counsel at Weil, Gotshal & Manges LLP ("Weil"), which the Board retained to investigate related-party transactions and pledging activities of Cano's CEO, Dr. Marlow Hernandez ("Dr. Hernandez"),

presented their interim conclusions to the Board. Weil reported that it found Dr. Hernandez's borrowing and pledging activities to be "egregious violations of the Company's code of conduct," and that his activities required remediation. Defendants, however, refused to recommend any meaningful disciplinary action against Dr. Hernandez.

3. The Board immediately took steps to thwart Plaintiffs efforts to bring full transparency and accountability at the Board level and to retaliate against them for their insistence on pursuing the investigation. While Weil's review was underway, the Board called a special meeting for March 17, 2023, in which Defendants formed a sham Special Committee comprised of all directors *other* than Plaintiffs, with Dr. Hernandez permitted to be an "observer" on the Special Committee. The purported Special Committee was granted an enormously wide scope of authority, which had the effect of unlawfully precluding Plaintiffs from fulfilling their fiduciary duties as directors and creating a "shadow board."

4. On March 30, 2023, the Board met again, and Weil provided another interim report regarding troubling evidence that Dr. Hernandez's father, Jose Hernandez, through a number of companies, had likely been directly or indirectly paid by Cano without proper vetting of conflicts of interest or making related-party disclosures. Weil stated that further additional investigation would be required.

5. Although the Board had learned of a number of troubling transactions, including facts which showed that Dr. Hernandez had lied about the Company's dealings with his father, Defendants continued to refuse to hold Dr. Hernandez accountable. Instead, Defendants announced that the "Special Committee" had decided that the Company was "moving on," and that the Board would be retaining Dr. Hernandez as CEO.

6. Plaintiffs resigned during or immediately following the meeting. Plaintiffs had no choice but to resign because, among other reasons, the Board refused to remove Dr. Hernandez and because the Board's conduct prevented them from exercising their fiduciary obligations.

7. As required under the federal securities laws, each Plaintiff filed a Schedule 13D disclosing their concerns regarding Dr. Hernandez's leadership and the other Defendants' firm alignment with him.

8. The material facts that caused Plaintiffs' resignations have been exacerbated by new revelations unearthed after their resignations.

9. For example, on April 6, 2023, in the wake of Plaintiff's resignations, Dr. Hernandez filed a Schedule 13-D publicly disclosing—*for the first time*—(i) a *$30 million* loan made by the Company's Chief Operating Officer, Robert Camerlinck to Dr. Hernandez and his affiliated companies, over a year before, on February 28, 2022; (ii) that the promissory note (the "Note") had been guaranteed

- 4 -

by two current and one former Cano officers; and (iii) that Dr. Hernandez and his guarantors had repaid the $30 million loan on April 5, 2023, through another related-party transaction: the transfer of 20,000,000 shares of stock to Mr. Camerlinck, about 3.79% of the voting power of the Company (the "Repayment Agreement").

10.     Then, on April 17, 2023, the Company announced that Defendant Solomon "Sol" Trujillo had succeeded Dr. Hernandez as Chairman of the Board, with Dr. Hernandez remaining a director and CEO.  The Company touted Mr. Trujillo's appointment as strengthening its corporate governance.  However, Plaintiffs had discovered just one week earlier that Mr. Trujillo—who served as Lead Independent Director of the Company and was required to have "no material relationships with the Company"—is also compromised.  Cano, a company in dire financial shape, recently spent hundreds of thousands of dollars sponsoring a 2022 conference put on by Mr. Trujillo's company, L'Attitude, LLC.  This transaction has never been disclosed.

11.     Under Cano's bylaws, the advance notice window for the Annual Meeting to make stockholder proposals and nominate candidates closed on February 15, 2023.  Cano has provisionally set June 28, 2023, as the Annual Meeting date. Cano has a classified board, currently consisting of six members.  Two Class II directors, Defendants Alan Muney and Kim Rivera, will be up for election at the 2023 Annual Meeting.

- 5 -

12.     The aforementioned material developments all transpired or were discovered *after* the February 15, 2023 deadline, and have dramatically changed the Company's future prospects and altered the total mix of information available to stockholders.  These developments have also raised significant questions regarding the suitability of the Defendants to serve as fiduciaries.

13.     On April 14, 2023, Plaintiffs delivered a letter to Cano's outside counsel at Weil, demanding that Cano's Board waive the advance notice bylaw, and reopen the window to make director proposals and nominations.  Cano's Board has not responded.

14.     Advance notice bylaws have utility because they create certainty and predictability for the orderly conduct of stockholder meetings.  However, where the Company's own actions and recent public disclosures raise serious and fundamental questions about boardroom misconduct, self-dealing, and whether the remaining directors are suitable to serve as fiduciaries, the Company (through those same directors) cannot invoke such bylaws to thwart the will of stockholders and interfere with the stockholder franchise. These public disclosures, moreover, are just the tip of the iceberg, with Defendants' having curtailed Weil's internal investigation, and then suppressing disclosure of Weil's factual findings.

15.     Having shown a greater allegiance to Dr. Hernandez than to Cano's stockholders, Defendants have left Plaintiffs with no recourse except to seek the

removal of Dr. Hernandez, Mr. Trujillo, and potentially other self-dealing partners on the Board pursuant to 8 *Del. C.* § 141(k).  In light of Defendants' malfeasance and breaches of fiduciary duties, equity requires that Cano's stockholders be provided an opportunity to determine whether to elect new directors and remove Dr. Hernandez and others for cause.  The advance notice bylaw must be waived.

16.     Plaintiffs therefore petition this Court to issue an order permanently enjoining Defendants from enforcing the advance notice bylaw for the Annual Meeting or, in the alternative, to set a new deadline in advance of the upcoming Annual Meeting by which stockholders may comply with the notice requirements. Should the Court grant the relief sought, Plaintiffs will submit proposals aimed at correcting the course of the Company, including to nominate two director candidates on Cano's classified Board of Directors, and to remove Dr. Hernandez, Mr. Trujillo, and potentially others for cause.

**THE PARTIES**

17.     Plaintiff Barry Sternlicht is a significant stockholder and former director of the Company.  While a director, Mr. Sternlicht was a member of Cano's Nominating and Corporate Governance Committee (the "NCGC").  Mr. Sternlicht was the Chairman of JAWS Acquisition Corp. ("JAWS"), the SPAC that was Cano's predecessor company.  He is the beneficial owner of 25,480,624 shares of Cano's Class A common stock, through which he controls approximately 4.8% of the

- 7 -

Company's voting power.[1]  Mr. Sternlicht founded Starwood Capital Group, a private alternative investment fund, and serves as its Chairman and Chief Executive Officer.  He also serves as Chairman and CEO of Starwood Property Trust, a leading diversified finance company.  He is also a member of the board of the Estée Lauder Companies and has served as a director of Tri Pointe Homes, Inc., Restoration Hardware Holdings, Inc., A.S. Roma, and Invitation Homes, Inc., among other entities.

18.     Plaintiff Elliot Cooperstone is a significant stockholder and former director of the Company.  He is the record owner of 14,825 shares of Cano's Class A common stock.  Mr. Cooperstone is also the founder and Managing Partner of InTandem Capital Partners, LLC ("ITC"), a private equity firm.  Beginning in 2016, ITC invested in Cano Health through its affiliate, ITC Rumba LLC ("ITC Rumba"), prior to the business combination with JAWS.  ITC Rumba is the record owner of 159,780,988 shares of Cano Class B common stock.  Together with ITC, Mr. Cooperstone controls approximately 30.3% of the Company's voting power.

19.     Plaintiff Lewis Gold is a significant stockholder and former director of the Company.  Dr. Gold served as a member of Cano's Audit Committee and its

---

[1] Under Cano's Certificate of Incorporation, holders of Cano's Class A and Class B common stock are each entitled to one vote per share.

Compensation Committee. Dr. Gold owns 14,825 shares of Cano's Class A common stock and, individually and through entities he controls, is beneficial owner of 1,706,760 shares of Cano's Class A common stock and 1,391,935 shares of Cano's Class B common stock, representing 1% of Cano's voting power.

20. Defendant Marlow Hernandez is the founder, director, and Chief Executive Officer of Cano. He has been a director of Cano since 2021, and his term expires in 2024. Dr. Hernandez served as Cano's Chairman between June 2021 and April 17, 2023. According to the Schedule 13D/A filed on April 6, 2023, Dr. Hernandez beneficially owns 25,108,418 shares of Cano, or 4.75% of the aggregate Class A and Class B common stock outstanding, which includes the option to repurchase the 8,536,936 Class B Shares transferred to Mr. Camerlinck pursuant to the Repayment Agreement.

21. Defendant Angel Morales has been a director of Cano since 2021 and his term expires in 2024. Mr. Morales serves as Chair of Cano's Audit Committee. He currently beneficially owns 62,902 shares of Class A common stock of Cano. On information and belief, these Class A shares consist entirely of director compensation. He is also a beneficial owner, through an entity named Morales Borrower Holdings LLC, of 6,968,507 shares of Class B common stock. In total Mr. Morales owns less than 2% of Cano's total voting power. According to the Company's public filings, all of these shares have been pledged to a "certain lender."

22.     Defendant Jacqueline Guichelaar has been a director of Cano since 2021 and her term expires in 2024.  Ms. Guichelaar is a member of Cano's Audit Committee.  She beneficially owns 62,902 Class A common stock of Cano, which represents less than 1% of Cano's voting power. On information and belief, these Class A shares consist entirely of director compensation.

23.     Defendant Alan Muney has been a director of Cano since 2021 and his term expires in 2023.  He is the Chair of Cano's Compensation Committee and is a member of the Audit Committee.  He beneficially owns 62,902 Class A common stock of Cano, which represents less than 1% of Cano's voting power. On information and belief, these Class A shares consist entirely of director compensation.

24.     Defendant Kim Rivera has been a director of Cano since 2021 and her term expires in 2023.  She is the Chair of Cano's NCGC and a member of its Audit Committee.  She beneficially owns 62,902 Class A common stock of Cano, which represents less than 1% of Cano's voting power.  On information and belief, these Class A shares consist entirely of director compensation.

25.     Defendant Solomon Trujillo is a director of Cano, and is a member of Cano's NCGC.  On April 17. 2023, he was elevated to position of Chairman.  Before he was elevated to Chairman, Mr. Trujillo was Cano's "Lead Independent Director," which required that he have "no material relationship with the Company" and "not

[be] significantly aligned with any particular shareholder group(s) such that there is even the appearance that the Lead Director may not represent all shareholders."[2] Mr. Trujillo beneficially owns 166,663 Class A Common stock and 13,680,443 shares of Class B common stock of Cano, which represents less than 3% of Cano's voting power.

26.     Nominal Defendant Cano is a Delaware corporation with its principal place of business in Miami, Florida.   On June 3, 2021, Cano became a public company through a combination with JAWS.  Cano stock trades on the NYSE under ticker symbol CANO.

27.     Non-party Robert Camerlinck is Cano's Chief Operating Officer.

28.     Non-party Richard Aguilar is Cano's Chief Clinical Officer.

29.     Non-party Rick Sanchez is Cano's former Chief Marketing Officer.

## SUBSTANTIVE ALLEGATIONS

### Cano Health

30.     Cano is a value-based primary care provider and population health company that provides health care services through over 170 owned medical centers and affiliate relationships with other health care providers.   Cano predominantly

---

[2] *See* Corporate Governance Guidelines, Section L, available at https://s27.q4cdn.com/826681067/files/doc_downloads/Corporate_Governance_ Guidelines.pdf.

enters into capitated contracts with the nation's largest health plans to provide holistic, comprehensive healthcare.  Cano receives the majority of its revenue from Medicare, through Medicare Advantage plans.

31.     When Cano agreed to the business combination with JAWS, it had an enterprise value of $4.4 billion, with additional funding through a fully committed $800 million PIPE.  Demonstrating its belief in the Company, ITC remained Cano's largest stockholder following the business combination.

32.     Cano's shares have declined by a shocking 92.5% since the business combination closed in 2021, a staggering underperformance relative to the S&P 500 Index, S&P Healthcare Sector Index, Russell 2000 and practically every possible peer.  Since then, Cano has depleted all of the roughly $535 million of capital it had on its balance sheet and most of the approximately $1 billion of debt capital raised since then.

33.     As of the new year, Plaintiffs knew that Cano needed to make significant changes to get the Company's performance back on track.  As some of the Company's largest stockholders, Plaintiffs' interests were and are aligned with other stockholders, in that they seek to enhance and increase stockholder value over the long term.

**Cano's Advance Notice Bylaw**

- 12 -

34.     Section 2(a)(b) of Cano's Bylaws require timely notice of nominations or other business to be brought no later than 90 days and no earlier than 120 days before an annual meeting:

> For nominations or other business to be properly brought before an Annual Meeting by a stockholder pursuant to clause (ii) of Article I, Section 2(a)(1) of these By-laws, the business must be (i) specified in the notice of the meeting (or any supplement thereto) given by or at the direction of the Board of Directors, (ii) brought before the meeting by the person presiding over the meeting or (iii) otherwise properly requested to be brought before the meeting by a stockholder of the Corporation in accordance with this Section 2(a) of Article I of the By-laws. For business to be properly requested to be brought before an Annual Meeting by a stockholder, the stockholder must (i) be a stockholder of the Corporation of record at the time of the giving of the notice for such Annual Meeting, (ii) be entitled to vote at such Annual Meeting, (iii) have given Timely Notice (as defined below) thereof in writing to the Secretary of the Corporation, (iv) have provided any updates or supplements to such notice at the times and in the forms required by these By-laws and (v) together with the beneficial owner(s), if any, on whose behalf the nomination or business proposal is made, have acted in accordance with the representations set forth in the Solicitation Statement (as defined below) required by these By-laws.
>
> To be timely, a stockholder's written notice shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the one-year anniversary of the preceding year's Annual Meeting[.]

35.     Section 2(a)(1) of Cano's Bylaws state that stockholders "must comply with the notice and other procedures set forth" in the Bylaws "to bring such nominations or business properly before an annual meeting," and that the Bylaws set

- 13 -

forth the "exclusive means for a stockholder to bring nominations or business properly before an Annual Meeting."

36.    Cano's annual stockholder meeting for 2022 took place on May 16, 2022.  Accordingly, written notice of nominations or business to be brought at the Company's 2023 Annual Meeting was due no later than ninety days prior to May 16, 2022, on or before February 15, 2023.

## Cano's Policies Concerning Related-Party Transactions and Conflicts of Interest

37.    Cano has in place certain policies designed to identify and address potential conflicts of interest that may impact the performance and decisions of its officers and directors.  These policies largely require the officer or director to self-report, so that the conflict of interest can be reviewed, as appropriate, by the Board's Audit Committee or NCGC.

38.    These policies include an anti-pledging policy, a policy concerning related-party transactions and, more broadly, conflicts of interest.

39.    Cano has in place a broad policy governing conflicts of interest, which is set forth in its Code of Business Conduct and Ethics.  The policy defines a conflict of interest as "any personal or business activity or relationship, whether for-profit, volunteer or charitable, that could be viewed or interpreted by the Company as actually or potentially inconsistent with or opposed to the Company's best interests,

- 14 -

or that creates or gives the appearance of impropriety or divided loyalty as determined by the Company."

40. The policy places the burden on officers and directors to self-report potential and actual conflicts of interest. For Dr. Hernandez and other executive officers, the proper line of reporting was to the Chief Compliance Officer and Corporate Secretary, who are in turn to notify the Chair of the NCGC for review by the full committee.

41. According to Cano's 2022 proxy filed with the SEC on May 6, 2022, the anti-pledging policy is as follows:

> We also have an anti-pledging policy whereby **no executive officer or director may pledge the Company's securities as collateral for a loan (or modify an existing pledge) unless the pledge has been approved by the Audit Committee and the amount borrowed by such executive officer or director does not exceed more than 25% of the total value of such person's holdings of the Company's securities**. As described earlier in this CD&A, we have a pay-for-performance compensation philosophy under which compensation is predominantly earned and delivered in the form of equity. Given that our executive compensation program is heavily weighted towards equity and as a newly public company, we believe permitting **a limited amount of pledging is necessary and appropriate because it mitigates the need for executives to sell Company shares** to address unanticipated or urgent personal and family liquidity needs. As part of its risk oversight function, the Audit Committee will regularly review any share pledges to assess whether such pledging poses an undue risk to the Company.

- 15 -

(emphasis added.)

