**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:22-CV-20827-WILLIAMS/SANCHEZ**

ALBERTO GONZALEZ, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiff,

   v.

CANO HEALTH, INC. f/k/a JAWS
ACQUISITION CORP., MARLOW
HERNANDEZ, and BRIAN D. KOPPY,

       Defendants.

<u>**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**</u>
<u>**AND SUPPORTING MEMORANDUM OF LAW**</u>

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 6

I.      CANO'S BUSINESS. ............................................................................................. 6

II.     CANO'S FEBRUARY 28, 2022 DISCLOSURE OF THE NEED TO ADJUST THE TIMING OF MRA REVENUE RECOGNITION. ........................................................ 7

III.    CANO'S Q2 2023 MRA REVENUE RECONCILIATION OF PRIOR ESTIMATES TO ACTUALS ..................................................................................................... 8

ARGUMENT .................................................................................................................. 10

I.      THE SAC FAILS TO PLEAD SCIENTER AS TO ANY DEFENDANT. ...................... 10

     A.     Non-Fraudulent Inferences Far Outweigh Any Inference of Fraud. ..................... 10

     B.     Plaintiff's Confidential Witness Allegations Do Not Supply A Strong Inference of Scienter. ....................................................................................... 12

     C.     Falsity Alone Is Insufficient to Plead A Strong Inference of Scienter. ................ 15

     D.     The Core Operations Doctrine is Insufficient to Plead Scienter. ......................... 18

     E.     The SAC Fails to Allege Motive to Commit Fraud. ........................................... 20

     F.     The Individual Defendants' Departures Do Not Support Scienter. ...................... 22

     G.     The SAC Does Not Allege Scienter as to Cano. ................................................ 23

II.     THE AUGUST 2023 DISCLOSURES DO NOT RENDER ANY STATEMENTS MATERIALLY FALSE OR MISLEADING. ............................................................. 24

     A.     Statements of Quarterly Revenue. .................................................................... 24

     B.     Disclosures Concerning Estimates of MRA Revenue and ASC 606 Compliance. ................................................................................................... 27

     C.     Statements Concerning Internal Controls. .......................................................... 28

III.    THE SAC FAILS TO ALLEGE LOSS CAUSATION ............................................... 29

IV.    THE SAC DOES NOT PLEAD A SECTION 20(a) CLAIM. ..................................... 30

CONCLUSION ............................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adaptive Broadband Sec. Litig.*,
2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...............................................................................16

*In re AFC Enters., Inc.*,
348 F. Supp. 2d 1363 (N.D. Ga. 2004) .....................................................................................19

*In re AirGate PCS, Inc. Sec. Litig.*,
2006 WL 8431172 (N.D. Ga. Feb. 28, 2006) ...........................................................................27

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2010 WL 6397500 (S.D. Fl. Aug. 18, 2010) ..............................................................................5

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) ....................................................................................6, 10, 20

*In re Buca, Inc. Sec. Litig.*,
2006 WL 3030886 (D. Minn. Oct. 16, 2006) ...........................................................................30

*Carvelli v. Ocwen Fin. Corp.*,
2018 WL 4941110 (S.D. Fla. Apr. 30, 2018),
*aff'd*, 934 F.3d 1307 (11th Cir. 2019) ......................................................................................30

*Cheney v. Cyberguard Corp.*,
2000 WL 1140306 (S.D. Fla. Jul. 31, 2000) ............................................................................17

*City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*,
649 F. Supp. 3d 1256 (S.D. Fla. 2023) ....................................................................................23

*City of L.A. v. Bankrate, Inc.*,
2015 WL 11438106 (S.D. Fla. Nov. 23, 2015)..........................................................................29

*Climo v. Office Depot, Inc.*,
2012 WL 13018593 (S.D. Fla. May 24, 2012) .........................................................................13

*In re Colonial Bancgroup, Inc. Sec. Litig.*,
9 F. Supp. 3d 1258 (M.D. Ala. Mar. 27, 2014).........................................................................30

*Druskin v. Answerthink*,
299 F. Supp. 2d 1307 (S.D. Fla. 2004) ......................................................................18, 21, 30

*Durham v. Whitney Info. Network, Inc.*,
2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) .........................................................................14

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
   594 F.3d 783 (11th Cir. 2010) ......................................................................15, 21

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) .................................................................4, 17, 25

*Hattaway v. Apyx Med. Corp.*,
   2023 WL 4030465 (M.D. Fla. Jun. 15, 2023).................................................14, 28

*In re Hertz Glob. Holdings, Inc.*,
   905 F.3d 106 (3d Cir. 2018).............................................................................22, 23

*In re Iconix Brand Grp., Inc.*,
   2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) .........................................................17

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ........................................................29

*In re KLX, Inc. Sec. Litig.*,
   232 F. Supp. 3d 1269 (S.D. Fla. 2017) ...............................................................3, 11

*Lanfear v. Home Depot, Inc.*,
   679 F.3d 1267 (11th Cir. 2012) ............................................................................6

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd* 616 F. App'x. 442 (2d Cir. 2015)........................12

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) .................................................................29

*In re Med/Waste, Inc.*,
   2000 WL 34241099 (S.D. Fla. Aug. 30, 2000)........................................................15

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .........................................................................5, 30

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) .................................................................. *passim*

*Mogensen v. Body Cent. Corp.*,
   15 F. Supp. 3d 1191 (M.D. Fla. 2014).............................................................11, 12

*Mulvaney v. Geo Grp., Inc.*,
   237 F. Supp. 3d 1308 (S.D. Fla. 2017) ..................................................................15

*In re NDCHealth Corp., Inc. Sec. Litig.*,
   2005 WL 6074918 (N.D. Ga. Jul. 27, 2005).........................................................19

*In re PetSmart, Inc. Sec. Litig.*,

iii

61 F. Supp. 2d 982 (D. Ariz.) ...................................................................................25

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
572 F. App'x 713 (11th Cir. 2014) ...........................................................................21

*Plymouth Cty. Ret. Sys. v. Carter's Inc.*,
2011 WL 13124501 (N.D. Ga. Mar. 17, 2011) .........................................................19

*In re Royal Caribbean Cruises, Ltd. Sec. Litig.*,
2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ..................................................... *passim*

*Scott v. Enter. Fin. Servs. Corp.*,
947 F. Supp. 2d 1021 (E.D. Mo. 2013) ....................................................................17

*Sheet Metal Workers Local 28 Pension Fund v. Office Depot*,
2010 WL 11505856 (S.D. Fla. Jan. 14, 2010),
*aff'd*, 405 F. App'x 384 (11th Cir. 2010) ..................................................................15

*In re Smith Gardner Sec. Litig.*,
214 F. Supp. 2d 1291 (S.D. Fla. 2002) .....................................................................16

*In re Sportsline.com Sec. Litig.*,
366 F. Supp. 2d 1159 (S.D. Fla. 2004) ..........................................................16, 17, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................... *passim*

*In re: Tupperware Brands Corp. Sec. Litig.*,
2023 WL 5091802 (11th Cir. 2023) .........................................................................14

*Ziemba v. Cascade Int'l, Inc.*,
256 F.3d 1194 (11th Cir. 2001) ................................................................................16

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..............................................................................13, 14

**Statutes and Rules**

Federal Rule of Civil Procedure 9(b)............................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) .....................................................................1

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ............................................ *passim*

Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).................................................6, 30

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* ...................... *passim*

SEC Rule 10b-5, 17 C.F.R. § 240.10b5-1 ................................................................10, 30

Defendants Cano Health, Inc. ("Cano") and Marlow Hernandez and Brian D. Koppy (the "Individual Defendants," and together with Cano, "Defendants") move to dismiss the Second Amended Class Action Complaint (D.E. 70) (the "SAC") with prejudice for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

Plaintiff's original theory of securities fraud concerned Cano's March 2022 restatement of its quarterly 2021 financial results based on a technical, non-cash accounting change to the timing of its recognition of revenue from the Medicare Risk Adjustment ("MRA"), which Cano's outside auditor recommended in February 2022 during the year-end 2021 audit process. As Defendants' motion to dismiss Plaintiff's First Amended Class Action Complaint ("FAC") made clear, Plaintiff could not meet his burden to plead a strong inference of scienter as to any Defendant that was at least as strong as the opposing, non-fraudulent inference that Defendants merely negligently failed to correctly implement a complex generally accepted accounting principle ("GAAP"), ASC 606, and promptly corrected Cano's accounting methodology when its auditor discovered the issue. Defs' Mot. to Dismiss FAC ("MTD FAC"), D.E. 54.

