**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-20827-CIV-WILLIAMS/SANCHEZ**

ALBERTO GONZALEZ, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v.

CANO HEALTH, INC. f/k/a JAWS
ACQUISITION CORP., MARLOW
HERNANDEZ, and BRIAN D. KOPPY,

Defendants,

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ..................................................................................... 1

II.     STATEMENT OF RELEVANT FACTS ...................................................................... 2

        A.      Jaws, A SPAC With Inherent Conflicts Of Interest, Completes A Business
                Combination Through Which Cano Becomes A Public Company ........................ 2

        B.      Defendants Improperly Recognized Revenue From Medicare Advantage Contracts
                Before The Amounts Could Be Estimated Accurately ......................................... 3

        C.      Defendants Issue Materially Misleading Statements And Omissions Overstating
                Fiscal 2021 Revenue And Net Loss ...................................................................... 4

        D.      Defendants Admit Cano Improperly Recognized Revenue From Medicare
                Advantage Contracts And Purportedly Corrects Its Accounting Method .............. 4

        E.      Defendants Continue To Issue Materially Misleading Statements And Omissions
                About Cano's Revenue ........................................................................................ 5

        F.      After Defendant Hernandez Is Ousted For His Role In Undisclosed Related Party
                Transactions, The Newly Appointed CEO Reveals Cano's Revenue Controls Were
                "Overly Manual" And Had "Limited Predictive Power" ...................................... 6

III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION ........... 7

IV.     THE SAC ALLEGES ACTIONABLE MISREPRESENTATIONS AND OMISSIONS . 7

        A.      Quarterly Revenue Statements Were Materially False And Misleading ............... 8

        B.      Risk Disclosures Are Materially Misleading By Omission ................................. 11

        C.      Defendants Failed To Disclose That Revenue Recognition Controls Were Overly
                Manual And Error Prone ................................................................................... 12

V.      THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER ............................... 13

        A.      The Multiple, Systemic Accounting Improprieties Evidence, At A Minimum,
                Severe Recklessness ......................................................................................... 13

        B.      The Confidential Witnesses Bolster A Strong Inference Of Scienter By Confirming
                Defendants' Own Admissions ............................................................................ 18

        C.      The Delaware Litigation Supports That Defendant Hernandez Acted With
                Scienter ............................................................................................................ 19

D. The Individual Defendants' Departures Soon After The Truth Emerged Supports An Inference Of Scienter ........................................................................... 20

E. The Balance Of Inferences Supports Scienter ........................................................ 21

VI. PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION ...................................... 22

VII. CONCLUSION ................................................................................................................ 25

**TABLE OF AUTHORITIES**

<u>CASES</u>

*21st Century Holding Co. Sec. Litig.*,
  2008 WL 5749572 (S.D. Fla. Nov. 7, 2008) .......................................................................... 22

*100079 Canada, Inc. v. Stiefel Labs., Inc.*,
  2011 WL 13116079 (S.D. Fla. 2011) ................................................................................... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................... 7

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................... 7

*Brophy v. Jiangbo Pharm., Inc.*,
  781 F.3d 1296 (11th Cir. 2015) ........................................................................................... 20

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) ........................................................................................... 16

*Bryant v. Dupree*,
  252 F.3d 1161 (11th Cir. 2001) ........................................................................................... 24

*Chalverus v. Pegasystems, Inc.*,
  59 F. Supp. 2d 226 (D. Mass. 1999) .................................................................................... 15

*City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc.*,
  2023 WL 1998174 (S.D. Fla. Feb. 13, 2023) ...................................................................... 16

*City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*,
  69 F. Supp. 3d  (S.D. Fla. 2023) .......................................................................................... 20

*City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. AraCruz
  Cellulose S.A.*,
  41 F. Supp. 3d 1369 (S.D. Fla. 2011) ............................................................................. 19, 20

*Dorsey v. Portfolio Equities*, *Inc.*,
  540 F.3d 333 (5th Cir. 2008) ............................................................................................... 15

*Druskin v. Answerthink, Inc.*,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004) ........................................................................... 16, 23

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ..................................................................................................... 21

*Eastwood Enterprises, LLC v. Farha*,
   2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ........................................................... 24

*Edward J. Goodman Life Incom Tr. v. Jabil Cir., Inc.*,
   595 F. Supp. 2d 1253 (M.D. Fla. 2009) ..................................................................... 16

*FindWhat Inv'r Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ......................................................................... *passim*

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) .................................................................................. 18

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) .............................................................. 17

*Hall v. The Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) ......................................................................... 20

*Hattaway v. Apyx Med. Corp.*,
   2023 WL 4030465 (M.D. Fla. June 15, 2023) ...................................................... 12, 19

*Hemmer Grp. v. Southwest Water Co.*,
   527 F. App'x 623 (9th Cir. 2013) ................................................................................. 8

*In re Acuity Brands, Inc. Sec. Litig.*,
   2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ........................................................... 24

*In re AFC Enterprises, Inc. Sec. Litig.*,
   348 F. Supp. 2d 1363 (N.D. Ga. 2004) ....................................................................... 14

*In re AirGate PCS, Inc. Sec. Litig.*,
   2006 WL 8431172 (N.D. Ga. Feb. 28, 2006) ............................................................. 11

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ......................................................................... 15

*In re Bio-Technology General Corp. Sec. Litig.*,
   380 F. Supp. 2d 574 (D.N.J. 2005) ............................................................................... 9

*In re Buca Inc. Sec. Lit.*,
   2006 WL 3030886 (D. Minn Oct. 16, 2006) .............................................................. 23

iv

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018) ................................................................. 17

*In re Catalina Mktg. Corp. Sec. Litig.*,
   390 F. Supp. 2d 1110 (M.D. Fla. 2005) ............................................................... 14

*In re Colonial Bancgroup, Inc. Sec. Litig.*,
   9 F. Supp. 3d 1258 (M.D. Ala. 2014) .................................................................. 24

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) .................................................................. 10

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) ........................................................... 10, 21

*In re Faro Techs. Sec. Litig.*,
   534 F. Supp. 2d 1248 (M.D. Fla. 2009) ............................................................... 16

*In re FleetBoston Fin. Corp. Sec. Litig.*,
   2007 WL 4225832 (D.N.J. Nov. 28, 2007) .......................................................... 23

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*,
   2004 WL 5278716 (E.D. Tex. June 16, 2004) ...................................................... 16

*In re Flowers Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ................................................. 15, 22

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ...................................................................... 23

*In re JDN Realty Corp. Sec. Litig.*,
   182 F. Supp. 2d 1230 (N.D. Ga. 2002) ................................................................ 19

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) ............................................................... 22

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................... 14

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................... 17

*In re Ocwen Fin. Corp. Sec. Litig.*,
   2015 WL 12780961 (S.D. Fla. Dec. 22, 2015) ...................................................... 7

v

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008)................................................................................. 23

*In re Paincare Holdings Sec. Litig.*,
  541 F. Supp. 2d 1283 (M.D. Fla. 2008) ......................................................................... 17, 21

*In re PSS World Med., Inc. Sec. Litig.*,
  250 F. Supp. 2d 1335 (M.D. Fla. 2002)............................................................................. 15

*In re Rent-Way Sec. Litig.*,
  209 F. Supp. 2d 493 (E.D. Pa. 2002) ................................................................................ 14

*In re Resideo Techs., Inc., Sec. Litig.*,
  2021 WL 1195740 (D. Minn. Mar. 30, 2021) ................................................................... 17

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
  2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ........................................................ 15, 18, 19

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009)................................................................................ 20

*In re Seitel, Inc. Sec. Litig.*,
  447 F. Supp. 2d 693 (S.D. Tex. 2006) ............................................................................... 14

*In re The Baan Co. Sec. Litig.*,
  103 F. Supp. 2d 1 (D.D.C. 2000)....................................................................................... 15

*In re Unicapital Corp. Sec. Litig.*,
  149 F. Supp. 2d 1353 (S.D. Fla. 2001) ............................................................................... 8

*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) ..................................................................... 20

*In re: Ebix, Inc. Sec. Litig.*,
  898 F. Supp. 2d 1325 (N.D. Ga. 2012) .............................................................................. 13

*Janbay v. Canadian Solar, Inc.*,
  2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ................................................................... 22

