UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-20827-CV-WILLIAMS

ALBERTO GONZALEZ, Individually and
on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

CANO HEALTH, INC., *et al.*,

      Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on the Motion to Dismiss (DE 73) ("***Motion***")

filed by Defendants Marlow Hernandez and Brian D. Koppy (collectively, "***Defendants***")

to which Lead Plaintiff Gudelio Fundora ("***Plaintiff***") filed a Response (DE 79) and

Defendants filed a Reply (DE 82).  For the reasons set forth below, Defendants' Motion

(DE 73) is **GRANTED**.

**I.    BACKGROUND**

    ***A.  Factual Background.***

This putative securities class action was filed on behalf of a class who purchased

or otherwise acquired the publicly traded securities of Cano Health, Inc. ("***Cano Health***"

or "***Company***") between May 7, 2021 and August 10, 2023 ("***Class Period***"). (DE 70 at

1.)  Cano Health, a registered Delaware corporation with its principal place of business in

Miami, Florida, operates as an independent primary care physician group that "utilize[s]

[a] technology-powered, value-based care delivery platform to provide medical [services]"

to more than 100,000 members throughout the state of Florida and across the U.S.  (DE

70 at 1, 6; DE 74-4 at 3.)  Defendant Marlow Hernandez ("**Hernandez**") founded and served as the Chief Executive Officer ("**CEO**") of the Company from 2009 to 2022 and Defendant Brian D. Koppy ("**Koppy**") served as the Company's Chief Financial Officer ("**CFO**") from 2021 to 2023.  (DE 70 at 6.)

In 2020, Jaws Acquisition Corp. ("**Jaws**"), a special purpose acquisition company ("**SPAC**"), raised $690 million in an initial public offering ("**IPO**") to acquire, combine, rename, and restructure two separate entities, Primary Care (ITC) Holdings, LLC ("**PCH**") and Primary Care (ITC) Intermediate Holdings, LLC ("**PCIH**"), into Cano Health to form an umbrella partnership-C corporation ("**Business Combination**").[1]  (*Id.* at 7–9.)  As a part of this deal, Jaws acquired Cano Health and in return Cano Health received a 35 percent economic interest and 100 percent voting interest in PCIH.  (*Id.*)  Following completion of the merger, Cano became incorporated under the laws of the state of Delaware, trading Class A common stock and warrants on the New York Stock Exchange under the symbols "CANO" and "CANO/WS," respectively.  (*Id.* at 6.)

Concentrating on providing healthcare services to seniors across the state of Florida, the majority of Cano Health's revenue is derived from Medicare.  Medicare is a federally funded health insurance program administered by the U.S. Department of Health and Human Services ("**HHS**") through the Centers for Medicare and Medicaid Services ("**CMS**") for individuals who are disabled or sixty-five (65) and older. Generally, there are

---

[1] As a result of this de-SPAC acquisition, a company merger between a SPAC and a target private business, $690,054,727 was held in a trust account ("**Trust Account**") established for the benefit of the public shareholders. (*Id.* at 8.) According to Plaintiff, the proceeds in the Trust Account were used as consideration to complete the Business Combination in the form of cash consideration to PCH and debt relief to PCIH. (*Id.* at 57.)

four parts to the Medicare program—Part A covers inpatient and institutional care, Part B covers outpatient care, Part C is the Medicare Advantage Program, and Part D is the prescription drug program.  According to Hernandez, Cano Health "focuses on the Medicare Advantage population" as it is "arguably the fastest growing market in healthcare." (*Id.* at 10.)  Under the Medicare Advantage program, Medicare-eligible seniors and beneficiaries with disabilities obtain healthcare services through private plans approved by CMS.  (*Id.*)  In return, health organizations receive fixed or capitated monthly payments from CMS for each enrolled Medicare patient the organization treats.  (*Id.*)

Since its founding and through its incorporation, Cano Health received capitated monthly pre-payments for healthcare services rendered to Medicare patients.[2] (DE 70 at 1.)  A capitated payment is an estimated form of compensation healthcare providers receive upfront to cover the predicted healthcare cost provided to a specific patient over a period of time.[3]  In calculating these estimated capitated payments, CMS utilizes a prospective risk-adjustment process that accounts for the patient's demographic and

---

[2] As set forth in Cano Health's filings with the U.S. Securities and Exchange Commission ("**SEC**"), the Company's "[r]evenue consists primarily of fees for medical services provided under capitated arrangements with HMO [(health maintenance organizations)] health plans. Capitated revenue consists of revenue earned through Medicare Advantage as well as through commercial and other non-Medicare governmental programs, such as Medicaid." Cano Health, Inc., 2021 Annual Report (Form 10-K) 95 (Mar. 14, 2022).

[3] Capitation is a special method of payment utilized by CMS to cover the cost of healthcare services provided to Medicare patients.  CMS often uses pre-payments to enable health care providers to focus on their patients' needs and deliver services that may not be individually payable according to Medicare's payment system.
*See Capitation and Pre-payment*, Centers for Medicare & Medicaid Services, https://www.cms.gov/priorities/innovation/key-concepts/capitation-and-pre-payment.

health status.[4]  (DE 70 at 1.)  As this process is prospective, there is often an approximate one-year gap between CMS' estimated payout for the predicted monthly healthcare costs and any subsequent adjustment, which finalizes the exact payment amount the Company is entitled to receive.[5]  (DE 70 at 1–2.)

As a publicly traded corporation, Cano Health must adhere to certain accounting and financial reporting standards, including the Generally Accepted Accounting Principles ("**GAAP**").[6]  Due to the delay between Cano Health providing healthcare services to its patients (date of service) and the final adjusted capitated payments, the Company

---

[4] According to CMS, risk adjustment is used to estimate the health cost to treat a patient in a given year based on a patient's health status, their likely use of health care services and the costs of those services. This process allows doctors and other health providers to be paid fairly for the people they treat at no consequence to patients who require more healthcare services.  For example, health providers are paid more for patients who have more health problems than for healthy patients who may not need as many services. *See Risk Adjustment*, Centers for Medicare & Medicaid Services, https://www.cms.gov/priorities/innovation/key-concepts/risk-adjustment.