42.     Cano's board has also adopted a Related Person Transaction Policy that requires review and oversight by the Audit Committee of related person transactions involving its officers and directors.  Such transactions must be elevated to the Audit Committee, with the requirement that all material information be disclosed:

> The Company's Audit Committee shall review the material facts of all related person transactions. The Company shall provide the Audit Committee with all material information regarding the related person transaction, the interest of the related person and any potential disclosure obligations of the Company in connection with such related person transaction. **To identify related person transactions in advance, the Company will rely on information supplied by the Company's executive officers, directors and certain significant stockholders**. In considering related person transactions, the Company's Audit Committee will take into account among other factors that it deems appropriate, whether the related person transaction is on terms no less favorable to the Company than terms generally available in a transaction with an unaffiliated third-party under the same or similar circumstances and the extent of the related person's interest in the related person transaction.

(emphasis added.)

43.     The Company also requires members of the Board of Directors and its Officers to fill out detailed questionnaires in connection with the proxy statement for annual meetings and the Form 10-K Annual Report. The Directors and Officers questionnaires contain multiple questions that require disclosure on related party

- 16 -

transactions and loans, and required broad disclosure on any material relationships and any payment and compensation received.

### Plaintiffs Learn Material Information Regarding Dr. Hernandez's Related-Party Transactions after the Nomination Window Closes

44.    In January 2023, as the Company was preparing its annual report on Form 10-K and its audit, Cano's Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO") notified members of the Board that they were concerned about whether related party issues and conflicts of interest involving a loan to Dr. Hernandez and his pledging of stock needed to be reported.

45.    At the time, the primary question was whether the Company had met all applicable disclosure requirements.  The CFO and CAO were particularly concerned that they had discovered that COO Camerlinck had made a loan to Dr. Hernandez, which had never been disclosed.

46.    Cano's CFO and CAO expressed their unwillingness to sign the Form 10-K, which was due to be filed on March 1, 2023, until they received a legal opinion on the topic.

47.    In January or early February 2023, the Company retained Weil, on behalf of the Board to investigate certain of Hernandez's related-party transactions, with a focus on certain borrowing and pledging activities.

48.   Of note, between September 2021 and December 2022, Dr. Hernandez had made a series of filings that contained the following disclosures regarding related-party transactions:

- Dr. Hernandez had disclosed in his initial Schedule 13D filed with the SEC on September 27, 2021, that his wholly-owned entity, Hernandez Borrower Holdings, LLC ("HBH"), had pledged all 22,034,622 shares of its Class B common stock as security for a margin loan agreement.

- In a prospectus supplement filed on October 4, 2021, the Company also disclosed that HBH and corporate affiliates of key Cano executives, Dr. Richard Aguilar, the Company's Chief Clinical Officer, Jason Conger, the Chief Growth Officer, and Rick Sanchez, the former Chief Marketing Officer, had each pledged all of their shares "to a certain lender in connection with a financing arrangement," (note that there was no suggestion that these pledges were related to each other).

- On May 31, 2022, Dr. Hernandez filed Amendment No. 1 to the 13D, in which he disclosed that HBH had "pledged all 22,034,622 shares of Class A and Class B common Stock it holds in connection with a financing arrangement," and "had borrowings totaling approximately $2.4 million in aggregate principal amount under the financing arrangement."

- On December 16, 2022, Dr. Hernandez filed Amendment No. 2 to his Schedule 13D, which stated that "the Margin Loan Agreement, dated as of August 25, 2021. . . was terminated on December 12, 2022," and no longer included the language about HBH's pledged shares. This implied that his stock was no longer pledged.

49.   Following its preliminary investigation, Weil provided an oral report to the Board of its findings at a March 7, 2023, Board meeting.

50.   Weil reported that its investigation revealed that Dr. Hernandez's May 31, 2022 and December 16, 2022 Schedule 13D/As were, at a minimum, misleading,

- 18 -

and that Dr. Hernandez had engaged in multiple other troubling undisclosed loan transactions (that have never been disclosed).

51. With respect to the loan made by Mr. Camerlinck, the Board learned that, although the margin loan agreement referenced in Dr. Hernandez's September 27, 2021, 13D had apparently terminated, in February 2022, Dr. Hernandez and his affiliated companies had received a $30 million loan from Robert Camerlinck, Cano's current Chief Operating Officer. The loan was secured by a Promissory Note, secured by his personal assets, to Mr. Camerlinck, as had the corporate affiliates of Dr. Aguilar, Mr. Conger and Mr. Sanchez, who served as Dr. Hernandez's guarantors.

52. Weil's report at the March 7 meeting was the first time Plaintiffs learned that the loan was for $30 million dollars, and that Dr. Hernandez and other Company officers had pledged their personal assets which included millions of shares to Mr. Camerlinck.

53. This information was deeply disturbing on many levels.

54. First, Mr. Camerlinck was not COO in February 2022, when he loaned $30 million dollars to Dr. Hernandez. Rather, Mr. Camerlinck was president of a portfolio company Cano had purchased. Mr. Camerlinck was promoted to COO a few months after making this sizeable loan to Dr. Hernandez. In his new role, Mr. Camerlinck reports directly to Dr. Hernandez.

- 19 -

55. Second, Dr. Hernandez's $30 million indebtedness to Mr. Camerlinck was not disclosed in the Company's Form 8-K announcing Mr. Camerlinck's promotion to COO.

56. Third, Mr. Camerlinck has had extensive business dealings with the Company and is affiliated with a company critical to Cano's business operations. Mr. Camerlinck owns 20% of MedCloud Depot, LLC ("MedCloud"), a Florida-based software development firm that specializes in health information technology and data warehousing. Cano has a non-exclusive licensing agreement with MedCloud, whose technology is mission critical to the Company's conduct of its business. Because MedCloud is critical to Cano's business operations, Mr. Camerlinck's ownership interest in MedCloud positions him to be able to exert leverage over the Company, should he choose to do so.

57. The Promissory Note violated the Company's policies and code of conduct, and it was neither disclosed to nor approved by Plaintiffs, including Dr. Lewis Gold, a former member of Cano's Audit Committee. Dr. Hernandez also likely violated federal securities laws by failing to promptly disclose the Promissory Note in February 2022, and filing a misleading 13D/A in December 2022 implying that he had paid off his debt.

58. At the March 7, 2023 Board meeting, Plaintiffs also learned of three other troubling, undisclosed loans. For example, Weil reported that Dr. Hernandez

- 20 -

had borrowed approximately $4 million and $4.7 million from individuals whose families had sold businesses to Cano, and that these loans were in or near default. To Plaintiffs' knowledge, these loans were not vetted by the Audit Committee, on which Dr. Gold sat, nor the NCGC, on which Mr. Sternlicht sat.

59.     At the March 7, 2023 meeting, Weil stated that it found Dr. Hernandez' borrowing and pledging activities to be "egregious violations of the Company's code of conduct" and that Dr. Hernandez's borrowing and pledging activities required remediation.

60.     Despite the egregious nature of these violations, the Company's Form 10-K was filed on March 15, 2023 without disclosing them based on guidance that was provided by Weil.

61.      Despite Weil's finding that Dr. Hernandez had engaged in egregious misconduct, Defendants Morales, Guichelaar, Muney, Rivera and Trujillo decided that Dr. Hernandez should continue as CEO, and stated that they would not consider recommending any meaningful disciplinary action against Dr. Hernandez.

### Defendants Retaliate Against Plaintiffs and Form a Sham Special Committee

62.     Almost immediately after Weil's March 7 oral report to the Board, it became clear that the Defendants were purposefully excluding Plaintiffs from material discussions and decision-making on critical topics, and denying Plaintiffs

- 21 -

access to the full information, discussion and debate to which they were entitled as directors.

63.     Specifically, after the March 7, 2023, meeting, at Dr. Gold's insistence, the Board directed Weil to investigate related party transactions at Cano that were discovered during the course of the loan investigation, starting with those involving Dr. Hernandez father, Jose Hernandez.  But the Defendants then immediately took actions to retaliate against all three Plaintiffs for demanding that the Board perform further investigation and to insulate Dr. Hernandez from accountability.

64.     While Weil's review was underway, the Board called a video meeting on March 17, 2023.  Over Mr. Cooperstone's and Dr. Gold's objections, Defendants Morales, Guichelaar, Muney, Rivera and Trujillo announced that they had formed a Special Committee.  Defendants contended that forming a Special Committee was necessary in anticipation of a potential resignation from the Board by Barry Sternlicht.  Mr. Sternlicht had previously indicated that he was considering resignation because of the Company's disastrous performance under Dr. Hernandez's leadership and the Board's refusal to call Dr. Hernandez to account.  In other words, the purpose of this Special Committee was *explicitly* to sideline a director favoring oversight.

65.     This was an obvious pretext.  The Special Committee did not just exclude Mr. Sternlicht.  The Special Committee also excluded Dr. Gold and Mr.

- 22 -

Cooperstone, such that the "Special Committee" consisted of all Board members *other* than Plaintiffs.

66.    Further, according to the Special Committee's Charter, which upon information and belief had been prepared secretly by Defendants in advance of the March 17 meeting, contained a mandate that stretched broadly into corporate governance and operational matters not in any way relevant to Sternlicht's potential resignation:

> The Committee is responsible for (i) ensuring the Company has the proper readiness planning in place to effectively consider, explore, review, analyze and evaluate the strategic positioning of the Company, including, without limitation, how the current composition of the Board may positively or negatively affect the Company's positioning; (ii) investigating, reviewing, and evaluating the relationships among the Board and employees and officers of the Company and how those relationships have fostered or hindered the Company's ability to increase and sustain shareholder value; (iii) investigating, reviewing, and evaluating any potential conflicts of interest currently possessed by any members of the Board ("Conflict Matters"), including, without limitation, analysis of the materiality of any such conflicts and how any such conflicts may be directly or indirectly adversely affecting the operational and/or financial performance of the Company, and (iv) taking other such actions as are advisable and in the best interests of the Company and its stockholder in connection with the foregoing (i)-(iv), the "Purpose of the Committee").

- 23 -

67. Defendants thereafter used the Special Committee as a means of excluding each of the Plaintiffs from deliberations and decisions that should have been the province of the full Board.

68. And incredibly, even though the Special Committee's mandate purported to include "investigating, reviewing, and evaluating any potential conflicts of interest," the Special Committee permitted Dr. Hernandez to serve as an "observer."

69. The Special Committee's actions reflect that Defendants Morales, Guichelaar, Muney, Rivera and Trujillo lack independence from Dr. Hernandez, and are effectively controlled and dominated by him. They improperly insulated governance decisions from Plaintiffs, invited the subject of their investigation to observe their deliberations, made the determination to retain Dr. Hernandez fully knowing that an investigation by outside counsel remained incomplete, and failed to meaningfully discipline Dr. Hernandez in any way after findings of "egregious" behavior.

**Defendants Cut Short Any Meaningful Investigation
of Related Party Transactions, Making
Plaintiffs' Continued Board Service Untenable**

70. On March 30, 2023, after approximately one week of investigation, Weil delivered to the Board an interim oral report concerning transactions between Cano and Dr. Hernandez's father, Jose Hernandez. Although the Company had

- 24 -

disclosed in the Form 10-K filed on March 15, 2023 that Jose Hernandez's company had been paid over $23 million in the past three fiscal years for leasehold improvements and repairs and maintenance, the Board received information that Jose Hernandez was involved in other, undisclosed marketing and media activities. Weil further reported that they had discovered facts indicating that there were yet other related-party transactions that required further investigation.

71. Plaintiffs were deeply disturbed by Weil's conclusions. Dr. Hernandez had previously denied that his father was involved in any paid marketing and media activities, and the facts uncovered by Weil demonstrated that Dr. Hernandez had misled Plaintiffs. In Plaintiffs' view, immediate action was appropriate in response to the results of the interim report.

72. But, yet again, Defendants refused to discipline Dr. Hernandez, and instead determined to retain him. Incredibly, Dr. Alan Muney, who chaired the Special Committee, announced immediately after the Weil report concluded and with no discussion that the Special Committee had made the decision that they had heard enough and that Dr. Hernandez would remain CEO, and that they were "moving on."

73. Dr. Gold resigned during the Board meeting; Mr. Sternlicht and Mr. Cooperstone resigned immediately following the meeting. Plaintiffs resigned as directors because of Defendants' brazen fealty to Dr. Hernandez in the face of his

- 25 -

egregious malfeasance, and because Defendants' conduct prevented Plaintiffs from exercising their fiduciary obligations.

74.     Plaintiffs do not know whether Defendants have permitted Weil's investigation to continue, or whether they have impeded or redirected Weil's investigation.  No public disclosures have been made on that issue.

75.     Upon their resignations, Plaintiffs formed a group pursuant to which they agreed to act together to pursue changes at Cano to enhance stockholder value. Each Plaintiff filed a Schedule 13D to which they attached their respective letters of resignation from the Board as required by Section 13(d) of the Securities Act of 1934 and the rules thereunder.

76.     Cano immediately tried to silence Plaintiffs, sending a letter that threatened them with legal action for allegedly disclosing confidential company information and allegedly privileged information learned during the Weil investigation.

## Additional Related and Conflicted Transactions Come to Light after Plaintiffs' Resignations

77.     Since Plaintiffs' resignations (and after the February 15, 2023 advance notice window closed), additional extraordinary facts regarding Dr. Hernandez's conflicted transactions have been revealed.  On or around April 6, 2023, Hernandez publicly disclosed for the first time his *$30 million* loan from COO Camerlinck and

that Chief Clinical Officer Aguilar, Chief Growth Officer Conger, and former Chief Marketing Officer Sanchez had guaranteed the loan. The April 6 disclosure further disclosed that on April 5, 2023, the loan had purportedly been repaid by Dr. Hernandez and the guarantors through the transfer of 20,000,000 shares of Company stock from them to Mr. Camerlinck pursuant to the Repayment Agreement. The Repayment Agreement also conferred upon Dr. Hernandez and the guarantors the option to re-acquire transferred shares at $3.00 per share.

78.    While Plaintiffs had learned some of the details of the related-party loan at the March 7 Board meeting (well after the advance notice window had closed), the Repayment Agreement and transfer of shares was yet another new material transaction that could not have been known at the time the nomination window was open.

79.    Then, on April 17, 2023, Cano announced that Dr. Hernandez would no longer serve as Chairman of Cano's Board and named Defendant Trujillo as the Chairman. This was done to purportedly to "enhance[e] the Company's governance structure and Board Oversight." But Mr. Trujillo, like the other Defendants, had refused to hold Dr. Hernandez accountable after the March 7 and March 30 Board meetings and, as Plaintiffs have recently discovered, has also engaged in self-interested transactions with the Company.

- 27 -

80.     Of particular concern, Cano, a company in dire financial shape, recently spent hundreds of thousands of dollars sponsoring a 2022 conference put on by L'Attitude, LLC, where Mr. Trujillo is a Founder and Managing Partner. These sponsorship expenditures—which appear to provide limited relevant business benefits to Cano—came at a time when the Company was hemorrhaging cash and planning to terminate hundreds of employees.  None of Cano's sponsorship payments to Mr. Trujillo's organization L'Attitude have been disclosed in the Company's filings as a related-party transaction, and to Plaintiffs' knowledge, the sponsorship was not vetted by the Audit Committee, the NCGC or full Board.

81.     Mr. Trujillo is involved in other transactions that should have been vetted for conflicts of interest because they raise questions regarding his independence.  For example, Encantos, an education technology company chaired by Mr. Trujillo, received funding in 2022 from Morales Capital, a firm owned by Cano Board member and Audit Committee Chair Angel Morales.  Mr. Trujillo is also a business partner of Dr. Hernandez's guarantor, Rick Sanchez, in the company Agua Media.

82.     The foregoing revelations regarding Dr. Hernandez's conflicted transactions and the Defendants' refusal to properly investigate them arrive at a critical point for the Company.  Cano's financial status continues to deteriorate, and Cano's performance under Hernandez's leadership has been dismal.  As of March

30, 2023, Cano's total return to stockholders was -83% over the prior 12 months and -92.5% since going public in 2021.  As of yesterday, Cano's stock price closed at $1.12 per share.

83.    Under Cano's Bylaws, Cano's stockholders cannot submit any proposals to be considered at Cano's annual stockholder meeting, because the advance notice window closed on or around February 15, 2023.  Thus, as it stands, Cano's stockholders may miss their only meaningful opportunity to correct the disastrous course that Cano's management has set.

### The Board Wrongfully Refuses to Reopen the Window

84.    On April 14, 2023, Plaintiffs sent a letter to Company counsel advising that the recent disclosures by Dr. Hernandez and the Company and the significant changes at the Company that have occurred following the expiration of the nomination window constitute material changes that required the Board to immediately re-open the window for nominations and proposals.  Plaintiffs noted that the Board's fiduciary duties mandate that it act immediately to re-open the window, and demanded that the Board issue a press release reopening the nomination and proposal window for 30 days following the press release.

85.    Plaintiffs also stated in their April 14th letter that upon the reopening of the window, they are prepared to immediately submit a notice including a

- 29 -

proposal for the removal of one or more directors for cause pursuant to 8 *Del. C.* § 141(k) and a nomination of directors at the Annual Meeting.