Faced with the inevitable dismissal of his claims, Plaintiff has since employed several tactics to try to salvage his case, first by improperly adding allegations from an unrelated complaint to his opposition to the MTD FAC, and most recently, by again amending his complaint to change his theory of liability by blurring the distinction between the 2022 restatement driven by a change to the timing of MRA revenue accrual and a routine disclosure by Cano more than a year later of its mid-year reconciliation of actual and estimated MRA revenue that did not restate any historical results. Plaintiff's tactics are transparent and, more importantly, insufficient to cure the glaring pleading deficiencies in the SAC. Plaintiff has delayed adjudication of Defendants' motion to

dismiss for too long, and the time has come to dismiss his case in its entirety, and with prejudice.

Cano is a health care provider to primarily underserved and dual-eligible Medicare and Medicaid populations. Through contracts with the Centers for Medicare & Medicaid Services ("CMS"), Cano receives monthly payments for each enrolled member (patient) that cover all of that member's health care expenses using CMS-established rates that are risk adjusted for the member's projected health status and demographic characteristics. Those risk adjustments, which are variable, technical, and complex aspects of the health care contract payment collection process, are reflected in a MRA within Cano's accounts receivable. Cano disclosed in detail its interpretation of the applicable standard under GAAP, ASC 606, that provides companies with guidelines for CMS revenue recognition from contracts like Cano's, and it disclosed how Cano applied that interpretation to its methodology for recognizing MRA revenue.

In late February 2022 while preparing its year-end 2021 financial statements, Cano and its independent auditor determined that Cano should change its methodology for accruing MRA revenue, a change that impacted the *timing* of revenue recognition by delaying certain amounts into subsequent quarters. Less than a week later, on February 28, 2022, Cano promptly disclosed that it would delay the filing of its Form 10-K in order to make the adjustments. Cano filed its Form 10-K on March 14, 2022, along with a press release explaining the impact of the adjustment in accounting methodology. Cano restated its financial results for the first, second, and third quarters of 2021, shifting some revenue into 2022. Contrary to Plaintiff's mischaracterization, and based on the documents incorporated into the SAC, Cano has not restated its revenue since then.

On August 10, 2023, following receipt of its mid-year reconciliation payment from its health care partners, Cano disclosed that its actual MRA revenue for Q2 2023 turned out to be "approximately $58 million lower than previously estimated in the Company's [May 9, 2023] guidance, driven by lower MRA payments received and expected to be received in 2023." SAC

2

¶ 10. Although Plaintiff falsely portrays this as an announcement of a "restatement," it is simply a reflection of Cano's disclosed process: "[c]apitated revenues are recognized in the month in which [Cano is] obligated to provide medical care services" and "are adjusted in subsequent periods after the final data is compiled by the CMS." SAC ¶ 96. On the same day, Cano disclosed in an earnings call (the "Q2 2023 Earnings Call") that it was improving certain of its "back-end processes," the data from which "inform" its MRA revenue estimates. SAC ¶ 11. But, just because those processes had been "overly manual" does not mean that Defendants committed securities fraud.

The SAC is ripe for dismissal on three independently sufficient grounds:

***No Strong Inference of Scienter***: The PSLRA raises the pleading standard for scienter—*i.e.*, an intent to deceive, manipulate, or defraud or severe recklessness—requiring that "the complaint shall, with respect to each act or omission alleged . . . *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting 15 U.S.C. § 78*u*-4(b)(2)). An inference of scienter is only strong if it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *In re Royal Caribbean Cruises, Ltd. Sec. Litig.*, 2013 WL 3295951, at *10 (S.D. Fla. Apr. 19, 2013).

Here, nearly two years after this lawsuit was filed, the SAC still alleges no facts from which the Court can draw an inference of scienter at all, much less the required strong inference. The SAC still lacks any of the types of allegations that are typically present in complaints that survive a motion to dismiss (and even in many that do not), such as allegations of insider trading, allegations attributed to confidential witnesses with reliable first-hand knowledge that is indicative of scienter, internal reports, emails, or other documents suggesting that Defendants knew or recklessly disregarded that (i) Cano's timing of MRA revenue accruals was incorrect in 2021; or (ii) Cano's estimates of MRA revenue were allegedly false when made. *See In re KLX, Inc. Sec.*

3

*Litig.*, 232 F. Supp. 3d 1269, 1279, 1283 (S.D. Fla. 2017) (dismissing complaint with prejudice in the absence of "any report, document, email, or statement that, if true, suggests Defendants *knew* or were reckless not to know an impairment charge was necessary").

Under the Supreme Court's *Tellabs* mandatory balancing test, the far more plausible, non-culpable inference here is that Cano mistakenly thought it applied ASC 606 correctly to the timing of its MRA revenue recognition prior to February 2022 and mistakenly thought it accurately estimated MRA revenue. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1269 (11th Cir. 2006) (affirming dismissal where GAAP violations "merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care"). The SAC should be dismissed in its entirety because it fails to plead particularized facts raising *any* inference of scienter—much less the requisite *strong* inference.

***No Falsity*:** The SAC's allegedly false statements fall into three categories:  (i) statements of the Company's quarterly and annual revenue throughout the class period (SAC ¶¶ 84, 86, 88, 90, 92, 94, 108, 110, 112, 114, 116, 118, 120, 122, 124, 126); (ii) disclosures concerning Cano's methodology for applying ASC 606 and the risks associated with estimating MRA revenue (SAC ¶¶ 96, 98, 100, 102, 104, 106, 128, 129, 130); and (iii) statements concerning the Company's internal controls (SAC ¶ 133). None of these alleged categories of statements is rendered materially false or misleading based on any alleged omission that Cano's "back-end processes" were allegedly "manual and error-prone." *See, e.g.*, SAC ¶¶ 61, 111.

*First*, Plaintiff does not satisfy Rule 9(b)'s requirements to plead, among other allegations, "precisely what statements were made in what documents or oral representations or what omissions were made." *Garfield*, 466 F.3d at 1262. Nowhere does Plaintiff explain whether and to what extent the revenue and other financial metrics reported by Cano in each prior quarter were

4

rendered materially inaccurate based upon Cano's Q2 2023 MRA revenue reconciliation—nor could he, when the alleged $44 million so-called "charge" against 2022 revenue accounted for only 1.6% of Cano's 2022 annual revenue. *See, e.g.*, SAC ¶ 120. *Second*, the Company never restated any of its revenue after 2021 and the restatement of 2021 financials pertained solely to the *timing* of MRA revenue recognition, not the *amounts* of MRA revenue. Its reconciliation of estimated to actual MRA revenue in Q2 2023 did not render its previous *estimates* inaccurate at the time they were made. *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *30 (S.D. Fl. Aug. 18, 2010) (explaining, "the relevant inquiry on a § 10(b) claim is not whether future events made the statements in question true or false but whether the statements were false at the time they were made"). *Third*, at all times, Cano accurately disclosed the methodology it applied for estimating and accruing MRA revenue and also disclosed the challenges associated with that process. *Fourth*, Plaintiff conflates Cano's accurate disclosure that it had remediated the ASC 606 MRA revenue accrual *timing* issue that led to the March 2022 restatement—confirmed in its auditor's own certification—with the entirely separate issue of how it *estimates* MRA revenue.

*No Loss Causation*: The SAC must also be dismissed for failure to plead the independent element of loss causation based on its alleged sequence of partially corrective disclosures. No fraud was revealed at the time of the first alleged corrective disclosure on February 28, 2022. The February 28, 2022 disclosure of a delay in filing Cano's Form 10-K and the need for an adjustment to the Company's timing of accounting for MRA revenue recognition is not a revelation "to the market [of] the pertinent truth." *See Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013) (affirming dismissal). And, the final alleged corrective disclosures on August 10, 2023 do not reveal fraud either, but only a reconciliation of previously estimated to actual numbers and the Company's stated plan to improve certain internal processes. In the absence of a revelation of fraud on any of these dates, the SAC has not pleaded loss causation.

Because Plaintiff fails to allege a primary violation of Section 10(b), his Section 20(a) control person claim should be dismissed. *Royal Caribbean Cruises*, 2013 WL 3295951, at *9, 19.