*Lemen v. Redwire Corp.*,
  2023 WL 2598402 (M.D. Fla. Mar. 22, 2023) .................................................................. 16

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)................................................................................................. 8

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ......................................................................................... 24

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)............................................................................................. 25

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)............................................................................................................ 7

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ................................................................................. 13, 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015).......................................................................................................... 10

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
  572 F. App'x 713 (11th Cir. 2014) .................................................................................. 16

*Pritchard v. Apyx Med. Corp.*,
  2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ................................................................ 12

*Rawls v. Williams*,
  2008 WL 11470983 (M.D. Ga. Apr. 7, 2008) ................................................................. 12

*Schaeffer v. Nabriva Therapeutics plc*,
  2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)................................................................... 12

*Schultz v. Applica Inc.*,
  488 F. Supp. 2d 1219 (S.D. Fla. 2007) ........................................................................... 12

*Stocke v. Shuffle Master, Inc.*,
  615 F. Supp. 2d 1180 (D. Nev. 2009)............................................................................... 17

*Taylor v. Alabama*,
  275 F. App'x 836 (11th Cir. 2008) .................................................................................... 2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................ 7, 13, 21

*Wilson v. LSB Indus., Inc.*,
  2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .................................................................... 9

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) ................................................................. 20

vii

STATUTES

15 U.S.C. § 78u-4(b)(2) ................................................................................................................ 13

RULES

Fed. R. Civ. P. 12(b)(6) .................................................................................................................. 7

Fed. R. Civ. P. 12(g) ...................................................................................................................... 7

## I. PRELIMINARY STATEMENT

Cano and its executives have admitted that Defendants committed securities fraud.[1]

First, Cano revealed that its financial statements for the quarterly periods of fiscal 2021 should no longer be relied upon, and these statements would be restated due to "the Company's *correction* of its accounting for Medicare Risk Adjustment ('MRA') revenue within Medicare Advantage contracts."

Second, Cano ultimately revealed a $44 million charge against its second quarter 2023 revenue, which Defendant Koppy confirmed was "related to services provided in 2022 [and] in the first quarter of 2023," and which analysts surmised was another restatement of Cano's financial results.

Third, after less than two months on the job, Cano's new CEO admitted that Cano's "prior processes were overly manual, and our back testing analysis demonstrated that they provided limited predictive power." As a result, the Company was "revising [its] approach to limit data variability and to ensure [it] close[s] gaps in real-time data reporting," which would lead to "a more accurate view of these MRA projections that will result in a higher realized and appropriate MRA revenue." Moreover, the new CEO admitted that prior process was "very tedious and manual" and "fraught with all kinds of errors," and that Cano had to "enhance" its processes. These are admissions that the prior processes resulted in data variability, that there were gaps in real-time data reporting, and as a result, the Company lacked a reasonable basis to predict MRA revenue.

Not only has the Company and its executives admitted to all of these facts, but multiple former employees have confirmed that the CEO's admission accurately reflected what occurred during the Class Period. Specifically, former employees confirm that Cano's internal controls were grossly inadequate because they were overly "manual," and that, as a result, data used in the MRA process lacked accuracy. Moreover, former Cano Board members alleged, and a court confirmed, that Defendant Hernandez and others engaged in undisclosed related party transactions

---

[1] Citations to the Defendants' Motion to Dismiss the Second Amended Complaint and Supporting Memorandum of Law (Dkt. No. 73) (the "Motion") are in the form Def. Br. at __, and citations to the Second Amended Class Action Complaint (the "SAC," Dkt. No. 70) are in the form "¶__." Terms not otherwise defined have the same meanings as in the SAC. In particular, "Defendants" refers to Defendants Marlow Hernandez and Brian Koppy only, as Cano Health, Inc. ("Cano") has been dismissed. *See* Dkt. No. 78.

resulting in millions of dollars being transferred to his family members while Cano was in a dire financial situation, which demonstrates their willingness to defraud public investors.

Faced with this reality, Defendants focus on differences between the operative complaint and the prior amended complaint, and imply that there was something improper about Plaintiff amending as new facts were disclosed.[2] *See, e.g*., Def. Br at 1-2. Putting aside that it was Defendants that insisted on unnecessary motion practice (seeking to strike certain pleadings and forcing Plaintiff to file a motion to amend—in both cases, Plaintiff offered to stipulate to amendment but Defendants refused, unnecessarily burdening the Court), as Defendants certainly know and the Court has already ruled, the granting of the motion to amend and the filing of a new amended complaint make the prior filings irrelevant to the instant motion. *See* Dkt. No. 69 at 4 (holding that Defendants' motion to dismiss and motion to strike "are denied as moot"); *see Taylor v. Alabama*, 275 F. App'x 836, 838 (11th Cir. 2008) (noting that an amended complaint moots a motion to dismiss a prior pleading). As such, unless Defendants are confused about this black-letter law, this focus on an irrelevant prior complaint instead of addressing the instant complaint is an admission that the SAC states a claim.

Defendants' motion to dismiss cannot defeat Plaintiff's well-pled claims. As such, Defendants' motion to dismiss should be denied in its entirety.

## II. STATEMENT OF RELEVANT FACTS

### A. Jaws, A SPAC With Inherent Conflicts Of Interest, Completes A Business Combination Through Which Cano Becomes A Public Company

A special purpose acquisition company ("SPAC") is a publicly traded company with no business activities of its own that is formed for the specific purpose of acquiring an existing, private company. ¶¶ 24-26. There is a conflict of interest between the SPAC's insiders, who stand to profit handsomely from a successful acquisition but whose securities expire worthless if a suitable

---

[2] While Plaintiff would have appreciated if Defendants had revealed the whole truth at one time, only Cano and its executives were in control as to when the truth was revealed. In this litigation, Plaintiff has promptly brought all relevant facts to the Court's attention upon their disclosure. In fact, the Court has already determined that Plaintiff promptly investigated and moved the court to amend. Dkt. No. 69 at 3 ("Following the disclosure of the new information, Lead Plaintiff reasonably conducted further investigation and filed the instant Motion with the proposed amended complaint in relatively short order."); at 4 (finding that there was an "absence of undue delay, bead faith, undue prejudice, or repeated failure to cure deficiencies"). As such, Defendants' claim that "Plaintiff has since employed several tactics to try to salvage his case" is misleading at best.

business combination is not consummated timely, and the public investors, who rely on the insiders to conduct due diligence into the acquisition target and provide accurate information about the target's business. ¶¶ 25-26. SPAC management is incentivized to complete a deal, even if the deal is a losing proposition for the SPAC's stockholders, because the alternative is liquidation. *Id.*

Jaws Acquisition Corp. ("Jaws") was a SPAC formed with the purpose of acquiring a "growth-oriented" company across a variety of industries, except "real estate, lodging, oil and gas and energy infrastructure" because those companies would compete with Starwood Capital Group Holdings, L.P., which is owned by Jaws' Chairman, Barry Sternlicht. ¶¶ 29-30. To that end, Jaws raised approximately $690 million through its initial public offering ("IPO"). ¶ 29. With these funds, Jaws consummated a business combination with Primary Care (ITC) Holdings, LLC and Primary Care (ITC) Intermediate Holdings, LLC on June 3, 2021, and the combined entity was renamed Cano (the "Business Combination"). ¶¶ 31-32.

**B.     Defendants Improperly Recognized Revenue From Medicare Advantage Contracts Before The Amounts Could Be Estimated Accurately**

Cano is a primary care physician group that uses a technology-powered, value-based care platform to serve more than 100,000 members. ¶ 34. Approximately 95% of its revenue is derived from recurring per member per month capitated revenue. ¶ 35. Medicare accounts for more than 80% of the Company's revenue. *Id.* Medicare Advantage allows Medicare-eligible seniors and beneficiaries with disabilities to obtain care through private plans rather than traditional fee-for-service Medicare. ¶ 36. The Centers for Medicare and Medicaid Services ("CMS") pays a fixed (or capitated) monthly amount per enrolled beneficiary to provide Medicare benefits. *Id.* There is a one-year lag between the diagnosis and the capitated payment while CMS conducts a risk adjustment to spread costs across healthcare plans. ¶¶ 37-39.