[5]  As detailed in Cano Health's SEC filing,
> Capitated revenue consists of a per member per month ('**PMPM**') amount paid for the delivery of healthcare services and our rates are determined as a percent of the premium that the health plans receive from the CMS for our at-risk members.  Those premiums are based upon the cost of care in a local market and the average utilization of services by the members enrolled . . . . Under the risk adjustment model, capitated premium is paid based on the acuity of members enrolled for the preceding year and ***subsequently adjusted once current year data is complied***.

Cano Health, Inc., 2021 Annual Report (Form 10-K) 84 (Mar. 14, 2022) (emphasis added).

[6] In SEC filings, Cano Health reported that it complies with revenue recognition protocol in accordance with the Accounting Standards Codification 606 ("**ASC 606**"), Revenue from Contracts with Customers, developed by the Financial Accounting Standards Board ("**FASB**"). *See* Cano Health, Inc., 2021 Annual Report (Form 10-K) (Mar. 14, 2022). Generally, ASC 606 established standards for reporting information in financial statements about the nature, timing, and uncertainty of revenue from contracts with customers.

recognizes revenue from CMS by including variable consideration within the transaction price.  (DE 70 at 11–13.)  Variable consideration is a fairly common component of patient care contracts when the payment amount is contingent on the occurrence of a future event, and it is subject to discounts, rebates, refunds, and credits.[7]  Specifically, with regard to Cano Health's variable consideration, the transaction price for services may vary depending on adjustments in the form of any renegotiated terms between health plans or any change in member-specific rates based on a member's demographics and health status.[8]  Under ASC 606, a company that recognizes variable consideration may employ one of two available accounting methods—the expected value method or the most likely amount method—as it relates to recognizing revenue.  (*Id*. at 11.)  Every company has the discretion to select the accounting method it employs depending on which method a company expects to better predict the amount of consideration to which it will subsequently be entitled, or, in other words, revenue it expects to realize.[9]  (*Id.*)  Based on Cano Health's SEC filings, the Company initially utilized the expected-value

---

[7] FASB acknowledges that consideration in customer contracts may vary as a result of many different factors, and variability may arise in many different circumstances. *See* 6.3.1 Identifying Variable Consideration, Deloitte, https://dart.deloitte.com/USDART/home/codification/revenue/asc606-10/roadmap-revenue-recognition/chapter-6-step-3-determine-transaction/6-3-variable-consideration.

[8] FASB asserts that an entity "shall include in the transaction price" the variable consideration "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." (DE 70 at 12) (citing ASC 606-10-32-11.  To assess this probability, "an entity shall consider both the likelihood and the magnitude of the revenue reversal." (*Id.*) (citing ASC 606-10-32-12).

[9] FASB released guidance stating that revenue should be recognized when (or as) a company fulfills its performance obligations for each contract.  (*Id.*)  The consideration allocated to these performance obligations can vary "if an entity's entitlement to the consideration is contingent on the occurrence or nonoccurrence of a future event." (*Id.*) (citing ASC 606-10-32-6).

method, which is the sum of probability-weighted amounts in a range of possible consideration amounts. (*Id.* at 11, 13.) According to accounting standards, the expected value method is the appropriate estimate of variable consideration if a company has a large number of contracts with similar characteristics. (*Id.* at 12.)

As it relates to the claims brought in this action, in a press release dated February 28, 2022, Cano Health announced that it would need to delay the release of its full year 2021 financial results, citing certain errors in its revenue recognition processes. (*Id.* at 13.) Particularly, there were issues with "certain potential non-cash adjustments" that needed to be modified "to account for revenue recognition under accounting standard ASC 606." (*Id.*) This issue was identified by Cano Health's auditor, Ernst & Young LLP ("***EY***"), and would "delay[] recognition of certain amounts related to the Medicare Risk Adjustment ["***MRA***"] to subsequent periods." (*Id.*) Despite the Company's assurances that the adjustments would "not impact the Company's cash from operations, its cash position, or estimated collectability of receivables," Cano Health's stock price fell $0.32, or 6 percent, closing at $4.87 per share on February 28, 2022. (*Id.*) By March 6, 2022, Cano Health filed a Form 12b-25, a Notification of Late Filing, with the SEC, stating that it could not timely file its 2021 annual report due to the issues discussed in its February 28, 2022 Press Release. (*Id.*) Further, the Company acknowledged to the SEC that "it is possible that the adjustments . . . may result in changes to current and/or prior period financial statements." (*Id.*)

After Cano Health publicly announced the need to adjust its revenue recognition process, investment analysts at Credit Suisse issued a series of reports on the Company's accounting practices. According to the analysts, Cano Health's "prior MRA

revenue recognition approach had been booking revenues at the time of documentation itself (essentially, the date of service)" whereas the Company's peers "book[ed] MRA-related revenue one year after the documentation." (*Id.* at 17.)  Under Cano Health's new revenue recognition approach, the Credit Suisse analysts posited that the Company would conform its accounting practices with its peers by "book[ing] MRA related revenues in a more conventional approach (matching revenues with cash collections), resulting in MRA related revenues being pushed out to future periods." (*Id.*)  Citing these reports, Plaintiff alleges that under Cano Health's prior process the Company immediately booked revenue before the risk adjustment process occurred in an effort to overstate its financials for the first few quarters following the Company's Business Combination.  (*Id.* at 17–18.)

On March 14, 2022, Cano Health filed its 2021 yearly report, Form 10-K, along with Form 8-K, a separate SEC form designated for disclosures of a material change or event.  (*Id.* at 14.)  In its Form 8-K, Cano Health disclosed that the Company's financial statements for the quarterly periods of fiscal year ("*FY*") 2021 were no longer reliable and would need to be restated due to "the Company's *correction* of its accounting for MRA revenue within Medicare Advantage contracts."[10]  (*Id.*)  Within the same document, Cano Health also acknowledged the need to revise its financial statements for FY 2019 and 2020, although it declared the impact was "not material."  (*Id.*)  In the Company's Form

---

[10] According to Cano Health's 2021 Form 10-K filed with the SEC on March 14, 2022, the Company's fiscal year ended December 31, 2021. As such, when referring to the Company's yearly financial results, the Court will use FY 2021 to reference the results corresponding to the fiscal year starting January 1, 2021 and ending December 31, 2021. For any preceding or subsequent yearly results, the Court will use FY alongside the corresponding year.  Additionally, for 2021, Cano Health's recognized its first quarter ("*Q1 2021*") ending on March 31, 2021, second quarter ("*Q2 2021*") ending on June 30, 2021, third quarter ("*Q3 2021*") ending on September 30, 2021, and fourth quarter ("*Q4 2021*") ending on December 31, 2021.