86. To date, the Company has failed to respond to Plaintiffs' request.

87. Defendants' refusal to waive or adjust the timing of the Advance Notice Bylaw is, under the circumstances, a breach of their fiduciary duties to the Company's stockholders. Their inequitable conduct violates the fundamental right of Cano's stockholders to exercise their franchise.

88. Plaintiffs therefore seek declaratory and injunctive relief preventing Defendants from enforcing the Nomination Deadline in connection with the 2023 Annual Meeting.

### COUNT I:
### (Breach of Fiduciary Duty)

89. Plaintiffs repeat, reallege and incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

90. Defendants owe Cano's stockholders, including Plaintiffs, the fiduciary duties of loyalty and good faith.

91. Defendants created or revealed material changes in circumstances after the expiration of the Nomination Deadline.

92. Under the circumstances, Defendants had a fiduciary duty to extend the Nomination Deadline to afford stockholders a fair opportunity to nominate directors

and bring other proposals forth, including the removal of one or more directors for cause pursuant to 8 *Del. C.* § 141(k) at the Annual Meeting.

93.     Defendants breached that fiduciary duty by refusing to waive or extend the Nomination Deadline to permit Plaintiffs and other stockholders a fair opportunity to vote on Plaintiffs' Section 141(k) proposal and to nominate candidates for election at the Annual Meeting.

94.     In breach of their fiduciary obligations, Defendants have acted for the disloyal and inequitable purpose of preventing stockholders from taking action that would threaten the Defendants' positions as directors, including by making other stockholder proposals or nominating new directors at the Annual Meeting.

95.     Cano's deteriorating financial condition means that, if Cano's stockholders are not given an opportunity to vote at the Annual Meeting, they may be unable to meaningfully exercise their franchise to fully investigate Dr. Hernandez's and the Board's conduct.

96.     Plaintiffs will be irreparably harmed if they are not entitled to exercise their franchise rights by electing two new directors and seeking the removal of Dr. Hernandez and Mr. Trujillo for cause.

97.     Plaintiffs have no adequate remedy at law, and equity dictates that Defendants must be enjoined from enforcing the advance notice bylaw in connection

- 31 -

with the Annual Meeting, or alternatively that a new deadline must be set for stockholder nominations and proposals.

98.    Plaintiffs are entitled to injunctive and declaratory relief to remedy Defendants' breaches of fiduciary duty.

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Declare that the Nomination Deadline is unenforceable under the circumstances, that the Defendants have breached their fiduciary duties to Cano's stockholders, including Plaintiffs, that Defendants have acted inequitably by refusing to waive the Nomination Deadline in connection with the Annual Meeting, and that Defendants may not reject Plaintiffs' forthcoming Section 141(k) proposal and nomination notice on the basis that it was delivered after the nomination deadline;

(b)    Permanently enjoin Cano from enforcing the Nomination Deadline in connection with the 2023 Annual Meeting or, in the alternative, set a new date by which stockholders may provide timely notice of nominations or other business to be presented at the Annual Meeting;

(c)    If necessary, adjourn the 2023 Annual Meeting to allow the Court sufficient time to consider and render its ruling and allow Plaintiffs sufficient time to submit their stockholder proposal(s) and director nominations and solicit proxies;

(d)    Find that Cano's directors have breached their duty of loyalty to the Company and its stockholders by refusing to waive the advance notice bylaw;

(e)    Award to Plaintiffs their attorneys' fees, costs and expenses incurred in connection with bringing this action;

(f)    Grant such other and further relief as the Court deems just and proper.

/s/ John M. Seaman

OF COUNSEL:

John M. Seaman (#3868)
April M. Ferraro (#6152)
Lori Marks-Esterman (*pro hac vice forthcoming*)
Adrienne M. Ward (*pro hac vice forthcoming*)
Daniel M. Stone (*pro hac vice forthcoming*)
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, NY 10019
(212) 451-2300

ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
(302) 778-1000

*Counsel for Plaintiffs*

*Counsel for Elliot Cooperstone and Lewis Gold*

Tariq Mundiya (*pro hac vice forthcoming*)
Richard Li (#6051)
WILLKIE FARR &
   GALLAGHER LLP
787 7th Avenue
New York, NY 10019
(212) 728-8000

*Counsel for Barry S. Sternlicht*

Dated:  April 28, 2023

- 34 -

# EXHIBIT C

EFiled:  Jun 14 2023 11:52AM EDT
Transaction ID 70196923
Case No. 2023-0477-PAF

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BARRY STERNLICHT, DR. LEWIS GOLD, ELLIOT COOPERSTONE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-0477-PAF |
| MARLOW HERNANDEZ, ANGEL MORALES, JACQUELINE GUICHELAAR, ALAN MUNEY, KIM RIVERA, SOLOMON TRUJILLO, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CANO HEALTH, INC., | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  June 9, 2023
Date Decided:  June 14, 2023

John M. Seaman, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Adrienne Ward, Lori Marks-Esterman, OLSHAN FROME WOLOSKY LLP, New York, New York; *Attorneys for Plaintiffs Dr. Lewis Gold and Elliot Cooperstone.*

John M. Seaman, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Tariq Mundiya, Richard Li, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Plaintiff Barry Sternlicht.*

Blake Rohrbacher, Kevin M. Gallagher, Matthew W. Murphy, Nicole M. Henry, Jordan L. Cramer, Sandy Xu, Mari Boyle, Edmond S. Kim, Morgan R. Harrison, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants Marlow Hernandez, Angel Morales, Jacqueline Guichelaar, Alan Muney, Kim Rivera, Solomon Trujillo, and Nominal Defendant Cano Health, Inc.*

**FIORAVANTI, Vice Chancellor**

Three former directors of Cano Health, Inc. ("Cano" or the "Company") ask the court to issue a preliminary injunction to prevent the Company from holding its annual meeting of stockholders on June 15, 2023 and to enjoin enforcement of the Company's advance notice bylaw.  The plaintiffs, who resigned en masse six weeks after the deadline to submit director nominations and stockholder proposals, contend that it would be inequitable to permit enforcement of the bylaw due to a radical change in circumstances at the Company after the deadline.  For the reasons that follow, the motion is denied.

## I.   BACKGROUND

The facts are drawn from the record developed in connection with the application for a preliminary injunction. The parties have submitted approximately 250 exhibits and deposition testimony from seven fact witnesses.[1]

After depositions were complete, the plaintiffs submitted an affidavit from plaintiff Elliot Cooperstone in support of their motion for a preliminary injunction. The affidavit was accompanied by two audio files, which were produced the evening before Cooperstone's deposition.[2]  Defendants have moved to strike it, arguing that

---

[1] Exhibits are cited as "Ex. #."  Documents that do not already contain page numbers are cited using the last three digits of their Bates number.  After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr."  No disrespect is intended.  Unless otherwise indicated, citations to the parties' briefs are to their preliminary injunction briefs.

[2] Dkt. 70.

plaintiffs could have adduced the information in the affidavit by examining Cooperstone at his deposition, which would have been subject to cross-examination. *See Meyers v. Quiz-DIA LLC*, 2017 WL 76997, at *18 (Del. Ch. Jan. 9, 2017); *Pell v. Kill*, 135 A.3d 764, 770 (Del. Ch. 2016). In the exercise of my discretion, I afford "little if any weight" to the Cooperstone affidavit. *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *19 (Del. Ch. May 22, 2000).

What follows are the facts as they are likely to be found after trial, based on the current record.[3]

### A. The Parties

Cano is a primary care provider and population health company. The Company owns and operates medical centers and delivers healthcare services through affiliate relationships with other providers, focusing primarily on coordinating care to members under Medicare Advantage health plans. The Company is incorporated in Delaware and has its principal place of business in Miami, Florida. Dr. Marlow Hernandez and Richard Aguilar co-founded the Company in 2009.[4] Since its inception, Hernandez has acted as the chief executive officer of the Company. Hernandez controls 4.75% of Cano's voting power.[5] Cano

---

[3] Of course, "the eventual findings of fact after trial could be different." *Pell*, 135 A.3d at 770.

[4] Ex. 10.

[5] Ex. 185 at 58.

2

received early investments from Angel Morales and Solomon Trujillo. Trujillo invested in Cano in 2014 and joined its board of directors shortly before the Company went public in June 2021.[6] Jason Conger and Rick Sanchez also became involved with Cano early in its lifecycle. While Cano remained a private company, Hernandez, Aguilar, Morales, Trujillo, Conger, Sanchez, and other early investors held their shares in Cano through an entity called Cano America.[7]

In 2016, InTandem Capital Partners, LLC ("InTandem"), a private equity firm specializing in healthcare, invested in Cano through its affiliate, ITC Rumba, LLC ("ITC Rumba").[8] Following that investment, InTandem's founder and managing partner, Elliot Cooperstone, joined the Cano board. InTandem, through ITC Rumba, currently holds approximately 30.3% of Cano's total voting power.[9]

Dr. Lewis Gold, a prominent anesthesiologist and healthcare entrepreneur, joined Cano's board in 2018. Gold currently holds approximately 1% of Cano's voting power.[10]

On June 3, 2021, Cano went public through a de-SPAC transaction with JAWS Acquisition Corp. ("JAWS"). Barry Sternlicht was the chairman of JAWS

---

[6] Ex. 5 ("Trujillo Dep.") at 24:2–25.

[7] Ex. 6 ("Hernandez Dep.") at 277:24–279:7.

[8] Ex. 2 ("Cooperstone Dep.") at 28:9–29:19.

[9] Ex. 185 at 58.

[10] Ex. 189 at 35.

prior to the merger.[11]   When Cano merged with JAWS, Sternlicht personally invested $50 million in Cano and joined the Cano board of directors.[12]  Around this time, Sternlicht also raised around $800 million through private placement in public equity ("PIPE") financing and introduced Cano to certain institutional investors.[13] He currently holds approximately 4.8% of the voting power of Cano.[14]

After the merger was consummated, Hernandez ascended to the position of chairman and remained as CEO.  Trujillo, Cooperstone, and Gold also continued as directors, with Trujillo being designated as the Company's "Lead Independent Director."[15]  Morales, Kim Rivera, Dr. Alan Muney, and Jacqueline Guichelaar joined the board after the merger.  Immediately following the merger, Cano's stock was trading at around $15 per share.[16]

Following the merger, Hernandez, Trujillo, Morales, Rivera, Muney, Guichelaar, Sternlicht, Gold, and Cooperstone constituted the Cano board of directors.  Gold, Guichelaar, Muney, Rivera, and Morales served on the Company's

---

[11] Ex. 200.

[12] Ex. 1 ("Sternlicht Dep.") at 193:8–12.

[13] *Id.* at 26:23–29:3.

[14] Ex. 189 at 28.

[15] Ex. 27 at 10.

[16] *Cano Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/cano/historical (listing Cano's closing stock price at $15.09 on June 4, 2021).

Audit Committee, which was chaired by Morales.[17]   Rivera, Guichelaar, Trujillo, and Sternlicht served on the Company's Nominating and Corporate Governance Committee (the "Governance Committee"), which Rivera chaired.[18]

Sternlicht, Gold, and Cooperstone (the "Plaintiffs") control 35.7% of the voting power of Cano.[19]  They resigned from the board on or shortly after March 30, 2023.[20]   Hernandez, Trujillo, Morales, Rivera, Muney, and Guichelaar (the "Defendants") currently serve as Cano's board of directors and are each named as defendants in this case.  Cano has a classified board.[21]  The terms of Rivera, Muney, and Cooperstone were to expire at the 2023 annual meeting.[22]   Following the Plaintiffs' resignations, the board reduced its size to six directors.[23]   Rivera and Muney are on the board slate for the 2023 election of directors.[24]

---

[17] Ex. 27 at 16.

[18] *Id.*

[19] Ex. 185 at 28.

[20] Ex. 156; Ex. 157; Ex. 160.

[21] Ex. 202 at Art. VI § 4.

[22] Ex. 85 at '263.

[23] Cano Health, Inc., Annual Report Amendment No. 1 (Form 10-K/A) (Apr. 7, 2023).

[24] Ex. 185 at 13.

5

**B. Relevant Board Policies**

Cano has a policy that no director may pledge Company securities as collateral for a loan unless the Audit Committee first approves the pledge (the "Anti-Pledging Policy").[25]  The Company explained in its 2022 proxy statement that it viewed a limited amount of pledging as necessary and appropriate, but as part of its risk oversight function, required the Audit Committee to review any share pledges to assess whether the pledging would pose an undue risk to the Company.[26]  According to the Company's 2023 proxy:  "As of December 31, 2022, there were no outstanding pledges for our NEOs and directors."[27]

The Audit Committee is also responsible for reviewing all related person transactions, which the Company defines as "any transaction in which the Company is a participant and a Related Person[, including a director or executive officer of the Company,] has a direct or indirect interest."[28]

---

[25] Ex. 13; Ex. 14.

[26] Ex. 27 at 35.

[27] Ex. 185 at 34.

[28] Ex. 12 (the "Related Party Transaction Policy") at App'x A.  The Company also has a conflict of interest policy that prevents directors, officers, and employees from engaging in activities that could impair, influence, or interfere with the performance of their duties to the Company or their ability to act in the Company's best interest.  *See* Ex. 13 at 3 (the "Conflict of Interest Policy").

6

## C. Hernandez Leverages His Cano Stock

On August 25, 2021, shortly after the de-SPAC merger, Hernandez pledged 22,034,622 of his shares of Cano's Class B common stock to secure a loan from Citibank, which he used to purchase Cano stock on margin.[29]  On September 27, 2021, Hernandez publicly disclosed this loan in a Schedule 13D filed with the United States Securities and Exchange Commission ("SEC").[30]  Conger, Sanchez, Aguilar, and Morales each opened a margin account with Citibank around the same period.[31] At this time, Conger served as Cano's senior vice president of business development, Aguilar served as Cano's chief clinical officer, and Morales sat on Cano's board of directors.

By late 2021, Cano's stock traded around $9 per share, about 40% below its post-merger trading price.[32]  Hernandez began to face margin calls and explored possible sources of funding.[33]  Among those approached was Robert Camerlinck,

---

[29] Ex. 17 at 6–7; *id.* at Ex. D.  Hernandez pledged these shares through a holding company, Hernandez Borrower Holdings, LLC.

[30] Ex. 17.

[31] Ex. 21 § 5.1(b).

[32] *Cano Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/cano/historical.

[33] Hernandez Dep. 185:16–186:23.

the president of Cano's wholly owned subsidiary Healthy Partners, Inc., which Cano had acquired in July 2020.[34]

At a January 26, 2022 board meeting, the Audit Committee shared information on an equity earnout payment to Camerlinck in lieu of a cash payment.[35] At this meeting, Hernandez disclosed that he was considering a loan from Camerlinck.  According to the minutes of that meeting:  "The Board had no objections to the equity in lieu of cash payment, the disclosure of a potential loan, or to the Audit Committee report addressing [pledging], lock up agreements, and disclosures."[36]

In January 2022, Hernandez and his wife, Stephanie Hernandez, borrowed $10 million from Ventura De Paz (the "De Paz Loan").[37]  The loan is memorialized in a January 28, 2022 promissory note.[38]  The De Paz Loan provided for a one-year term, maturing on January 28, 2023.[39]  Six months earlier, Cano had purchased De Paz's company, Doctor's Medical Center, LLC, for $300 million.[40]  Hernandez did

---

[34] *Id.* at 211:13–212:7; *see* Cano Health, Inc., Annual Report (Form 10-K) (Mar. 14, 2022) ("2021 10-K") at 157 (disclosing the acquisition of all assets of Healthy Partners, Inc.).

[35] Ex. 19 at 4.

[36] *Id.*

[37] Ex. 20.

[38] *Id.*

[39] *Id.* § 1.1.

[40] Ex. 16 at 3.

not disclose the De Paz Loan at the January 26 board meeting or any other board meeting in 2022.

On February 28, 2022, Hernandez executed a promissory note and loan agreement providing for a $30 million loan from Camerlinck (the "Camerlinck Loan").[41]  Hernandez secured the loan with stock that his wife owned in Dental Excellence Partners, LLP ("Dental Excellence Partners").[42]  At that time, Dental Excellence Partners was a contractor of Cano.  Aguilar, Conger, and Sanchez guaranteed the Camerlinck Loan.[43]  The terms of the Camerlinck Loan required Hernandez to use the loan proceeds to repay part of his debt to Citibank and to make subsequent loans to Aguilar, Conger, and Sanchez to repay their margin loans from Citibank.[44]  The loan had a maturity date of February 27, 2023.[45]

In April 2022, Onsite Dental purchased Dental Excellence Partners.[46]  At the same time, Cano entered into a strategic partnership with Onsite Dental.[47]  Stephanie Hernandez received cash and stock in Onsite Dental in the sale.[48]

---

[41] Ex. 21.