## BACKGROUND

### I.   CANO'S BUSINESS.

Cano is an independent primary care physician group. SAC ¶ 2; D.E. 74-4[1] (Form 10-K for year ended Dec. 31, 2021 ("2021 Form 10-K")) at 6 (SAC ¶¶ 49, 51–52, 128–29, 132). It provides access to high-quality health care to primarily underserved and dual-eligible Medicare and Medicaid populations. *Id.* at 6. Cano's members receive "value-based" care via the Medicare Advantage program. SAC ¶ 62; D.E. 74-4 (2021 Form 10-K) at 7. Value-based care is viewed by many as a superior payor model, aligning the incentives of providers, payors, and patients, and driving better care and superior patient experiences. D.E. 74-4 (2021 Form 10-K) at 7.

In Medicare Advantage, Cano receives a monthly payment per member to manage all of the member's medical expenses pursuant to a contract referred to as a capitation contract. SAC ¶¶ 36–37; D.E. 74-4 (2021 Form 10-K) at 7. In return, Cano is generally responsible for all of its members' health care costs incurred at Cano's primary care locations as well as all third-party medical expenses. D.E. 74-4 (2021 Form 10-K) at 7. The capitated revenue payments to Cano are calculated using CMS's statistical method that adjusts the payments based on the expected medical costs of enrolled members. SAC ¶¶ 37–38; D.E. 74-4 (2021 Form 10-K) at 84. Those payments are then adjusted through the MRA, which prospectively uses members' diagnoses and demographic characteristics from one year to calculate a risk adjustment for its monthly payments

---

[1] "D.E. 74-[X]" refers to exhibits attached to the Declaration of Katherine G. McKenney in support of Defendants' Motion to Dismiss the SAC (D.E. 74). The Court may consider exhibits that are referenced in the SAC, filed with the SEC, and/or publicly available, including stock prices. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999) (court may consider documents "publicly filed with the SEC at the motion to dismiss stage"); *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1282 n.17 (11th Cir. 2012) (judicial notice of stock prices on motion to dismiss).

in the next year. SAC ¶¶ 37–38; D.E. 74-4 (2021 Form 10-K) at 84. As Cano disclosed, it recognizes capitated revenue in the month it provides services to members, and the MRA revenue amounts are adjusted in subsequent periods after final data are compiled by CMS. SAC ¶ 49.[2]

## II.   CANO'S FEBRUARY 28, 2022 DISCLOSURE OF THE NEED TO ADJUST THE TIMING OF MRA REVENUE RECOGNITION.

Since its adoption of ASC 606 in 2019, Cano engaged two independent accounting firms to audit its year-end financials. D.E. 74-1 (Proxy Statement, filed May 7, 2021 ("Proxy Statement")) at 369, F-25 (SAC ¶¶ 84, 96, 98, 143). The 2019 and 2020 financial statements in the Proxy Statement at the time Cano became publicly traded were audited by Ernst & Young LLP ("EY"), and were accompanied by EY's clean audit opinion that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020 and 2019 . . . in conformity with U.S. [GAAP]." *Id.* at F-25.

On February 28, 2022, Cano issued a press release on SEC Form 8-K explaining that, "[l]ast week, in the course of finalizing its audit of the financial statements for the year ended December 31, 2021, the Company and its independent auditor, [EY], identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606." D.E. 74-2 (Feb. 28, 2022 Form 8-K) at Ex. 99.1, at 1 (SAC ¶¶ 6, 45, 137). The press release continued, "The adjustments relate to how and when the Company accrues revenue related to Medicare Risk Adjustments. The adjustments are expected to impact the timing of revenue recognition, by delaying recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods . . . ." *Id.* Cano filed its 2021 Form 10-K on March 14, 2022, reflecting restated financials for the first, second, and third quarters of 2021. D.E. 74-4 (2021 Form 10-K);

---

[2] Plaintiff appears to conflate capitated revenue more generally (Cano's accrual of which has never been an issue) with the small MRA revenue component of capitated revenue, which was the subject of the restatement of 2021 quarterly financials and the Q2 2023 reconciliation.

*see also* D.E. 74-5 (Mar. 14, 2022 Form 8-K) at Item 4.02 (SAC ¶ 7, 48); D.E. 74-6 (Mar. 14, 2022 Press Release) at Ex. 99.1, at 2 (SAC ¶¶ 7, 50). Upon Cano's issuance of the restatement after the close of trading on March 14, 2022, Cano's stock price rose from $5.31 per share to $6.03 per share at the close of trading on March 15, 2022. D.E. 74-7 (CANO Stock Price Chart).

Cano also disclosed in the Form 10-K that EY and management determined that Cano had material weaknesses in controls that led to the misapplication of GAAP, specifically that Cano "did not have a sufficient complement of personnel with an appropriate level of knowledge, experience, and oversight commensurate with its financial reporting requirements to ensure proper selection and application of [GAAP]." D.E. 74-4 (2021 Form 10-K) at 63–64. In its Form 10-K for the following fiscal year 2022, Cano disclosed that this particular material weakness in internal controls had been "remediated" (SAC ¶ 133), and EY affirmed that "[w]e have audited [Cano's] internal control over financial reporting as of December 31, 2022. . . . In our opinion, [Cano] maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022. . . ." D.E. 74-8 (Form 10-K for year ended Dec. 31, 2022 ("2022 Form 10-K") at 147 (SAC ¶¶ 122, 130, 133).

### III. CANO'S Q2 2023 MRA REVENUE RECONCILIATION OF PRIOR ESTIMATES TO ACTUALS.

On August 10, 2023, Cano reported Q2 2023 financial results and disclosed:

> During the second quarter of 2023, the ***MRA revenue was approximately $58 million lower than previously estimated in the Company's guidance***, driven by lower MRA payments received and expected to be received in 2023. Approximately $44 million of lower-than-expected MRA revenue was related to out-of-period items, which are not expected to reoccur.

SAC ¶ 10; D.E. 74-9 (Form 8-K, filed Aug. 10, 2023) at Ex. 99.1, at 1 (SAC ¶¶ 10, 58). The Company further elaborated on this lower-than-estimated MRA revenue in its Q2 2023 Earnings Call, explaining, "This lower MRA revenue reflects our updated view of the final 2022 and mid-year 2023 MRA revenue estimates of the approximate $58 million shortfall versus our

expectations." SAC ¶ 60; D.E. 74-10 (Cano Earnings Call Transcript, Aug. 10, 2023 ("Q2 2023 Transcript")) at 11 (SAC ¶¶ 59–64, 139). Of the $58 million, $14 million represented the reconciliation of prior forward-looking guidance for Q2 2023 versus actual Q2 2023 MRA revenue, and $44 million represented the reconciliation of estimated MRA revenue in "prior periods," going back to 2022. SAC ¶ 10; D.E. 74-9 (Form 8-K, filed Aug. 10, 2023) at Ex. 99.1, at 1–2. The $44 million is not a "charge against" or restatement of prior reported revenue, but is instead an ordinary-course reconciliation consistent with Cano's disclosed process for recognizing capitated revenue in the month services are performed, and then those amounts "are adjusted in subsequent periods after the final data is compiled by CMS." SAC ¶ 49. Cano had previously disclosed that it received a "mid-year reconciliation payment" from its health plan partners in June or July of each year. D.E. 74-6 (Mar. 14, 2022 Press Release) at Ex. 99.2, at 19. Plaintiff's allegation that the $44 million portion of the reconciliation pertains to 2022 revenue (SAC ¶ 10) represents just 1.6% of Cano's $2.7 billion annual revenue in 2022. SAC ¶¶ 59, 120.[3]

Although the reconciliation to actuals of MRA revenue affected a small percentage of Cano's previously reported total 2022 revenue, Cano endeavored to improve certain of its internal practices that produced data informing its MRA revenue estimates. In the Q2 2023 Earnings Call, Mark Kent, Cano's new CEO, gave a description of commencing a review upon his arrival at Cano in April 2023 of Cano's clinical documentation, billing and coding methodologies to enhance the Company's practices:

> Our review found that while our clinical documentation, billing and coding followed by nearly all internal policies, *we have clear opportunities to implement simpler, scalable*

---

[3] Revenue from the Medicare Advantage program can be very difficult to predict in Cano's industry, as reflected by the recent announcement by agilon health, inc. lowering its 2023 medical margin expectation by $110 million. *See* Agilon Health Press Release, dated  Jan. 5, 2024, *available at* https://www.agilonhealth.com/news/press-release/agilon-health-provides-2023-guidance-update-initial-2024-view/

*and more effective protocols designed to enhance our performance*. The largest gap we found was attributable to back-end processes and the ways that data from those processes inform our MRA estimates. The ***prior processes were overly manual***, and our back testing analysis demonstrated that they provided limited predictive power.