Because Cano's capitated payment depends on the CMS risk adjustment process, the payments are treated as variable consideration. *See* ¶ 41. Under generally accepted accounting principles ("GAAP"), variable consideration is estimated using one of two methods: the expected value method or the most likely amount method. *Id.* Variable consideration must be reassessed at the end of each reported period "to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances during the reporting period." ¶ 43 (citing ASC 606-10-32-14). According to the correspondence filed with the SEC on March 15, 2021, Cano historically estimated the transaction price for Medicare Advantage contracts using the

3

expected value method using rates provided by CMS and adjusted for the demographics of the Company's enrolled members. ¶ 44. This was not the method that its peers used. ¶ 52.

During the Class Period, the Company claimed that it recognized revenue in accordance with GAAP, including as to Medicare Advantage contracts. Though they acknowledged that such revenue was considered variable consideration (due to the adjustments by CMS), Defendants claimed that such adjustment was presented within accounts receivable. *E.g.*, ¶ 96. However, because the adjustments by CMS would not be issued until a year after the initial diagnosis, Cano could not estimate revenue for the new patients until the audit was completed. ¶ 39.

Due to this timing difference, Cano's peers booked revenue when they collected cash, *i.e.,* one year after the documentation, not in the manner than Cano did. ¶ 52. As Credit Suisse analysts explained, Cano's peers "book MRA-related revenue one year after the documentation" whereas Cano's "approach had been booking revenues at the time of documentation itself (essentially, the date of service)." *Id.* Essentially, Cano's prior practice had been to *predict* expected revenue, and Credit Suisse noted that "several investors have raised questions about whether the company was intentionally trying to overstate its financials for the first few quarters post its De-SPAC and whether there is a write-down risk with the MRA receivables." *Id.*

**C.      Defendants Issue Materially Misleading Statements And Omissions Overstating Fiscal 2021 Revenue And Net Loss**

In the proxy statement soliciting investor approval of the Business Combination and throughout fiscal 2021, Defendants issued statements that overstated Cano's revenue because the Company recognized revenue before it was entitled to receive such payments from CMS. ¶¶ 84-95 (identifying amount of the overstatement for each of these periods). Additionally, Defendants made statements in the proxy statement and during fiscal 2021 that purported to warn of risks with estimating MRA revenue, while failing to disclose that Cano's revenue recognition process was manual and error-prone and, as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal. ¶¶ 96-107.

**D.      Defendants Admit Cano Improperly Recognized Revenue From Medicare Advantage Contracts And Purportedly Corrects Its Accounting Method**

On February 28, 2022, Cano delayed the release of its full year 2021 financial results because its auditor "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606," which would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment to subsequent periods[.]" ¶ 45. On this news,

4

the Company's stock price fell $0.32, or 6%, to close at $4.87 per share on February 28, 2022, on unusually heavy trading volume. ¶ 46.

Thereafter, on March 14, 2022, Defendants revealed that that its financial statements for the quarterly periods of fiscal 2021 should no longer be relied upon and that these statements would be restated due to "the Company's *correction* of its accounting for Medicare Risk Adjustment ('MRA') revenue within Medicare Advantage contracts." ¶ 48. Specifically, "[t]he correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606, *Revenue from Contracts with Customers* ('ASC 606')." *Id.* The Company further disclosed that it would revise its financial statements for fiscal 2019 through 2020. *Id.*

On that same date, the Company further disclosed that it would change its method of revenue recognition, so that MRA revenue would be estimated using the "most likely amount" methodology rather than the "expected value" method. ¶ 49. This new method would ensure that Cano only recognized amounts that it "believes will not result in a significant reversal of revenue based on historical results." *Id.* By stating in the Form 10-K for fiscal 2021 that "a misapplication of GAAP . . . resulted in a restatement," Defendants admitted that they were not complying with GAAP during the Class Period. ¶52.

As a result of the restatement, approximately $122 million of MRA revenue previously reported in fiscal 2021 results would now be recognized during fiscal 2022, and the net negative impact to fiscal 2021 adjusted EBITDA was $91 million. ¶50. Moreover, the restatement increased Cano's net loss by 53.9% for first quarter 2021 and 58.9% for third quarter 2021. ¶51. For second quarter 2021, the restatement caused previously reported net income of $4.94 million to swing to a net loss of $36.29 million, a change of 830%. *Id.*

**E. Defendants Continue To Issue Materially Misleading Statements And Omissions About Cano's Revenue**

Throughout fiscal 2022 and first quarter 2023, Defendants issued statements purporting to accurately reflect Cano's revenue, but they were materially misleading because they omitted that Cano's revenue recognition process was manual and error-prone and, as a result, the Company lacked a sufficient basis to assess the risk or magnitude of revenue reversal. ¶¶ 108-27. Moreover, Defendants falsely claimed they had "remediated" the material weakness with respect to revenue recognition. ¶¶ 133-34.

Multiple former employees confirm that Cano's internal controls were grossly inadequate. According to former employee #1 ("FE 1"), who was Cano's chief administration officer from August 2021 to December 2022, Cano's "Accounting was manual for a very long time" and the access to the underlying "data analytics and predictive data" was restricted to one person, the Chief Population Health Officer. ¶¶ 69-70. This was problematic because "no one has the capacity to evaluate, assess or audit the information – to make sure the information was actual and factual." ¶ 70. FE 2, who worked as a coding and billing specialist from August to November 2021, and FE 3, who worked as a medical coder from January 2020 to March 2021, corroborated that billing and coding were manual and unorganized. ¶¶ 71-72. FE 2 said "everyone was plugging in numbers like robots and didn't know what they were doing" about risk adjustment coding. ¶ 71. According to FE 1, this lack of accurate data and manual processes directly contributed to misleading financial reports of MRA revenue because "[t]here are nuances to each of these codings that make a big difference in how Medicare recognizes it." ¶73.

F.   **After Defendant Hernandez Is Ousted For His Role In Undisclosed Related Party Transactions, The Newly Appointed CEO Reveals Cano's Revenue Controls Were "Overly Manual" And Had "Limited Predictive Power"**

On May 3, 2023, a derivative complaint was filed by former Cano Board members against certain of the Company's executives, including Defendant Hernandez, for engaging in undisclosed related party transactions resulting in millions of dollars going to his family members while Cano was in a dire financial situation. ¶ 53; SAC, Ex. B. Following substantial discovery, Vice Chancellor Paul Fioravanti, Jr. issued his factual findings confirming the accuracy of these allegations. ¶ 53; SAC, Ex. C. Just two days after the opinion was issued, Defendant Hernandez was ousted as CEO and replaced by deMarquette Kent ("Kent") as Interim CEO on June 20, 2023. ¶¶ 55-56.

On August 10, 2023, Cano revealed a $44 million charge against its second quarter 2023 revenue, which was an "out-of-period" item that reflected "a shortfall in the Medicare [MRA] collected versus what was expected and accrued for in prior periods." ¶¶ 58-59. Defendant Koppy confirmed that the charge was "related to services provided in 2022 [and] in the first quarter of 2023." ¶ 60. Analysts surmised that this charge was another restatement of Cano's financial results. ¶ 10 n.1.

Less than two months on the job, Kent realized that Cano's "prior processes were overly manual, and our back testing analysis demonstrated that they provided limited predictive power."

¶ 61. Cano was "revising [its] approach to limit data variability and to ensure [it] close[s] gaps in real-time data reporting," which would lead to "a more accurate view of these MRA projections that will result in a higher realized and appropriate MRA revenue." ¶ 62. The prior process was "very tedious and manual" and "fraught with all kinds of errors." ¶ 64. That Cano had to "enhance" its processes is an admission that the prior processes resulted in data variability, there were gaps in real-time data reporting, and, as a result, the Company lacked a reasonable basis to predict MRA revenue. ¶ 63. On this news, Cano's stock price fell $1.11, or 73%, to close at $0.41 per share on August 11, 2023, on unusually heavy volume.

## III.   APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

To state a claim under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) scienter; (3) the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[3] When ruling on a "Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true[,]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), "and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

To avoid dismissal, a complaint need only "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff need only plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable." *Id.* at 678.  Also, the Court "must consider the complaint in its entirety." *Tellabs*, 551 U.S. at 310. A court should deny a motion to dismiss when the complaint plausibly articulates the circumstances constituting fraud. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.   THE SAC ALLEGES ACTIONABLE MISREPRESENTATIONS AND OMISSIONS

A statement may be false not only for its literal falsity, but also for any omissions of material fact necessary to make the statement not misleading. *In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780961, at *2-3 (S.D. Fla. Dec. 22, 2015) ("Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements

---

[3] Defendants challenge only falsity, scienter and loss causation, thus any challenge to the remaining elements is deemed waived. *See* Fed. R. Civ. P. 12(g).