10-K, Cano Health indicated a shift in its initial accounting method from the expected value method to the most likely amount methodology, under which "[t]he amount of variable consideration recorded in the transaction price [would be] limited to an amount that the Company believes will not result in a significant reversal of revenue based on historical results." (*Id.*)  According to Cano Health, its 2021 quarterly statements required restatement due to "the Company's correction of its accounting for Medicare Risk Adjustment ('MRA') revenue within Medicare Advantage contracts." (*Id.*)  The Company elaborated that "[t]he correction changes the timing of the revenue recognition for the MRA revenue, which results in recognizing such revenue when the Company is entitled to receive such revenue upon satisfaction of performance obligations in accordance with the requirements of ASC 606." (*Id.*)

In a press release published on March 14, 2022, Cano Health announced that "[a]s a result of the restatement, approximately $122 million of MRA revenue related to care provided in 2021 that would have previously been recognized in 2021 is expected to be recognized in 2022 . . . offset by $10 million in MRA revenue that was previously recognized in 2020 under the prior accounting methodology, for a negative impact to 2021 revenue of approximately $112 million." (*Id.* at 15.)  Specifically, as set forth in Cano Health's 2021 Form 10-K, the Company decreased its previously reported capitated revenue by $5.69 million for Q1 2021, $49.73 million for Q2 2021, and $28.02 million for Q3 2021, which increased the Company's operating loss in each quarter by $5.64 million, $41.24 million, and $23.96 million, respectively. (*Id.*)

In May of 2023, approximately one year after Cano Health's corrective disclosure and restatement, former members of Cano Health's Board of Directors filed a derivative

action in the Delaware Court of Chancery against the Company's executives, alleging that certain directors entered into undisclosed related party transactions, including payments of millions of dollars to Defendant Hernandez's family members.  (*Id.* at 18.) Soon after, on June 16, 2023, the Company issued a press release announcing Hernandez's resignation as CEO of the Company and naming then-Chief Strategy Officer deMarquette Kent ("***Kent***") as the Interim CEO effective immediately.  (*Id*. at 19.)

Within two months of Kent's tenure as Interim CEO, on August 10, 2023, Cano Health issued a press release, disclosing a $44 million charge and correction against its Q2 2022 and Q1 2023 revenue.  (*Id.* at 20.)  In an earnings call, Kent explained that the charge "was primarily due to a shortfall in the Medicare risk adjustment revenue or MRA collected versus what was expected and accrued for in prior periods."  (*Id.*) Following Kent's lead, Defendant Koppy revealed that the $44 million charge "was out of period or related to services provided in 2022" and, accordingly, the Company had to realize a lower-than-expected MRA revenue in 2023.  (*Id.* at 21.)  Against the backdrop of the Company's second correction to its revenue in eighteen months, Kent explained that Cano Health suffered from "process issues that have affected [Cano Health's] ability to project [its] performance."  (*Id.*)  Kent added that there were significant issues "attributable to back-end processes and the ways that data from those processes inform[ed] our MRA estimates" given that "[t]he prior processes were overly manual, and [Cano Health's] back testing analysis demonstrated that they provided limited predictive power."  (*Id.*) Following these disclosures, Plaintiff alleges that the Company's stock price fell 73 percent from $1.54 to $0.43 per share at the close of the trading session on August 11, 2023.  (*Id.* at 24.)

Former employees characterized Cano Health's revenue process as "overly manual" and stated that Cano Health employees were allowed to independently adjust billing codes during the Class Period.  (*Id.*)  A former chief administration officer employed by Cano Health from August 2021 to December 2022, Former Employee #1 ("*FE #1*"), observed outdated policies being employed and witnessed a lack of transparency at the Company.  (*Id.*)  FE #1 claims that the accounting and systems for billing and coding were "manual for a very long time" and the accounting team maintained the Company's accounts payable and accounts receivable by hand, using Microsoft Excel spreadsheets. (*Id.*)  According to FE #1, data and predictive analytics only flowed through the Chief Population Health Officer Pedro Codero ("*Codero*") who facilitated the processes with no data governance as to the methodology and no data definitions.  (*Id.* at 25.)  Additionally, FE #1 maintains that Cano Health also attempted to maximize revenue by adding higher-paying codes to patients' medical claims, a process otherwise known as "upcoding".  (*Id.* at 27.)

Former Employee 2 ("*FE #2*"), a coding and billing specialist from August 2021 to November 2021, said that Cano Health "up-code[d]" patients' bills, citing instances where he received instructions to enter higher-paying codes.[11]  (*Id.*)  FE #2 remembers other specialists used "cheat sheets" to add extra codes based on patients' medical conditions and symptoms.  (*Id.* at 26–27.)  FE #2 explained that the billing process was "overly manual" requiring billing specialist to "do a lot of guessing on the backend."  (*Id.* at 25.) For example, according to FE #2, "[s]omeone would go into one software, pick 150

---

[11] As stipulated in Plaintiff's Second Amended Complaint, the Court uses masculine pronouns for all former employees to protect their anonymity.

patients, transfer them to Excel and send it around to coders." (*Id.*)  The coders then "[w]ouldn't spend even one minute on a chart . . . because [they] had to get through [many] patients in one day" despite the fact that FE #2 and his colleagues had no training in risk adjustment coding.  Consequently, FE #2 concluded "everyone was plugging in numbers like robots and didn't know what they were doing." (*Id.* at 25–26.)  A third employee, Former Employee #3 ("**FE #3**"), worked as a medical coder from January 2020 to March 2021.  According to FE #3's recollection, Cano Health's billing was "very unorganized with coding and billing" as the Company mainly used Excel spreadsheets and a lot of paperwork to a point that "there [were] so many different hands that they [could not] regulate who [was] doing what at what time." (*Id.* at 26.)