[42] Hernandez Dep. 206:25–207:17.

[43] Ex. 22; Ex. 23; Ex. 24.

[44] Ex. 21 § 5.1(b).

[45] *Id.* § 1.1.

[46] Ex. 28.

[47] *Id.*

[48] Ex. 204.

At a July 21, 2022 board meeting, Hernandez announced that the Company had created the positions of chief operating officer and chief administrative officer and planned to seek the board's approval to appoint Camerlinck and Amy Charley to those positions, respectively.[49]   On July 30, 2022, the board approved those appointments.[50]   On August 5, 2022, Cano filed a form 8-K, signed by Hernandez, announcing the appointment of Camerlinck as chief operating officer.[51]   The disclosure made no mention of the Camerlinck Loan.[52]   Cano's securities counsel, Goodwin Procter LLP ("Goodwin"), had not been made aware of the loan when preparing the 8-K.[53]

On August 9, 2022, Cano's general counsel, chief compliance officer, and corporate secretary, David Armstrong, contacted Goodwin regarding the Camerlinck Loan.[54]   Armstrong indicated that Hernandez was in default on the first $10 million installment and would likely default on the impending second $10 million installment.[55]   Counsel at Goodwin later recalled these discussions, noting:

> I mentioned to [Armstrong] that the Form 8-K requires companies to disclose any arrangements or understandings between the individual

---

[49] Ex. 32.

[50] Ex. 33.

[51] Ex. 34.

[52] *Id.*

[53] Ex. 77 at '460–61.

[54] *Id.* at '460.

[55] *Id.* at '461.

10

appointed (i.e., in this case, [Camerlinck]) or any other person pursuant to which the individual was appointed as COO. I queried whether [Camerlinck] was appointed as COO by [Hernandez] as a result of the loan. A separate question came up as to whether the loan should be disclosed in a stand-alone Form 8-K or the upcoming Form 10-Q. Per Item 404 of Regulation S-K, we got comfortable that the loan did not have to be disclosed because it was a private loan between two parties —and the company was not a party to the loan.[56]

Goodwin "suggested follow up to ensure the Board was informed."[57] Armstrong discussed the loan with Hernandez, who said that he had informed certain directors of the loan, including Morales, chair of the Audit Committee.[58] Armstrong notified Morales and Rivera, chair of the Governance Committee, of the Camerlinck Loan.[59] At Morales's request, Armstrong posted a memorandum about the loan to the Audit Committee on the Company's online portal.[60] Armstrong informed Weil, Gotshal & Manges LLP ("Weil"), counsel to the board, about the Camerlinck Loan and provided Weil with a memorandum discussing the loan.[61]

On August 27, 2022, Rivera convened a special confidential meeting of all committee chairs to discuss the Camerlinck Loan.[62] Michael Aiello of Weil joined

---

[56] *Id.*

[57] Ex. 79 at 1.

[58] Ex. 36; Ex. 79 at 1.

[59] Ex. 37; Ex. 62; Ex. 79 at 2.

[60] Ex. 79 at 2.

[61] *Id.* Armstrong also provided Weil with the loan documents and the memorandum provided to the Audit Committee.

[62] Ex. 79 at 2.

11

as board counsel, and Hernandez, Lopez, Conger, Armstrong, and other Cano legal staff also attended.[63]  According to a March 11, 2023 timeline of events created by Armstrong:  "Following this special meeting the Directors decided to do nothing about the Camerlinck loan."[64]  Formal minutes were not taken at this meeting.  Gold, Sternlicht, and Cooperstone, were not informed of the issues discussed at that time.

Nevertheless, Cooperstone was generally aware that Hernandez had borrowed money from Camerlinck in mid-summer 2022, although he did not then know the details of that loan.[65]  Gold claims not to have been aware of the Camerlinck Loan at that time, even though he was a member of the Audit Committee, to which Armstrong posted a memo on the subject in August 2022.[66]

### D. Plaintiffs Push for a Sale

As the Cano stock lost its post-merger value, Plaintiffs began pushing the Company to sell.  In November 2022, Sternlicht told the board that the Company must announce that it is for sale and that any other course of action would be

---

[63] *Id.*

[64] Ex. 120 at '796.

[65] Cooperstone Dep. 87:8–15.

[66] Ex. 3 ("Gold Dep.") at 96:4–11; Ex. 36.

negligent.[67]  He proclaimed that Cano was on the verge of insolvency and that the current strategy of relying on revolving debt was infeasible.[68]

During this period, Cano was in exclusive talks with CVS to explore a potential acquisition of the Company.[69]  When it was publicly disclosed that CVS walked away from a deal in October 2022, Cano's stock price fell dramatically.  The Company's stock, which had begun October at around $9 per share, was trading for less than $2 by the end of November.[70]  In a November 2022 email exchange, Sternlicht repeated an allegation that Hernandez had told CVS and Humana that the Company was not for sale.[71]  Around the same time, Morales complained that Sternlicht had held an unauthorized meeting with Humana and his bankers to discuss a sale and possible price, even though Cano had been in exclusive talks with CVS.[72]  Humana has a right of first refusal on any sale of the Company under an Amended and Restated Right of First Refusal Agreement executed in connection with Cano's de-SPAC merger.[73]

---

[67] Ex. 40 at 1.

[68] *Id.*

[69] *Id.* at 2.  The CVS deal fell through at the end of October 2022.  Cooperstone Dep. 274:8–10.

[70] *Cano Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/cano/historical.

[71] Ex. 40 at 3.

[72] *Id.* at 2.

[73] 2021 10-K at 37.

### E. Whistleblowers

Sternlicht had emerged as Hernandez's most vocal critic.[74]  In December 2022, Cano's senior vice president of corporate finance, Amy Wilson, complained to Sternlicht regarding Hernandez's activity, including his loans, tax payments, and other transactions.[75]  The board's counsel at Weil interviewed Wilson on December 22, 2022.  Wilson expressed her concern that Hernandez had taken out loans that she regarded as related party transactions and that no one other than Armstrong, including Cano's accounting team and Goodwin, had the opportunity to review.[76]

On December 30, 2022, the board commissioned a "360 Report," requesting feedback from the Company's senior executives on Hernandez's performance.[77] Muney, chair of the Compensation Committee, sent the report to Trujillo and Rivera on January 7, 2023.[78]  The report revealed that the majority of Cano's executives disagreed that Hernandez exemplified values of high ethical awareness, integrity, and fairness.[79]  It also included complaints that Hernandez had dragged the Company into distracting and conflicted transactions, lacked professionalism, and has an

---

[74] *See, e.g.*, Ex. 40 at 9–11.

[75] *Id.* at 10.

[76] Ex. 41.

[77] Ex. 43.

[78] Ex. 194.

[79] Ex. 43 at 6.

14

inherent conflict of interest regarding his personal finances.[80]  The report was not shared with the full board until March 21, 2023.[81]

On January 11, 2023, Wilson informed Sternlicht that Camerlinck had filed UCC liens against Hernandez, Conger, Aguilar, and Sanchez.[82]  Sternlicht emailed Aiello, Rivera, and Cooperstone regarding this allegation.[83]  Aiello inquired as to the source of the allegation but acknowledged that he was "sure it's accurate."[84]  On January 20, 2023, Sternlicht emailed Aiello, Muney, and Rivera about the UCC filing, reporting that Hernandez, Aguilar, Conger, and Sanchez had granted a first priority lien to Camerlinck in the "Pledged Shares."[85]

Sternlicht also initiated an email chain with Aiello, Gold, Cooperstone, and Muney, inquiring as to the next steps in investigating these loans.[86]  Sternlicht expressed his frustration to Aiello, speculating that Hernandez and his fellow indebted executives may be inflating projections and conducting transactions solely to improve their debt position.[87]  Sternlicht said, "If that doesn't border on

---

[80] *Id.* at 7.

[81] Ex. 148.

[82] Ex. 46.

[83] Ex. 49.

[84] *Id.*

[85] Ex. 51; Ex. 53.

[86] Ex. 55.

[87] *Id.*

15

dismissal... I mean what is so hard?  Why aren't you reading the riot act to these directors and this Board? I don't get it."[88]  Gold tagged on, "I agree with your assessment- our fiduciary duty is to find out exactly who has margin loans and how much."[89]

On January 21, 2023, Hernandez emailed Weil, revealing that in addition to the Camerlinck Loan, he had received three other loans totaling $16 million from individuals who had been bought out in Cano acquisitions.[90]  This included the $10 million De Paz Loan as well as a loan from Margarita Quevedo for $4 million and from Joel Lago for $2 million.[91]  Cano had acquired Quevedo's family business in June 2021 for $609.7 million and had acquired Lago's company in 2017.[92]

Brian Koppy, Cano's chief financial officer, and Mark Novell, Cano's chief accounting officer, became concerned about the non-disclosure of Hernandez's loans.  Koppy sent a four-page email to Sternlicht, Gold, and Cooperstone, explaining that the finance team needed information and guidance as to whether the loans needed to be disclosed in the 10-K.[93]  Gold responded to Koppy:  "We are

---

[88] *Id.* at '461 (cleaned up).

[89] *Id.*

[90] Ex. 57 at '188–90.

[91] *Id.*

[92] Ex. 8 at 2–3; 2021 10-K at Ex. 2.3.

[93] Ex. 61.

16

aware of this and [are] discussing with outside counsel / obviously we will do the right thing once counsel advises – I appreciate you sharing and bringing this to our attention (we have been working on this)."[94]  Plaintiffs forwarded Koppy's email to Aiello and Rivera.[95]  Sternlicht had seen enough.  In an email to Rivera and Aiello, copying Cooperstone, Gold, and Muney, Sternlicht wrote, in pertinent part:

> This is as bright a RED FLASHING LIGHT as you can have and the Board should be shot for not doing something right now.  I think we need to have a Board meeting and get this information THIS WEEK. No more… manana.[96]

Rivera responded to the group that "there is no reason the full board (other than [Morales]) potentially shouldn't have full visibility into [Koppy's] note."[97]  Rivera then wrote separately to Aiello:

> I think we may have hit a tipping point with [Koppy] (and other mgmt) openly going to three board members only, multiple directors calling for [Sternlicht] to be investigated/removed, and [Sternlicht] threatening to sue us.  Not to mention the implication that [Armstrong] is hiding the ball.  I am concerned that we cannot continue our current approach.[98]

Rivera also texted Trujillo: "[W]e have a new issue with [Koppy] now raising issues formally with Lew, Barry and Elliott."[99]  After a call with Cooperstone, Gold,

---

[94] Ex. 59 at '648 (cleaned up).

[95] Id.

[96] Id. (cleaned up).

[97] Ex. 61 at '913.  Morales was identified in Koppy's email as a recipient of funds from the Camerlinck Loan.  Id. at '917.

[98] Id. at '913.

[99] Ex. 58.

Sternlicht, and counsel from Weil, Rivera wrote separately to Weil, "It's important that we not fall into a pattern of updating subsets of the board.  Please help me ensure that, unless there is a specific reason, we provide updates to the full board."[100]

Also in January 2023, Amy Charley, the chief administrative officer of Cano, raised concerns to Weil regarding payments from Cano to Cano Builders USA Inc. ("Cano Builders"), an entity owned by Hernandez's father.[101]  Charley believed that there was a lack of clarity surrounding the Company's relationship with Cano Builders.[102]

As Plaintiffs began receiving complaints about Hernandez from management, the Company was also in discussions with Humana to acquire more financing.[103] Cano had signed a convertible note agreement and certain collaboration agreements with Humana in 2020.[104]  The Plaintiffs hoped to finalize a transaction with Humana before addressing the concerns about Hernandez.[105]

---

[100] Ex. 65.

[101] Ex. 70.

[102] *Id.*

[103] Ex. 213 ("[D]uring the last Board meeting we instructed management, the special Board Committee (Angel & Lew), and our advisors to pursue the Humana transaction and any viable alternative avenue.").

[104] Ex. 35.

[105] Ex. 60 (replying to Koppy's email detailing concerns about Hernandez with the statement that "my hope is that we get Hum deal done next week and immediately address this issue"); *see also* Ex. 63 ("Do you mean where do we stand on closing Humana?  That is all Barry, Elliott, Lew and Amy (newest board member) care about." (cleaned up)).

### F.  Preparing the 2022 10-K

On February 2, 2023, Cano's chief accounting officer prepared an Audit Committee deck that contained a proposed draft of a related party disclosure for the 10-K relating to Hernandez's loans.[106]  Meeting resistance from Morales, Novell reached out to Goodwin, which advised him that "given the materiality of the loans and the perceived conflict of interest," there should be "some disclosure in the upcoming 10-K – whether it be in the related party transaction and/or risk factors – about these loans as the information could be arguably material to an investor."[107] Weil instructed Cano's general counsel to pull the slide from the deck for now, noting that it could be revisited once Weil had reported its findings to the board.[108]

Meanwhile, Sternlicht's distrust of Weil and frustration with the pace of its investigation was growing.[109]  On February 1, 2023, Sternlicht fumed to Weil, Cooperstone, and Gold, "This company has $20m of unrestricted cash and $20m left on its credit line. They are struggling to do a cash flow forecast.  Rome isn't just burning… it's in flames… and we wait and wait and wait.  If this doesn't warrant an

---

[106] Ex. 77 at '462.

[107] *Id.* at '461.

[108] *Id.* at '459.

[109] *See* Ex. 107 (noting Sternlicht's "serious reservations about Weil Gotshal advice and conflicts of interest which [he had] repeatedly raised").

off cycle Board update... what does?"[110]  Sternlicht also disclosed that he had been receiving reports from "two moles" in management.[111]

On February 4, 2023, Weil indicated that the board would meet in advance of its regularly scheduled board meeting to discuss the loans and related matters and would discuss the disclosure of the loans at that juncture.[112]  Cooperstone emailed Aiello at Weil, indicating that he believed multiple members of management had lost faith in Hernandez and that the board should decide after Weil's report whether to remove the CEO.[113]  The board convened a call on Sunday, February 5, 2023, to discuss the four personal loans, as well as loans from InTandem's affiliate to cover the taxes of former Cano America members as a result of the de-SPAC transaction.[114] Weil delivered its findings and preliminary recommendations, concluding that the loans violated the Company's Conflict of Interest Policy as they could raise a specter of impropriety or favorable treatment given their size and the business relationship between Hernandez and the lender.[115]  However, Weil determined that the loans did not appear to violate the Company's Related Party Transaction or Anti-Pledging

---

[110] Ex. 73 at '312–13 (cleaned up).

[111] *Id.* at '312.

[112] Ex. 77 at '456.

[113] Ex. 78.

[114] Ex. 220.

[115] *Id.*; Ex. 219.

Policy.[116]   Weil recommended that the board address the ramifications of Hernandez's failure to follow the conflicts policy and consider engaging an outside consultant for training on procedures.[117]  It also advised that the Company should consider strengthening its compliance policies, particularly surrounding potential conflicts of interest, transparency, and personal loans.[118]

The board held its regularly scheduled board meeting on February 7 and meetings of the standing committees on February 8, which included further conversation about Weil's investigation.[119]  In the Audit Committee presentation, Weil advised that "this matter is not ripe for determination at this time," referring to whether the loans needed to be disclosed in the 10-K.[120]  Weil indicated that it would issue its "findings and recommendations upon completion of their review."[121]

The Governance Committee met on February 8 to set the date for the annual meeting and determine the board slate.[122]  A slide deck prepared in advance of the meeting, and apparently posted to the online board portal, indicated that the annual meeting would be held on June 28 and contained a draft resolution nominating

---

[116] Ex. 219 at 6.

[117] *Id.* at 7.

[118] *Id.*

[119] Ex. 84; Ex. 85.

[120] Ex. 7 ("Rivera Dep.") at 163:10–21.

[121] Ex. 84 at 8.

[122] Ex. 89.

21

Cooperstone, Rivera, and Muney as the Class II directors.[123] After reviewing those materials, Morales texted Rivera, Hernandez, and Trujillo: "Let's try to talk today among the four of us. I just read the Nom & Gov recommendations related to the Proxy. If we are proposing [Cooperstone] to the Board for another three years, I will not serve."[124] On February 8, 2023, the Governance Committee resolved to set June 28, 2023 as the 2023 annual meeting date.[125] The committee deferred consideration of the nominees for the three seats left open by the expiry of Rivera, Muney, and Cooperstone's terms.[126] Rivera indicated that the decision on board nominees was deferred because Cooperstone had previously indicated a desire to be bought out, and Rivera considered there to be a possibility of Cooperstone being bought out and concurrently stepping down from the board.[127]

In a February 14, 2023 email from Rivera to Morales, Muney, and Trujillo, Rivera said that they need to align on a slate of directors and approach to board structure.[128] Rivera suggested meeting that weekend.[129] Morales responded that he was "in favor of nominating [Rivera] and [Muney], but not [Cooperstone], for re-

---

[123] Ex. 85 at '267.