SAC ¶ 61; D.E. 74-10 (Q2 2023 Transcript) at 6.

## ARGUMENT

### I.   THE SAC FAILS TO PLEAD SCIENTER AS TO ANY DEFENDANT.

#### A.   Non-Fraudulent Inferences Far Outweigh Any Inference of Fraud.

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, the SAC must satisfy the heightened pleading requirements of the PSLRA and Rule 9(b). *Mizzaro*, 544 F.3d at 1237–38.[4] "[I]mportantly, the PSLRA raised the standard for pleading scienter. . . . [T]he complaint shall, with respect to each act or omission alleged . . . , *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*." *Id.* at 1238. Scienter is distinguished from negligence, for which the U.S. Supreme Court has "clearly preclud[ed] liability" under Section 10(b), and "[s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but ***an extreme departure*** from the standards of ordinary care . . . ." *Bryant*, 187 F.3d at 1282, 1282 n.18 (emphasis added). An inference of scienter is only strong if, after the Court's mandatory balancing, it is "'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Mizzaro*, 544 F.3d at 1238 (quoting *Tellabs*, 551 U.S. at 324). And the "complaint must allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Id.* at 1238. "In sum, the reviewing court must ask: When the allegations

---

[4] The elements of a securities fraud claim are: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro*, 544 F.3d at 1236–37, 1257 (affirming dismissal for failure to plead scienter).

are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. The answer here is clearly "No" in the absence of any particularized facts that an Individual Defendant knew, or was severely reckless in not knowing, that any of Cano's statements were false when made.

Application of the Supreme Court's mandatory *Tellabs* balancing test is straightforward here. Critically, there is a glaring absence in the SAC of any particularized facts that any Defendant knew, or was severely reckless in not knowing, that (i) Cano's timing for recognizing MRA revenue did not comply with ASC 606 in 2021; or (ii) its estimates of MRA revenue was false when made. Indeed, the SAC ignores that Cano's independent auditor, EY, audited the Company's financial statements in 2019 and 2020, but did not detect anything wrong with the timing of Cano's MRA revenue recognition until its 2021 year-end review in February 2022 (at which time the Company promptly disclosed and corrected it). EY also certified that the Company "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022," encompassing the period in which Plaintiff alleges that Cano's "manual and error-prone" processes led to inaccurate MRA estimates. D.E. 74-8 (2022 Form 10-K) at 147.

In contrast to these attestations by an outside auditor, the SAC offers no allegations of any witnessed conversations, reports, emails, or other documents as typically alleged to raise a strong inference of scienter. *See KLX, Inc.*, 232 F. Supp. 3d at 1279. Courts have held that the non-fraudulent inferences of scienter outweigh fraudulent inferences in the face of far more particularized allegations than the SAC presents here. *See, e.g.*, *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1210, 1217–18, 1223–24 (M.D. Fla. 2014) ("Even reasonable and plausible fraud cases will be dismissed if an inference of poor business judgment—and even negligence or mismanagement—flows even slightly more naturally from the well-pled factual allegations than does an inference of scienter.").

11

Because Plaintiff's allegations fail to raise *any* inference of scienter, the opposing inferences are not only more compelling, they are the *only* inferences that can be drawn from the SAC: (i) Cano did not know it had misapplied ASC 606 to the timing of its MRA revenue recognition after receiving clean audit opinions until its outside auditors discovered it in February 2022; and (ii) Cano—which grew rapidly during the Class Period—did not have back-end billing and coding processes that kept pace with its increasing size and those practices left something to be desired.[5] Plaintiff's attempts to create an inference of scienter all fall far short of the cogent and equally compelling strong inference of scienter that *Tellabs* balancing requires.[6]

### B.    Plaintiff's Confidential Witness Allegations Do Not Supply A Strong Inference of Scienter.

Because the SAC still lacks any evidence of emails, reports, or other documents evidencing an Individual Defendant's scienter, Plaintiff attempts to bolster his deficient allegations through the purported statements of three confidential witnesses ("FE 1," "FE 2," and "FE 3"). SAC ¶¶ 69–80. "[T]he Eleventh Circuit has instructed that courts may be wary of confidential sources" and requires that "the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." *Royal Caribbean Cruises*, 2013 WL 3295951, at *18. The PSLRA requires that confidential witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge" and their statements "must themselves be

---

[5] *Compare* D.E. 74-6 (Mar. 14, 2022 Press Release) Ex. 99.2, at 23 (graph noting 156,000 members as of the second quarter of 2021), *with* D.E. 74-8 (2022 Form 10-K) at 31 (reporting 309,590 members as of December 31, 2022).

[6] In each of Plaintiff's alleged corrective disclosures, Cano promptly disclosed to investors the need for an adjustment to the timing of its MRA revenue accruals and the need for a reconciliation of estimated to actual MRA revenue amounts. *See Mogensen*, 15 F. Supp. 3d at 1223 (no scienter where most likely inference is that defendants "timely disclosed adverse information as they became aware of it"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297–98 (S.D.N.Y. 2014), *aff'd* 616 F. App'x. 442 (2d Cir. 2015) (no scienter in restatement case where prompt disclosure after errors identified).

indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Here, the Court should afford no weight to the FE allegations because they fail to specify "the foundation or basis of the confidential witness[es'] knowledge" or "the proximity to the offending conduct" as required by the PSLRA (*Mizzaro*, 544 F.3d at 1240) for at least the following reasons:

*First*, none of the FEs is alleged to have had any direct communication or interaction with either of the Individual Defendants regarding the subject matter of the alleged misstatements, let alone any basis from which the Court can infer the Individual Defendants' knowledge or states of mind. Among the FEs, only one allegedly reported to one of the Individual Defendants, and none even mentions the Individual Defendants at all. SAC ¶¶ 69–80; *see Royal Caribbean Cruises*, 2013 WL 3295951, at *18 (no scienter where "none of these witnesses allege that they spoke to the individual Defendants, that the individual Defendants had *actual* knowledge of this data"). This deficiency alone renders all of the FEs' statements incapable of salvaging the non-existent scienter allegations of the SAC. *See Mizzaro*, 544 F.3d at 1247–48.

*Second*, none of the statements attributed to the FEs concerns the Company's financial reporting in SEC filings. None of the FEs is even alleged to have worked in Cano's accounting department. FE 1 was a "chief administration officer," and FE 2 and FE 3 were employees in billing and coding. SAC ¶¶ 69 n.8, 71 n.11, 73 n.12. Therefore, despite the SAC's broad-sweeping generalizations that the Company was "just very unorganized with coding and billing," "documentation is not up to par," and "everything was manual" (SAC ¶¶ 69, 71–72), the allegations lack any link to the allegedly misleading statements in Cano's publicly reported financial statements. *See Climo v. Office Depot, Inc.*, 2012 WL 13018593, at *17 (S.D. Fla. May 24, 2012) ("The information attributed to the Confidential Witnesses is vague, irrelevant and fails to link the Individual Defendants to any fraud."). In fact, FE 1 admits that they had no visibility into publicly reported financials, alleging that "[d]ata analytics and predictive analytics flowed

13

through one person, Pedro Cordero" and the "[f]inancial output of our operations" was "accessible only through Cordero." SAC ¶ 70; *see In re: Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *6 (11th Cir. 2023) (affirming dismissal where confidential witness allegations "lack[ed] particularized facts showing why" the witnesses "would be familiar with [defendant's] financial reporting"); *Durham v. Whitney Info. Network, Inc.*, 2009 WL 3783375, at *16 (M.D. Fla. Nov. 10, 2009) (rejecting confidential witness allegations where "[t]here are no facts alleged to show that this member of the technical support team—who is not a part of the Company's executive, legal or accounting department—would have any firsthand knowledge").

*Third*, the FEs' statements do not pertain to the class period. FE 3 did not even work at Cano during the class period. *Compare* SAC ¶ 72 n.12 (alleging that FE 3 "was a medical coder from January 2020 through March 2021"), *with* SAC ¶ 1 (class period commencing on May 7, 2021). For this reason alone, the allegations attributed to FE 3 should be disregarded entirely. *Hattaway v. Apyx Med. Corp.*, 2023 WL 4030465, at *11 (M.D. Fla. Jun. 15, 2023) (confidential witness not employed by company during class period lacked insight into company's class period operations). FE 2 worked at Cano for only four months very early in the class period, from August 2021 to November 2021, prior to the 2022 and Q1 2023 periods subject to the Q2 2023 MRA revenue reconciliation. SAC ¶ 71 n.11. And although FE 1 worked at Cano until December 2022, FE 1 only vaguely alleges that processes were manual for some unspecified portion of the class period and admits that the Company's accounting department had adopted Oracle accounting software before FE 1's departure. SAC ¶ 69. The FEs' statements lack the "personal knowledge" and "reliability" that the PSLRA requires, and the allegations attributed to them do not contribute to a strong inference of scienter. *Zucco Partners, LLC*, 552 F.3d at 995.