. . . not misleading.'"). "A statement is misleading if in light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *FindWhat*, 658 F.3d at 1305. Materiality is a fact-intensive inquiry "that rarely may be resolved at the motion to dismiss stage." *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1364 (S.D. Fla. 2001). Dismissal on materiality grounds is appropriate only if "the alleged misrepresentations or omissions are *so obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality." *Id.*[4]

### A.     Quarterly Revenue Statements Were Materially False And Misleading

**Fiscal 2021**: Defendants overstated revenue for fiscal 2020 and the first three quarters of fiscal 2021 and, as a result, Defendants filed a restatement correcting the financial statements for these periods, which demonstrates the falsity of the previously issued financials. ¶¶ 84-95; *see Hemmer Grp. v. Southwest Water Co.*, 527 F. App'x 623, 626 (9th Cir. 2013) ("By definition, a restatement corrects financial data that was false when made."). The restatement increased Cano's net loss by 53.9% for first quarter 2021 and 58.9% for second quarter 2021, and the Company's previously reported net income swung to a net loss for third quarter 2021 amounting to an 830% change. ¶ 51. Such amounts are material. *E.g.*, *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011) (quantitative misstatements of 5% or more are presumed material).

Defendants expressly state that they do not challenge the falsity of financial statements issued for interim periods of fiscal 2021 as it relates to the timing of MRA revenue accrual. Def. Br. at 24 n.13. Yet they go on to raise faulty arguments, all of which must fail.

*First*, Defendants distort the "*timing* of MRA revenue accrual" as "unrelated" to "*estimates* of future MRA payments." Def. Br. at 25 (emphasis in original). But the revenue metric refers to amounts earned within a particular period.[5] The Company is entitled to report revenue when it has performed its contractual obligations, even though payment may be received later. ¶ 40. Defendants' purported distinction is wrong: "MRA revenue accrual" reflects the "estimates of

---

[4] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all internal citations and quotations are omitted.

[5] *See, e.g.*, "Revenue Recognition: What It Means in Accounting and the 5 Steps," *Investopedia*, https://www.investopedia.com/terms/r/revenuerecognition.asp *("Generally accepted accounting principles require that revenues are recognized according to the revenue recognition principle, which is a feature of accrual accounting. This means that **revenue is recognized on the income statement in the period when realized and earned**—not necessarily when cash is received.").

8

future MRA payments" to which Cano is entitled for its provision of services *within a particular period*. ¶ 100 ("Capitated revenues is recognized in the month in which the Company is obligated to provide medical care services."). Thus, Defendants' admission that Cano would "delay[] recognition of certain amounts related to the [MRA] to subsequent periods" necessarily means that previously reported revenue was incorrect. ¶ 45. Defendants' vague assertion to the contrary is baseless. *See* Def. Br. at 25-26.

*Second*, Defendants disingenuously claim that the SAC "alleges that every revenue amount going back to Q1 2021 that Cano reported was overstated *by some unknown amount* based on an alleged 'error-prone' process." Def. Br. at 25. Plaintiff has alleged the specific amount of the overstatement. *See, e.g.*, ¶ 89 (second quarter 2021 revenue overstated by $49.73 million and net loss understated by $41.24 million).[6] To the extent Defendants are arguing that these overstatements are not tethered to the August 10, 2023 disclosure of an overly manual, error-prone revenue recognition process, Defendants conveniently omit that February 28, 2022 admission of improper accounting practices is sufficient to render the fiscal 2021 financials misleading. *E.g.*, *In re Bio-Technology General Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 586 (D.N.J. 2005) (a restatement establishes the falsity of the original statements for purposes of surviving a motion to dismiss). Additionally, it strains credulity to suggest that Cano's revenue recognition process was effective in fiscal 2021 but deteriorated to one with "limited predictive power" and "gaps in real-time data reporting" at some unspecified point in time—nor is that narrative supported by the accounts of the former employees, who all corroborate that Cano has had an overly manual process since as early as January 2020. ¶¶ 69-73. Viewing the alleged facts in favor of Plaintiff on this pleading motion, the more plausible inference is that these deficient internal controls existed at the time the fiscal 2021 statements were issued, and the omission of this fact is an additional reason the alleged fiscal 2021 statements are misleading. ¶¶ 84-95.

**Fiscal 2022 and 2023**: As for the fiscal 2022 and first quarter 2023 financial statements, Defendants misleadingly omitted that Cano had grossly deficient internal controls that stymied Defendants' ability to assess the risk or magnitude of revenue reversal. ¶¶ 108-27; *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *1 (S.D.N.Y. Mar. 2, 2017) ("cost and schedule estimates"

---

[6] *See also* ¶ 85 (fiscal 2020 revenue overstated by $10 million); ¶ 87 (first quarter 2021 revenue was overstated by $5.69 million and net loss was understated by $5.64 million); ¶ 93 (third quarter 2021 revenue overstated by $28.02 million and net loss was understated by $23.96 million).

were misleading they omitted that the company "had not performed a meaningful inquiry into the engineering necessary to complete the ammonia plant project"). Defendants claim the lack of specificity of the overstatement is a "glaring deficiency," but in fact, Defendants misconstrue the allegations. Def. Br. at 25. Rather, the fiscal 2022 financials and first quarter 2023 financials were materially misleading because they omitted that Defendants had no reliable process to report MRA revenue. As a result of these deficient processes, Defendants reported MRA revenue figures for fiscal 2022 and first quarter 2023 that were later corrected by $44 million. ¶ 59 ("These reconciliations resulted in a reduction to our final 2022 and midyear 2023 estimates during the second quarter.").

At bottom, Defendants' challenge to these statements rests on the characterization of previously reported revenue as mere estimates, but this reliance is misplaced. *See* Def. Br. at 26-27. Statements purporting to issue "estimates" are nevertheless actionable if they lack a reasonable basis. *See generally Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015) (An opinion is actionable if it "omits material facts about the [speaker's] inquiry into, or knowledge concerning, a statement of opinion, and if these facts conflict with what a reasonable investor, reading the statement fairly and in context, would take from the statement itself."). Under this theory, "the court must ask whether . . . the excluded fact shows that [the speaker] lacked the basis for making those statements that a reasonable investor would expect." *Id.* at 196; *see, e.g.*, *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 287-88 (E.D.N.Y. 2023) (goodwill estimates were actionable opinions because they were inflated by sales to exclusive distributor in excess of end-user demand).

Here, Kent admitted on August 10, 2023 that Cano suffered from "process issues that have affected our ability to project our performance" because its processes were "overly manual" and was fraught with errors. ¶ 61. He connected these process issues to Cano's MRA revenue, stating that the Company was "revising [its] approach to limit data variability and to ensure we close gaps in real-time data reporting." ¶ 62. These admissions show that prior to August 10, 2023, Cano's processes "provided limited predictive power" to reach MRA estimates, and that Defendants lacked a reasonable basis to report MRA revenue. *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1231-32 (N.D. Ga. 2019) (opinions about company's cybersecurity actionable where speaker was warned of deficiencies in systems). This lack of predictability caused Defendants to overestimate MRA revenue for fiscal 2022 and first quarter 2023, which was adjusted by taking a

$44 million charge to second quarter 2023 revenue. ¶¶ 58-59. This $44 million charge distinguishes the instant case from Defendants' sole authority, where the company did not restate its estimates or otherwise indicate that prior figures were inaccurate at the time they were reported. *See In re AirGate PCS, Inc. Sec. Litig.*, 2006 WL 8431172, at *6 (N.D. Ga. Feb. 28, 2006).