### B.  Procedural Background.

This securities litigation began on March 18, 2022, upon the filing of the original Class Action Complaint (DE 1), alleging violations of the Securities Exchange Act of 1934 ("**Exchange Act**") and the Private Securities Litigation Reform Act of 1995 ("**PSLRA**"). Following the published notice advising class members of the putative class, various members of the proposed class filed motions seeking appointment as lead plaintiff and approval of lead counsel pursuant to the Exchange Act, as amended by the PSLRA.  15 U.S.C. § 78u-4(a)(3)(A)(i).  On December 22, 2022, the Court appointed Gudelio Fundora as Lead Plaintiff and approved Glancy Prongay & Murray LLP and Desmond Law Firm P.C. as Lead Counsel and Liaison Counsel respectively.  (DE 45.)  Three weeks later, in the interest of judicial economy and efficiency, the Court granted the Parties' Joint Motion for Entry of an Order Setting a Schedule for the Filing of an Amended Complaint (DE 46), permitting Plaintiff to file a first amended class action complaint.  (DE 47.)

Plaintiff filed the Amended Class Action Complaint (DE 51) on February 21, 2023, and Defendants subsequently filed their Motion to Dismiss (DE 54) on April 7, 2023. Following briefing on Defendants' Motion to Dismiss (DE 54) and Defendants' Motion to Strike Portions of Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (DE 60), Plaintiff filed his Motion for Leave to Amend the Amended Class Action Complaint (DE 65), seeking to expand the class period and to include new factual allegations related to information disclosed by the Company on August 10, 2023.   The Court granted Plaintiff's Motion for Leave to Amend the Amended Class Action Complaint, admonishing Plaintiff that the second amended class complaint would be the last and final opportunity to allege sufficient allegations to support his claims.  (DE 69.)

On January 5, 2024, Plaintiff filed the Second Amended Class Action Complaint (DE 70) ("***Second Amended Complaint***") alleging violations of Section 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 ("***Rule10b-5***"). Defendants subsequently filed their instant Motion to Dismiss (DE 73) seeking to dismiss Plaintiff's allegations with prejudice for failure to state a claim pursuant to the PSLRA and Federal Rule of Civil Procedure 9(b) ("***Rule 9(b)***") and 12(b)(6) ("***Rule 12(b)(6)***").  *See* 15 U.S.C. § 78u-4(b).[12]

## II.    LEGAL STANDARD

Complaints alleging securities fraud are subject to a "triple-layered pleading standard." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).  To survive

---

[12] On February 16, 2024, upon review of Plaintiff's Notice of Voluntary Dismissal of Defendant Cano Health, Inc. Only (DE 77), the Court dismissed without prejudice Plaintiff's claims against Cano Health, Inc. pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).  (DE 78.)

a motion to dismiss, a securities-fraud claim brought under Rule 10b-5 must satisfy the run-of-the-mill federal notice-pleading requirements under Federal Rule of Civil Procedure 8(a)(2) ("***Rule 8(a)(2)***"), the heightened pleading standards found in Rule 9(b), and the special fraud pleading requirements imposed by the PLSRA, 15 U.S.C. § 78u-4. *Id.* at 1317–18.

Under the notice-pleading requirements, a complaint must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a complaint "does not need detailed factual allegations," it must provide "more than labels, and conclusions." *Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do.") (citations omitted). Rule 12(b)(6) does not allow dismissal of a claim because a court anticipates "actual proof of those facts is impossible," but the "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 545).

A court must accept the factual allegations in the complaint as true and draw reasonable inferences in plaintiff's favor. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). Although the court resolves all doubts or inferences in the plaintiff's favor, the plaintiff bears the burden to frame the complaint with sufficient facts to suggest that she is entitled to relief. *Twombly*, 550 U.S. at 556. Plaintiffs make a facially plausible claim when they plead factual content from which the court can reasonably infer that the defendants are liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. "The plausibility standard is not

akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. In determining whether a complaint states a plausible claim for relief, the court draws on its judicial experience and common sense. Dismissal pursuant to a motion under Rule 12(b)(6) is warranted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint." *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1310 (11th Cir. 2000) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

In addition to the requirements of *Twombly, Iqbal*, and Rule 12(b), causes of action grounded in fraud are subject to the heightened pleading standards of Rule 9(b). *See Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007). That rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Consequently, "[t]o satisfy the Rule 9(b) standard, [fraud claims] must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Ambrosia Coal*, 482 F.3d at 1316–17 (citing *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1380–81 (11th Cir. 1997)).

The PSLRA imposes additional heightened pleading requirements for private securities actions. The PSLRA requires a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting 15 U.S.C. § 78u–4(b)(1)). "If an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting *id.* at § 78u–4(b)(1)). Additionally, with respect to each act or omission, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." *Id.* (quoting *id.* at § 78u–4(b)(2)).

### III. DISCUSSION

#### A. Section 10(b) and Rule 10b-5.

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, the Complaint must allege (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) damages; and (6) loss causation. *FindWhat*, 658 F.3d at 1295 (citations omitted). Here, Defendants challenge falsity, scienter, and the loss causation elements of Plaintiff's 10(b) claim. As explained below, because the Court finds that Plaintiff does not sufficiently allege material misrepresentations or omissions that give rise to a strong inference of scienter, the Court only addresses falsity and scienter and does not reach Defendants' causation argument.