[124] Ex. 86.

[125] Ex. 89 at '289.

[126] *Id.*

[127] Rivera Dep. at 66:6–24.

[128] Ex. 94 at '081–82.

[129] *Id.* at '082.

election.  [Sternlicht] has also been clear about his desire to resign from the Board, and we should accept his resignation."[130]  Muney responded that he agreed with Morales, but clarified that Sternlicht had indicated that he would resign only if Hernandez was not removed.[131]  Muney added that he "assumed" that Rivera meant that the Company would keep Hernandez on as CEO, but require more monitoring, and potentially split his roles as CEO and chairman or require him to unwind his current conflicts.[132]  Rivera did not indicate whether she favored renominating Cooperstone.[133]  Trujillo replied that they should wait on making any recommendations until they met together.[134]

As the March 1 filing date for the 10-K drew ever nearer, Novell and Koppy continued to press for a legal opinion concerning the disclosure of Hernandez's transactions.[135]  Weil refused to deliver a written opinion.[136]  After repeated pushing from Novell, on February 18, Weil sent a one-sentence email confirming its view, based on its investigation, "that it is reasonable to conclude that no disclosure is

---

[130] *Id.* at '081.

[131] *Id.*

[132] *Id.*

[133] *Id.* at '080.

[134] *Id.*

[135] Ex. 95.

[136] Ex. 96.

required regarding" the personal loans received by Hernandez.[137]   At an Audit Committee meeting on February 23, Weil reported on its investigation, affirming that disclosure was not required.[138]   Ernst and Young ("EY"), the Company's independent auditor, reached a similar conclusion.[139]

On March 2, 2023, Sternlicht emailed the board.[140]  Calling the previous day's earning call "a joke," Sternlicht stated that he would "attend this one last Board meeting, and then if we don't make real and substantial changes, including removing [Hernandez] as CEO . . . I will resign.  I will also resign w[ith] a full public statement of why I was resigning."[141]

In reaction to Sternlicht's email, Morales, Rivera, Muney, and Trujillo discussed potentially retaining separate counsel from Vinson & Elkins LLP ("V&E").[142]  Morales said, "I've been arguing to deal with him for months so not a moment too soon as far as I'm concerned."[143]   At this stage, Rivera noted that "[Sternlicht's] threats started to escalate, his threats, the intensity, the frequency, the nature, you know, in both board meetings, in email, in texts.  And so there was a real

---

[137] Ex. 97.

[138] Ex. 103.

[139] *Id.*

[140] Ex. 107 at '656.

[141] *Id.*

[142] Ex. 106.

[143] *Id.*

concern about whether or not we needed to take steps to make sure that the board and the company were doing the right things to protect themselves."[144]

In a March 7, 2023 board meeting, Weil provide a second oral report regarding its investigation of the Hernandez loans.[145] Aiello confirmed Weil's initial finding that the Company's Conflict of Interest Policy was not followed on certain occasions by certain board members and executives of the Company, but as previously discussed with the board, there was no evidence to suggest that there was any violation of the Company's Related Party Transaction Policy or the Company's Anti-Pledging Policy.[146] As Weil had previously reported, the violations of the Conflict of Interest Policy included Hernandez's loans and the loans that Cooperstone's ITC Rumba had made to certain directors in April 2022.[147] Weil also "advised the Board that in the course of our inquiry, we were made aware of certain insider-related/affiliate transactions – separate from the loans – that should be reviewed and that, given what we had heard, the Board should make confirm [sic] that there are no other similar transactions and that, as part of the remediation, that be appropriately addressed."[148]

---

[144] Rivera Dep. 195:20–196:4.

[145] Ex. 114.

[146] *Id.*

[147] *Id.*; Ex. 82.

[148] Ex. 135 at '150.

25

EY required the Audit Committee and Trujillo to sign a letter representing: "Based on the findings of the Investigation by Legal Counsel, the Company's Board of Directors and management are considering, timely and appropriate remedial action as considered necessary."[149]   The board discussed potential remediation measures, including changes to management, including the CEO, CFO, and general counsel, the possibility of hiring an outside consultant, and changes to their standing policies and governance structure.[150]   At that stage, the board ruled out termination of the CFO and CEO, but continued to discuss taking other action, such as revising their compliance policies and taking remedial action as to Hernandez, possibly by separating his roles as chairman and CEO.[151]

### G. Relations Break Down Between Board Factions

With Gold, Sternlicht, and Cooperstone constantly pressing for asset sales and Hernandez's removal, the board continued to fracture.[152]   On March 8, 2023,

---

[149] Ex. 196.

[150] Rivera Dep. 150:12–152:3.

[151] *Id.*; Ex. 114.

[152] *See, e.g.*, Ex. 108 ("It goes without saying that I strongly favor selling ALL non florida assets if we can get anywhere near the 100-150m the bankers have said they are worth."); Ex. 115 (listing a discussion or vote "on whether Cano can and should continue as an independent public company and whether we should plan to sell Cano Holdco within X days (once non-core assets have been sold) and should prepare for that process now and be prepared to announce the process once ready."); Ex. 107 ("I will attend this one last Board meeting, and then if we don't make real and substantial changes, including removing Marlowe as CEO and Jason Conger as his attaché in crime, I will resign.  I will also resign w[ith] a full public statement of why I was resigning.").

Sternlicht sent Cooperstone and Gold a startled message, alleging that he had learned from his "mole" that the 10-K will not be filed on time and that management intended to "dump tens of millions of stock the second the window opens."[153]  Gold replied with his plan, one that Plaintiffs had heard from Gold before:  fire Hernandez, Conger, Aguilar, and Pedro Cordero, form a new management team with those loyal to Plaintiffs, including Charley, Wilson, and Koppy, and commence an "immediate national search for [a] major healthcare CEO."[154]  Cooperstone replied:  "Whomever we hire, it should be a short term gig to sell the company."[155]

The following day, Sternlicht sent Hernandez a three-page email titled "The future of Cano," expressing his criticisms of Hernandez's performance, the loss of Cano's stock value, Hernandez's related party transactions, and his belief that Hernandez was treating Cano "as your personal piggy bank, almost assuming no one would notice."[156]  Sternlicht reiterated his threat to resign as a director and to issue a public statement explaining his reasons for doing so if Hernandez would not step down as CEO.[157]  Trujillo, Cooperstone, and Rivera were copied on the message.[158]

---

[153] Ex. 225.

[154] *Id.*

[155] *Id.*

[156] Ex. 124.

[157] *Id.*

[158] *Id.*

27

On March 14, 2023, Sternlicht forwarded the message to Morales, Muney, Aiello, Guichelaar, and Gold, referring to the Company as a "cesspool."[159] Sternlicht informed the recipients that, with the help of counsel, he had prepared a public announcement regarding his departure from the board. Later that day, V&E sent drafts of board resolutions and a special committee charter to Rivera, Trujillo, Muney, and Morales.[160]

The board met on March 17, 2023. At this meeting, the Defendants proposed and resolved, over the objection of Sternlicht, Cooperstone, and Gold, that the board create a special committee consisting of Rivera, Trujillo, Morales, Muney and Guichelaar "in response to Barry Sternlicht's plan to publicly disclose his critiques of the Company" (the "Special Committee").[161] The Special Committee's charter authorized it to retain advisers, to respond on the Company's behalf to any public statements made by Sternlicht, to make decisions related to communications between the Company and its stockholders, to negotiate and make recommendations to the board regarding settlements with stockholders "notwithstanding any such stockholder's designation as a member of the Board," and "all such other actions

---

[159] *Id.*

[160] Ex. 126 at 1–2.

[161] Ex. 127 at 1.

28

that the Special Committee may determine are necessary or advisable in connection with the Purpose of the Committee."[162]

The full board met on March 20, 2023.[163]  Gold raised an issue with Cano's payments to Cano Builders, a company owned by Hernandez's father, Jose Hernandez.[164]  He also alleged that Jose Hernandez received compensation for marketing services provided through entities named "Imago" and "Immersion," which Hernandez denied.[165]  The board also discussed the Company's relationship with Onsite Dental, a company owned in part by Hernandez's wife.[166]  The board moved on to discussing potential asset sales, including the possible divestiture of Medicaid businesses and non-core assets.[167]  Sternlicht pointed out that the Company's stock was trading below a dollar per share, urging the Company to announce a sale of assets.[168]  Hernandez explained that the Company planned to seek approval of a reverse stock split to address the low stock price.[169]

---

[162] *Id.*

[163] Ex. 131.  Guichelaar was not present at this meeting.

[164] *Id.* at '040.

[165] *Id.* at '041.

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *Id.* at '042.

On March 21, Gold sent an email to the board relaying what he knew about potential related party transactions involving Hernandez's family members.[170] Gold alleged that Hernandez's father, Jose Hernandez, owned Cano Builders, a company that Cano paid over $7.8 million in fees the previous year.[171] Gold asserted that the Company had two companies in its system named "Immersion," one owned by Hernandez' father and the other owned by Elizabeth Morales.[172] Imago, another marketing company associated with Hernandez's father, was paid $1.35 million for marketing.[173] Gold alleged that Hernandez's father also ran "Cano sports[,] Clav[e] Guajira, and Viva la vida" and had requested fees from Cano through those entities.[174] Muney replied to Gold, saying that he had just reviewed those allegations with Hernandez, and explained Hernandez's view that the allegations were probably from Charley and not based on fact.[175] He also relayed that "[Hernandez] is unaware of any company named Immersion."[176]

In an email to the Special Committee and its advisers, Rivera wrote that she wanted to "strongly discourage you from engaging in any further back and forth with

---

[170] Ex. 135.

[171] Id. at '152.

[172] Id.  Gold suggested that Elizabeth Morales may have some relation to Angel Morales.

[173] Id. at '153.

[174] Id.

[175] Id. at '151–52.

[176] Id.

30

Lew or any other board member.  We don't know all the facts.  It's dangerous to make statements that aren't underpinned by objective investigation and we should not be parroting Marlow's defenses."[177]  Also on March 21, Muney finally circulated the 360 Report to the full board.[178]

In the meantime, Weil formulated a plan to focus its investigation on three areas:  (1) transactions between Cano and Hernandez's father relating to various marketing vehicles; (2) transactions between Cano and Hernandez's father relating to his general contracting company, Cano Builders; and (3) other related party transactions.[179]  Weil planned to provide an oral summary of its findings regarding the first topic on or around March 29–30, with an interim status update on the two other topics at the same juncture.[180]

The full board met on March 30, 2023.[181]  At the outset of the nearly two-hour meeting, Trujillo announced there were two purposes for the meeting:  for Weil to present its findings regarding Hernandez's family's related party transactions and for the Special Committee to present recommendations for remediation.[182]  Weil

---

[177] Ex. 132.

[178] Ex. 148.

[179] Ex. 142.

[180] *Id.*

[181] Ex. 158.

[182] *Id.* at 1.

31

informed the board that there is no evidence to support a conclusion that Jose Hernandez had a stake in Imago, that it cannot say with certainty that Jose Hernandez has a stake in Immersion and "remain seriously concerned" regarding that business, and that it does not believe that Hernandez "made any representations regarding his father in statements to the Board."[183] Weil also noted that "Jose's involvement with Imago and Immersion is troubling, creates appearance of conflict of interest or issues with related party transactions, and should have been addressed earlier."[184]

The board next turned to the Special Committee's recommendations. After questions were raised about the committee's composition and mandate, Gold questioned why the Special Committee prepared its recommendations before receiving Weil's report.[185] Muney replied that "the recommendations would be the same no matter what the outcome of the investigation is/was."[186] The Special Committee then presented its four recommendations: (1) that Hernandez be removed as chairman of the board, but remain a director; (2) that the Company hire a new general counsel, chief financial officer, and add an investor relations role; (3) that the Company create a probationary period for Hernandez to improve Company

---

[183] *Id.* at 4.

[184] *Id.* at 1.

[185] *Id.* at 5.

[186] *Id.*

performance; and (4) that Hernandez work with an executive coach.[187]   Weil clarified that it had not reviewed the Special Committee's recommendations in advance, which was "highly unusual."[188]   Aiello said that "Weil may need to consider whether we can go forward with the representation and whether we can effectively advise the Board given the circumstances."[189]

During the meeting, Trujillo pushed the board to take a vote, and the Plaintiffs asked Weil if the board could vote without the full scope of information.[190] Ultimately, the board voted.  Gold voted no and announced that he would formally resign from the board.  Sternlicht voted no and stated that he would consider resigning from the board.  Cooperstone abstained from the vote.[191]   Morales, Trujillo, Guichelaar, Muney, and Rivera all voted in favor of the Special Committee's recommendations.[192]   In the days that followed, Sternlicht and

---

[187] *Id.* at 6.

[188] *Id.* at 7.

[189] *Id.*

[190] Plaintiffs contend that Weil's investigation was terminated at the March 30, 2023 meeting.  In late April, Weil finalized a new work plan with the Cano board that focused on investigating the related party transactions between Cano and Hernandez's family members.  Ex. 168; Ex. 242.  Plaintiffs argue that the "re-start" of the investigation on April 24, 2023 was due only to Plaintiffs' noisy resignations.  Pls.' Reply Br. 17 n.8.

[191] Ex. 158 at 7.

[192] *Id.*

33

Cooperstone also resigned from the Cano board.[193]   The coordinated resignations had been part of a plan that had been in the works for weeks.

### H. Plaintiffs' Scheme

As the foregoing events played out through March, the Plaintiffs were strategizing to convince the board to sell the Company or to buy out their stock. Sternlicht and Cooperstone in particular had been pushing for a sale since at least November and were frustrated with the opposition that they received.[194]   They viewed Hernandez as the biggest obstacle, believing he had told CVS and Humana that the Company was not for sale.[195]

On March 11, 2023, Cooperstone emailed Sternlicht and Gold his "suggestion for how to proceed with the threat of a noisy resignation to secure the board votes we need."[196]   First, they would demand that the board launch the Company into an auction and remove Hernandez as CEO.  If asking nicely failed to convince the holdouts, Cooperstone would threaten to resign.  Cooperstone theorized that the threat of a noisy resignation coupled with the prospect of civil liability and risks to their personal reputations would force the other directors to

---

[193] Ex. 156; Ex. 157; Ex. 160.

[194] Ex. 40 at 1; *id.* at 3; Ex. 115.

[195] Ex. 40 at 3.

[196] Ex. 227.

come around.[197]   If the board still opposed a short-term sale of the Company, Plaintiffs would either launch a proxy contest, coupled with litigation or threat thereof, or sell their shares to a third-party who could launch a future proxy contest.[198]   By March 17, 2023, Plaintiffs had engaged counsel and were discussing the logistics of a proxy contest.[199]   Despite their apparent motivation to nominate a competing slate, however, they made a calculated decision not to act promptly. Cooperstone told his compatriots: "No need to rush here – time is actually building some leverage for us."[200]   They did wait—resigning about 13 days later and waiting 28 days before finally demanding that the board allow them to nominate a competing slate.

### I.  Post-Resignation Events

On April 4, 2023, Plaintiffs filed a group agreement under Section 13(d) of the Securities Exchange Act of 1934.[201]   The filing disclosed that Cooperstone, Sternlicht, and Gold had each resigned from the Cano board on March 30 and attached Cooperstone's resignation letter.[202]   On April 6, 2023, Hernandez filed a

---

[197] *Id.* at '391.

[198] *Id.* at '392.

[199] Ex. 197.

[200] *Id.* at '610.

[201] Cano Health, Inc., Beneficial Ownership Report (Schedule 13D) (Apr. 4, 2023).

[202] *Id.*

Schedule 13D/A with the SEC disclosing the Camerlinck Loan and that Hernandez and his guarantors had agreed to transfer 20 million shares of Cano stock to Camerlinck to repay the loan, subject to a buyback option.[203]  On April 7, 2023, Cano filed an amended annual report disclosing the resignation of the Plaintiffs and announcing that it had reduced the board's size to six directors.[204]

On April 14, 2023, Plaintiffs sent a letter to Weil explaining that the recent disclosures by Hernandez and the Company, together with the changes at the Company that occurred after the February 15 nomination deadline, constituted material changes that required the board to immediately reopen the nomination window for thirty days.[205]  At that time, Plaintiffs did not submit a nomination proposal or otherwise attempt to comply with any of the requirements of the advance notice bylaw.[206]  The Company did not respond to Plaintiffs' letter.

On April 17, 2023, the Company announced that Trujillo would replace Hernandez as chairman of the board.[207]  On April 24, 2023, Weil provided Defendants with an updated work plan, which states that Weil will investigate, and

---

[203] Ex. 162.

[204] Cano Health, Inc., Annual Report Amendment No. 1 (Form 10-K/A) (Apr. 7, 2023).

[205] Ex. 165.

[206] Cooperstone's ITC Rumba submitted a formal nomination notice on May 18, 2023. *See* Ex. 184.