Regarding the alleged "upcoding" and other coding practices at Cano (SAC ¶¶ 73–79), the SAC has failed to allege how such vaguely described practices caused Cano to "overestimate[] the

14

MRA estimate." *See id.* ¶ 80. Further, none of the FEs alleges that the Individual Defendants instructed them to engage in any upcoding or other improper practices. *Sheet Metal Workers Local 28 Pension Fund v. Office Depot*, 2010 WL 11505856, at *5 (S.D. Fla. Jan. 14, 2010), *aff'd,* 405 F. App'x 384 (11th Cir. 2010) (no scienter where confidential witnesses did not allege "knowledge, direct or indirect, of any communication made by either defendant that could reasonably be interpreted to reflect his or her knowledge, direction or encouragement of the alleged vendor rebate scheme"); *Mulvaney v. Geo Grp., Inc.*, 237 F. Supp. 3d 1308, 1324 (S.D. Fla. 2017) (no scienter where confidential witness failed to allege individual defendant knew about the alleged directive).

### C. Falsity Alone Is Insufficient to Plead A Strong Inference of Scienter.

For each of the alleged misstatements, Plaintiff also relies heavily on the fact of the 2022 restatement itself (and his false characterization of the Q2 2023 mid-year reconciliation of estimated to actual MRA revenue) as an additional restatement to plead scienter:

> [T]here were no new facts or circumstances to change the accounting treatment of these contracts—no new accounting rule, no new process by CMS, and no new auditor for Cano—between the issuance of the Proxy soliciting approval of the Business Combination and the announcement of the restatement. Therefore, the most ***reasonable inference*** is that the Individual Defendants knew or recklessly disregarded the correct GAAP treatment of Medicare contracts.

SAC ¶ 145 (emphases added). Even if this were a "reasonable inference," which it is not, the PSLRA requires a "strong inference." *Royal Caribbean Cruises*, 2013 WL 3295951, at *17.

*First*, simply because Cano restated the first three quarters of 2021 and its MRA revenue estimates in 2022 and Q1 2023 were higher than future, actual payments, does not equate to scienter. *See Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 790, 793 (11th Cir. 2010) (affirming dismissal of Section 10(b) claims based on inaccurate financial restatements for lack of scienter); *In re Med/Waste, Inc.*, 2000 WL 34241099, at *5–8 (S.D. Fla. Aug. 30, 2000) (although the complaint met Rule 9(b)'s requirements to allege falsity, the complaint failed to

15

"show that Defendants either knew or were extremely reckless regarding the falsity of the Company's statements *at the time* the statements were made"). This is particularly true in the context of accounting issues. The law of this Circuit is that "allegations of violations of . . . GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208–10 (11th Cir. 2001) (affirming dismissal where "plaintiffs have pointed to no 'tips,' letters, or conversations raising inferences that [defendant] knew of any fraud"); *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1165–70 (S.D. Fla. 2004) ("Violations of GAAP without more, may establish negligence, but can never establish scienter."). Instead, a plaintiff must plead "more" (*see Ziemba*, 256 F.3d at 1209), such as GAAP violations coupled with "detailed evidence of the contemporaneous decision-making behind the accounting errors." *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *13 (N.D. Cal. Apr. 2, 2002).[7]

The SAC does not supply the something "more" or the "red flags" that the Eleventh Circuit requires of Section 10(b) claims based on accounting issues. Instead, the SAC relies upon the Individual Defendants' positions within the Company, which Plaintiff alleges gave them "the power and authority to control the contents of the Company's reports to the SEC" and "the ability and opportunity to prevent their issuance or cause them to be corrected." SAC ¶ 23. "Mere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter." *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002). In the context of GAAP violations specifically, the court explained in *Cheney v. Cyberguard Corporation* that "[t]he inference plaintiffs wish the court to make from the complaint is that by virtue of their positions . . ., they were severely reckless in not knowing about the [GAAP] violations. . . .

---

[7] To be clear, Cano has *never* announced any GAAP violation associated with its routine Q2 2023 MRA revenue reconciliation.

[R]eliance on their high level position is not enough." 2000 WL 1140306, at *8–9 (S.D. Fla. Jul. 31, 2000). This is particularly true where Defendant Hernandez is a doctor, not an accountant, and where none of the FEs are alleged to have any interaction at all with Defendant Koppy. Instead, courts have found that in the absence of additional allegations, GAAP violations do not create a strong inference of even recklessness because "[t]hey merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care." *Garfield*, 466 F.3d at 1269.

Plaintiff's self-serving and unsupported characterization of the applicable GAAP revenue recognition practices as "simple and uncomplicated" (SAC ¶ 143) does not supply the inference of scienter that is otherwise lacking in the absence of "any factual basis from which the Court could infer that ASC [606] implementation is straightforward or simple." *Scott v. Enter. Fin. Servs. Corp.*, 947 F. Supp. 2d 1021, 1029 (E.D. Mo. 2013) (dismissing claims); *see also Sportsline.com*, 366 F. Supp. 2d at 1168 (rejecting argument that "because Defendants' GAAP violations were of simple accounting rules and therefore incredibly obvious, an inference of scienter can be made"). Contrary to Plaintiff's unsubstantiated say-so, ASC 606 is anything but "simple," evidenced by Cano's detailed disclosures regarding its interpretation and application of ASC 606 (*see, e.g.*, SAC ¶ 97) and the many factors impacting MRA revenue recognition as detailed in Cano's risk disclosures (*see, e.g.*, SAC ¶ 98). The fact that EY gave Cano clean audit opinions throughout the class period also supports a "compelling inference . . . that [the] accounting errors were not obvious or unreasonable." *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *18–19 (S.D.N.Y. Oct. 25, 2017) (dismissing fraud claims based on restatements where "Iconix's financial statements and accounting judgments were subject to audit by BDO—an independent public accounting firm");[8]

---

[8] For this reason, the SAC's vague reference to Cano's "peers" using the accrual timing methodology that Cano ultimately adopted in 2022 based on a Credit Suisse analyst report (*see,*

17

*see also Druskin v. Answerthink*, 299 F. Supp. 2d 1307, 1324 n.27 (S.D. Fla. 2004) (auditor's "clean opinion" raises inference that the company was properly reserving for bad debt).[9]

Finally, in an attempt to connect two unrelated disclosures to create the impression of a fraudulent scheme of revenue overstatement throughout the class period, Plaintiff mischaracterizes Cano's August 10, 2023 disclosure as "amounting to" "another restatement of the Company's financial results" based upon the conjecture of a single securities analyst. SAC ¶¶ 10 n.1, 59. A financial restatement is "an act of revising one or more of a company's previous financial statements to correct an error."[10] Cano did not revise any of its previous financial statements based upon the reconciliation described in its August 10, 2023 disclosure, nor did it disclose any non-compliance with GAAP. Instead, it updated previously *estimated* MRA revenue to *actual* MRA revenue, consistent with its disclosed methodology, which was "lower than previously estimated in the Company's guidance." SAC ¶ 10. Companies update guidance and estimates all the time. Merely because subsequent actual numbers are lower than previously estimated does not render the estimate fraudulent when issued. There are zero allegations that anyone thought that previous MRA revenue estimates or guidance were false.

### D.     The Core Operations Doctrine is Insufficient to Plead Scienter.

Plaintiff next alleges that "revenue from Medicare contracts [was] core to the Company's business." SAC ¶ 143. Plaintiff uses what is known as the "core operations doctrine" to impute knowledge to the Individual Defendants—in the absence of allegations of actual knowledge—

---

*e.g.*, SAC ¶ 52) does not transform Cano's misapplication of ASC 606 into fraud. In fact, the same Credit Suisse report described Cano's prior methodology as "reasonable," albeit less conservative than some of its peers. D.E. 74-3 (Credit Suisse, "Follow-up Post Catch-up With Peers and Industry Experts on CANO's Revenue Recognition Changes," Feb. 28, 2022).