Defendants' reliance on Cano's reconciliation process is equally unavailing. Def. Br. at 26-27. They claim that the $44 million charge was "based on new information," but they merely point to the "quarterly service funds from our health plan partners." *Id.* at 27; *see also* ¶ 58 (charge "driven by lower MRA payments received"). The payments actually received by Cano is not "new information," nor is a third-party's correction of Cano's estimate.[7] These are simply other ways of saying that Defendants' estimates were wrong. In this context, new information would bear on the data underlying the MRA revenue estimates, such as the care provided by Cano or risk adjustment data in the industry. ¶¶ 36-39. The Court need not speculate whether the enhancements to controls would change Cano's previous estimates. *Cf.* Def. Br. at 27. As Kent admits, the underlying problem with Cano's estimates was its back-end processes and, as a result of recently implemented enhancements, "estimates going forward will reflect a more accurate view of these MRA projections that will result in a higher realized and appropriate MRA revenue." ¶ 62.

### B.     Risk Disclosures Are Materially Misleading By Omission

During the Class Period, Defendants issued statements mispresenting the risk of inaccurate MRA estimates as mere hypothetical. ¶¶ 96-107; 128-31 ("*If* our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows."). These purported risk warnings omitted to disclose that the Company's "back-end processes" used to estimate MRA revenue had "limited predictive power" due to "data variability" and "gaps in real-time data reporting." ¶¶ 61-62. These omissions led to a misleading impression

---

[7] Defendants' authority does not suggest that actual payments received constitutes "new information" to warrant updates to estimates. In *AirGate*, the company's accountants requested additional information and made an adjustment to the allowance for doubtful accounts (i.e., the likelihood that the company will not receive payments to which it is entitled) in 2002, which did not show that the 2001 figures were inaccurate. 2006 WL 8431172, at *6. That the company and its vendor for billing and accounting functions "became embroiled in a business dispute also does not show that the 2001 figures were inaccurate." *Id.* That vendor's notification that the 2002 figures should not be relied upon "also does not demonstrate that the 2001 figures were false." *Id.* In sum, the challenged metrics in *AirGate* were not false *at the time they were made*.

11

of the likelihood that the risk would materialize. *See, e.g.*, *Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463, at *11 (S.D.N.Y. Apr. 28, 2020) (risk associated with failure to comply with FDA regulations materially misleading for omitting that company had already received warning letter from FDA). Moreover, statements claiming to comply with GAAP were materially misleading because they omitted to disclose that the reported revenues were not based in fact as Cano's internal controls were wholly deficient. *E.g.*, ¶¶ 100-01.

Defendants conflate falsity and scienter, claiming that "[t]he problem for Plaintiff . . . is that Plaintiff does not allege that Defendants were even aware of these shortcomings prior to Q2 2023." Def. Br. at 28. That is a knowledge requirement, i.e., scienter.[8] That is not what their cited authority says: in *Hattaway v. Apyx Med. Corp.*, there was no allegation of "material information that was not disclosed or publicly available at the time Defendants released their challenged risk disclosures," i.e., that the statements were *false* at the time they were made. 2023 WL 4030465, at *10 (M.D. Fla. June 15, 2023).

**C.    Defendants Failed To Disclose That Revenue Recognition Controls Were Overly Manual And Error Prone**

Statements about Cano's internal control over financial reporting omitted that its revenue recognition process was flawed due to "data variability" and "gaps in real-time data reporting." ¶¶ 61-62, 132-34. Defendants fail to engage with the allegations and instead claim Plaintiff is "confused" because "the timing of MRA revenue accrual is entirely distinct from" the MRA estimates themselves. Def. Br. at 28-29. The timing of MRA revenue and the estimate itself is not "entirely distinct." *See* pp. 8-9, *supra*. But even if the previously identified weaknesses with respect to timing had been remediated (as Defendants claim), the assessments of internal controls over financial reporting omitted to disclose the purportedly separate issues with the controls over the MRA estimates stemming from a revenue recognition process "fraught with all kinds of

---

[8] There may be a knowledge requirement if the alleged statements were forward-looking (which the alleged risks are not). *See generally Pritchard v. Apyx Med. Corp.*, 2020 WL 1180731, at *6-7 (M.D. Fla. Mar. 11, 2020) (doubting whether the alleged statements were "entirely forward-looking," but even if they were, the risks were not protected by the PSLRA safe harbor). Here, Defendants have made no attempt to argue that the alleged risks are protected forward-looking statements, and they are precluded from raising this new argument on reply. *Rawls v. Williams*, 2008 WL 11470983, at *1 (M.D. Ga. Apr. 7, 2008) (declining to consider new argument raised on reply, as non-moving party could not respond to it). Regardless, "[t]he safe harbor does not apply to . . . omissions of historical or contemporaneous facts." *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1229 (S.D. Fla. 2007).

errors." ¶ 64. This omission renders the statements materially misleading. *E.g.*, *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1341-43 (N.D. Ga. 2012) (statements about effectiveness of internal controls over financial reporting were materially misleading due to "specific internal control and integration problems" and "problems with accounts receivable").

## V.      THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER

To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).  Scienter encompasses recklessness, and in this Circuit, scienter is sufficiently alleged by facts demonstrating "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *FindWhat*, 658 F.3d at 1300.

An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing inference." *Tellabs*, 551 U.S. at 324, 328 (emphasis in original); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008) ("the question before us boils down to whether a reasonable person *would* infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount") (emphasis in original).  The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.

When competing inferences are shown, the tie goes to the plaintiff.  *Id*. The relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 310, 322 (emphasis in original); *see also 100079 Canada, Inc. v. Stiefel Labs., Inc*., 2011 WL 13116079, at *12 (S.D. Fla. 2011).

### A.      The Multiple, Systemic Accounting Improprieties Evidence, At A Minimum, Severe Recklessness

Defendants attempt to downplay the seriousness of their misstatements by claiming that they "promptly" disclosed the corrections to MRA revenue. Def. Br. at 12 n.6. But there are several "red flags" showing that Defendants were severely reckless, including that MRA revenue accounts for more than 80% of Cano's revenue, Defendants had already been notified by the auditor that the Company inaccurately reports revenue, and Cano differed from its peers who waited until CMS's risk adjustment process occurred to accurately record revenue. ¶¶35, 45, 48, 52; *Ebix*, 898

13

F. Supp. 2d at 1345-47 ("serious billing problems" and "internal controls" are "naturally within the purview of the company's top executives" and they had "specific communications . . . regarding these issues" to support scienter).

The nature of the restatement—that it relates to revenue recognition for substantially all of Cano's services—supports an inference of scienter. *In re McKesson HBOC, Inc. Sec. Litig*., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves."). Defendants complain that characterizing Cano's revenue recognition process as "simple and uncomplicated" is "unsubstantiated say-so," but they ignore that Cano's method was inconsistent with that of the other companies in the industry until February 28, 2022. *See* Def. Br. at 16-17; ¶ 52.[9] Defendants similarly argue that there were "many factors impacting revenue recognition." Def. Br. at 17. Not so. The issue was the application of which of the *two methodologies* Cano should have used. *See* ¶ 41. Because the risk adjustments by CMS would not be issued until a year after the initial diagnosis and was based on the risk and treatment data *across the industry* (data which Cano did not have), Defendants could not estimate revenue for the new patients until the audit was completed. ¶ 38-39. Due to this timing difference, Cano's peers booked revenue when they collected payment from CMS, not in the manner than Cano did. ¶ 51. Whether Cano should have waited until after the audit was conducted to recognize revenue was not particularly complicated (as Defendants now claim), and it was reckless for Defendants to recognize revenue before the audit was completed. *In re Rent-Way Sec. Litig*., 209 F. Supp. 2d 493, 507 (E.D. Pa. 2002) (specific facts explaining how defendants violated GAAP support an inference of scienter).

Here, there are several red flags that, combined with Defendants' admitted GAAP violations, support a strong inference of scienter.

---

[9] While Defendants dispute the probative value of the Credit Suisse report (Def. Br. at 17 n.8), the report shows what investors understood from the public statements during the Class Period and confirms that Cano's disclosures did not put them on notice of the GAAP violations.  Instead, investors themselves believed that the Defendants had sought to overstate its financials in connection with the Business Combination as there was no change in facts or circumstances to warrant the sudden change in accounting treatment except for the consummation of the Business Combination. ¶ 145.