#### 1. Material Misrepresentation or Omission.

The Exchange Act prohibits "literally false statements" and "any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* at 1305 (quoting 17 C.F.R. § 240.10b–5(b)). "A securities fraud plaintiff has the burden of showing an alleged misstatement was material." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th

Cir. 2020) (citation omitted).  "A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'"  *Carvelli*, 934 F.3d at 1317 (quoting *FindWhat*, 658 F.3d at 1305).  The materiality requirement "depends on the specific circumstances of each case, including the totality of information available to investors."  *Id*. (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).  It "aims to strike a balance between protecting investors and allowing companies to distribute information without perpetual fear of liability—in essence, to ensure that not every minor misstatement provides litigation fodder for disgruntled investors."  *Id.*

First, Plaintiff alleges Defendants issued material misstatements regarding Cano Health's financial results.  (DE 70 at 28–29.)  Plaintiff asserts that Cano Health's statements in its SEC filings—that the Company recognized revenue in accordance with ASC 606—were materially misleading because Cano Health misapplied GAAP and prematurely recognized revenue from Medicare Advantage contracts before the risk adjustment process was completed, which would have been one year after the date of service.  (DE 70 at 28–29, 34.)  By recognizing revenue prior to any risk adjustment, Plaintiff alleges that the Company recognized revenue before satisfying its performance obligations, as required by ASC 606 and, as a result, overstated capitated revenue and understated net losses for FY 2020, Q1 2021, Q2 2021, Q3 2021, and FY 2021.  (DE 70 at 29–34.)  In the Second Amended Complaint, Plaintiff highlights the fact that the Company overstated FY 2020 revenue by $10 million and cumulatively overstated FY 2021 revenue, including Q1–Q3 2021, by $122 million.  According to Plaintiff, each misstatement enabled Cano Health to report increased revenue to make the Business

Combination appear "more appealing," disincentivizing shareholders from redeeming their shares for funds from the Trust Account.  (DE 70 at 57.)  Based on these allegations and because Defendants do not challenge the alleged falsity of the statements associated with "the correction to Cano [Health]'s *timing* for accrual of MRA revenue pursuant to ASC 606 methodology and the subsequent restatement announced in Match 2022," the Court finds that Plaintiff has pled misrepresentations and omissions of material fact with sufficient particularity to satisfy the PSLRA's standards as to the Company's financial results for FY 2020, Q1 2021, Q2 2021, Q3 2021, and FY 2021.  *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (ruling that a sufficient level of factual support for a 10(b) claim is found where circumstances of the fraud are pled in detail to provide the who, what, when, where, and how) (citations omitted).

Second, Plaintiff alleges Cano Health failed to disclose in its SEC filings and press releases throughout the Class Period that its processes used to estimate MRA revenue were "overly manual" with "limited predictive power".  (DE 70 at 44–50.)  Throughout FY 2022 and Q1 2023, Cano Health reported that it accurately captured the estimated MRA revenue within the Company's accounts receivable on its balance sheet.  (DE 70 at 19.)  Then, on August 10, 2023, Cano Health issued a corrective disclosure that MRA revenue in Q2 2023 was, in fact, $58 million less than initially estimated given that $44 million was out of period or related to services provided in 2022.  (DE 70 at 21.)  On an earnings call, Interim CEO Kent revealed the Company's projection issues were "attributable to back-end processes and the ways that data from those processes inform our MRA estimates." (DE 70 at 21.)  He elaborated, saying that he believed, "[t]he prior processes were overly manual, and [the Company's] back testing analysis demonstrated that they provided

limited predictive power." (DE 70 at 21.) Therefore, according to Kent, the Company "began revising [its] approach to limit data variability and to ensure [it] close[d] gaps in real-time data reporting." (DE 70 at 22.).

Relying on Kent's statements and the Company's disclosure that MRA revenue estimates were lower than expected, Plaintiff alleges Cano Health materially omitted the fact that the Company had no sufficient basis or reliable process to either calculate MRA revenue generally or to assess the risk and magnitude of MRA reversal.[13] In response, Defendants argue that Plaintiff misunderstands the meaning of Kent's August 2023 statements. Rejecting the suggestion that Cano Health's revenue recognition processes were still flawed following the Company's March 2022 corrective disclosure, Defendants assert that the August 2023 correction only related to adjustments to the Company's MRA estimates and had nothing to do with the timing of accrual of MRA revenue.[14] Defendants contend that the reduction in its estimates was attributable to a mid-year reconciliation in Q2 2023 for quarterly service funds received from the Company's health plan partners, which was previously disclosed to investors in its March 14, 2022 Press Release. (DE 74-6 at 13.) As such, Defendants argue that Plaintiff fails to adequately allege that Cano

---

[13] With regard to this falsity allegation, Plaintiff also contends the Company omitted material information in its warning of risks and internal controls. According to Plaintiff, Cano Health claimed to have "remediated" material weaknesses associated with revenue recognition, but the Company did not disclose that until August 2023. (DE 70 at 50–55.)

[14] Additionally, Defendants maintain the errors in the Company's accounting method that led to the March 2022 correction had "been fully remediated and resolved" as certified by the Company and its accounting firm in Cano Health's 2022 Form 10-K regarding the Company's internal controls. *See* Cano Health, Inc. 2022 Annual Report (Form 10-K) 147 (Mar. 15, 2023) (EY's certification that the Company "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022[,]" the time in which Plaintiff alleges the Company operated an "overly manual" and error prone process leading to inaccurate MRA estimates).

Health omitted material information related to its MRA estimates (classified as MRA revenue on the Company's balance sheet) simply by labeling their system as reliant on "overly manual" processes with a "limited predictive power".

Here, the key issue is whether Cano Health's guidance related to MRA revenue is immunized from liability under the PSLRA's safe harbor provision.  15 U.S.C. § 78u-5(c)(1).   In that safe harbor, corporations and individual defendants have "three independent, alternative means of inoculating forward-looking statements: those that are (1) accompanied by meaningful cautionary language, (2) immaterial, or (3) made without actual knowledge of their falsity."  *Carvelli*, 954 F.3d at 1326 (citing 15 U.S.C. § 78u-5(c)(1)).  Whether a statement is forward-looking depends on the nature and specificity of each alleged misstatement or omission.  *See Harris v. Ivax Corp.*, 182 F.3d 799, 804 (11th Cir. 1999).  Statements about projections of revenue, income, and other financial items and metrics fall squarely within the definition of forward-looking statements. *See* 15 U.S.C. § 78u-5(i)(1).  Accordingly, given that Cano Health and the individual Defendants characterize MRA revenue as "estimates of future MRA payments," the Court finds such representations are forward-looking statements.

Defendants argue that they prevail under the PSLRA's safe harbor provision because the Company's guidance was both (1) accompanied by meaningful cautionary language and (2) was made without actual knowledge of falsity.  (DE 73 at 24.)  Notably, cautionary language need not identify the specific factor that ultimately causes the different results or all of the factors that could cause different results.  *Harris*, 182 F.3d at 807.  The statute only requires the warning to mention "important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15

U.S.C. § 78u-5(c)(1)(A)(i).  As such, the Eleventh Circuit has established that "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."  *Harris*, 182 F.3d at 803.