[207] Ex. 166.

will hire an adviser to perform background checks, regarding "Hernandez family related party transaction concerns."[208]

### J. Procedural History

On April 28, 2023, the Plaintiffs filed their complaint in this action, seeking to enjoin the Company from enforcing the deadline in the advance notice bylaw and adjourning the 2023 annual meeting.[209]   The Plaintiffs moved to expedite the proceedings, initially seeking a one-day trial on their application for a mandatory injunction prior to June 16, 2023.[210]   That request was based on Plaintiffs' understanding that the meeting would be held on June 28.  But on April 27, before Plaintiffs filed their complaint, Cano decided to set the annual meeting date on June 15 and to use a record date of May 8.[211]   On May 1, Plaintiffs learned that the Company had scheduled the annual meeting for June 15.  On May 3, Plaintiffs filed a motion for a preliminary injunction seeking to enjoin the meeting until this case is resolved.[212]   The court ruled that the case would proceed on an expedited preliminary injunction motion to enjoin the annual meeting and to order waiver of the advance

---

[208] Ex. 168.

[209] Dkt. 1 ("Compl.").

[210] *Id.*

[211] Ex. 169.

[212] Dkt. 12.

37

notice bylaw.[213] The parties conducted expedited discovery and the court held a half-day preliminary injunction hearing on June 9, 2023.

## II. ANALYSIS

Plaintiffs ask this court to issue an order (a) enjoining Cano from enforcing the advance notice bylaw; (b) setting June 21, 2023 as the record date for Cano's 2023 annual meeting; and (c) setting July 26, 2023 as Cano's annual meeting date.[214]

"The Court of Chancery has broad discretion in granting or denying a preliminary injunction." *Data Gen. Corp. v. Digit. Comput. Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972). To obtain a preliminary injunction, Plaintiffs must establish (1) a reasonable probability of success on the merits, (2) that they will suffer irreparable harm if an injunction is not granted, and (3) that the harm to Plaintiffs if the injunction does not issue will exceed the harm to the Defendants if the injunction does issue. *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 976 (Del. 2020).

### A. Reasonable Probability of Success on the Merits

Plaintiffs must establish a reasonable probability that they will succeed on their claim that the Cano directors have a fiduciary duty to waive the advance notice bylaw in this circumstance. "This showing 'falls well short of that which would be

---

[213] Dkt. 47.

[214] Pls.' Opening Br. 46.

required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made.'" *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998)).

It is well established that stockholders have a fundamental right to "vote for the directors that the shareholder[s] want[] to oversee the firm." *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012). Subsumed within that fundamental right to vote is the right to nominate a competing slate. *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *5 (Del. Ch. Jan. 14, 1991); *accord Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *8 (Del. Ch. Feb. 14, 2022); *Linton v. Everett*, 1997 WL 441189, at *9 (Del. Ch. July 31, 1997). Beyond the statutory requirement that corporations hold an annual meeting to elect directors, the Delaware General Corporation Law enables corporations to set standards and procedures that govern the director nomination process. *See* 8 *Del. C.* § 211(b); *id.* § 109(b). It is now common for corporate boards to establish these procedures in "advance notice bylaws." *Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228, 239 (Del. Ch. 2007).

Advance notice bylaws require stockholders to provide the corporation with prior notice of their intention to make stockholder proposals or to nominate directors

and to supply information about their proposals or nominees. *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 43 (Del. Ch. 1998), *aff'd sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998). These types of bylaws serve dual purposes: marshalling orderly meetings and election contests where the nominees are fixed in advance of the annual meeting, and providing fair warning to the corporation so that it can respond to stockholder nominations. *Openwave*, 924 A.2d at 239; *Lee Enters.*, 2022 WL 453607, at *9. Cano's advance notice bylaw states, in pertinent part:

> To be timely, a stockholder's written notice shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the one-year anniversary of the preceding year's Annual Meeting.[215]

The 2022 annual meeting was held on May 16, 2022. Accordingly, under the bylaw, written notice of nominations or business to be brought at the 2023 annual meeting was due by February 15, 2023.

A stockholder challenge to the application of an advance notice bylaw presents a series of questions. First, is the bylaw valid on its face? Second, did the stockholder's nomination comply with the terms of the bylaws? Third, if the first two criteria are met, is there some basis in equity to excuse strict compliance with

---

[215] Ex. 15 § 2(a)(2).

the bylaw?  *See Lee Enters.*, 2022 WL 453607, at *9.  It is this third question that animates this case.

### 1.    The *Schnell* Doctrine

In *Schnell v. Chris-Craft Industries, Inc.*, 285 A.2d 437 (Del. 1971), the Delaware Supreme Court reaffirmed the long-standing principle that "inequitable action does not become permissible simply because it is legally possible."  *Id.* at 439.  In *Schnell*, the board, knowing of an impending proxy contest, advanced the date of the annual stockholders' meeting by approximately one month and moved the location of the meeting to upstate New York.  *Id.*  The board's conduct was held to be inequitable because the dissidents had already geared their campaign to the announced meeting date, and the board's actions gave the dissidents little chance to prepare a proxy contest.  *Id.*  The Delaware Supreme Court accepted this court's finding that management had attempted to militarize the corporate machinery and Delaware law to entrench itself by "obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management."  *Id.*

The Delaware Supreme Court has repeatedly upheld the principles of *Schnell*. *See, e.g., Coster v. UIP Cos., Inc.*, 255 A.3d 952, 960 (Del. 2021) (invoking *Schnell* in the context of a dilutive stock issuance); *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1132 (Del. 2003) (describing the *Schnell* doctrine as "[o]ne of the most

venerable precepts of Delaware's common law corporate jurisprudence"); *Bäcker v. Palisades Growth Cap. II, LP*, 246 A.3d 81, 96 (Del. 2021) (applying *Schnell* to hold that certain boardroom deceptions were inequitable, even though defendants may have complied with the company's governing documents). *Schnell* embodies the fundamental power of equity. But that power should not be invoked lightly. The flexibility of equity, as delineated in *Schnell*, "should be reserved for those instances that threaten the fabric of the law, or which by an improper manipulation of the law, would deprive a person of a clear right." *Alabama By-Products Corp. v. Neal*, 588 A.2d 255, 256 n.1 (Del. 1991);[216] *see In re WeWork Litig.*, 250 A.3d 976, 996 (Del. Ch. 2020) ("'[C]ase law is indicative of a healthy inclination on the part of the judiciary to employ the *Schnell* principle of 'legal but inequitable' only sparingly'" (citation omitted)); *Accipiter Life Scis. Fund, L.P. v. Helfer*, 905 A.2d 115, 127 (Del. Ch. 2006) (noting that "extraordinary facts" must underly a *Schnell* claim); *Coster v. UIP Cos., Inc.*, 2022 WL 1299127, at *7 (Del. Ch. May 2, 2022) ("The elusive nature of *Schnell* as a standard and potentially harsh consequences of its application

---

[216] This statement in *Alabama By-Products* was issued just a few weeks after the *Hubbard* decision, which had been the subject of an appeal, but was settled after the filing of the appellants' opening brief. *See* 2 David A. Drexler et al., *Delaware Corporate Law and Practice* § 25.10[1][a] (2023). The Drexler treatise suggests that the footnote in *Alabama By-Products* was directed to the *Hubbard* decision and some of the points raised in the appeal brief, leading the authors of the treatise to conclude that "the significance of the *Hubbard* precedent is, perhaps, suspect." *Id.* On a related note, the parties here did not cite and the court did not identify any published decision of the Delaware Supreme Court citing *Hubbard*.

42

provide good reasons to limit *Schnell*'s application."); Leo E. Strine, Jr., *If Corporate Action Is Lawful, Presumably There Are Circumstances in Which It Is Equitable to Take That Action: The Implicit Corollary to the Rule of* Schnell v. Chris–Craft, 60 Bus. Law. 877, 893 n.68 (2005) ("*Schnell*'s tradition cautions against a literal reading of the quoted language, which is better read as manifesting a recognition that equity should not lightly impede actions authorized by law.").

Cases challenging the application of an otherwise valid advance notice bylaw present a context-specific application of *Schnell*. *AB Value P'rs, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *5 (Del. Ch. Dec. 16, 2014); *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208 (Del. Ch. 1987) (enjoining further postponement of the company's annual meeting where the company learned that management's slate was likely to lose to the dissident slate); *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906, 914 (Del. Ch. 1980) (holding that bylaw requiring 70-days' notice for nominations was inequitable because it was not announced until 63 days before the meeting was to occur, making compliance impossible); *Linton v. Everett*, 1997 WL 441189, at *9–10 (Del. Ch. July 31, 1997) (setting aside election of directors where an annual meeting had not been held in three years and the board announced a meeting on 30-days' notice, triggering a ten-day window to propose nominees).

43

Plaintiffs have framed their claim within the context-specific application of the *Schnell* doctrine recognized in *Hubbard*.[217]  In *Hubbard,* the court held that the board had a duty to waive an advance notice bylaw provision under the principles of *Schnell* where a "radical shift in position, or a material change in circumstances" had occurred after the deadline for nominations had passed.  *Hubbard,* 1991 WL 3151, at *12.  Neither the court nor the parties have been able to identify any decision of this court in the ensuing 32 years enjoining the application of an advance notice bylaw in reliance on *Hubbard*.  Before applying its principles to the facts and circumstances of this case, it is important to review *Hubbard* within the *Schnell* framework.

In *Hubbard,* an insurgent stockholder brought suit to enjoin an advance notice bylaw.  *Id.* at *3.  He then reached a settlement agreement with the company that

_____

[217] In *Blasius Industries, Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988), Chancellor Allen held that not all board action which impedes the effective exercise of a stockholder vote is *per se* invalid.  Rather, when a board acts "for the primary purpose of impeding the exercise of stockholder voting power," the board "bears the heavy burden of demonstrating a compelling justification for such action."  *Id*. at 661.  The Delaware Supreme Court adopted *Blasius* in *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118 (Del. 2003).  "For the *Blasius* standard to be invoked, the challenged action had to be taken for the sole or primary purpose of thwarting a shareholder vote."  *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 258 (Del. Ch. 2013) (citing *Blasius*, 564 A.2d at 662); *accord Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at *14 (Del. Ch. Oct. 13, 2021).  Neither side has presented this expedited injunction action through that lens.  Indeed, *Hubbard* found that *Blasius* was not the appropriate framework in that case.  *Hubbard*, 1991 WL 3151, at *10 n.11; *see also Rosenbaum*, 2021 WL 4775140, at *14 ("[T]he Court will not draw upon *Blasius* unless the evidence reveals the Board engaged in 'manipulative conduct' in responding to the Nomination Notice.").  The court, therefore, addresses the claims here as the parties have presented them.

added him to the board and prevented the board from amending or waiving its advance notice requirement. *Id.* Hubbard quickly obtained the support of a majority of the other directors to take the company in his proposed new direction. The other board members, now the minority faction, sought to run their own slate of directors and filed an action to enjoin the company from enforcing the agreement and the advance notice bylaw. *Id.* at *4. The court noted that:

> This is not a case where the shareholders, unprovoked by any board action, unilaterally and belatedly changed their minds and decided to nominate a slate of candidates for director. In such a situation, relief should clearly be denied. Rather, this is a case where the . . . board itself took certain action, after the by-law nomination deadline had passed, that involved an unanticipated change of allegiance of a majority of its members. It was foreseeable that that shift in allegiance would result in potentially significant changes in the corporation's management personnel and operational changes in its business policy and direction. Such material, post-deadline changes would also foreseeably generate controversy and shareholder opposition. Under those circumstances, considerations of fairness and the fundamental importance of the shareholder franchise dictated that the shareholders be afforded a fair opportunity to nominate an opposing slate, thus imposing upon the board the duty to waive the advance notice requirement of the by-law.

*Id.* at *12. Under *Hubbard*, where the key facts upon which a stockholder would decide to nominate candidates or make proposals are "inherently unknowable until after the nomination deadline had expired" and the board's actions cause this significant change in circumstances, it is inequitable for the board to continue to bar stockholder nominations under the advance notice bylaw. *Id.* at *11–12.

45

Twenty-three years later, in *AB Value*, a stockholder sought a temporary restraining order to enjoin an advance notice bylaw and run a competing slate. 2014 WL 7150465. Relying on *Hubbard*, the plaintiff argued that after the advance notice deadline had passed, the company had distributed a 37.2% voting bloc previously held in trust to four trust beneficiaries, had unanimously approved salary increases for the co-presidents of the company, and had included errors in its meeting notice. *Id.* at \*2. The court noted that the standard for invoking *Hubbard*, a context-specific application of *Schnell*, was high and required the plaintiff to provide compelling facts indicating that enforcement of the bylaw was inequitable. *Id.* at \*5. The court distilled the *Hubbard* framework to three questions: "First, did the change in circumstances occur after the advance notice deadline? Second, was the change 'unanticipated' and 'material'? Third, was the change caused by the board of directors?" *Id.* at \*5.

Applying a preliminary injunction standard, the court denied the motion. The court rejected plaintiff's argument as to the trust distribution, noting that the board had nothing to do with the dissolution of the trust. While such a change may, in fact, radically alter the playing field for a proxy context, stockholder composition changes frequently and "the Court's focus is on the board and material actions taken by the board that substantially alter the direction of the company." *Id.* at \*6. The court found the pay increases for management insufficient to satisfy *Hubbard* because

46

they did not "constitute a radical shift in corporate direction" as they neither changed the operations nor the business direction of the company. *Id*. at *7. The court likewise rejected the plaintiff's argument regarding inaccurate disclosures, noting that the information came to light before the notice deadline and "[fell] short of *Hubbard*'s material or radical change standard." *Id*.

Plaintiffs rely on two other decisions where this court granted motions to expedite claims to enjoin the enforcement of advance notice bylaws. In *Healthcor Management, L.P. v. Allscripts Healthcare Solutions, Inc.*, C.A. No. 7557-CS (Del. Ch. May 25, 2012) (TRANSCRIPT), the CEO and four out of nine directors resigned after the deadline for nominations had closed. The court noted that such a change was extraordinary and was not a typical circumstance in the life of a company. *Id*. at *4. The court found that the events, which the board itself acknowledged would result in the board proposing to seat a very different board, "raise[d] a colorable equitable question about whether the board can hide behind the advance notice by-law and retain for itself the flexibility to change the shape of the board in a fundamental way shortly before the meeting and deny the other stockholders the ability to react to it." *Id*.

In *Icahn Partners LP v. Amylin Pharmaceuticals, Inc.*, 2012 WL 1526814 (Del. Ch. Apr. 20, 2012), the board inexplicably refused to engage with a potential acquirer that offered a substantial premium at a time when the board and

47

stockholders were contemplating a sale of the company. *Id.* at \*3. The court granted the motion to expedite, explaining that the plaintiffs had adequately alleged that the rejection of the offer evinced the board's radical change of plans for the company. *Id.*

### 2.    The *Hubbard* Standard

The parties disagree on what a plaintiff must prove to establish a claim under *Hubbard*. Plaintiffs point to *AB Value*, which "read[s] *Hubbard* as requiring a material change in circumstances, which the case alternatively describes as a 'radical shift in position,' caused by the directors that occurs after the advance notice deadline." *AB Value*, 2014 WL 7150465, at \*5. Plaintiffs equate the terms "radical" and "material," and conclude that materiality under *Hubbard* is the same as the materiality standard governing proxy disclosures to stockholders.[218] In the disclosure context, "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 499 (1976)). There must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal quotations omitted). Thus, Plaintiffs seem to argue that they

---

[218] Pls.' Reply Br. 8.

can succeed on the motion if there is a substantial likelihood that a stockholder would consider any of the board's conduct after February 15 important to know in deciding whether to run a proxy contest.

Plaintiffs' attempt to import the disclosure standard of materiality into *Hubbard* relies on *Sherwood v. Ngon*, 2011 WL 6355209 (Del. Ch. Dec. 20, 2011). That reliance is misplaced. In *Sherwood*, plaintiff stockholders sought a temporary restraining order to enjoin an annual meeting where three days before the then-scheduled meeting, the board removed an agitating director from the company's previously disclosed slate of directors. *Id.* at *4. The company did not immediately announce the director's removal from the slate, but it did announce an approximately two-week delay in the annual meeting. *Id.* The director's removal from the slate was not announced until nine days before the new meeting date. *Id.* The plaintiff stockholders argued that the company's disclosure regarding the removal of the director from the slate was materially misleading and moved to enjoin the annual meeting to provide stockholders with sufficient time to consider corrective disclosures. *Id.* at *5.

Although the *Sherwood* court discussed certain factual similarities between that case and *Hubbard*, the question in *Sherwood* was not whether the board had a duty to waive enforcement of its advance notice bylaw. The plaintiffs argued, and the court agreed, that defendants' deferral of the meeting reopened a ten-day window

49

for nominations, with which the plaintiffs complied. *Id.* at \*11. The question before the court in *Sherwood* was whether the plaintiffs had adequately stated a colorable disclosure claim. *Id.* at \*15.