[9] The SAC does not allege that Cano gave its auditors incomplete information or otherwise prevented them from detecting the accounting errors. *See id.*

[10] "What is a restatement?," *Investopedia*, https://investopedia.com/terms/r/restatement.asp

based upon the alleged importance of Medicare Advantage contracts. Courts in this Circuit have repeatedly rejected this doctrine as insufficient to plead a strong inference of scienter. *See, e.g.*, *In re NDCHealth Corp., Inc. Sec. Litig.*, 2005 WL 6074918, at *8 n.10, *9 n.11 (N.D. Ga. Jul. 27, 2005) (accepting plaintiff's core operations argument "would contravene the express directives of the PSLRA requiring Plaintiff to allege facts sufficient to meet its pleading burden").

The core operations doctrine has been rejected even more stridently in the context of accounting issues. After noting that the Eleventh Circuit "has never adopted the core operations doctrine," the court in *Plymouth County Retirement Systems v. Carter's Inc.* explained, "[I]t is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question. . . . ***That is especially so here where the alleged fraud revolves around accounting practices***." 2011 WL 13124501, at *17 (N.D. Ga. Mar. 17, 2011) (emphasis added); *see also In re AFC Enters., Inc.*, 348 F. Supp. 2d 1363, 1374 (N.D. Ga. 2004) ("It is more tenuous to impute knowledge of cumulative accounting errors generally to operational officers and directors of a corporation," particularly where company "re[lies] on an outside accounting firm to audit its financials.").

The SAC's attempt to invoke the core operations doctrine is particularly ineffective here because it generically alleges that the Individual Defendants "possessed the power and authority to control the contents of the Company's reports to the SEC." SAC ¶ 23. These threadbare allegations stand in stark contrast to complaints in which defendants' alleged "intimate[] involve[ment]" in the alleged accounting errors coupled with allegations of motive, such as insider trading, supported a strong inference of scienter. *See AFC Enters., Inc.*, 348 F. Supp. 2d at 1375 (fraud claim adequately pleaded where complaint alleged that CFO "engineered the conversion plan to make the company's earnings look better" and was "intimately involved in the conversion

19

process," coupled with allegations of large stock sales and manipulation of earnings to precisely match analyst estimates). Plaintiff's attempt to invoke the core operations doctrine here falls flat.

### E. The SAC Fails to Allege Motive to Commit Fraud.

In the absence of any allegations concerning the Individual Defendants' knowledge of the alleged accounting errors, any attempt by Plaintiff to plead that the Individual Defendants possessed motive to commit fraud necessarily fails on its own. *Bryant*, 187 F.3d at 1285 (this Circuit has "reject[ed] the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter"). The SAC attempts to allege that the Individual Defendants "were financially motivated for the Business Combination [of Jaws and PCIH] to occur" and "the accounting method that Defendants employed enabled them to report increased revenue in the near-term, making PCIH appear as a more appealing acquisition target." SAC ¶¶ 143−44. As a result of the business combination, Plaintiff points to the sale proceeds (paid in cash to PCIH's parent and also used to defray corporate expenses and debts) and equity incentive compensation awarded to the Individual Defendants as motives for the alleged fraud. SAC ¶ 144. None of these alleged motives passes muster, either as a matter of logic or a matter of law.

*First*, all of the alleged motivations to consummate a business combination that Plaintiff attributes to the Individual Defendants occurred prior to the class period. And even if the Court could take account of pre-class period motives, the SAC's motives are nonsensical, implausible, and unsupported by the allegations. Plaintiff does not explain how an issue with the *timing* of revenue recognition would impact PCIH's "projected growth," as Plaintiff suggests (SAC ¶ 143), which is necessarily forward-looking. Moreover, the Company disclosed that EY concluded that the restatements to the Company's revenue for fiscal years 2019 and 2020 (the two years prior to the business combination) were not material, which severely undermines Plaintiff's theory that any Defendant was motivated to accrue revenue early in order to attract a buyer for PCIH. *See*

D.E. 74-6 (Mar. 14, 2022 Press Release) at Ex. 99.1, at 2.

*Second*, Plaintiff impermissibly lumps both Individual Defendants together even though the alleged motives the SAC attributes to "the Individual Defendants" do not apply to both of them. Defendant Koppy became the CFO of Cano in April 2021 after the business combination was announced in November 2020, and thus he had no role at PCIH at the time Plaintiff alleges the Individual Defendants had the incentive to make PCIH a more appealing acquisition target. *See* SAC ¶ 22. Plaintiff's sloppy, shotgun-pleading references to "Individual Defendants" collectively betray the absence of any plausible motives as to either Individual Defendant.

*Third*, allegations concerning financial motivations to consummate and receive proceeds from a business combination are categorically insufficient general corporate motives. "[A] personal financial incentive, standing alone, is insufficient to establish a strong inference of actual fraud." *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 718 (11th Cir. 2014). "[M]otives such as greed can be ascribed to any company insider and are thus fundamentally inconsistent with the provisions of the [PSLRA] that require allegations of specific facts that establish scienter." *Druskin*, 299 F. Supp. 2d at 1335. The same is true for Plaintiff's allegations that Defendants Hernandez and Koppy received stock options and restricted stock units ("RSUs") at the closing. Allegations that an officer "received an incentive-based compensation plan, could be ascribed to virtually all corporate officers and directors and thus fail[] to raise a strong inference of scienter." *Id.* at 1338. Instead, a complaint must allege an "extraordinary" incentive package to provide an inference of scienter. *Edward J. Goodman Life Income Tr.*, 595 F. Supp. 2d at 1275. Because the SAC fails to allege that the stock options and RSUs were somehow "extraordinary," Plaintiff's allegation fails to raise any inference of scienter.

*Finally*, the SAC cites the speculation of unidentified investors referenced in a Credit Suisse analyst report who believed "the company was intentionally trying to overstate its financials

for the first few quarters post its" business combination. SAC ¶ 145. Credit Suisse's reference to the hearsay of unidentified investors is precisely the sort of allegation that the PSLRA guards against and only serves to highlight the utter lack of factual basis for Plaintiff's claims.

### F. The Individual Defendants' Departures Do Not Support Scienter.

Plaintiff attempts to connect the resignations of Defendants Hernandez and Koppy to his allegations in order to manufacture the strong inference of scienter that is otherwise lacking in the SAC. *See* SAC ¶¶ 9, 13, 55, 61 n.7. Plaintiff points to (i) the timing of Dr. Hernandez's resignation as CEO in June 2023 as prompting a changing of the guard that led to the discovery of deficiencies in Cano's accounting processes; and (ii) Mr. Koppy's resignation on September 26, 2023 as indicative of failures in the Company's accounting processes. *Id*. Even if Dr. Hernandez's and Mr. Koppy's resignations are the result of leadership failures (and as to either, Plaintiff cites no such admission in the Company's disclosures[11]), "pleading scienter requires more than pleading a link between bad news and an executive's resignation." *In re Hertz Glob. Holdings, Inc*., 905 F.3d 106, 119 (3d Cir. 2018). "Changes in leadership are only to be expected when leadership fails. That is not, in itself, a symbol of fraud. Corporate resignations do not strengthen an inference of scienter, when, as here, the allegations do not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud." *Id.* at 119–20.

With respect to Mr. Koppy, his resignation on September 26, 2023 is no indication that he knew or was severely reckless in not knowing that any of Cano's statements was false when made. Similar to in *City of Hollywood Police Officers' Retirement Systems v. Citrix Systems, Inc*., Plaintiff insinuates with no facts that the circumstances of Mr. Koppy's departure "include alleged systemic operational shortcomings due to poor performance, internal company problems, and

---

[11] The SAC itself offers a reason for Mr. Koppy's departure, *i.e.*, that he was replaced by "a Cano employee with a long [12-year] relationship with [the new CEO] Kent." SAC ¶ 13 & n.7.

inaccurate forecasting." 649 F. Supp. 3d 1256, 1275 (S.D. Fla. 2023). The *Citrix* court concluded that, "Even assuming that [defendant] caused these adverse consequences due to poor management, this does not amount to intentional or reckless misconduct at the level of fraud." *Id.* at 1276. The same is true here concerning Mr. Koppy.