*First*, the "magnitude of the [misstatements] for the entire time that [Cano] was a public company suggest an extreme departure from ordinary care[.]" *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1375 (N.D. Ga. 2004). The disclosures on February 28, 2022, March 14, 2022, and August 10, 2023 collectively demonstrate that Cano has inaccurately reported MRA revenue for years, at times overstating its profitability by nearly 60%. ¶¶ 45, 51, 58-59; *see In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006) (30% overstatement of revenue "significantly contributes to a finding of scienter"); *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1114 (M.D. Fla. 2005) (43% overstatement of income). That the Company did not accurately report revenue for years supports an inference of scienter. *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1350 (M.D. Fla. 2002) ("multiple, systematic violations of GAAP" demonstrates that "it was so obvious that [executives] must have been aware of it").

*Second*, the fact that the accounting error involves premature recognition of revenue, rather than some other financial metric, supports scienter. *See, e.g.*, *In re The Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) ("[V]iolations involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter."). Defendants heavily rely on *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, which was not an accounting case but involved a scheme to conceal lagging demand. 2013 WL 3295951, at *2 (S.D. Fla. Apr. 19, 2013). *Royal Caribbean* also did not involve a restatement or an admission that the Company had violated GAAP. *Id.* at *17. Defendants are wrong that the restatement alone is insufficient for scienter. *Compare* Def. Br. at 15-16, *with In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488-89 (S.D.N.Y. 2004) ("When a company is forced to restate its previously issued financial statements, the mere fact that the company had to make a large correction is some evidence of scienter.") *and Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 234 (D. Mass. 1999) (similar).

*Third*, the core operations doctrine supports an inference of scienter.[10] The errors revealed on February 28, 2022 and August 10, 2023 both relate to MRA revenue, which is more than 80%

_____

[10] Defendants again discuss this additional scienter factor in isolation, ignoring that the core operations doctrine can be part of the holistic analysis of scienter. Def. Br. at 18-20. Though the core operations doctrine has not been formally adopted in this Circuit, courts nevertheless agree that "where the alleged fraudulent activity is the basis of 84% of the defendants' business, such a

of Cano's revenue. ¶¶ 35, 45, 58. It is illogical that the corporate officers were unaware of the accounting treatment for nearly all of Cano's revenue. *See, e.g.*, *Atlas Air*, 324 F. Supp. 2d at 491 (failure to timely recognize impairment of value of its planes supports scienter because "acquiring and hiring cargo planes" were "activities that constitute[d] the core operations of [the company]"); *Dorsey v. Portfolio Equities*, *Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (that alleged misrepresented information was sufficiently important to the health of the company was probative of scienter). This, combined with the fact that Defendants were on notice of incorrect revenue recognition no later than February 28, 2022, supports a strong inference of scienter. *City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc.*, 2023 WL 1998174 (S.D. Fla. Feb. 13, 2023), *report and recommendation adopted by* 2023 WL 2601816 (S.D. Fla. Mar. 22, 2023) (inferring CFO's scienter from circumstantial allegations that "the accounting department was understaffed and followed very loose accounting processes and procedures" and that accounting rule was inconsistently applied for similar transactions); *see also In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004) (scienter inferred where executives "failed to check information they had a duty to monitor").

*Fourth*, Defendants were motivated to consummate the Business Combination, and the incorrect accounting method enabled them to report increased revenue in the short-term to make PCIH appear as a more appealing acquisition target. ¶¶ 143-44; *Lemen v. Redwire Corp.*, 2023 WL 2598402, at *4 (M.D. Fla. Mar. 22, 2023) (motive to complete de-SPAC transaction by concealing internal control deficiencies supports scienter). Defendants incorrectly subvert the holistic analysis proscribed by *Tellabs* (Def. Br. at 20-21), but as their own authority shows, "allegations of motive and opportunity may be relevant to a showing of severe recklessness." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir. 1999); *see also In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263-64 (M.D. Fla. 2009) (crediting fraud "designed to artificially inflate the stock value so that [certain officers] could cash out"). Here, the motive to effectuate the Business Combination and the stock awards received in connection therewith are not the general financial incentives cited by Defendants. *See Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 718 (11th Cir. 2014) (officer seeking to stem his own financial losses insufficient); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1337-38 (S.D.

---

fact is relevant for the issue of scienter." *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018).

Fla. 2004) (insider trading and maintain value of officers' stock options insufficient); *Edward J. Goodman Life Incom Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009) ("standard incentive-based bonus" insufficient).

*Finally,* Defendants' assertion that the February 2022 and August 2023 disclosures are "unrelated" is, frankly, perplexing. Def. Br. at 18. Both revealed material weaknesses related to revenue recognition. ¶¶ 61-65, 132. The February 28, 2022 weakness relates to the "misapplication of GAAP that resulted in a restatement [to] correct[] . . . accounting for Medicare Risk Adjustment ('MRA') revenue[.]" ¶ 132. The August 10, 2023 weakness is an admitted failure to corroborate information from the health plan and from CMS to ensure data is reliable, resulting in "all kinds of errors" in recognizing MRA revenue. ¶¶ 64-65. Analysts also understood the two material weaknesses to be related. *See* ¶ 64 (asking "how this is now the second time [Cano is] off by a large amount in this [MRA] process"). As such, Cano was not employing personnel with "an appropriate level of knowledge, experience and oversight . . . to ensure proper selection and application of GAAP." *Cf.* ¶133 (claiming to have remediated the earlier-disclosed weakness). This failure to remediate weaknesses regarding revenue recognition supports scienter. *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) ("poor internal controls over a sustained period of time" supports scienter); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (similar).

Moreover, Kent's admissions—that Cano's "back-end processes [that] inform [its] MRA estimates" were "overly manual" and "provided limited predictive power" and the contemporaneous disclosure that fiscal 2022 revenue was overstated by $44 million—**confirm** Plaintiff's theory that Defendants knew or were severely reckless in not knowing the egregiously deficient revenue recognition controls. ¶¶60, 64; *cf. In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1292-93 (M.D. Fla. 2008) ("false reason for the accounting errors *immediately after* acknowledging the accounting errors led to the massive restatement supports an inference of scienter") (emphasis in original). That the deficient internal controls were reported by Cano's new CEO soon after his appointment supports an inference that the deficiencies were egregious and the Individual Defendants were, at least, severely reckless in ignoring them. *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]he fact that the new CEO . . . discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly."); *accord In re*

17

*Resideo Techs., Inc., Sec. Litig.*, 2021 WL 1195740, at *6 (D. Minn. Mar. 30, 2021); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *14 (S.D.N.Y. Aug. 8, 2012).

The foregoing allegations lead to a plausible inference that Defendants knew, or were severely reckless, in reporting inaccurate MRA revenue throughout the Class Period.

### B. The Confidential Witnesses Bolster A Strong Inference Of Scienter By Confirming Defendants' Own Admissions

The former employees added in the SAC confirm the Company's own admissions that Cano wholly lacked adequate procedures to report revenue as a public company. Specifically, FE 1 was the Chief Administration Officer at Cano from August 2021 to December 2022 and recounts that, even after the Company "went public, they were still running manual" for "Everything" including "Billing and coding" and "Accounting." ¶ 69. FE 1 continued that "there was no data governance as to the methodology, and no data definitions," so "no one has the capacity to evaluate, assess or audit the information – to make sure the information was actual and factual." ¶ 70. FE 2 and FE 3 worked in coding and corroborate that "they had to do a lot of guessing on the backend, which is billing and coding," which directly impacted financial reports because "[t]here are nuances to each of these codings that make a big difference in how Medicare recognizes it." ¶¶ 71-73. Similarly, FE 1 stated that these changes to codes "didn't pass the Medicare audit, and they didn't get the RAF score they thought they would," indicating that CMS concluded the Company overstated its services and thereby overstated its revenue.[11] ¶ 77.