Regarding the Company's warnings, Defendants cite to Cano Health's March 14, 2022 Press Release, which provides that MRA revenue may be adjusted due to three (3) MRA adjustments in the fiscal year, including a "mid-year reconciliation payment".  In Cano Health's 2022 Form 10-K, the Company also warned that MRA "primarily depend[s] on reimbursements by third-party payors," which "is complex and can involve delays." Although such warnings may not qualify as meaningful cautionary language[15] against the "upcoding" or "overly manual" accounting Plaintiff alleges to be the cause of Cano Health's inability to reliably estimate future MRA payments, the Court must also consider whether the Company's MRA estimates were made with actual knowledge of falsity.

Considering all of Plaintiff's allegations, and absent any assertion that Defendants had actual knowledge that the Company's MRA revenue figures were false, the forward-looking statements are protected by the safe harbor provision.  *See* 15 U.S.C. § 78u-5(c)(1)(B); *see also Harris*, 182 F.3d at 806–07 (ruling that where an explanation underlying a forward-looking statement contains a mixture of historical statements and

---

[15] *See In re Sci.-Atlanta, Inc., Sec. Litig.*, 239 F. Supp. 2d 1351, 1362 (N.D. Ga. 2002) ("Boilerplate warning will not suffice as meaningful cautionary statements . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement."); *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2020 WL 1072582, at *6 (M.D. Fla. Feb. 14, 2020) (concluding that defendants' risk disclosures did not warn of risks of a significance similar to that actually realized; *see also In re Royal Caribbean Cruises Ltd.*, 2013 WL 3295951, at *13 (S.D. Fla. Apr. 19, 2013) (finding that defendants' warnings were neither boilerplate nor generic).

assumptions about the future, and the explanation is alleged to be misleading by omission, the entire explanation is treated as forward looking and can fall within the safe harbor provision). As it relates to the actual knowledge prerequisite for immunizing forward-looking statements, Plaintiff advances no allegation that either Defendant Hernandez or Koppy personally knew about irregularities pertaining to the Company's estimation of future MRA payments following the Company's restatement in March 2022. No former employee recalled attending any meetings with Defendants where MRA revenue was discussed.  Moreover, there are no allegations that Hernandez and Koppy were ever told or informed of the "overly manual" accounting and "upcoding" billing practices.  In fact, the only person identified as having access to data and predictive analytics used to substantiate the Company's financial results was Chief Population Health Officer Codero.

In sum, the Court finds that Plaintiff sufficiently alleges material misstatements regarding the Company's overstated capitated revenue and understated net losses reported in its financial results for FY 2020, Q1 2021, Q2 2021, Q3 2021, and FY 2021, but determines that Plaintiff did not adequately allege material omissions regarding MRA estimates and an "overly manual" predictive process under the heightened pleading standard of the PSLRA.  While Interim CEO Kent's statements acknowledge that the Company may have utilized an "overly manual" process to estimate future MRA payments, the MRA estimates constitute forward-looking statements protected by the PLSRA's safe harbor provision.  Consequently, the Court will now examine Plaintiff's scienter allegations only as they pertain to Cano Health's material misstatements related

to the Company's financial results for FY 2020, Q1 2021, Q2 2021, Q3 2021, and FY 2021.

### 2. Scienter.[16]

In addition to the pleading requirements for fraud, under the PSLRA, a private securities complaint must also allege facts with particularity to establish scienter.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007).  In the Eleventh Circuit, actions under Section 10(b) and Rule 10b-5 "require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness,'" commonly referred to as "scienter."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999).  The Eleventh Circuit has characterized "severe recklessness" as:

> [L]imited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 1282 n.18.

A plaintiff cannot plead scienter generally. Rather, for each alleged misrepresentation or omission, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *See* 15 U.S.C. § 78-u-4(b)(2); *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1352 (S.D. Fla. 2015).  An inference of scienter is strong when it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)

---

[16] In light of the Plaintiff's dismissal of Defendant Cano Health, Inc., the Court does not consider Plaintiff's corporate scienter allegations.

(quoting *Tellabs*, 551 U.S. at 324).  "Because the strong-inference inquiry asks, 'whether all of the facts alleged taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard,' 'courts must consider the complaint in it is entirety' and 'omissions and ambiguities count against inferring scienter.'"  *Id.* at 1238–39 (quoting *Tellabs*, 551 U.S. at 322–23.)   In sum, when assessing scienter, a reviewing court must ask: when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as an opposing inference?[17]  *FindWhat*, 658 F.3d at 1300 (citing *Mizzaro*, 544 F.3d at 1239).

Here, Defendants generally argue that the Second Amended Complaint is insufficient because of a "glaring absence" of any particularized facts that Defendants knew or were severely reckless in not knowing the accounting errors associated with the timing for recognizing revenue.  (DE 73 at 11.)  Notably, in the Eleventh Circuit, violations of GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b).  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208–09 (11th Cir. 2001).  Nonetheless, the *Ziemba* court recognized that in certain circumstances a court can draw a strong inference of scienter when violations of GAAP are coupled with allegations that defendants also ignored "red flags" warning them of the accounting irregularities.[18]  *Id.*  Acknowledging

---

[17] This question is not the same as the standard employed for summary judgment under Federal Rule of Civil Procedure 56, because it asks what a reasonable person *would* think, not what a reasonable person *could* think. *Mizzaro*, 544 F.3d at 1239 (citations omitted).

[18] Generally, "red flags" are viewed as signals that would warn or place a reasonable executive, auditor, or accountant on notice that a company is engaging in wrongdoing to the detriment of its investors. *Garfield*, 466 F.3d at 1268 ("Red flags are 'those facts which come to the attention of an auditor which would place a reasonable auditor on notice that

the *Ziemba* standard, Plaintiff argues that there are four cognizable "red flags" indicative of Defendants' severe recklessness that sufficiently demonstrate the necessary showing of scienter.  The Court will address each of the four purported bases and then "'holistically' evaluate the [Second Amended Complaint] in its entirety—as well as other sources courts ordinarily examine like 'documents incorporated into the Second Amended Complaint] by reference and matters of which a court make take judicial notice'—to determine whether all of the facts give rise to a strong inference of scienter." *Alms v. Luminar Techs., Inc.*, 2024 WL 2803261, at *4 (M.D. Fla. May 31, 2024) (quoting *Tellabs*, 551 U.S. at 322–26).