To the extent Plaintiffs argue that they need only establish that there has been a post-deadline disclosure or discovery of an omission about the company or a nominee that would satisfy a preliminary injunction, they are mistaken. Neither *Hubbard* nor *AB Value* stands for that proposition.[219] Rather, "the Court's focus is on the board and material actions taken by the board that *substantially alter the direction of the company*." *AB Value*, 2014 WL 7150465, at \*6 (emphasis added); *see Icahn*, 2012 WL 1526814, at \*3 (indicating that plaintiffs might prevail if they could show that the board "radically changed its plans for the Company" by refusing to engage with a potential acquirer in light of the company's previously stated investment thesis).[220]

---

[219] One of the grounds for the plaintiff's claim in *AB Value* was an error in the meeting notice. The court observed that the information came to light before the nomination deadline "and falls well short of *Hubbard*'s material or radical change standard." 2014 WL 7150465, at \*7. The court did not indicate that it was applying a disclosure standard.

[220] In *Hubbard*, the court was persuaded that the "material, post-deadline changes would also foreseeably generate controversy and shareholder opposition." 1991 WL 3151, at \*12. That quotation must be assessed within the overall context of the case, and understood within the court's finding that the allegiances of a board majority had shifted to take the company in a different direction after the nomination deadline, coupled with the board's having contractually prohibited the company from waiving the bylaw.

As the court cautioned in *AB Value*, "Delaware jurisprudence that makes clear that compelling circumstances must exist before the equitable powers invoked in *Hubbard* (based on *Schnell*) will be applied." 2014 WL 7150465, at *5. In *Hubbard*, the compelling circumstances that justified waiving the advance notice bylaw included a shift in board-level allegiance that "would result in potentially significant changes in the corporation's management personnel and operational changes in its business policy and direction," and a contractual agreement not to waive the bylaw. 1991 WL 3151, at *12. In *Icahn*, under the colorable claim standard of review, the compelling circumstance that warranted expedition was the board's unexpected decision to reject, without consideration, a company-altering buyout offer. 2012 WL 1526814, at *2–3. In *Healthcor Management*, the resignation of four out of nine directors after the deadline for nominations had closed warranted expedited treatment of a claim to require waiver of the bylaw. C.A. No. 7557-CS, at *4. The court in *Healthcor* stated:

> When there's an *extraordinary* change like this, and the board itself feels a board majority is essentially going to propose to seat a very different board, that, in my mind, raises a colorable equitable questions about whether the board can hide behind the advance notice by-law and retain for itself the flexibility to change the shape of the board in a *fundamental way* shortly before the meeting and deny the other stockholders the ability to react to it.

*Id.* (emphasis added).

51

Plaintiffs do not argue that the revelations regarding Hernandez and his family's related party transactions constitute fundamental changes to Cano so as to trigger *Hubbard*. Indeed, they cannot, because they do not involve action of the board. *AB Value*, 2014 WL 7150465, at *6. Instead, Plaintiffs frame their claim around the board's response to Hernandez's conduct and the fissure between Plaintiffs and the other outside directors.

### 3. The Alleged Radical Shift

Plaintiffs have asserted a moving target of post-deadline "material" changes as supporting their claim. They first asserted in discovery that there are 17 different bases for their claim.[221] They next cited five distinct events in their opening brief and then provided a list of seven "material facts" at oral argument.[222] For the reasons that follow, Plaintiffs fail to establish a reasonable probability of success on their *Hubbard* claim.

### a. The August 27, 2022 Meeting of Committee Chairs

Plaintiffs first point to the August 27, 2022 meeting of committee chairs over the Camerlinck Loan. Plaintiffs insist that this meeting was concealed from them until after February 15, 2023. Plaintiffs admit that they learned about the loans

---

[221] Ex. 245 at 8–17.

[222] Pls.' Opening Br. 2; Tr. 12:16–14:10; *id.* at 16:7–18:24.

52

before the February 15 close of the nomination window and do not base their claims on the loans' existence.[223]

Plaintiffs also received information regarding the August 27 meeting of committee chairs prior to the close of the nomination window. Minutes of the Audit Committee's February 8, 2023 meeting reflect a discussion of the Camerlinck Loan and other Hernandez loans.[224] Gold is listed as present at the meeting.[225] At the February 8, 2023 meeting, Armstrong recounted that the August meeting of board chairs had occurred and described the meeting's participants and its outcome: that no further action was required.[226] "There was no disagreement by the Committee

---

[223] Tr. 12:11–20. Both Cooperstone and Gold had reason to know about the Camerlinck Loan in August 2022. Cooperstone testified that he was generally aware of the loan. Cooperstone Dep. at 87:8–15. Gold was a member of the Audit Committee and would have access to Armstrong's detailed memo regarding the Camerlinck Loan which was shared with the Audit Committee on August 22, 2022. Ex. 36.

[224] Ex. 223 at '112–13.

[225] *Id.* at '111.

[226] The meeting minutes describe this disclosure as follows:

> David Armstrong reminded the Committee the record shows between August 17, 2022 and August 27, 2022 multiple Board disclosures were made including reports to both the Chairs of the Audit Committee and the Nominating and Corporate Governance Committee and a memorandum was posted to Diligent for the entire Audit [C]ommittee on the issue. Following these disclosures, the Chair of the Nominating and Governance Committee convened a special meeting of all Committee Chairs to discuss the personal loan from Bob Camerlinck. . . . During an hour-long meeting the personal loan from Bob Camerlinck was discussed in detail, all Committee chairs asked questions, Board counsel asked questions, Hernandez answered all questions and the Board was informed that Audrey Leigh, Company

that these events as described did in fact transpire in August 2022."[227] Aiello advised the Audit Committee on February 8 that "following Weil's investigation they determined that the personal loans did not constitute related party transactions, are not disclosable, and" should not be disclosed in the upcoming 10-K.[228]

In an email to the Audit Committee on February 9, 2023, Armstrong discussed the prior retention of Weil in August 2022 in connection with the Camerlinck Loan and that Weil was handling the matter for the board "when we held a special Board call (of Committee Chairs) to review this matter . . . on August 27, 2022."[229] Gold was copied on this email.[230] These documents refute Plaintiffs' argument that they did not know and could not have known about the August 27 meeting prior to the February 15 nomination deadline. Gold's failure to read or remember these communications is no excuse. In any event, Plaintiffs fail to show that a meeting among committee chairs in August 2022 constituted board action that radically

---

disclosure counsel (Goodwin Proctor) had advised no disclosure was required including no 8-K. At the conclusion of the August 27, 2022 meeting the Committee Chairs accepted management's presentation, excused management to conduct an executive session, and thereafter took no further action.

*Id.* at '112–13.

[227] *Id.* at '113.

[228] *Id.*

[229] Ex. 224 at '038.

[230] *Id.* at '037.

changed the direction of the Company.  Indeed, as Cooperstone reminded Gold and Sternlicht on February 6, 2023, even if the loans violated internal corporate policy, three law firms advised that Hernandez's loans did not need to be publicly reported.[231]

### b.      The "Shadow Board"

Plaintiffs claim that Trujillo, Morales, Muney, and Rivera formed a "Shadow Board" in January 2023 through which they decided not to renominate Cooperstone and concealed the results of Hernandez's 360 Report.[232]  As an initial matter, a conversation that took place between individual directors is not board action as required by *Hubbard* and *AB Value.  See Hubbard*, 1991 WL 3151, at *12 ("[T]his is a case where the . . . board itself took certain action, after the by-law nomination deadline had passed, that involved an unanticipated change of allegiance of a majority of its members."); *AB Value*, 2014 WL 7150465, at *6 ("[T]he Court's focus is on the board and material actions taken by the board that substantially alter the direction of the company.").  The Cano board took no action to conceal the results of the 360 Report.  Admittedly, it was not delivered to the full board until after February 15, but that did not reflect a board decision that materially altered the

---

[231] Ex. 83 ("I've heard directly from Goodwin that they agree with Weil that no disclosure is required.  That was the original advice from McDermott [Will & Emery].  So three law firms agree on this.").

[232] Pls.' Opening Br. 17–19, 50–51.

direction of the Company.  In any event, Plaintiffs were aware well before February 15 that some members of management had concerns about Hernandez, having been privately contacted by multiple members of management.[233]

Plaintiffs' assertion that the board secretly agreed not to nominate Cooperstone on management's 2023 slate is also unfounded.  Cooperstone resigned before the board decided on the 2023 slate.  Plaintiffs point to private email and text conversations among certain directors showing that Morales, Muney, and Rivera decided not to support Cooperstone's nomination.[234]  Yet Plaintiffs concede that there was no board-level, or even committee-level, action resolving not to include Cooperstone on the slate.[235]  What might have happened had Cooperstone not resigned is conjecture.  *See AB Value*, 2014 WL 7150465, at \*7 & n.40 ("This Court cannot grant the extraordinary relief of enjoining a Company's facially valid advance notice bylaw on the basis of hypothetical future events." (citing *Openwave*, 924 A.2d at 240 ("Because Delaware law does not permit challenges to bylaws based on hypothetical abuses, the court will not consider those scenarios.")).[236]  Plaintiffs'

---

[233] Ex. 78 (Cooperstone email on February 4, 2023 noting "the fact that the faith of multiple members of [Hernandez's] management team is I think irretrievably lost."); Ex. 73 (Sternlicht February 1, 2023 email:  "Our two moles are reaching out every day."); Ex. 40 at 9; Ex. 55; Ex. 149.

[234] Ex. 86; Ex. 94.

[235] Tr. at 15:1–6.

[236] Plaintiffs have cited no evidence that the Governance Committee or any subset of the board had suggested an alternative nominee to Cooperstone.

allegations are speculative and do not concern board action and therefore cannot support a *Hubbard* claim.[237]

### c. Creation of a Special Committee

Plaintiffs next contend that the board's creation of the Special Committee on March 17 "fundamentally changed the composition of the Board."[238] Defendants concede that the board created the Special Committee after the notice deadline, but they argue that its formation does not constitute the type of change sufficient to require a waiver of the advance notice bylaw. Defendants point to the fact that the Special Committee took no action binding the Company, but rather only made recommendations to the board, which it could then vote to approve or reject.

Plaintiffs, and particularly Sternlicht, were the impetus for creation of the Special Committee. Sternlicht had become increasingly aggressive in his pursuit of a sale of the Company, and on March 2, sent an email to the board threatening to resign and issue a public statement if Hernandez were not removed as CEO.[239]

---

[237] This case is readily distinguishable from *Sherwood*, which, while not a *Hubbard* case, involved a circumstance in which a board removed a nominee from its slate and advanced the meeting date just before the annual meeting was meant to take place. *Sherwood*, 2011 WL 6355209, at *5 (focusing on the misleading nature of a disclosure describing why a director was removed from the slate). Had Cooperstone remained on the board and not been renominated after the deadline, his claim might be much stronger. *See Hubbard*, 1991 WL 3151, at *11 (indicating that minority directors should not be compelled to nominate a dissident slate to protect against a potential "electoral coup" by the majority after the nomination deadline).

[238] Pls.' Reply Br. 17.

[239] Ex. 107 at '656.

57

Defendants viewed Sternlicht's potential public statement as a threat to the Company, and they sought counsel familiar with activist investors and formed a Special Committee to address it.[240]  Between the Special Committee's formation on March 17 and March 25, the Special Committee held four meetings to discuss how to address the public relations risk posed by Sternlicht's threats and paths forward as to Hernandez's conduct.[241]  While Plaintiffs label the Special Committee as a strategic ploy to silence them, placing Sternlicht or his cohort on a special committee designed to address the negative effects of Sternlicht's public condemnation of the Company would be like "putting a fox on the special committee for henhouse security."[242]

In arguing that the formation and function of the Special Committee constitutes a radical change in the direction of the Company, Plaintiffs focus on

---

[240] Ex. 106; Rivera Dep. 195:20–196:4 ("[T]here was a real concern about whether or not we needed to take steps to make sure that the board and the company were doing the right things to protect themselves."); Ex. 4 ("Muney Dep.") at 113:14–114:2 ("[W]e acted as a Special Committee on behalf of the shareholders to lay out all the options on a number of issues to bring to the full board for discussion, as I stated earlier, because of Barry's letter and because the prior attempts at board meetings to have discussions on issues such as assets, we couldn't have a discussion because the three board members were adamant and not willing to discuss other options with facts.").

[241] Ex. 232 at '709 ("[T]he Committee's main concern is not about Mr. Sternlicht's message, but rather his behavior and the manner in which he is choosing to convey his message."); Ex. 233 (discussing the potential retention of a public relations firm); Ex. 234 (deliberating about which public relations firm to hire and reporting on discussions with Sternlicht's counsel); Ex. 236 (discussing public relations concerns and formulating recommendations for the full board regarding Hernandez's infractions).

[242] Tr. 97:15–16.

language in the Special Committee's charter which they claim gave the committee "unfettered plenary power" and eliminated any "dissenting voices."[243]  The Special Committee's charter is admittedly broad, giving the committee full authority to take actions that it "may determine are necessary or advisable in connection with the Purpose of the Committee."[244]  The committee's authority is not plenary, but cabined by the scope of its purpose.  The "Purpose" of the committee was multifold, including to evaluate how to strategically position the Company and to investigate relationships between directors and management and potential conflicts of interest by the board, all of which were "in response to . . . Sternlicht's plan to publicly disclose his critiques of the Company."[245]  And in actual function, the Special Committee did not independently act to bind the Company.  Rather, it made recommendations to the board, which it then discussed and voted upon.[246]

The creation of the Special Committee did not constitute a "significant change in corporate direction or policy."  *Hubbard*, 1991 WL 3151, at *12.  Unlike in *Hubbard*, where a subset of the board, constituting a majority, switched from opposing a dissident stockholder's proposals to supporting them, the creation of the

---

[243] Pls.' Opening Br. 32.

[244] Ex. 127 at '830.

[245] *Id.* at '829.

[246] *See, e.g.*, Ex. 158 at 5 ("[Rivera] informed the Board that the Special Committee has a broad charter and that the Committee is simply making recommendations to the Board at this time to discuss together").

59

Special Committee did not represent a radical shift in position or material change in the direction of the Company. Plaintiffs were a three-member minority of the board. They took a strong view that the Company should be sold promptly and that Hernandez should be terminated. They never had a majority of the board in their camp who suddenly switched allegiances and radically changed the direction of the Company. In that regard, the formation of the Special Committee did not even change the status quo, let alone radically shift board allegiances like in *Hubbard*.

### d.   The March 30 Decision

Plaintiffs next argue that the Special Committee's recommendations and the board's adoption of those recommendations proves that the board was unwilling to remediate Hernandez's misconduct. The evidence does not reflect board inaction. *See Hubbard*, 1991 WL 3151, at *10 (observing that from a legal viewpoint "'inaction' and 'action' may be substantive equivalents, different only in form"). Rather, the board members were attuned to the issues raised about the CEO and acted.[247] The board, upon recommendation of the Special Committee, held a one-

---

[247] *See* Ex. 132 ("I believe we need to ask Weil to investigate immediately and thoroughly today's list. Whatever the inquiry shows we will have to deal with it."); Ex. 234 ("Committee members noted that the undisclosed margin loan and related party transactions have been thoroughly investigated and resolved at significant cost to the Company. It was agreed that the Board should confirm that the proper controls are in place and vote on a resolution to close out this investigation."); Ex. 236 (discussing, at length, the pros and cons of retaining Hernandez as CEO, including Hernandez's key relationships with providers and patients, stockholder perception of Hernandez, the lack of suitable public company CEO replacements, and Hernandez's suitability in the short-term).

hour and forty-five-minute board meeting on March 30, with Plaintiffs present. The board majority did not radically change the direction of the Company, but rather favored a less radical approach than what Plaintiffs had been advocating. The majority did so after concluding that Hernandez's removal as CEO at that time, with no successor in place, would not be in the Company's best interest.[248] This court expresses no view as to whether the board's decision was "good" or "bad" in a business sense. *See Hubbard*, 1991 WL 3151, at \*12. What matters is that the Special Committee made recommendations, the full board was presented with those recommendations, and the board voted. Plaintiffs' dismay at having been outvoted in these circumstances does not create a radical shift in the fundamental operation of the Company as contemplated in *Hubbard*.

Notably, what Plaintiffs frame as an abdication actually reflects the adoption of many of Weil's suggestions from February 5.[249] The idea of separating

---

[248] *See* Ex. 247 at '501 ("[T]he Special Committee noted that the believe it is in the Company's best interest to allow Dr. Hernandez additional time to make adjustments in response to the action items presented in connection with the recommendations during the next few quarters, in particular given the critical role he plays with the physicians and the human capital-centric business model of the Company's business."); Ex. 158 at '356 ("The Committee members feel that they can give [Hernandez] more time to make adjustments and, in the meantime, the Board can consider alternatives in the even the is unable to make those adjustments."); *id*. at '358 ("There is also a consensus that the [Special Committee's] recommendations are not permanent and can always be changed in new circumstances/findings arise.").