Moreover, even if Dr. Hernandez's resignation amounted to a recognition that the Company needed a change in leadership, Plaintiff's efforts to malign Dr. Hernandez by attempting to incorporate entirely unrelated matters (SAC ¶¶ 53–56) have nothing to do with the securities fraud alleged in this case—specifically relating to how the Company has historically accounted for and estimated MRA revenue.[12] There has never been any (and still is no) allegation that Dr. Hernandez had any involvement with those processes. *Sportsline.com*, 366 F. Supp. 2d at 1172 (complaint "fails to plead any connection between the resignation of these two employees and the accounting errors that led SportsLine to restate its financial statements"); *Hertz Glob. Holdings, Inc.*, 905 F.3d at 118 (no scienter where "the FAC lacks allegations that those resignations were a result of the Individual Defendants' involvement in a systemic fraud"). The resignations add nothing to Plaintiff's futile efforts to plead scienter. *See Citrix Sys.*, 649 F. Supp. at 1275–76.

**G.      The SAC Does Not Allege Scienter as to Cano.**

The SAC alleges, "Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Cano as an entity." SAC ¶ 147. To allege the rare corporate scienter, the SAC must plead that "officials were both responsible for issuing the allegedly false public statements ***and were aware of the alleged fraud***." *Mizzaro*, 544

---

[12] The Delaware Court of Chancery proxy contest matter that is the subject of Exhibits B and C to the SAC concerned allegations of related party transactions that have nothing to do with the accounting matters in this litigation. For that reason, and the reasons set forth in Defendants' briefing on their Motion to Strike (D.E. 60, 64), which Defendants incorporate by reference herein, Plaintiff's Exhibits B and C, and references thereto, should be stricken from the SAC.

F.3d at 1254–55 (emphasis added). To determine whether a corporate official's scienter can be imputed to the corporation in a misrepresentation claim, a court must "look to the state of mind of the individual corporate official or officials who make or issue the statement." *Id.* The SAC suffers the same deficiency as to the Individual Defendants (*see* pp. 12–23, *supra*) and fails to identify any other Cano official who made a challenged statement with scienter. Thus, it necessarily fails to raise a strong inference as to Cano. *Royal Caribbean Cruises*, 2013 WL 3295951, at *19 ("[a]s the Court has not found any strong inference of scienter as to the individual Defendants, Plaintiffs have failed to plead a strong inference of scienter with regard to the Company").

## II.   THE AUGUST 2023 DISCLOSURES DO NOT RENDER ANY STATEMENTS MATERIALLY FALSE OR MISLEADING.

Cano's Q2 2023 disclosures that its actual MRA revenue came in lower than estimated and that it had taken steps in that same quarter to "enhance" its internal processes to improve the "predictive power" of future MRA revenue estimates do not render any of the alleged misstatements materially false or misleading.[13]

### A.   Statements of Quarterly Revenue.[14]

Plaintiff alleges that the Company's statements are materially false and misleading for the following reasons: for statements made in 2021, "(i) Cano recognized revenue from Medicare before it was entitled to receive such revenue upon satisfaction of performance obligations; (ii) as

---

[13] Defendants do not challenge, at the pleading stage, the alleged falsity of Cano's statements of MRA revenue for the first, second, or third quarters of 2021 or its statements of ASC 606 compliance during the same period, to the extent the alleged falsity of those statements is attributed to the correction to Cano's *timing* for accrual of MRA revenue pursuant to ASC 606 methodology and the subsequent restatement announced in March 2022.

[14] To the extent Plaintiff alleges that Cano's forward-looking revenue guidance provided on May 9, 2023 was materially false and/or misleading (*see* SAC ¶ 10), such guidance would be immunized from liability under the PSLRA's safe harbor, 15 U.S.C. § 78u-5, because it was both (i) accompanied by meaningful cautionary language and (ii) made without actual knowledge of falsity. *Royal Caribbean Cruises*, 2013 WL 3295951, at *15–17.

a result, the Company overstated capitated revenue . . .; [and] (iii) as a result, Cano understated net loss . . .," and for statements made over the entire class period, "[iv] the Company failed to disclose that [] its revenue recognition process was manual and error-prone; [v] as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal; and . . . [vi] the Company lacked a reasonable basis to report MRA revenue." SAC ¶¶ 85, 87, 89, 91, 93, 95, 109, 111, 113, 115, 117, 119, 121, 123, 125, 127. But Plaintiff merges two unrelated issues—the *timing* of MRA revenue accrual and the *estimates* of future MRA payments.

*First*, a glaring deficiency in the SAC is any allegation of the extent to which (if at all) any particular metric in Cano's 2022 and Q1 2023 financial statements was misstated as a result of the allegedly inaccurate MRA revenue estimates. Based entirely upon the Company's August 10, 2023 disclosure that $44 million of its Q2 2023 MRA revenue reconciliation pertained to prior periods (specifically, Q1 2023 and 2022, SAC ¶ 10; D.E. 74-9 (Form 8-K, filed Aug. 10, 2023) at Ex. 99.1, at 1–2), Plaintiff alleges that every revenue amount going back to Q1 2021 that Cano reported was overstated by some unknown amount based on an alleged "error-prone" process. Rule 9(b) requires more, specifically that "the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Garfield*, 466 F.3d at 1262. The SAC satisfies none of these requirements, let alone all of them. Moreover, Plaintiff has failed to alleged the materiality of any alleged misstatements in Cano's financial statements from the 2023 announcement, particularly given that at most, the $44 million component of the MRA revenue reconciliation that Plaintiff alleges pertained to 2022 amounts to just 1.6% of Cano's 2022 annual revenue. *See, e.g.*, *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 994 (D. Ariz.)

(even "revenue shortfalls of 10% or less may be immaterial as a matter of law").

*Second*, the change in Cano's methodology for the *timing* of its accrual of MRA revenue pursuant to ASC 606 is the only reason why the Company's financial statements for Q1 2021, Q2 2021, and Q3 2021 were restated on March 14, 2022. *See* SAC ¶¶ 85, 87, 89, 91, 93, 95. The issue has been fully remediated and resolved since that time, as confirmed by both Cano and EY in their 2022 year-end attestations regarding Cano's internal controls. *See* p. 8, *supra*. Cano did not restate its MRA revenue *estimates* for any quarter in 2021 for any reason other than timing of accrual. *See* D.E. 74-4 (2021 Form 10-K, at 64) ("The correction changes the timing of the revenue recognition for the MRA revenue. . . ."). Thus, the statements of Cano's revenue are not false in Q1 2021, Q2 2021, and Q3 2021 for Plaintiff's additional reasons (iv)–(vi), p. 25, *supra*, related to Cano's Q2 2023 disclosure two years later. *See* SAC ¶¶ 84–95.

*Third*, Cano did not correct or restate its revenue and net loss amounts in any quarter after Q3 2021. Plaintiff's allegations reflect a fundamental misunderstanding of Cano's August 10, 2023 disclosures and the MRA process more generally. As Cano explained,

> ***Capitated revenues are recognized in the month in which we are obligated to provide medical care services.*** The transaction price for the services provided is variable and depends upon the terms of the arrangement provided by or negotiated with the health plan and ***includes [per-member-per-month] PMPM rates that may fluctuate****. . . . **Through our Medicare Risk Adjustment ("MRA"), the rates are risk adjusted based on the health status (acuity) and demographic characteristics of members***. The fees are paid on an interim basis based on submitted enrolled member data for the previous year and ***are adjusted in subsequent periods after the final data is compiled by the CMS***. MRA revenues are estimated using the "most likely amount" methodology under ASC 606 and the revenue is recorded when the price can be estimated by the Company and only if it is probable that a significant reversal will not occur and any uncertainty associated with the variable consideration is subsequently resolved.

D.E. 74-8 (2022 Form 10-K), at 95–96. The Company had also previously disclosed to investors that it receives payments from capitation contracts monthly and receives MRA adjustments approximately three times per year: an "interim estimated payment," a "mid-year reconciliation

26

payment," and a "final run payment." D.E. 74-6 (Mar. 14, 2022 Press Release) at Ex. 99-2, at 19. Corresponding to this disclosed process, Cano reconciled its previous estimates of MRA revenue with adjusted, actual MRA revenue as it received its mid-year reconciliation in Q2 2023: "[at] the second quarter of 2023 close, we received the quarterly service funds from our health plan partners, which reflected their reconciliations of the actual and estimated MRA revenue from CMS for our members. These reconciliations resulted in a reduction to our final 2022 and midyear 2023 estimates during the second quarter." SAC ¶ 59; D.E. 74-10 (Q2 2023 Transcript) at 6. An update based on new information, consistent with the Company's disclosed process, does not render prior estimates false at the time they were made. *See In re AirGate PCS, Inc. Sec. Litig.*, 2006 WL 8431172, at \*2, \*6 (N.D. Ga. Feb. 28, 2006) (dismissing claims that accounting estimates lacked a reasonable basis in the absence of allegations that the estimates were false when made or that the previous estimates had to be restated). Nor do the statements of Mr. Kent regarding Cano's "overly manual" back-office processes and enhancements to improve the "predictive power" of its MRA estimates inform whether or to what extent such enhancements would have altered Cano's previous estimates. A contrary inference is speculation, particularly where EY concluded, as of December 31, 2022, that "[i]n our opinion, [Cano] maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022. . . ." D.E. 74-8 (2022 10-K), at 147.