Defendants' principal challenges against the allegations by FEs rely on this Court's decision, *Royal Caribbean*. Def. Br. at 13-15. But Defendants overlook key differences that render that case inapposite. In *Royal Caribbean*, the Court had already dismissed the bulk of the case on falsity grounds as forward-looking statements protected by the PSLRA safe harbor, and it

---

[11] Contrary to Defendants' suggestion that "either management or the accountant missed something" (Def. Br. at 17), the FEs' accounts demonstrate that the Company was devoid of procedure such that accounting employees had to "guess[]" the value of the services provided, ¶¶69-80. This is a far cry from the allegations compared by Defendants in *Garfield v. NDC Health Corp.*, where plaintiff had not shown any irregularities alerted the auditor of improper accounting. 466 F.3d 1255, 1269-70 (11th Cir. 2006) ("DeKalb may not establish scienter by alleging that the auditor would have discovered the fraud had it not violated GAAS."). Moreover, unlike *Garfield*, Plaintiff does not rely on accounting violations "standing alone" to plead scienter; here, Plaintiff alleges scienter based on, *inter alia*, the Company's own admissions, executive departures, and former employee testimony. *See id.* at 1263, 1269 ("NDC's intention to restate its accounts is not alleged" in the operative complaint).

addressed, "in an abundance of caution," whether defendants possessed facts that conflicted with their public statements. 2013 WL 3295951 at *12-17. Already wary that the complaint alleged a theory of fraud, the Court unsurprisingly concluded the allegations did not support a strong inference of scienter. There, stock sales and "hands on" executives were insufficient to establish that officers possessed specific, non-public facts about the company's bookings. *Id.* at *12, *19.

Here, falsity is adequately pled. *See* Sec. IV, *supra*. A strong inference of scienter is supported by the nature and magnitude of the restatement; the core operations doctrine; the motivation to defraud to effectuate a business combination; the fact that Defendants were already on notice by the auditor that Cano's revenue recognition was non-compliant; and, most importantly, the Company's concessions that it lacked effective processes to predict MRA revenue. *Royal Caribbean* lacked any such allegations, so plaintiffs were forced to rely on confidential witnesses, which is why the Court required direct interaction with the executives and specific facts to demonstrate defendants' knowledge of the company's operations. 2013 WL 3295951, at *18. Here, the FEs *support* the reasonable inference drawn from the SAC's remaining allegations and from the Company's own admissions, but the FEs are not the sole basis to plead scienter.

Defendants also improperly view each FE in isolation. Def. Br. at 14. Their only basis to discount the accounts of former employees based on their tenure is a case where plaintiff relied solely on ***one*** confidential witness who left a year before the class period, and thus had "no insight" into operations during the class period. *Hattaway*, 2023 WL 4030465, at *11 (Def. Br. at 14). Here, FE 3 was employed by Cano from January 2020 to March 2021, FE 2 from August 2021 to November 2021, and FE 1 from August 2021 to December 2022. ¶ 69 n.8; ¶ 71 n.11; ¶ 72 n.12. Collectively, their corroborating accounts demonstrate that the pervasive internal control deficiencies existed throughout the Class Period. Defendants' claim that the FEs' accounts "lack any link" to the fraud is also baseless: Kent laid bare that the manual, error-prone process led to improper estimates and that, due to recent improvements, the Company's MRA estimates will be more accurate. ¶ 62.

### C. The Delaware Litigation Supports That Defendant Hernandez Acted With Scienter

Defendants claim that there is no admission that the executive changes were "the result of leadership failures," (Def. Br. at 22) but Plaintiff alleges that it was only after Defendant Hernandez was ousted that Mr. Kent took over the Company and disclosed the rampant accounting

irregularities at Cano, ¶¶54-57; *In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1242 (N.D. Ga. 2002) (CEO who entered secret promissory notes was, at a minimum, severely reckless in not knowing that statements regarding executive compensation and related party transactions were incomplete). Defendant Hernandez departed following credible allegations that he engaged in undisclosed related party transactions, which is relevant to show that he had a history of withholding material information from investors. Defendants claim that the Delaware litigation is an attempt "to malign" Defendant Hernandez, but the nature of the lawsuit and the result support an inference of scienter. *City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. AraCruz Cellulose S.A.* 41 F. Supp. 3d 1369, 1397 (S.D. Fla. 2011) (resignation of CEO responsible for misleading statements sued by shareholders for company's derivative losses relevant to scienter).

### D. The Individual Defendants' Departures Soon After The Truth Emerged Supports An Inference of Scienter

Courts overwhelmingly conclude that the "close temporal proximity" between executive resignations and a restatement "weigh against an innocent inference that defendants resigned for unrelated personal or business reasons." *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020).[12] Here, Defendant Hernandez was ousted two days after a court found that he concealed the truth about numerous financial transactions, and Defendant Koppy "stepped down" weeks after Kent admitted to flawed revenue recognition processes. ¶¶ 53-55, 61 & n.7; *see also AraCruz*, 41 F. Supp. 3d at 1397 (scienter supported by CEO exit announced contemporaneously with admission that transactions violated company policy). Defendants rely on a case in which the executives resigned amid "poor performance" and a "major overhaul" of the sales organization, all of which suggested "poor management" but not fraud. Def. Br. at 22-23 (citing *City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*, 69 F. Supp. 3d 1256 (S.D. Fla. 2023)). Hardly the same can be said here—Defendant Koppy exited after multiple disclosures of systemic failures in Cano's financial reporting, and as Chief Financial Officer, he was directly responsible for the accuracy of financial statements.

---

[12] *Accord Yannes v. SCWorx Corp.*, 2021 WL 2555437 at *6 (S.D.N.Y. June 21, 2021) ("[T]he timing and circumstances of resignations . . . can add to a pleading of circumstantial evidence of fraud."); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24, 534 (S.D.N.Y. 2009); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *see also Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1305 (11th Cir. 2015) (similar).

###### E.     The Balance Of Inferences Supports Scienter

The foregoing allegations support a plausible inference that Defendants knew, or were severely reckless, in issuing statements purporting to report MRA revenue estimates when Cano had no reliable process to predict revenue. As Defendants have admitted, Cano did not comply with GAAP for much of the Class Period because it recognized revenue before the Company had completed its performance obligations. ¶ 48. And as Kent has admitted, Cano's "back-end process [that] inform [its] MRA estimates" were "overly manual" and "provided limited predictive power." ¶ 61. The failure to institute adequate controls to report nearly all of Cano's revenue is not mere negligence, as Defendants would have the Court believe.

Defendants' proffered inference is unsupported and is certainly not "more compelling" than the fraudulent inference. Def. Br. at 12. Specifically, Defendants claim that Cano "did not have back-end billing and coding processes that kept pace with its increasing size and that those practices left something to be desired." *Id.* That Cano grew is not a fact alleged in the SAC. *See id*. Even if it were properly considered, membership growth would not significantly impact the efficacy of revenue recognition procedures—particularly where Cano purportedly "remediated" the material weaknesses with respect to revenue recognition by the end of that period. ¶ 133. Moreover, the FEs employed by Cano over that purported growth period recount that, throughout the Class Period, the Company had manual billing processes resulting in data that could not be validated. ¶¶ 69-73 & n.8, 11-12. Kent's admission that the Company had not been "correlating and corroborating . . . what is received by the health plan and what is received by CMS" is damning because it shows that Defendants did not bother to validate their estimates. ¶¶ 64-65. Rather than confront these facts, Defendants claim without support that Plaintiff is required to allege Defendants participated in the billing and coding practices that led to inaccurate reporting of revenue. Def. Br. at 12-14; *but see Mizzaro*, 544 F.3d at 1249 ("The lack of direct evidence connecting the defendants to the alleged fraud is not fatal").

In light of these facts, the fraudulent inference is at least as compelling as Defendants' proffered narrative, and the motion to dismiss must be denied. *Tellabs*, 551 U.S. at 324; *Paincare*, 541 F. Supp. 2d at 1293 (scienter pled because "while it is *plausible* that the Defendants truly did not know that they were using inappropriate accounting methods and had a good faith basis to blindly pursue its ambitious acquisition strategy, it is equally *plausible* that Defendants took great care *not* to 'know' . . . .") (emphasis in original).

21

## VI.   PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION

"To prove loss causation in a section 10(b) claim, a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1247 (N.D. Ga. 2019); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "The loss causation element is only subject to Rule 8's notice pleading standard . . ., not the heightened pleading standards of the PSLRA." *In re Equifax*, 357 F. Supp. 3d at 1248, 1249. Loss causation can be demonstrated by (1) identifying a corrective disclosure; (2) showing a stock price drop as a result of the corrective disclosure; and (3) eliminating other possible explanations for the price drop. *FindWhat*, 658 F.3d at 1311-12.