First, Plaintiff argues that the magnitude of Cano Health's misstatements and its inability to accurately report revenue for years suggest an inference of scienter.  On this point, Plaintiff directs the Court's attention to the size of Cano Health's corrective disclosures in March 2022.  In its March 14, 2022 Press Release, the Company announced that it needed to make a $112 million restatement of MRA revenue for FY 2021 based on revenue that was incorrectly recognized in 2021 that was expected to be recognized in 2022.  The breakdown of the Company's restatement across its 2021 quarterly financial results included a decrease in its previously reported capitated revenue by $5.69 million, or 2.13 percent, for Q1 2021; $49.73 million, or 13.11 percent, for Q2 2021; and $28.02 million, or 5.58 percent, for Q3 2021.  Moreover, due to the Company's restatement, Cano Health's net income for Q2 2021 went from a $4.94 million gain to a

---

the audited company was engaged in wrongdoing to the detriment of its investors.'") (citation omitted); *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1362 (S.D. Fla. 2005) ("Courts within the Eleventh Circuit have considered a wide variety of alleged red flags, including lack of internal controls in the audited company, tip-offs from company employees, publications accusing the company of accounting fraud, knowledge that the company was under financial pressure, and the obvious or basic nature of the fraud. [Yet] none of these factors are specifically required or dispositive[.]") (citations omitted).

$36.29 million loss, a total change of 830 percent.  Although Defendants contend the restatement did not affect the amounts of revenue ultimately garnered by the Company but instead impacted the *timing* of the accrual, which "shifted revenue into subsequent quarters" leading to "a net positive impact on Cano [Health's] 2022 revenue guidance,"[19] the Court finds that the size of the change or "shift" is notable in this context.  *Compare Rosenberg v. Gould*, 554 F.3d 962, 966 (11th Cir. 2009) (noting that a restatement of 0.5 percent of revenue in one year and 0.17 percent of revenue in another to be a de minimis change that does not amount to a glaring "red flag"), *with In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1114 (M.D. Fla. 2005) (ruling that overstating income by 43 percent supports an inference of scienter).

Second, Plaintiff argues that because the issue in this case pertains to accounting errors involving premature recognition of revenue, the Court should appropriately draw an inference of scienter.  On this issue, Plaintiff directs the Court's attention to the purported manipulation of revenue, as opposed to any other financial metric, to be an indication of Defendants' severe recklessness.  In support, Plaintiff cites confidential testimonials and statements from former employees regarding Cano Health's coding and accounting departments.

Under the PSLRA, a court may consider information from a confidential or anonymous source.  *Mizzaro*, 544 F.3d at 1240.  However, the weight afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case.  *Id.*  Here, the former employees' testimonials are vague and devoid of any indicia of particularity about Defendants' actual

---

[19] *See* DE 74-6 at 6–7 (Cano Health, Inc., Form 8-K (Mar. 14, 2022)).

knowledge or awareness of any improper accounting or billing practices.  As pointed out by Defendants, none of the former employees worked in accounting and can only claim generally that "accounting was manual for a very long time."  All three former employees either worked in administration or in billing and coding.  The former employees' most salient observation regarding the accounting department is that it maintained the Company's accounts payable and accounts receivable by hand using Microsoft Excel spreadsheets.  But the conclusory characterization that accounting was "overly manual" provides no specific factual basis upon which to build a strong inference of scienter against these two Defendants.  *See Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015) ("Under the PSLRA, a plaintiff cannot 'plead the requisite scienter element generally . . . ").

Third, Plaintiff maintains that the core operations doctrine supports an inference of scienter.  In essence, the core operations doctrine is utilized by plaintiffs to show that defendants, based on their position and role within the company, should have known of the issues set out in the complaint.  *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018) (defining the core operation doctrine as a theory that infers "that facts critical to a business' 'core operations' or an important transaction are known to a company's key officers.") (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008). Defendants contend that courts in the Eleventh Circuit have repeatedly rejected this doctrine as insufficient to plead a strong inference of scienter.  (DE 73 at 19.) But courts in this circuit are not foreclosed from considering the core operations doctrine and some have acknowledged this doctrine can be relevant in determining the sufficiency of the

plaintiff's scienter allegations.  *See In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at \*14 (M.D. Ga. Mar. 23, 2018) (collecting cases).

Here, it is undisputed that capitated revenue was critical to Cano Health's core operations; as stated in its 2021 Form 10-K, "[a] significant portion of our total revenue for the years ended December 31, 2019, 2020, and 2021, respectively, is capitated revenue [from CMS]".[20]  Further, in the Second Amended Complaint, Plaintiff quantifies this "significant portion" to be more than 80 percent of the Company's total revenue. However, although the Court recognizes that this percentage is consequential and could be seen as critical to Cano Health's core operations, the absence of any allegation that Defendants ignored "meaningful" reports or communications about any irregularities with the Company's revenue recognition processes limits the weight this doctrine carries in the accumulation of considerations related to scienter.[21]  *See In re Flowers Foods*, 2018 WL 1558558, at \*14–18 (ruling that plaintiff's allegations that defendants had access to meaningful internal reports and notice of irregularities ***in conjunction*** with the fact that the alleged fraudulent activity amounted to 84 percent of defendant's business added to the strong inference of scienter).

---

[20] Cano Health, Inc., 2021 Annual Report (Form 10-K) 95 (Mar. 14, 2022).

[21] The only relevant allegation about Defendants receiving a report on accounting irregularities is based on the Company's February 28, 2022 Press Release where it publicly announced the need to adjust its accounting methodology.  In the Company's press release, Cano Health stated that it and its auditor "identified certain potential non-cash adjustments to account for revenue recognition under accounting standard ASC 606."  (DE 70 at 13.)  Based on this statement, it could be surmised that Defendants received a report from its auditor about the Company's accounting practices.  If, however, Defendants did receive such report, this statement fails to demonstrate that they ignored it.  *See e.g.*, *Brophy*, 781 F.3d at 1304 (ruling that omissions and ambiguities in plaintiff's allegations weaken any inference of scienter).