[249] *See* Ex. 218 (recommending that the board address Hernandez's failure to abide by the Conflict of Interest Policy, consider strengthening compliance procedures, engage an

61

Hernandez's roles as CEO and chairman had long been on the table. Sternlicht had expressed his distaste for this approach in a February 27 email to his fellow directors.[250] The directors included a potential separation of these roles as among potential remedial actions discussed in a meeting on March 7.[251] Ultimately, the Special Committee, after discussion, decided to recommend that Hernandez be removed as board chair and presented that proposal to the full board.[252]

The Special Committee's professed predetermination of its recommendations regardless of the outcome of Weil's investigation at the March 30 meeting is troubling. When asked why the Special Committee made recommendations without hearing the entirety of Weil's report, Muney responded that "the recommendations would have been the same no matter what the outcome of the investigation is/was."[253] On the other hand, Trujillo had informed the board on March 27, 2023 that, although they needed to take action urgently, "[i]f Weil's report ultimately includes information that sheds new light on the topic of the CEO or anyone else,

outside consultant for training on board and corporate communications, consider enacting policies related to personal loans to executive officers).

[250] Ex. 107 at '657 ("Bringing in a Chairman will not have the same impact on the stock and if the stock were to rise $1 because Marlowe is not CEO, he will benefit immensely by being able to hold on to some of his shares. Id like to vote on the issue shortly. I have stated my position clearly and I will reserve all my rights as a substantial stockholder and in the street's eye, the sponsor of this debacle.").

[251] Ex. 114 at 2.

[252] Ex. 234 at '715.

[253] Ex. 158 at 5.

62

we can consider it then, but I don't believe that would change any of our minds with respect to decisions in other critical areas."[254]   He confirmed this in the board meeting, explaining that the Special Committee was not dismissing the findings of any report, but was of the view that "they are not willing to terminate the CEO without a plan to keep the Company going."[255]   In another meeting of the Special Committee on March 30, 2023, the committee noted that it "would likely have later changed its recommendation if evidence of wrongdoing was found."[256]   While Muney appeared to be defensive of Hernandez, other directors, such as Trujillo and Rivera, were much more open minded.[257]

Plaintiffs' disagreement with the Defendants' chosen remediation plan does not make that moderate course of action a radical shift in the business or management of the Company.  As a result, it does not support a *Hubbard* claim.

---

[254] Ex. 238.

[255] Ex. 158 at 7.

[256] Ex. 239 at '722.

[257] *See* Rivera Dep. 217:19–218:16 ("[W]e knew the recommendation, but we were waiting to hear what people had to say and whether or not there was any other reasonable alternative for a thoughtful solution that was going to be proposed.  The point was to anchor the discussion on the problem, what needed to be resolved, what we thought was the most viable path.  But anyone in that meeting was welcome to put forward alternate proposals, talk about, you know, why certain things made sense or didn't make sense and it was always supposed to be a full board vote.  If there is one thing that I do know about this board, there are several members of this board who you cannot predict what their vote is going to be until they've heard all the discussion and debate.  So it was not a foregone conclusion.").

### e.  Appointment of Trujillo as Chairman

Plaintiffs next allege that the board's appointment of Trujillo as chairman constituted a material change the operation and management of Cano.  Plaintiffs do not attempt to explain how the appointment of Trujillo as chairman requires waiver of the advance notice bylaw under *Hubbard*.  Rather, they focus on attacking Trujillo's alleged lack of independence from Hernandez.  The logical flaw in Plaintiffs' argument is that if, under their theory, Trujillo is in Hernandez's pocket, his appointment would not substantially change the allegiances of the board or the Company's trajectory.  Rather, a loyal Trujillo would continue to steer the company in the same direction advanced by Hernandez.  Further, the Plaintiffs' newly minted challenge to Trujillo's independence is undermined by the fact that they signed off on Cano's SEC disclosures representing that Trujillo is independent[258] and that they voted in favor of his appointment as Lead Independent Director.[259]  In any event, Sternlicht admitted that there was no fundamental change as a result of Trujillo's installation as chairman:  "He acted as the chairman of the board when he was lead

---

[258] Ex. 27 at 1.

[259] Trujillo Dep. 24:25–25:5 (noting that the board unanimously voted to appoint Trujillo as Lead Independent Director).

director. Nothing changed."[260] Trujillo's appointment as chairman does not support Plaintiffs' claim.[261]

### f. The Abandoned Onsite Dental Stock Sale

Plaintiffs argue that the circumstances surrounding Hernandez's wife's possible sale of Onsite Dental support their theory of a radical change in allegiances. They do not. Stephanie Hernandez acquired her stake in Onsite Dental after Onsite Dental acquired her business, Dental Excellence Partners, in April 2022.[262] In connection with that transaction, Cano entered into a dental services administration agreement with Onsite Dental.[263] At a March 20 board meeting, Gold raised an issue as to the transaction, alleging that the board had not been informed of Hernandez's wife's involvement in the transaction or the terms of the resulting agreement.[264] As Gold was later reminded, the acquisition of Dental Excellence Partners, the subsequent agreement with Onsite Dental, and the involvement of Hernandez's wife

---

[260] Sternlicht Dep. 203:20–22.

[261] Plaintiffs' counsel conceded at argument that removal of Hernandez as CEO would not constitute a fundamental change in the operation and management of Cano warranting waiver of the bylaw under *Hubbard*. Tr. 60:10–61:11. If his removal as CEO would not constitute a *Hubbard* change, the court is hard pressed to see how his removal as chairman and replacement with the Lead Independent Director would satisfy Plaintiffs' burden.

[262] Ex. 28; Ex. 35.

[263] Ex. 35.

[264] Ex. 131 at '041.

were disclosed to the board and were approved two separate times.[265]  They were also publicly disclosed.[266]

Plaintiffs argue that in April 2023, Kiran Patel, an individual who wanted to become involved with Cano, sought to purchase Stephanie Hernandez's interest in Onsite Dental for $20 million.[267]  This transaction did not receive all necessary approvals from Onsite Dental, and accordingly, was not consummated.[268]  The transaction did not involve Cano and the board was not asked to approve it.  This unexecuted transaction could not have caused a material or radical change in Cano's circumstances.

### 4.    The Plaintiffs' Conduct

Plaintiffs accept that the court must evaluate their claims in light of the circumstances of these particular plaintiffs.[269]  The record here demonstrates that the Plaintiffs sought to nominate a competing slate before the occurrence of the changes they allege here.  In pursuit of that aim, they schemed to delay pressing their proxy

---

[265] Ex. 199 at '486 ("The Onsite Dental/Stephanie Hernandez/Pedro Cordero issues were all raised to this Board and approved at least twice – first November 29, 2021 and second on March 15, 2022.  During this time the full proposed terms of the agreement were provided, and the related party transaction was approved with full understanding of the exclusive terms of the agreement, Stephanie Hernandez's ownership and Pedro Cordero's Board seat were all approved.").

[266] Ex. 35.

[267] Pls.' Opening Br. 44.

[268] Hernandez Dep. 153:18–154:2.

[269] Tr. 110:9–13.

contest in the hopes that the board would unwittingly reopen the nomination window.

On March 11, Cooperstone sent Sternlicht and Gold an email mapping out a plan.[270]  Their goal?  Force the Company to either buy them out or to sell the Company entirely.  Cooperstone wrote, "This is my suggestion for how to proceed with the threat of a noisy resignation to secure the board votes we need."[271]  They would demand that the board authorize a banker to immediately conduct an auction for Company and to remove Hernandez as CEO, replaced by Gold as interim CEO.[272]  If this did not occur, Cooperstone would threaten to resign.[273]  Cooperstone wrote:

> The threat of this noisy resignation may move the Board to act.  We should use that threat as other board members then have a risk of damage to their reputations (Kim, Alan) as well as increased potential for additional class actions.  My goal would be to a negotiated outcome that enables the company to be sold.

> However, if we were to proceed [in] this manner it would further devalue company stock causing injury to all remaining shareholders including our investors and friends/family supporters.  If the board [sic] vote does not go our way, as a fallback, I suggest we pursue the sale of our collective position. . . .  The new investors' plan would be to take our board seats and then they would acquire their way to 50% and take

---

[270] Ex. 227.

[271] *Id.* at '390.

[272] *Id.* at '391.

[273] *Id.* at '392.

the company private or use the 2024 proxy season . . . to take full control.[274]

The next day, Sternlicht forwarded a letter designed "to scare the holdouts" to Cooperstone and Gold.[275]   The Plaintiffs planned to deliver their "scathing condemnation[s]" to the board and to make clear that they will "consider resignation if the vote goes the wrong way."[276]   "If the board does not go our way, we can regroup and consider next steps."[277]   Sternlicht, Cooperstone, and Gold discussed running a proxy contest to fill Muney and Rivera's seats with candidates of their choice.[278]  Each of the Plaintiffs were aware that the period for stockholder proposals had closed on February 15, 2023.  Yet the Plaintiffs did not then demand that the board reopen the nomination period.  Rather, they intentionally remained silent, hoping that the board would overlook the terms of the advance notice bylaw and set the annual meeting date after July 16, which would reopen the nomination period by default.[279]  That bet did not pan out.

---

[274] *Id.* (cleaned up).

[275] Ex. 228 at '361.

[276] *Id.* at '360.

[277] *Id.*

[278] Ex. 230 (inclosing an email from Sternlicht in which he states, "we could launch a proxy fight to oust Kim and Alan.  That would give us me, you [(Cooperstone)], lew and our two people.").

[279] Ex. 231 (noting that the nomination period would reopen if the annual meeting is held after July 16 and stating:  "What is critical now is that we not ask the Cano people or other board members any questions around the proxy or the annual meeting.  I think they are oblivious to the implications of the timing.").

68

Plaintiffs saw the writing on the wall. Cooperstone's company retained counsel on March 17, 2023 "in connection with [its] investment in Cano Health" and Sternlicht followed along four days later.[280] But the Plaintiffs were in no hurry to take action. In a WhatsApp message on March 17, 2023, Cooperstone told Gold and Sternlicht that there is "No need to rush here - time is actually building some leverage for us."[281] On March 21, Plaintiffs hatched their current strategy to resign and run a slate against the 2023 nominees.[282]

Plaintiffs exploited their leverage-building lethargy. Following the board meeting on March 30, 2023, Plaintiffs continued to delay. By April 5, 2023, the Plaintiffs had a proxy adviser and had received notice that the Company intended to hold its annual meeting on June 28, 2023.[283] But despite having just under 84 days until the annual meeting, Plaintiffs waited nine days to send a letter demanding that the Company reopen the nomination period.[284] Even then, they did not deliver a nomination proposal. Plaintiffs then waited an additional fourteen days before filing

---

[280] Ex. 181 at 22.

[281] Ex. 197 at '610.

[282] Ex. 134 at '655 (Sternlicht text exchange with Gold and Cooperstone: "And we have one other strategy to deploy gents. Wilkie [sic] Farr said [redacted.] It's a fascinating idea but the three of us opposing these dumb dumbs might work!").

[283] Dkt. 12 at Ex. B.

[284] Ex. 165.

a complaint in this court, dwindling an 84-day head start to around 60 days.[285]  They did this based on the quickly approaching provisional annual meeting date of June 28, 2023, which was not yet publicly announced.  That date could have been changed, and it was here, cutting an additional 13 days off of Plaintiffs' already tight timeline.  In light of these circumstances, the strategy of delay that Plaintiffs undertook here was not a reasonable one.

When the board did not cave to their demands, Plaintiffs took their alternative path—framing the board's decisions and responses to Plaintiffs' demands as "material changes" worthy of reopening the nomination window.  Plaintiffs' actions bring two venerable maxims of equity to mind.  First, "equity aids the vigilant, not those who slumber on their rights." *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982).  Second, "[a]ll plaintiffs seeking the aid of equity's extraordinary remedies do so subject to the maxim that he who seeks equity must do equity." *Richard Paul, Inc. v. Union Imp. Co.*, 91 A.2d 49, 54 (Del. 1952).  Taking the Plaintiffs' allegations together, they do not constitute fundamental changes in the operation and management of Cano to compel waiver of the advance notice bylaw under

---

[285] *Cf. Schnell*, 285 A.2d at 439 (holding that plaintiffs did not unreasonably delay when they filed suit five days after unofficially learning of management's changes to the date and location of the meeting).

*Hubbard.*[286]   The powerful tool of *Schnell* is "reserved for those instances that threaten the fabric of the law, or which by an improper manipulation of the law, would deprive a person of a clear right." *Alabama By-Products Corp. v. Neal*, 588 A.2d 255, 256 n.1 (Del. 1991).

Plaintiffs decided to nominate a competing slate in early March, and in furtherance of that goal, launched a ploy to strategically delay and ultimately, to assert claims of material post-deadline change that are both pretextual and insufficiently radical under in *Hubbard* and *Schnell*. In these circumstances, relief must be denied. Plaintiffs cannot establish a reasonable probability of success on their claim.

### B. Irreparable Harm

An essential condition of preliminary injunctive relief is the threat that irreparable harm will befall the plaintiffs between now and trial unless an injunction issues. *Kingsbridge Cap. Gp. v. Dunkin' Donuts, Inc.*, 1989 WL 89449, at *4 (Del. Ch. Aug. 7, 1989). "'Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their

---

[286] Plaintiffs also suffer from credibility problems. For example, they alleged in their verified complaint that they did not learn of the Camerlinck Loan until March 7. Compl. ¶ 52. While the other two plaintiffs were quicker to admit the statement's falsity, Sternlicht doubled down on the allegation, arguing that despite board minutes marking him present for a discussion of the loan, he must have "left the room" or "wasn't there." Sternlicht Dep. 61:19–62:14.

shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors.'" *Hubbard*, 1991 WL 3151, at *5 (quoting *Int'l Banknote Co., Inc. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989)); *see Icahn*, 2012 WL 1526814, at *3. However, where a plaintiff's imminent, irreparable injury is self-inflicted, equity will not come to her rescue. *See Rosenbaum v. CytoDyn Inc.*, 2021 WL 4890876, at *2 (Del. Ch. Oct. 20, 2021) ("While I recognize that prohibiting a stockholder from exercising her franchise rights can amount to irreparable harm, in this case, any such harm is, in large measure, self-inflicted.").

Plaintiffs' decision to resign from the board after they knew that the nomination deadline had passed was part of a strategic plan to pressure the board to agree to a buyout or to replace the CEO with someone aligned with Plaintiffs' strategy. They intentionally delayed in seeking to waive the bylaw and to assert their claims until their strategy played out and the board did not accede to their demands on March 30. Any harm to these Plaintiffs, who chose to leave the board and to sit on their claims, is self-inflicted.

### C. Balance of the Equities

The final element of the preliminary injunction framework is the balance of harms. Even assuming that Plaintiffs will suffer irreparable harm if they are unable to run their slate, the balance of equities favors Defendants. Plaintiffs' admitted strategy of delay and orchestrated pressure campaign were designed to create a

72

burdensome exigency. *Louisiana Mun. Police Emps.' Ret. Sys. v. Crawford*, 2007 WL 625006, at \*1 (Del. Ch. Feb. 13, 2007) (considering the self-inflicted nature of the harm in the court's evaluation of the court's balancing of the equities).

Plaintiffs strategically delayed in pursuing a proxy contest and bringing suit, forcing Defendants to litigate this case on a burdensome, expedited basis and increasing the costs to Cano in connection with its annual meeting.[287] Plaintiffs here failed to timely nominate directors to replace the directors up for election in 2023 despite their significant concerns about the management of the Company. Plaintiffs were not strangers to this Company, but rather were directors with a long-established familiarity with Cano's structure and policies. As their concerns continued to build, they chose to sit back in the hope that time would increase their leverage over the board. Plaintiffs must be forced to live with the consequences of their actions. The balance of equities tips in favor of the Defendants and counsels against the entry of a preliminary injunction.

---

[287] Defs.' Answering Br. 56–57, 59. The policy behind enforcing unambiguous advance notice bylaws is well established. *See, e.g., Saba Cap.*, 224 A.3d at 980 ("A rule that would permit election-contest participants to ignore a clear deadline and then, without having raised any objection, proffer after-the-fact reasons for their non-compliance with it, would create uncertainty in the electoral setting. Encouraging such after-the-fact factual inquiries into missed deadlines could potentially frustrate the purpose of advance notice bylaws, which 'are designed and function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations.'" (quoting *Openwave*, 924 A.2d at 239)).

## III.   CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for a preliminary injunction is denied.