**B.    Disclosures Concerning Estimates of MRA Revenue and ASC 606 Compliance.**

The SAC alleges that Cano's detailed risk disclosures concerning its ability to account for MRA revenue are materially false and misleading because its revenue recognition process was "error prone," impacting its ability to "report MRA revenue." *See, e.g.*, SAC ¶ 107. In part, Cano's risk disclosures informed investors that:

> There are ***risks associated with estimating the amount of revenues that we recognize under our capitation agreements*** with health plans in a reporting period. Medicare pays

capitation using a risk adjusted model, which compensates payors based on the health status, or acuity, of each individual member. Payors with higher acuity members receive a higher payment and those with lower acuity members receive a lower payment. Moreover, some of our capitated revenues also include adjustments for performance incentives or penalties based on the achievement of certain clinical quality metrics as contracted with payors. Our capitated revenues are recognized based on projected member acuity and quality metrics and are subsequently adjusted to reflect actual member acuity and quality metrics. ***Our ability to accurately project and recognize member acuity and quality metric adjustments are affected by many factors.*** For instance, our ability to accurately project member acuity and quality metrics may be more limited in the case of medical centers operating in new markets or medical centers that were recently acquired.

SAC ¶¶ 98, 102, 106, 128; *see also* SAC ¶ 129. Plaintiff alleges that these and other similarly detailed risk disclosures are materially false and misleading because of shortcomings in processes that impacted Cano's ability to estimate MRA revenue. The problem for Plaintiff, however, is that Plaintiff does not allege that Defendants were even aware of these shortcomings prior to Q2 2023. In this Circuit, "Plaintiff cannot claim that Defendants' repeated disclosure of risk was materially false and misleading simply because risk later materialized . . . Plaintiff must point to material information that was not disclosed or publicly available at the time Defendants released their challenged risk disclosures." *Hattaway*, 2023 WL 4030465, at \*10. The SAC contains no allegations that the Individual Defendants—or any executive of Cano—were aware of these alleged flaws in Cano's processes before Q2 2023, during which quarter Cano initiated its review of those processes.

With respect to the alleged misstatements concerning ASC 606 compliance (SAC ¶¶ 96, 100, 104), these statements from 2021 are not rendered materially false or misleading based upon the process issues described by Mr. Kent in 2023. Nothing in the Company's August 10, 2023 disclosures suggested any issue with GAAP compliance at all, let alone going back to a period unrelated to the Q2 2023 MRA revenue reconciliation.

### C.    Statements Concerning Internal Controls.

Plaintiff is confused when he alleges that the Company's statement in its 2022 Form 10-K

28

that it had "remediated" its previously disclosed material weakness in controls related to its non-compliance with ASC 606 is false because of its August 2023 disclosures concerning MRA estimates. *See* SAC ¶¶ 132–34. Again, the issue of compliance with GAAP for the timing of MRA revenue accrual is entirely distinct from the issue of how the Company estimates MRA revenue. Moreover, EY similarly confirmed that any previously identified weaknesses in material controls had been resolved. *See* p. 8, *supra.* There is no false statement here.

## III. THE SAC FAILS TO ALLEGE LOSS CAUSATION.

The SAC must be dismissed for the separate and independently sufficient reason that Plaintiff has failed to plead loss causation, *i.e.*, "a causal connection between the material misrepresentation or omission and the loss." *Mizzaro*, 544 F.3d at 1236–37. Plaintiff alleges that Cano "began to disclose the truth" through a corrective disclosure on February 28, 2022, when the Company disclosed it would make adjustments to the timing of its accounting for MRA. SAC ¶¶ 135–38. This allegation, however, is insufficient to allege the requisite "causal connection." As the SAC concedes, information about the Company's eventual restatements was only "partially" revealed on February 28, 2022. SAC ¶ 136. Plaintiff must allege that the disclosure "reveal[ed] to the market the pertinent truth." *City of L.A. v. Bankrate, Inc.*, 2015 WL 11438106, at *9 (S.D. Fla. Nov. 23, 2015). The announcement of a delay in reporting of a company's financials does not establish loss causation because it does not reveal the alleged fraud. *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) ("The announcement of a delay in the reporting of [company's] 1Q 2010 financials does not establish loss causation because it fails to reveal the truth that [the company] had engaged in sham sales, secret consignments, or any wrongdoing asserted in the Complaint."); *see also In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1046–47 (N.D. Cal. 2009) (no loss causation where "analyst reports identified by Plaintiffs here indicate only a 'risk for potential earnings restatement' [and] that

Maxim 'may have engaged in aggressive practices'"). This is particularly true where, as here, the gradual revelation of truth followed a trend downward in the company's stock. *In re Buca, Inc. Sec. Litig.*, 2006 WL 3030886 at *9 (D. Minn. Oct. 16, 2006); *Druskin*, 299 F. Supp. 2d at 1339 (no loss causation where company's stock had already decreased before any corrective disclosures were made); D.E. 74-7 (CANO Stock Price Chart). Tellingly, when Cano announced the restatement after the close of trading on March 14, 2022, its stock price *increased* on the next trading day. *Id.* (stock price increased from $5.31 per share to $6.03 per share on March 15, 2022).

Cano's August 10, 2023 disclosure that its actual MRA revenue was lower than previously estimated also does not reveal fraud. *See Meyer*, 710 F.3d at 1200 ("[A] corrective disclosure must 'reveal[ ] to the market the falsity of [a] prior misstatement[ ].'"). Here, Cano "merely reported negative financial results which were worse than estimated." *In re Colonial Bancgroup, Inc. Sec. Litig.*, 9 F. Supp. 3d 1258, 1271 (M.D. Ala. Mar. 27, 2014) (no loss causation).

## IV.     THE SAC DOES NOT PLEAD A SECTION 20(a) CLAIM.

Because the SAC fails to allege a primary violation of Section 10(b) and Rule 10b-5, the Section 20(a) claims must be dismissed. *Mizzaro*, 544 F.3d at 1255.

<strong><u>CONCLUSION</u></strong>

Plaintiff has now had three attempts to plead allegations that satisfy the PSLRA's and Rule 9(b)'s pleading requirements and has failed to do so. For the foregoing reasons, the SAC should be dismissed in its entirety with prejudice. *Carvelli v. Ocwen Fin. Corp.*, 2018 WL 4941110, at *8 (S.D. Fla. Apr. 30, 2018), *aff'd*, 934 F.3d 1307 (11th Cir. 2019); *see also* Order (D.E. 69) at 4 n.1 (advising that, "barring exceptional and extraordinary circumstances, [the SAC] shall be the last and final complaint filed in this litigation").

**REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Defendants respectfully request oral argument on their Motion to Dismiss the Second Amended Complaint. Defendants respectfully submit that oral argument would assist the Court because of the unique pleading requirements imposed by the PSLRA and the nature of Plaintiff's allegations. Defendants estimate that one hour would be sufficient for oral argument.

February 5, 2024

By: **NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Peter R. Goldman*
Peter R. Goldman (FBN 860565)
Nina C. Welch (FBN 118900)
Danna Khawam (FBN 1025114)
100 S.E. 3rd Avenue, Suite 2700
Fort Lauderdale, FL 33394
Telephone: (954) 745-5239
Facsimile: (954) 761-8135
peter.goldman@nelsonmullins.com
nina.welch@nelsonmullins.com
danna.khawam@nelsonmullins.com

and

**GOODWIN PROCTER LLP**

*/s/ Deborah S. Birnbach*
Deborah S. Birnbach (*pro hac vice*)
Katherine McKenney (*pro hac vice*)
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
dbirnbach@goodwinlaw.com
kmckenney@goodwinlaw.com

*Counsel for Defendants*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of February, 2024, I electronically filed the foregoing with the Clerk of Court by using the Court's CM/ECF system, which will furnish a copy to all counsel of record.


*/s/ Peter R. Goldman*
Peter R. Goldman

32