Plaintiff has sufficiently pled loss causation. On February 28, 2022, Cano delayed the release of its full year 2021 financial results because it had identified certain errors in revenue recognition related to MRA revenue, and as a result, Cano's stock price fell 6%. ¶¶ 45-46. These statements revealed to the market the pertinent truth, i.e., that the previously reported financial results were inaccurate. *Flowers Foods*, 2018 WL 1558558, at *20 ("Disclosures need not address the prior misstatements specifically or fact-for-fact as long as they share the same subject as the prior misstatements."). On August 10, 2023, Kent revealed Cano's efforts to "close gaps in real-time data reporting" for MRA revenue and revisions to fiscal 2022 reported revenue, which caused the Company's stock to fall 73%. ¶¶ 58-64, 67; *In re 21st Century Holding Co. Sec. Litig.*, 2008 WL 5749572, at *16 (S.D. Fla. Nov. 7, 2008) (2007 disclosure of the company's "loss strengthening which began in the third quarter of 2006" was sufficiently corrective).

Defendants claim that the announcement of a delay in financial results does not establish loss causation, but that is not what Plaintiff alleges. The corrective disclosure is Cano's revelation that prior financial results inaccurately reported MRA revenue.[13] As Defendants concede elsewhere in their motion, the actual corrective part of the February 28, 2022 announcement was

---

[13] Due to this distinction, Defendants' cited cases about delayed financials, which did not reveal the alleged misconduct, are inapposite. *See, e.g.*, *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) ("The announcement of a delay in the reporting of CSI's 1Q 2010 financials does not establish loss causation because it fails to reveal the truth that CSI had engaged in sham sales, secret consignments, or any wrongdoing asserted in the Complaint"); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1045 (N.D. Cal. 2009) (third-party reports were mere speculation that did not reveal company's illicit options backdating).

22

the "need for an adjustment to the Company's timing of accounting for MRA revenue recognition." Def. Br. at 5.

Relying on a nearly twenty-year-old, out-of-Circuit district opinion, Defendants wrongly argue that the downward trend in Cano's stock price before the corrective disclosure somehow negates loss causation. Def. Br. at 30 (citing *In re Buca Inc. Sec. Lit.*, 2006 WL 3030886 (D. Minn Oct. 16, 2006)). In *Buca*, the four alleged partial disclosures either did not reveal the fraud or did not result in a stock drop. 2006 WL 3030886 at *9 (CEO resignation "mentioned no investigation or accounting issues and thus disclosed nothing of the alleged fraud" and "preliminary determination of GAAP violations" did not cause stock to drop). There, the delayed SEC filing was not corrective where the company had *already* announced restatements. *Id.* That only one allegedly corrective disclosure remained negated plaintiffs' allegation that the fraud was "gradually" revealed. *Id.* There is no authority cited for *Buca*'s proposition that a corrective disclosure followed by a stock drop still does not establish loss causation because "the share price was trending downward throughout the Class Period and was already down [before] the alleged fraud was allegedly gradually revealed." *See id.* Unsurprisingly, no court has cited *Buca* for that proposition.[14]

Defendants' other cited authority—which was issued before the Supreme Court's landmark decision on loss causation in 2005, *Dura*—also fails to establish that a downward trend in the stock price negates loss causation. Def. Br. at 30 (citing *Druskin*, 299 F. Supp. 2d at 1339). In *Druskin*, the stock price fell after the alleged disclosure but "quickly rebounded," so plaintiffs had "failed to adequately allege that [d]efendants' false statements were in some reasonably direct way responsible for their loss." 299 F. Supp. 2d at 1339. Therefore, there is no sound authority for Defendants' challenge to the February 28, 2022 disclosure, and it must be rejected.

---

[14] In the 18 years since it was published, *Buca* has been cited by 3 cases on the issue of loss causation. *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) (director resignation unconnected to fraud is not corrective). Two of them conclude that the misrepresentation of a fact, as opposed to the magnitude of a fact, cannot be incrementally revealed. *In re FleetBoston Fin. Corp. Sec. Litig.*, 2007 WL 4225832, at *9 & n.12 (D.N.J. Nov. 28, 2007) (loan loss "reserves cannot be 'somewhat' materially inadequate"); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 337 n.53 (D.N.J. 2007) ("no 're-implication of the truth' . . . is possible . . . since the market either knows the truth or it does not"). Plaintiff's allegations are consistent with this line of authority: that Cano's financials were inaccurate was revealed on February 28, 2022, and the magnitude of the inaccuracy was reported on March 14, 2022.

Defendants point out that "stock price *increased*" after the restatement was issued on March 14, 2022, but this does not discount loss causation either. Def. Br. at 30. It only demonstrates that the market had already learned of the fraud and digested it into the stock price upon its disclosure on February 28, 2022. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-11 (9th Cir. 2016) (loss causation pled where stock price dropped after announcement of SEC investigation, and subsequent disclosure confirmed the falsity of defendants' statements, even though no price reaction accompanied second disclosure).

Defendants' argument about the August 10, 2023 disclosure fares no better because it incorrectly generalizes that the difference between actual results and prior estimates is not a revelation. Def. Br. at 30. First, Defendants' cited authority states that a statement of increased non-performing assets, net charge offs, and non-performing loans is not necessarily corrective of earlier representations because it "reported subsequent financial data." *In re Colonial Bancgroup, Inc. Sec. Litig.*, 9 F. Supp. 3d 1258, 1271 (M.D. Ala. 2014). Here, the August 10, 2023 disclosure was corrective because it changed prior statements of revenue for financial periods that had *already occurred*; thus, the factual predicate to recognize revenue had already occurred when Cano reported revenue for interim periods of fiscal 2022 and first quarter 2023, whereas the loans in *Colonial Bancroup* continued to deteriorate *after* defendants' statements. ¶¶ 58-59; *In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at *30 (N.D. Ga. Aug. 12, 2019) (disclosure of "true nature of Acuity's [financial] health" suffices).

Moreover, Defendants do not deny that the August 10, 2023 disclosure was corrective because it also revealed that Cano's revenue recognition process "lacked predictive power" and that the Company was enhancing its process. ¶¶ 63, 65; *see* Def. Br. at 30. Cano's disclosure of a $44 million charge against its fiscal 2022 revenue and of deficient internal controls with respect to the processes that "inform our MRA estimates" revealed new facts to the market and caused the Company's stock to decline by 73%. ¶¶ 138-39. This amply suffices to allege loss causation. *See FindWhat*, 658 F.3d at 1311 n. 28 (explaining that a corrective disclosure "obviously must disclose new information"). In any event, "loss causation is a fact-based inquiry that is generally not proper to resolve on a motion to dismiss." *Eastwood Enterprises, LLC v. Farha*, 2009 WL 3157668, at *5 (M.D. Fla. Sept. 28, 2009).

## VII.    CONCLUSION

Defendants' motion should be denied in its entirety.[15] If the Court grants any part of the motion, Plaintiff requests leave to replead. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("Generally, [w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice."). This is particularly the case here where Plaintiff has not been given the opportunity for a judicial decision about the sufficiency of his allegations. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190-91 (2d Cir. 2015) (emphasizing the "liberal spirit" of Rule 15 and warning against dismissal with prejudice prior to plaintiffs being given "the benefit of a ruling" that details the "precise defects" in their pleading);

Dated:  March 6, 2024

Respectfully submitted,

*/s/ Leo W. Desmond*
Leo W. Desmond, Esquire
Florida Bar Number 0041920
**DESMOND LAW FIRM, P.C.**
601 21st Street, Suite 300
Vero Beach, Florida 32960
Telephone: 772.231.9600
Facsimile: 772.231.0300
lwd@desmondlawfirm.com

*Liaison Counsel for Gudelio Fundora and for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler (*admitted pro hac vice*)
Pavithra Rajesh (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: csadler@glancylaw.com
          prajesh@glancylaw.com

*Counsel for Lead Plaintiff Gudelio Fundora and Lead Counsel for the Class*

---

[15] Defendants' sole argument against control person liability is that Plaintiff purportedly has not pled a primary violation of §10(b). Def. Br. at 30. As Plaintiff adequately pleads a primary violation, he states a §20(a) claim against Defendants.

25

## PROOF OF SERVICE

I hereby certify that on this 6th day of March, 2024, a true and correct copy of the foregoing

document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Leo W. Desmond*
Leo W. Desmond