Fourth, Plaintiff claims Defendants' personal and financial motives support a strong inference of scienter.[22] According to Plaintiff, Defendants were financially incentivized to report increased revenue, even if premised on improper methods, in order to prevent shareholders with an interest in the Business Combination and SPAC acquisition from redeeming their shares from the Trust Account and, in effect, decreasing investors' capital expenditures financed into the corporation. (DE 70 at 56–57.) Again, Plaintiff fails to supplement its allegation with reference to any documents or communications that each Defendant had this purported motivation. Moreover, allegations of motive that involve enhancing a company's business prospects or maintaining a company's stock value cannot, on its own, support scienter. *Bryant*, 187 F.3d at 1285–86 ("While allegations of motive and opportunity may be relevant to a showing of severe recklessness, we hold that such allegations, without more, are not sufficient to demonstrate the requisite scienter in our Circuit."); *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1171 (S.D. Fla. 2004).

Plaintiff also maintains that the close temporal proximity of Hernandez's and Koppy's resignations with the Company's restatements also supports an inference of scienter. Specifically, as to Hernandez, Plaintiff argues that the two days between his resignation and the resolution of the derivative action filed in the Delaware Court of Chancery indicates Hernandez's severe recklessness. But, the claims in the derivative action related to undisclosed related party transactions that purportedly paid millions of

---

[22] The Court does not necessarily view Defendants' alleged motives as a "red flag". Nonetheless, the Court gives due consideration to Plaintiff's allegations of motive under the holistic or totality of the circumstances standard courts must apply when evaluating scienter.

dollars to Hernandez's family members are not germane to Plaintiff's allegation of misstatements as to the Company's revenue recognition processes. *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 792 (11th Cir. 2010) (recognizing that a "red flag" fails to support scienter when it "does not match" plaintiff's allegations about accounting fraud). Moreover, with regard to Hernandez and Koppy, there has been no allegation that either Defendant resigned as part of the alleged fraud or that they knew about or approved any of the alleged improper accounting practices. *In re Sportsline.com*, 366 F. Supp. 2d at 1172.

Consequently, while the Court agrees that Plaintiff alleges certain facts that are relevant to the consideration of scienter—those related to the core business operation doctrine and the extent of the capitated revenue misstatement—the Court cannot find that, taking all of the facts collectively, Plaintiff has adequately presented circumstances to establish a strong inference of scienter. *Ziemba*, 256 F.3d at 1210 (affirming dismissal of complaint when plaintiff has not alleged any facts suggesting actual awareness of any fraud and has no tips, letters, or conversation raising inferences that defendant knew of any fraud or was severely reckless in not knowing about the fraud); *Plymouth Cnty. Ret. Sys. v. Carter's Inc.*, 2011 WL 13124501, at *17, 19–20 (N.D. Ga. Mar. 17, 2011) (ruling that, despite the relevancy of the core operations doctrine and the context of the restatement, plaintiff's lack of particularity surrounding allegations of scienter is fatal considering that the complaint failed to establish defendants knew of or participated in the alleged accounting fraud). Like other courts in the Eleventh Circuit, the Court concludes that without alleging Defendants were exposed to or made aware of sufficient facts, including reports, communications, discussions, or documents, that demonstrate that

they knew, were informed about, or had access to some aspect of the alleged fraud and ignored it, there is no inference of fraudulent intent that is "at least as compelling as any opposing inference of nonfraudulent intent." *FindWhat*, 658 F.3d at 1303 (ruling that plaintiff's allegations are conclusory and plainly lack sufficient particularity to create a strong inference of scienter where plaintiff alleges it was "commonly known" that defendants engaged in irregularities); *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1228 (S.D. Fla. 2007) ("Absent some specific allegation that these Defendants had actual knowledge of the substantive allegations in the Complaint, the Court cannot conclude that Plaintiffs have adequately alleged that Defendants [] were severely reckless in not knowing that their statements would be misleading to investors."); *In re Sportsline.com*, 366 F. Supp. 2d at 1173–74 (explaining that the failure to allege any facts showing defendants knew of, were warned about, or had suspected faulty accounting practices did not support an inference of scienter); *Kosowsky v. Icahn Enters. L.P.*, 2024 WL 4181212, at *12 (S.D. Fla. Sept. 13, 2024) (agreeing that the core operations doctrine is meant to bolster an inference of scienter, but it is not meant to excuse plaintiffs from offering specific facts); *Bush v. Blink Charging Co.*, 2023 WL 8263037, at *9 (S.D. Fla. Nov. 27, 2023) (finding that allegations and information that defendants attended meetings where components of the fraud were discussed weigh in favor of inferring defendants acted with scienter). Accordingly, viewing all the facts advanced in the aggregate, the Court cannot find that the Plaintiff has met his burden as to scienter. *Tellabs*, 551 U.S. at 326 (establishing that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically").

**B. Section 20(a).**

Under Section 20(a) of the Exchange Act, to state a claim for controlling person liability against a defendant, plaintiff must allege: "the defendant actually participated in (*i.e.*, exercised control over) the operations of the corporation in general and that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996) (quoting *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985)) (cleaned up). However, the viability of a Section 20(a) claim is dependent on the successful pleading of a primary violation under Section 10(b) of the Exchange Act. *Mizzaro*, 544 F.3d at 1236. Thus, because Plaintiff failed to alleged material misrepresentations or omissions made with scienter, Plaintiff's Section 20(a) claim also fails.

## IV.  CONCLUSION

Having carefully reviewed Defendants' Motion, the record, and applicable law, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendants Marlow Hernandez's and Brian D. Koppy's Motion to Dismiss (DE 73) is **GRANTED**.

2.  Plaintiff's Second Amended Class Action Complaint (DE 70) is **DISMISSED WITH PREJUDICE**.

3.  All pending motions are **DENIED AS MOOT**.

4.  All hearings and deadlines are **CANCELED**.

5.  The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers in Miami, Florida on this <u>4th</u> day of October, 2024.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE